Nos. 26-1354, 26-1371, 26-1440, 26-1441

In the

# United States Court of Appeals
### for the Seventh Circuit

ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION,
AMERICA'S CREDIT UNIONS & ILLINOIS CREDIT UNION LEAGUE,

*Plaintiffs-Appellants-Cross-Appellees,*

v.

KWAME RAOUL, in his official capacity as Illinois Attorney General,

*Defendant-Appellee-Cross-Appellant.*

On Appeal from the United States District Court
For the Northern District of Illinois, Case No. 24-cv-7307
Honorable Virginia M. Kendall, *Chief United States District Judge*

## PRINCIPAL BRIEF OF
## PLAINTIFFS-APPELLANTS-CROSS-APPELLEES

Boris Bershteyn
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: 212-735-3000
boris.bershteyn@skadden.com

Charlotte H. Taylor
*Counsel of Record*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: 202-879-3939
ctaylor@jonesday.com

*Counsel for Plaintiffs-Appellants-Cross-Appellees*
*Additional Counsel listed in signature blocks at end of Brief*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1354; 26-1371; 26-1440; 26-1441</u>

Short Caption: <u>Illinois Bankers Association, et al. v. Raoul</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Illinois Bankers Association; American Bankers Association; America's Credit Unions; Illinois Credit Union League</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Jones Day; Skadden, Arps, Slate, Meagher & Flom LLP</u>

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      <u>N/A</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Charlotte H. Taylor</u>     Date: <u>March 6, 2026</u>

Attorney's Printed Name: <u>Charlotte H. Taylor</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑ **No** ☐

Address: <u>Jones Day</u>

<u>51 Louisiana Avenue, NW, Washington, DC 20001</u>

Phone Number: <u>(202) 879-3872</u>     Fax Number: <u>(202) 626-1700</u>

E-Mail Address: <u>ctaylor@jonesday.com</u>

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-1354; 26-1371; 26-1440; 26-1441

Short Caption: Illinois Bankers Association, et al. v. Raoul

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Illinois Bankers Association; American Bankers Association; America's Credit Unions; Illinois Credit Union League

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Jones Day; Skadden, Arps, Slate, Meagher & Flom LLP

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Boris Bershteyn   Date: March 6, 2026

Attorney's Printed Name: Boris Bershteyn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY 10001

Phone Number: 212-735-3834   Fax Number: 917-777-3834

E-Mail Address: boris.bershteyn@skadden.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1354; 26-1371; 26-1440; 26-1441

Short Caption: Illinois Bankers Association, et al. v. Raoul

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

 ☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Illinois Bankers Association; American Bankers Association; America's Credit Unions; Illinois Credit Union League

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Jones Day; Skadden, Arps, Slate, Meagher & Flom LLP

(3) If the party, amicus or intervenor is a corporation:

  i) Identify all its parent corporations, if any; and

   N/A

  ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

---

Attorney's Signature: /s/ Matthew J. Rubenstein  Date: March 6, 2026

Attorney's Printed Name:  Matthew J. Rubenstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address:  Jones Day

 90 South Seventh Street, Suite 4950, Minneapolis, Minnesota 55402

Phone Number: (612) 217-8846  Fax Number:  (844) 345-3178

E-Mail Address: mrubenstein@jonesday.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1354; 26-1371; 26-1440; 26-1441</u>

Short Caption: <u>Illinois Bankers Association, et al. v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Illinois Bankers Association; American Bankers Association; America's Credit Unions; Illinois Credit Union League</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Jones Day; Skadden, Arps, Slate, Meagher & Flom LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Kamali P. Willett</u>      Date: <u>March 6, 2026</u>

Attorney's Printed Name: <u>Kamali P. Willett</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: <u>Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY 10001</u>

Phone Number: <u>212-735-2728</u>      Fax Number: <u>917-777-2728</u>

E-Mail Address: <u>kamali.willett@skadden.com</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1354; 26-1371; 26-1440; 26-1441

Short Caption: Illinois Bankers Association, et al. v. Raoul

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑          **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Illinois Bankers Association; American Bankers Association; America's Credit Unions; Illinois Credit Union League

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Jones Day; Skadden, Arps, Slate, Meagher & Flom LLP

(3)     If the party, amicus or intervenor is a corporation:

   i)          Identify all its parent corporations, if any; and

      N/A

   ii)         list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

      N/A

Attorney's Signature: /s/ Sam Auld          Date: March 6, 2026

Attorney's Printed Name:  Sam Auld

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address:  Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY 10001

Phone Number: 212-735-2044          Fax Number: 917-777-2044

E-Mail Address: sam.auld@skadden.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1354; 26-1371; 26-1440; 26-1441</u>

Short Caption: <u>Illinois Bankers Association, et al. v. Raoul</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Illinois Bankers Association; American Bankers Association; America's Credit Unions; Illinois Credit Union League</u>

             _____

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Jones Day; Skadden, Arps, Slate, Meagher & Flom LLP</u>

             _____

(3)      If the party, amicus or intervenor is a corporation:

         i)        Identify all its parent corporations, if any; and

             <u>N/A</u>

         ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

             <u>N/A</u>

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        <u>N/A</u>

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        <u>N/A</u>

Attorney's Signature: <u>/s/ Anthony J. Jeffries</u>      Date: <u>March 6, 2026</u>

Attorney's Printed Name: <u>Anthony J. Jeffries</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: <u>Jones Day</u>

      <u>51 Louisiana Ave., NW, Washington, DC 20001</u>

Phone Number: <u>(202) 879-3410</u>      Fax Number: <u>(202) 626-1700</u>

E-Mail Address: <u>ajjeffries@jonesday.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF ISSUES ...........................................................................3

PRELIMINARY STATEMENT.....................................................................4

STATEMENT OF THE CASE.......................................................................9

    A.    Federal Law Protects Federally Chartered Institutions from State Interference. ...................................................9

    B.    State and Federal Law Ensures That State-Chartered Financial Institutions Are Not Unfairly Disadvantaged by Preemption of State Regulation.......................................12

    C.    Plaintiffs' Members Exercise Their Federal Powers Through the Nation's Credit- and Debit-Card Payment Systems.......................................................13

    D.    The IFPA Threatens Significant Interference with Financial Institutions' Federally Authorized Banking Powers.......................................................17

    E.    Procedural Background.......................................................21

        1.    Preliminary-Injunction Proceedings. ...............................21

        2.    Summary-Judgment and Permanent-Injunction Proceedings. ...............................23

SUMMARY OF ARGUMENT.......................................................27

STANDARD OF REVIEW .......................................................30

ARGUMENT.......................................................30

I.    Federal Law Preempts The Interchange Fee Prohibition. ...................30

    A.    The NBA Preempts the Interchange Fee Prohibition.................31

1. National banks have federally granted powers to issue payment cards, process card transactions, and receive compensation for doing so. ....................................32

2. The Interchange Fee Prohibition prevents or significantly interferes with national banks' federal powers ..................................................................36

    a. The costs and regulatory burdens the Interchange Fee Prohibition imposes prevent or significantly interfere with national bank powers to issue payment cards and process payment-card transactions. ....................................37

    b. The Interchange Fee Prohibition's direct restriction on national banks' compensation for providing authorized services prevents or significantly interferes with their exercise of their federal powers. ..................................................42

    c. The Interchange Fee Prohibition in No Way Resembles the State Laws the Supreme Court Has Held Not Preempted. .........................................45

3. The District Court erred in concluding that the Interchange Fee Prohibition does not prevent or significantly interfere with national banks' federal powers ..................................................................47

    a. Card Networks' setting of default interchange rates is irrelevant to the NBA preemption analysis. ....................................................................48

    b. The District Court's dismissal of regulatory burdens and compliance costs as a basis for preemption was also error .........................................56

B. The HOLA Preempts the Interchange Fee Prohibition. ............58

Page

C. The FCUA Preempts the Interchange Fee Prohibition. ..............59

1. The Barnett Bank significant-interference standard applies to federal credit unions.............................................59

2. The Interchange Fee Prohibition prevents or significantly interferes with powers federally guaranteed by the FCUA. ......................................................63

D. The District Court's Riegle-Neal and Equity Analysis Applies with Full Force to the Interchange Fee Prohibition. ...................................................................................64

1. Riegle-Neal extends NBA preemption to out-of-state state banks.....................................................................64

2. Equity calls for enjoining enforcement against other payment-system participants to the degree they are facilitating the exercise of federal powers by federally protected institutions..........................................65

II. The Dormant Commerce Clause Prohibits Illinois From Imposing The IFPA's Burdens On Financial Entities Other States Charter, But Not On Those It Charters. .....................................68

A. Illinois Parity Statutes Extend the Benefit of Federal Preemption to Illinois-Chartered Financial Institutions............69

B. The Dormant Commerce Clause Prevents Illinois From Granting Such Protection to Illinois Institutions, but Not out-of-State Institutions. ...............................................................71

CONCLUSION ..................................................................................................74

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson National Bank v. Luckett,*
321 U.S. 233 (1944)......................................................................................46

*Bank of America v. City & County of San Francisco,*
309 F.3d 551, 562-64 (9th Cir. 2002) ......................................................44, 45

*Baptista v. JPMorgan Chase Bank, N.A.,*
640 F.3d 1194 (11th Cir. 2011)....................................................................44

*Barany v. Buller,*
670 F.2d 726 (7th Cir. 1982).......................................................................61

*Barnett Bank of Marion County, N.A. v. Nelson,*
517 U.S. 25 (1996)................................................................................*passim*

*Beneficial Nat'l Bank v. Anderson,*
539 U.S. 1 (2003)................................................................................10, 47

*Blow v. Bijora, Inc.,*
855 F.3d 793 (7th Cir. 2017)........................................................................30

*Bowe v. United States,*
146 S. Ct. 447 (2026)..................................................................................35

*Bresgal v. Brock,*
843 F.2d 1163 (9th Cir. 1987)..................................................................66, 67

*Cantero v. Bank of Am., N.A.,*
602 U.S. 205 (2024).............................................................................*passim*

**Page(s)**

*City of Chi. v. Barr,*
961 F.3d 882 (7th Cir. 2020) ........................................................................66, 67

*Conti v. Citizens Bank, N.A.,*
157 F.4th 10 (1st Cir. 2025) .........................................................................52, 53

*Davis v. Elmira Sav. Bank,*
161 U.S. 275 (1896)...............................................................................................9

*Fed. Nat. Mortg. Ass'n v. Lefkowitz,*
390 F. Supp. 1364 (S.D.N.Y. 1975)..................................................................61

*Fidelity First Sav. & Loan Ass'n v. De la Cuesta,*
458 U.S. 141 (1982)......................................................................................passim

*First National Bank of San Jose v. California,*
262 U.S. 366 (1923).......................................................................................46, 47

*Franklin Nat'l Bank of Franklin Square v. New York,*
347 U.S. 373 (1954)...............................................................6, 37, 38, 45, 58

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977)..........................................................................................73

*JCW Invs., Inc. v. Novelty, Inc.,*
482 F.3d 910 (7th Cir. 2007) ...........................................................................30

*Johnson v. First Banks, Inc.,*
889 N.E.2d 233 (Ill. App. Ct. 2008)..........................................................65, 69

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.,*
439 U.S. 299 (1978).............................................................................................9

*McClellan v. Chipman,*
164 U.S. 347 (1896).......................................................................45

*Mount Olivet Cemetery Ass'n v. Salt Lake City,*
164 F.3d 480 (10th Cir. 1998)......................................................61

*Nat'l Pork Producers Council v. Ross,*
598 U.S. 356 (2023).........................................................12, 68, 71

*National Bank v. Commonwealth,*
76 U.S. (9 Wall.) 353 (1870).........................................................45

*Nicodemus v. City of S. Bend,*
137 F.4th 654 (7th Cir. 2025).......................................................30

*People v. Molina,*
266 N.E.3d 1031, 1040 (Ill. 2024)...............................................72

*Pereira v. Regions Bank,*
752 F.3d 1354 (11th Cir. 2014) (per curiam)..............................65

*Russian Media Grp., LLC v. Cable Am., Inc,*
598 F.3d 302 (7th Cir. 2010).......................................................67

*T I Fed. Credit Union v. DelBonis,*
72 F.3d 921 (1st Cir. 1995) ....................................................11, 61

*United States v. Locke,*
529 U.S. 89 (2000)........................................................................60

*W. Lynn Creamery, Inc. v. Healy,*
512 U.S. 186 (1994)......................................................................73

Page(s)

*Watters v. Wachovia Bank, N.A.,*
550 U.S. 1 (2007)......................................................................................9, 10

*Wells Fargo Bank of Tx. NA v. James,*
321 F.3d 488 (5th Cir. 2003) .................................................................44

**STATUTES**

12 U.S.C. § 1.........................................................................................................1

12 U.S.C. § 24...................................................................................4, 9, 32, 33

12 U.S.C. § 25b ...............................................................................................10

12 U.S.C. § 93a..................................................................................................9

12 U.S.C. § 1464...........................................................................1, 11, 58

12 U.S.C. § 1465............................................................................................11

12 U.S.C. § 1757...........................................................................1, 11, 63

12 U.S.C. §§ 1766............................................................................................11

12 U.S.C. § 1831a..................................................................................*passim*

15 U.S.C. § 1693o-2 ..............................................................................1, 35

28 U.S.C. § 1291.............................................................................................1, 2

28 U.S.C. § 1331...............................................................................................1

205 ILCS 5/5...............................................................................................12, 69

205 ILCS 205/6002 ...................................................................................12, 70

**Page(s)**

205 ILCS 305/65 ..................................................................................12, 70

815 ILCS 151/150-10 .................................................6, 17, 18, 19, 24

815 ILCS 151/150-15 .................................................19, 20, 55

815 ILCS 505/7.................................................................................20

**REGULATIONS**

12 C.F.R. § 7.1000................................................................................32

12 C.F.R. § 7.4002................................................................................50

12 C.F.R. § 145.17................................................................................59

12 C.F.R. § 701.21................................................................................63

12 C.F.R. § 721.3................................................................................63

12 C.F.R. § 721.6................................................................................63

**OTHER AUTHORITIES**

Cong. Globe, 38th Cong., 1st Sess. 1451 (1864) .................................9

Fed. R. App. P. 4 .................................................................................2

Ill. Dep't of Financial & Professional Regulation, Interpretive
Ltr. 2000-02, at 1 (Jan. 12, 2000) .................................................69

OCC, Activities Permissible for National Banks and Federal
Savings Associations, Cumulative (Oct. 2017) .............................34

Ill. Dep't of Revenue, Tax Rate Database .........................................40

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

OCC Corp. Dec. 99-50, at 4 (Dec. 23, 1999).........................................................10

OCC Inter. Ltr. 689, 1995 WL 604271, at *1 (Aug. 9, 1995)..............................33

## REQUEST FOR ORAL ARGUMENT

In accordance with Federal Rule of Appellate Procedure 34(a) and Seventh Circuit Rule 34(f), Plaintiffs-Appellants-Cross-Appellees respectfully request oral argument. This appeal involves issues of great importance both legally and practically, and oral argument may substantially aid the Court in its analysis of this case.

**JURISDICTIONAL STATEMENT**

The District Court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the National Bank Act, 12 U.S.C. § 1 *et seq.*, the Home Owners' Loan Act, 12 U.S.C. § 1464 *et seq.*, the Federal Credit Union Act, 12 U.S.C. § 1757 *et seq.*, the Electronic Funds Transfer Act, 15 U.S.C. § 1693o-2, the Commerce Clause, U.S. Const. art. I, § 8, and 12 U.S.C. § 1831a(j). On February 10, 2026, the District Court granted in part and denied in part Plaintiffs' request for a permanent injunction and granted each side summary judgment in part. RSA.1-47. Plaintiffs filed a timely notice of appeal on February 13, 2026, Dist.Ct.Dkt.181, which was assigned case number 26-1354, relying on this Court's jurisdiction to hear appeals from interlocutory orders granting or denying injunctive relief. 28 U.S.C. § 1292(a)(1). The Attorney General filed a timely cross-appeal on February 23, 2026, Dist.Ct.Dkt.185, which was assigned case number 26-1371, likewise relying on 28 U.S.C. § 1292(a)(1).

The District Court then entered a final judgment, along with a separate order setting out the scope of the injunction, on February 27, 2026. RSA.48-50, 51-52. Plaintiffs' earlier notice of appeal is "treated as filed on the date of and after the entry" of final judgment, and jurisdiction over 26-

1354 is therefore proper under 28 U.S.C. § 1291 as well. *See* Fed. R. App. P.

4(a)(2). Plaintiffs also timely filed an additional notice of appeal on March

4, 2026, Dist.Ct.Dkt.196, which was assigned case number 26-1440 and the

Attorney General filed an additional notice of cross appeal that same day,

Dist.Ct.Dkt.198, which was assigned case number 26-1441. Jurisdiction over

these two appeals is proper under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

(1) Whether the National Bank Act, Home Owners' Loan Act, and Federal Credit Union Act preempt an Illinois statutory provision that (a) is "indisputably disruptive" to the exercise of core federal banking powers, with "complicated compliance challenges" and "potentially business-ending consequences for some members of the market," and (b) expressly limits the compensation federally chartered financial institutions can receive for exercising those powers; and whether 12 U.S.C. § 1831a(j) extends that protection to non-Illinois state-chartered banks.

(2) Whether an Illinois statutory scheme imposing burdensome regulations on financial institutions chartered by states other than Illinois, but not on financial institutions chartered by Illinois, violates the dormant Commerce Clause.

## PRELIMINARY STATEMENT

**I.** Federal law gives national banks and other federal financial institutions a broad array of powers in order to allow them to "carry on the business of banking." 12 U.S.C. § 24 (Seventh). As grants of federal authority, those powers are "not normally limited by, but rather ordinarily pre-empt[], contrary state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996). They include authority to "loan[] money on personal security" and to "receiv[e] deposits." 12 U.S.C. § 24 (Seventh). A necessary component of these powers is the ability to receive compensation for providing authorized banking services—otherwise the "business of banking" would scarcely be a "business" at all.

Much of financial institutions' credit-extending and deposit-taking activity now occurs through the credit and debit cards that have become ubiquitous in the modern economy. In 2022, for example, more than 150 billion credit- and debit-card transactions worth over $9.5 trillion were processed in the United States. RSA.4. Banks and other institutions that issue the cards—referred to as "Issuers"—play an essential role in each of these billions of transactions by maintaining deposit accounts, extending credit, authorizing transactions, monitoring for fraud, and otherwise

ensuring that the modern business of banking continues to function. In return, Issuers receive compensation in the form of "interchange fees," which typically consist of a set amount per transaction plus a percentage of the total transaction amount.

In today's world, national banks and other Issuers overwhelmingly ensure that merchants can accept payments with their cards by contracting with payment-card networks such as Visa or Mastercard ("Card Networks" or "Networks"). These Networks create rules and protocols that enable Issuers to exercise their banking powers efficiently without separately reaching agreement with every merchant on every detail of every transaction. Along similar lines, the Networks set default rates for interchange fees, which allow national banks and other Issuers to earn and receive the compensation to which they are entitled without the practically innumerable bilateral negotiations that would otherwise be required.

The Illinois Interchange Fee Prohibition Act ("IFPA"), however, purports to limit Issuers' ability to receive compensation for the exercise of these banking powers. Under its Interchange Fee Prohibition, national banks and other Issuers are prohibited from charging or receiving any interchange fee attributable to the tax or tip portion of a card transaction. *See*

815 ILCS 151/150-10.  That prohibition significantly interferes with federal powers in multiple ways.  It directly restricts the circumstances or manner in which national banks and other Issuers may receive compensation for their deposit-taking and credit-extending activities.  And complying with it imposes regulatory requirements so out of step with how the system functions that it will, as the District Court acknowledged, cause costs that are "undeniable" and "staggering," with "business-ending consequences for some members of the market."  RSA.12, 27.

Federal law does not permit the states to so disrupt the exercise of federal banking powers.  The National Bank Act ("NBA"), Home Owners' Loan Act ("HOLA"), and Federal Credit Union Act ("FCUA") each preempt any state law that "prevents or significantly interferes with the exercise by the [federal institution] of its powers."  *See Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 209 (2024).  States cannot, for example, limit the manner in which national banks enforce a single federally authorized clause in their loan contracts, or even prohibit national banks from using one particular term in advertising their services.  *Id.* at 216-17 (citing *Fidelity First Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982), and *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373 (1954)).  Limiting revenue from, and imposing a

crippling regulatory burden on, a core part of the modern business of banking interferes with the banks' exercise of their powers far more significantly.  The Interchange Fee Prohibition is thus preempted.

The District Court indicated that it would have agreed that the Interchange Fee Prohibition impermissibly interferes with federal banking powers, but it perceived one "snag"—namely, that "third parties set the fees."  RSA.27.  That was error.  That banks elect to contract with Networks that set default fee amounts has no bearing on the extent of the IFPA's interference with financial institutions' exercise of their banking powers.  The powers to offer credit and debit cards to banking customers—and receive compensation for doing so—remain authorized by federal law even where financial institutions elect to charge default fees set by Networks.

The District Court also erred in rejecting, as a ground for preemption, the burdensome regulations the IFPA would impose on banks and other financial institutions attempting to exercise their federal banking powers.  According to the District Court, because "State (and federal) laws will always require some kind of compliance cost," such costs are irrelevant to the preemption inquiry.  RSA.27.  But as the Supreme Court recently reaffirmed in *Cantero*, the question is whether the state law "significantly

interferes" with the exercise of a national bank power. Where a state law threatens, in the District Court's own words, "undeniable" and potentially "staggering" costs with "business-ending consequences," the answer must be yes.

**II.** The IFPA also contains a second substantive prohibition, the "Data Usage Limitation," which substantially restricts the use of data from card transactions by national banks and other payment-system participants. The District Court correctly recognized that the NBA, HOLA, and FCUA preempt this provision as to federally chartered entities. And it correctly concluded that Illinois law would extend this protection to Illinois-chartered institutions, but not to institutions chartered by other states. Yet it held that Illinois' decision to ease the regulatory burden on its own financial institutions, but not those chartered by other states, did not facially discriminate against interstate commerce. This Court should reverse that determination as well.

## STATEMENT OF THE CASE

### A. Federal Law Protects Federally Chartered Institutions from State Interference.

In the midst of the Civil War, Congress enacted the National Bank Act "to facilitate … a 'national banking system.'" *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 315 (1978) (quoting Cong. Globe, 38th Cong., 1st Sess. 1451 (1864)). As "instrumentalities of the federal government," national banks are "subject to the paramount authority of the United States." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896). The Office of the Comptroller of the Currency ("OCC") "oversees the operations of national banks." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 6 (2007). The OCC "is authorized to prescribe rules and regulations to carry out the responsibilities of the office." 12 U.S.C. § 93a.

"When a bank obtains a federal charter under the National Bank Act, [it] gains various enumerated and incidental powers" under federal law. *Cantero*, 602 U.S. at 210. For example, national banks may "receiv[e] deposits," "loan[] money on personal security," and "make contracts." 12 U.S.C. § 24 (Third), (Seventh). More broadly, the NBA empowers national banks "[t]o exercise … all such incidental powers as shall be necessary to

carry on the business of banking." 12 U.S.C. § 24 (Seventh). As the OCC has long explained, "processing credit and debit card transactions … [is] clearly part of the business of banking." OCC Corp. Dec. 99-50, at 4 (Dec. 23, 1999)[1]; *see also infra* Section I.A.1.

To protect national banks against a patchwork of laws from all 50 states—plus municipalities and other jurisdictions—the NBA preempts state or local law that would "prevent or significantly interfere with [a] national bank's exercise of its powers," whether "enumerated" or "incidental." *Barnett Bank*, 517 U.S. at 32-33; *see* 12 U.S.C. § 25b(b)(1)(B) (codifying *Barnett Bank* standard in some contexts); *Cantero*, 602 U.S. at 214 n.2, 219 (reiterating *Barnett Bank* standard). In this way, the NBA gives national banks, which serve customers nationwide, "needed protection from possible unfriendly state legislation," *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10 (2003) (internal quotation marks omitted), and avoids the regulatory "[c]onfusion" that would otherwise "necessarily result," *Watters*, 550 U.S. at 14 (internal quotation marks omitted). As the OCC has explained, NBA preemption thus

---

[1]https://www.occ.gov/topics/charters-and-licensing/ interpretations-and-actions/2000/cd99-50.pdf.

prevents an "unmanageable patchwork of state laws that undermine the uniformity necessary for the smooth and effective functioning of the national payment system." Dist.Ct.Dkt.61-1 at 2.

Congress has likewise granted federal banking powers to other financial institutions and protected them against state intrusion. Federal savings associations derive their powers from the HOLA, which the OCC also administers, and which preempts state law under the same standard as the NBA. 12 U.S.C. §§ 1464, 1465. And during the Great Depression, Congress enacted the Federal Credit Union Act "to make more available to people of small means credit … , thereby helping to stabilize the credit structure of the United States." *T I Fed. Credit Union v. DelBonis*, 72 F.3d 921, 931 (1st Cir. 1995). The FCUA grants federal credit unions powers similar to national banks' relevant powers here, and the National Credit Union Administration ("NCUA") oversees federal credit unions and "prescribe[s] rules and regulations for the administration" of the FCUA. *See, e.g.*, 12 U.S.C. §§ 1757, 1766(a).

**B.     State and Federal Law Ensures That State-Chartered Financial Institutions Are Not Unfairly Disadvantaged by Preemption of State Regulation.**

Like most states, Illinois has enacted parity statutes (sometimes called "wild card statutes") to ensure that financial institutions it charters compete on a level playing field with federally chartered institutions. Thus, the Illinois Legislature has granted Illinois-chartered banks the power, "[n]otwithstanding any other provisions of [the Illinois Banking Act] or any other law, to do any act … that is at the time authorized or permitted to national banks by an Act of Congress." 205 ILCS 5/5(11). It has enacted similar parity statutes for Illinois savings banks and credit unions. *See* 205 ILCS 205/6002(a)(11); 205 ILCS 305/65. These statutes effectively extend federal preemption under the NBA, HOLA, and FCUA to corresponding Illinois-chartered institutions.

The dormant Commerce Clause, in turn, prevents Illinois from imposing burdens only on financial institutions chartered by other states. It prohibits "regulatory measures" that "benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (internal quotation marks omitted). In a provision often called "Riegle-Neal," Congress has statutorily directed a similar result

specifically for banks, affording out-of-state state banks the same protection national banks receive. Under Riegle-Neal, "[t]he laws of a host State … shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank." 12 U.S.C. § 1831a(j)(1).

### C. Plaintiffs' Members Exercise Their Federal Powers Through the Nation's Credit- and Debit-Card Payment Systems.

Plaintiffs' members offer numerous financial services pursuant to their federal powers to administer deposit accounts and loan money on personal credit. Crucial here, they offer customers the ability to use credit and debit cards "for a wide range of activities," from buying goods in stores to shopping or paying bills online. SA.49. To provide those services, Issuers first evaluate and approve the customer for a credit card or deposit account. They then administer those accounts and perform services in connection with them, including monitoring the cardholder's account for suspicious activity, handling transaction-related disputes, removing fraudulent charges, and offering rewards programs. SA.52.

The Issuer's provision of a deposit account or extension of credit is only half of the picture—the merchant, acting through a financial institution

called an "Acquirer," must also accept the card. In theory, every Issuer could negotiate the terms of that acceptance, including any fees, with every merchant and Acquirer, reaching potentially millions of bilateral agreements. But that would be staggeringly inefficient. Instead, credit and debit cards are affiliated with one or more Networks such as Visa, Mastercard, STAR, or Pulse. SA.51-52.

Those Networks play two essential roles in the transaction process. They provide a rules-based framework to govern card transactions that both sides of the transaction adopt. SA.51–52. And they provide technology that allows both the near-instantaneous approval of card transactions and the subsequent settlement of funds that the card transaction requires. SA.52.

The steps in authorizing and approving a transaction are depicted on the figure on the following page, and described below.



Dist.Ct.Dkt.1 ¶ 47.

When a cardholder uses a payment card, the Network allows information to flow from the merchant to the Acquirer to the Issuer so that the Issuer can determine whether the customer has sufficient funds or credit available, check for fraud, and otherwise authorize the transaction. SA.53. Authorization can take mere seconds, and the cardholder then receives the goods or services, creating a seamless experience for both merchants and consumers. SA.53.

After transactions are approved, the Card Networks facilitate the flow of funds between Issuers (on cardholders' behalf) and merchants (via their Acquirers) to settle the transactions. SA.53. For debit cards, the Issuer deducts the amount from the cardholder's deposit account; for credit cards, the Issuer takes on the cardholder's debt until the cardholder repays it.

In short, the Networks are critical to the existence and efficient functioning of the payment system, enabling banks to efficiently exercise their powers to issue credit and debit cards and process millions of transactions every day.

Each participant in the payment system receives compensation for the part it plays, including the "interchange fee" the Issuer charges and receives as compensation for the costs and risk of providing and maintaining the cardholder's account and extending credit. SA.54. Interchange fees also fund core programs that benefit consumers, such as fraud protection, card rewards, and technological development. SA.54. Banks designing card products consider the amount of interchange fees they will receive when assessing how many customers will qualify and whether the account will include rewards or other benefits.

The amount of the interchange fee varies based on different aspects of the transaction; it typically consists of both a fixed amount and a percentage of the total transaction amount. SA.54. Issuers have the option of charging and receiving Card Networks' default interchange rates or negotiating different rates with certain merchants and their Acquirers on a bilateral basis. SA.54.

During the settlement process, the interchange fee flows from the Acquirer to the Issuer through the Networks' settlement mechanism. SA.54. So the volume of interchange fees paid by Acquirers, settled through the Network, and received by Issuers are the same.

D. **The IFPA Threatens Significant Interference with Financial Institutions' Federally Authorized Banking Powers.**

Enacted as part of an omnibus state budget bill, the IFPA contains two prohibitions at issue here: the Interchange Fee Prohibition and the Data Usage Limitation.

***Interchange Fee Prohibition.*** The Interchange Fee Prohibition forbids banks and other institutions from charging or receiving interchange fees on the tax or gratuity portion of Illinois transactions. 815 ILCS 151/150-10. The statute defines "Interchange fee" as "a fee established, charged, or received

by a payment card network for the purpose of compensating the issuer for its involvement in an electronic payment transaction." *Id.* § 150-5. It defines "Tax" as "any use and occupation tax or excise tax imposed by the State or a unit of local government in the state." *Id.*[2] And it defines "Gratuity" as "a voluntary monetary contribution to an employee from a guest, patron, or customer in connection with services rendered." *Id.*

The statute implements its prohibition in two ways, known as the "Automatic Process" and the "Manual Process." The Automatic Process applies "if the merchant informs the acquirer bank or its designee of the tax or gratuity amount as part of the authorization or settlement process for [an] electronic payment transaction." *Id.* § 150-10(a). If so, then entities including "[a]n issuer, a payment card network, [and] an acquirer bank … may not receive or charge a merchant any interchange fee on the tax amount or gratuity of [that] electronic payment transaction." *Id.*

The Manual Process applies if a merchant "does not transmit the tax or gratuity amount data" with the transaction, but instead "submit[s] tax

---

[2] That includes Illinois' 6.25% state-wide sales tax, plus additional taxes levied by the State's numerous counties and municipalities.

documentation for the electronic payment transaction to the acquirer bank or its designee no later than 180 days after the date of the electronic payment transaction." *Id.* § 150-10(b). Under those circumstances, "the issuer must credit to the merchant the amount of interchange fees charged on the tax or gratuity amount" "within 30 days after the merchant submits the necessary tax documentation" to the acquirer. *Id.* Notably, the IFPA's Manual Process provision imposes this 30-day refund obligation on *Issuers*, yet directs merchants to submit data to their *Acquirers*, without explaining how it is to be passed between the two—which typically lack direct contractual relationships. SA.55. It further directs Issuers to provide "credit[s] *to the merchant*," even though merchants and Issuers also typically lack direct contractual relationships. SA.55.

The Interchange Fee Prohibition carries draconian penalties. A violator of any of the above provisions "is subject to a civil penalty of $1,000 per electronic payment transaction, and the issuer must refund the merchant the interchange fee calculated on the tax or gratuity amount." 815 ILCS 151/150-15(a). That potential liability presents an existential threat. For example, one small Issuer with only 3,800 debit cardholders processes approximately 900,000 transactions annually, SA.49, while one national

Acquirer processed over 400 million credit and debit card transactions for Illinois merchants in 2023, Dist.Ct.Dkt.24-9, ¶ 5—producing potential annual penalties of up to *$900 million* and *$400 billion* respectively.

The Illinois Attorney General has authority to enforce the Interchange Fee Prohibition. SA.8-9.

***Data Usage Limitation.*** The Data Usage Limitation separately makes it unlawful for any "entity, other than the merchant, involved in facilitating or processing an electronic payment transaction" to "distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the … transaction or as required by law." 815 ILCS 151/150-15(b). "A violation of this subsection constitutes a violation of the [Illinois] Consumer Fraud and Deceptive Business Practices Act," *id.*, which the Attorney General may enforce. *See, e.g.*, 815 ILCS 505/7.

The IFPA was originally scheduled to "take[] effect July 1, 2025." Ill. P.A. 103-592 (H.B. 4951), § 999-99. The Illinois Legislature subsequently extended the effective date to July 1, 2026. 2025 Ill. Leg. Serv. 104-4.

### E. Procedural Background.

#### 1. Preliminary-Injunction Proceedings.

Faced with this grave threat to their members' ability to provide and be paid for their payment-card services, Plaintiffs sought a preliminary injunction. *See* Dist.Ct.Dkt.24. On a practical level, Plaintiffs explained that "the Interchange Fee Prohibition and Data Usage Limitation are both incompatible with the way the payment system actually functions." *Id.* at 17. Not only were there real doubts about whether compliance was technically possible on the timeframe the law required, but even if so, "implementing these IFPA provisions would come at enormous cost." *Id.* These costs could run to tens of millions of dollars, and could result in financial institutions exiting the market entirely. *Id.* at 36-38; *see* RSA.12.

In an amicus brief supporting Plaintiffs, the OCC described the IFPA as "an ill-conceived, highly unusual, and largely unworkable state law that threatens to fragment and disrupt [the] efficient and effective [card-payment] system." Dist.Ct.Dkt.61-1 at 1. The OCC confirmed that "this much is clear: the IFPA prevents or significantly interferes with federally-authorized banking powers that are fundamental to safe and sound banking and disrupts core functionalities that drive the Nation's

economy." *Id.* It reiterated its longstanding view that national banks have the power to process debit and credit card transactions, along with the "fundamental principle that the authority conferred by federal banking law to provide a banking service necessarily carries with it the authority to charge for that service." *Id.* at 7. "In short," the OCC concluded, "the IFPA constitutes both bad policy and an unlawful interference with federally granted powers." *Id.* at 1.

In orders issued on December 20, 2024 and February 6, 2025, the District Court granted in part Plaintiffs' requested preliminary injunction. The District Court concluded that Plaintiffs demonstrated a likelihood of success on their argument that both the Interchange Fee Prohibition and the Data Usage Limitation significantly interfere with powers granted by the NBA and are thus preempted as to national banks. SA16-17. Agreeing with Plaintiffs and the OCC, the District Court noted that both components of the IFPA "directly constrain[]" such banking powers and, moreover, that *Cantero* and the cases it cites "further illuminate[]" and "instruct[]" that preemption exists here. SA.18-19, 23. The District Court also found a likelihood of success for Federal savings associations as to HOLA preemption, SA.24, and for out-of-state state-chartered banks as to

protection against IFPA enforcement under Riegle-Neal, 12 U.S.C. § 1831a(j)(1), SA.44-45.  For those three types of entities, the District Court further found the remaining preliminary-injunction factors satisfied.  SA.33-36.

The District Court did not, however, grant preliminary injunctive relief based on Plaintiffs' arguments (1) that the FCUA preempts either portion of the IFPA, SA.40-43; (2) that the dormant Commerce Clause protects non-Illinois state-chartered financial institutions, *see* SA.30-31; or (3) that "in order to effectuate federal preemption, the IFPA cannot be applied to Card Networks or others involved in the payment process," SA.27-28.

### 2.      Summary-Judgment       and       Permanent-Injunction Proceedings.

The parties promptly cross-moved for summary judgment, and Plaintiffs sought a corresponding permanent injunction.  Plaintiffs submitted evidence establishing, among other things, that protected institutions would not be able to charge, receive, or process the full amount of interchange revenue that federal law permits if the Attorney General could continue to enforce the IFPA against other participants in the card-payment ecosystem, such as the Networks.  *See* SA.55, 78-83.  Plaintiffs

thus argued that the permanent injunction should be broader than the preliminary injunction, including by extending to actions of other payment-system participants to the degree necessary for national banks and other protected entities to exercise their federally granted powers. The Attorney General continued to argue that no portion of the law is preempted.

In its ensuing order, the District Court reiterated several of the same key conclusions that had led it to find preemption at the preliminary-injunction stage. It never disputed the existence of national banks' federal powers to receive deposits, make loans through credit cards, process card transactions, and charge at least some types of fees. RSA.19-20. It also recognized that, "[o]f course, the law does say that Issuers and Acquirers"— which are very frequently national banks—"'may not receive or charge a Merchant any interchange fee'" on tax and gratuity. RSA.12 (quoting 815 ILCS 151/150-10). And it further acknowledged the "undeniable" "compliance costs" that would flow from the Interchange Fee Prohibition, which could well drive some participants from the market. RSA.12, 27, 45.

Nonetheless, the District Court—although deeming this a "close case"—reversed its prior conclusion that the Interchange Fee Prohibition

was preempted.  RSA.11-28.  In explaining its change of heart, the District Court repeatedly returned to the fact that Networks, rather than banks, set default interchange fee rates.  *See, e.g.*, RSA.12, 20-23, 27-28.  In the District Court's reconsidered view, that "snag" took interchange fees outside of national banks' NBA authority to charge or receive fees.  *E.g.*, RSA.22-23, 27.  According to the District Court, this also meant that the Interchange Fee Prohibition "does not directly regulate banks."  RSA.12; *see also, e.g.*, RSA.20 ("[B]anks do not set, or arguably charge, interchange fees; rather, they receive them.").  The District Court also dismissed the upheaval the Interchange Fee Prohibition will cause, reasoning that all laws have some compliance costs and concluding that the IFPA's "costs, however staggering, do not speak to the core snag in Plaintiffs' case—third parties set the fees."  RSA.27.[3]

As to the Data Usage Limitation, the District Court continued to find significant interference, and thus preemption, with respect to national banks

---

[3] The District Court described the OCC's explanation of why the IFPA is preempted as mere criticism of the IFPA's "bad policy."  RSA.28 (quoting Dist.Ct.Dkt.61-1 at 1).  That ignores the OCC's explanation of why the law also constitutes "an unlawful interference with federally granted powers." Dist.Ct.Dkt.61-1 at 1; *see id.* at 4-12.

and Federal savings associations.  RSA.28-30.  It also held that the Data Usage Limitation impermissibly conflicted with the FCUA, and was thus preempted as to federal credit unions too.  RSA.34.  As to out-of-state financial institutions, the District Court held that Riegle-Neal extended this preemptive effect to non-Illinois state-chartered banks.  RSA.30-31.  But while the District Court agreed with Plaintiffs that the Illinois "parity statutes" will operate to exempt Illinois-chartered institutions (including non-banks) from the Data Usage Limitation in light of the preemption afforded to their federal peers, it rejected Plaintiffs' argument that the dormant Commerce Clause forbids Illinois from extending this exemption only to home-state institutions, to the disadvantage of institutions chartered by other states.  RSA.35-42.

Finally, the District Court concluded that "the Data Usage Limitation is so tied up in the federal entities' powers that the preemptive effect must run to the Payment Card Networks and others involved in the payment process, at least so far as necessary for the preempted entities to experience complete relief."  RSA.44.  In practical effect, the District Court's ruling leaves the Data Usage Limitation applicable only to savings associations or savings banks and credit unions chartered by states other than Illinois, a

result the District Court agreed posed a "confusing conundrum."  RSA.40-41 & n.7.[4]

## SUMMARY OF ARGUMENT

**I.A.**  The NBA preempts any state law that "prevents or significantly interferes with the exercise by [a] national bank of its powers."  *Cantero*, 602 U.S. at 209 (internal quotation marks omitted).  The IFPA does so.  Federal law gives national banks the power to "receiv[e] deposits" and "loan[] money on personal security," along with all "incidental powers as shall be necessary to carry on the business of banking."  Banks thus have federal power to issue payment cards, process card transactions, and receive compensation for providing those services.

The Interchange Fee Prohibition prevents or significantly interferes with national banks' exercise of those powers in multiple ways.  As to their deposit-taking, credit-extending, and card-processing powers, the statute imposes regulatory burdens and compliance costs so extreme that

---

[4] The Attorney General asserted sovereign immunity against an injunction based on the Illinois parity statutes prohibiting enforcement against Illinois-chartered institutions, and the District Court dismissed those claims. SA.14.  Accordingly, the District Court's interpretation of the parity statutes, while a predicate of its dormant Commerce Clause analysis, was not embodied in the permanent injunction or final judgment.

participants may be driven from the market—a degree of interference well beyond what Supreme Court cases find sufficient for preemption. And as to the essential authority to charge for services, Illinois seeks to dictate to national banks when and how they may receive federally authorized compensation. Both Supreme Court precedent on limiting national banks' flexibility to exercise federal powers and a circuit-court consensus specifically addressing fees hold that the State may do no such thing.

The District Court disagreed, believing that the IFPA did not impair national banks' powers because Card Networks, rather than banks, set the default amount of interchange fees. But national banks' power to receive compensation for their services does not depend on whether they choose to charge Networks' default fees or instead negotiate separate fee arrangements with merchants or Acquirers. The District Court's rationale that all regulations impose some compliance costs fares no better. The question is whether the state law's interference with the exercise of federal power is "significant," and here the Interchange Fee Prohibition's extreme costs and burdens plainly meet that test.

**I.B.** The HOLA preempts the Interchange Fee Prohibition as to Federal savings associations. They have similar federal powers to national banks', and by statute, the same preemption test applies.

**I.C.** The FCUA preempts the Interchange Fee Prohibition as to federal credit unions. Because federal credit unions are federal instrumentalities, the same preemption test applies to them as well, and they too have federal powers comparable to national banks'.

**I.D.** Riegle-Neal extends the benefit of NBA preemption of the Interchange Fee Prohibition to non-Illinois state-chartered banks. And, as the District Court correctly held with respect to the Data Usage Limitation, equity requires an injunction permitting other payment-system participants to take actions that facilitate the exercise of federal powers by federally protected entities.

**II.** The dormant Commerce Clause forbids Illinois from exempting its own institutions from the IFPA's burdensome requirements, while subjecting financial institutions of other states to those same requirements. States are free to use parity statutes to put their own institutions on an equal playing field with federal competitors. But they cannot leave only out-of-state institutions subject to burdensome regulations.

**STANDARD OF REVIEW**

This Court "review[s] the district court's decision on cross-motions for summary judgment de novo." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). The Court also applies de novo review to denials of permanent injunctive relief where, as here, the "appeal presents only a legal question." *Nicodemus v. City of S. Bend*, 137 F.4th 654, 661 (7th Cir. 2025). The District Court denied permanent injunctive relief on the Interchange Fee Prohibition based solely on its conclusion that that provision was not preempted by the NBA or other sources of federal law, *see* RSA.15-28, and "[w]hether federal law preempts state law is a question [this Court] review[s] de novo," *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 917 (7th Cir. 2007). Likewise, the District Court denied permanent injunctive relief on Plaintiffs' dormant Commerce Clause argument based solely on the legal ground that the Illinois statutory scheme does not facially and unlawfully discriminate in favor of Illinois-chartered financial institutions. *See* RSA.35-42.

**ARGUMENT**

**I. Federal Law Preempts The Interchange Fee Prohibition.**

As the District Court correctly held at the preliminary-injunction stage, the Interchange Fee Prohibition prevents or significantly interferes with

multiple powers the NBA affords to national banks, and is thus preempted. At the permanent-injunction stage, however, the District Court abruptly changed course based on its description of Networks, rather than national banks, as setting the amount of interchange fees. But national banks are equally authorized to make money from their federally authorized deposit-taking and credit-extending activities whether they choose to charge and receive the Networks' default amounts or to bilaterally negotiate rates with merchants or acquirers. The District Court's contrary conclusion rested on a fundamental misunderstanding of the scope of NBA preemption and the national-bank powers at issue. For similar reasons, the HOLA and FCUA preempt enforcement of the Interchange Fee Prohibition as to Federal savings associations and federal credit unions. And just as the District Court held in the Data Usage Limitation context, Riegle-Neal extends NBA preemption to out-of-state banks, and equity requires extending the scope of the injunction to other payment-system participants to the degree they are facilitating the exercise of federal powers by entities enjoying preemption.

### A. The NBA Preempts the Interchange Fee Prohibition.

The NBA preempts the Interchange Fee Prohibition because the Illinois law "prevents or significantly interferes with" national banks'

exercise of core, federally authorized powers.  In its recent *Cantero* decision, the Supreme Court reaffirmed that standard for NBA preemption and explained that courts should determine whether it is met "based on the text and structure of the [state law], comparison to other precedents, and common sense," identifying seven precedents that are central to the comparative analysis.  602 U.S. at 217, 220 n.3.  Applying those considerations, the Interchange Fee Prohibition plainly "prevents or significantly interferes with" powers the NBA grants national banks and is thus preempted.

> **1. National banks have federally granted powers to issue payment cards, process card transactions, and receive compensation for doing so.**

As described above, national banks are creatures of federal law, and the NBA is the source of their authority to engage in business activities.  The statute expressly grants them the power to "carry on the business of banking" by, among other things, "receiving deposits," "loaning money on personal security," "mak[ing] contracts," and exercising "all such incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C. § 24 (Third), (Seventh); *see also* 12 C.F.R. § 7.1000(d)(1) ("An activity is authorized for a national bank as incidental to the business of banking if it is

convenient or useful to an activity that is specifically authorized for national banks or to an activity that is otherwise part of the business of banking."). Under those authorities, national banks have the undisputed power to issue payment cards and process card transactions.

To start, national banks' power to issue payment cards flows directly from their statutory authority to "receiv[e] deposits" and "loan[] money on personal security." 12 U.S.C. § 24 (Seventh). After all, credit cards are nothing more than a modern way of "loaning money on personal security," and debit cards are simply a modern method of allowing accountholders to use the money in the accounts banks create when they "receiv[e] deposits." Indeed, neither the Attorney General nor the District Court has ever disputed that national banks have the federal power to issue payment cards.

The federal power to process card transactions is equally undisputed. As the OCC has long recognized, "processing credit and debit card transactions … [is] clearly part of the business of banking." OCC Corp. Dec. 99-50, at 4; *see also, e.g.*, OCC Inter. Ltr. 689, 1995 WL 604271, at *1 (Aug. 9, 1995) ("The processing of credit card transactions for merchants is a part of or incidental to the business of banking within the meaning of [the NBA]."); OCC, Activities Permissible for National Banks and Federal Savings

Associations, Cumulative, at 75 (Oct. 2017) (national banks "can provide authorization and processing services necessary for the merchants to accept online credit and debit card payments in a secure environment").[5]

The existence of those federal powers—to issue payment cards, provide corresponding services to their banking customers, and process card transactions—does not depend on *how* national banks choose to exercise them. In other words, a national bank could exercise these powers by contracting with the Networks to perform certain key functions or by creating a hypothetical alternative payment-card system from the ground up. In the real world, of course, national banks do the former. The Networks set rules, protocols, and default interchange rates, and national banks choose to contract with them. That model has enabled the creation of a global payment system of breathtaking scope and efficiency. It is small wonder that Issuers opt in to the Networks rather than negotiating myriad details of payment processing with millions of merchants or their Acquirers. *See supra*

---

[5] https://www.occ.gov/publications-and-resources/publications/banker-education/files/activities-permissible-nat-banks-fed-savings-associations.html.

at 14. But either way, national banks are exercising their statutory credit and deposit powers.

Finally, national banks have the federal power to receive compensation for the core banking services they provide. As the OCC observed in the District Court proceedings, "[i]t is a fundamental principle that the authority conferred by federal banking law to provide a banking service necessarily carries with it the authority to charge for that service." Dist.Ct.Dkt.61-1 at 7.

Indeed, both Congress itself and the OCC have plainly understood banks to have such authority with respect to interchange fees in particular, notwithstanding Networks' role in the process. Thus, in the Durbin Amendment to the Dodd-Frank Act, Congress directed the Federal Reserve Board to set federal limits on the amount of interchange fees that debit-card Issuers may receive or charge on debit-card transactions. 15 U.S.C. § 1693o-2. Such limits would be nonsensical if national banks lacked the power to receive interchange fees in the first place. *See, e.g.*, *Bowe v. United States*, 146 S. Ct. 447, 464 (2026) ("Congress presumably does not enact useless laws" (internal quotation marks omitted)). Scant surprise, then, that as the OCC explained to the District Court, the agency "has … addressed the

specific issue of interchange fees, finding that national banks are authorized to charge them to merchants as part of the standard clearing and settlement process for debit and credit card transactions." Dist.Ct.Dkt.61-1 at 8.

### 2. The Interchange Fee Prohibition prevents or significantly interferes with national banks' federal powers.

The IFPA's Interchange Fee Prohibition "prevents or significantly interferes" with the exercise of national banks' powers in multiple ways. It significantly interferes with their powers to exercise their deposit-taking, credit-extending, and card-processing powers through debit and credit cards by imposing "staggering[ly]" burdensome regulatory obstacles, all while decreasing the revenue banks may receive for doing so. And it even more directly interferes with their power to receive compensation for providing core banking services to their customers by preventing national banks from collecting a portion of the fees that the NBA permits for providing those underlying services. Either type of significant interference suffices to preempt the Interchange Fee Prohibition; both combined put preemption beyond doubt.

### a. The costs and regulatory burdens the Interchange Fee Prohibition imposes prevent or significantly interfere with national bank powers to issue payment cards and process payment-card transactions.

The Interchange Fee Prohibition "significantly interferes with" national banks' undisputed powers to receive deposits, make loans on personal credit, and process card transactions by imposing severe costs and regulatory burdens that prevent the efficient exercise of these powers. *Franklin National Bank*—which *Cantero* described as "[t]he paradigmatic example of significant interference," 602 U.S. at 216—shows why. There, the Court held that, because banks were authorized to receive savings deposits, federal law protected their "incidental power[]" to engage in "advertising" for such accounts. *Franklin Nat'l Bank*, 347 U.S. at 377. The NBA thus preempted a New York law that created a "clear conflict" with this incidental advertising power by precluding national banks from using the word "savings" in their advertisements. *Id.* at 374, 378. "Importantly," *Cantero* emphasized, that was so even though "the New York law did not bar national banks from receiving savings deposits, 'or even' from 'advertising that fact'" using different words. *Cantero*, 602 U.S. at 216 (quoting *Franklin Nat'l Bank*, 347 U.S. at 378). Because "[f]ederal law gave national banks the

power not only 'to engage in a business,' but also 'to let the public know about it,'" "state law could not interfere with the national bank's ability to do so efficiently." *Id.* (quoting *Franklin Nat'l Bank*, 347 U.S. at 377-78).

The Interchange Fee Prohibition interferes with national banks' "efficient" use of payment cards to exercise their core retail-lending, deposit-services, and card-processing powers far more significantly than the New York law at issue in *Franklin National Bank*. Instead of merely limiting the form of advertising for a particular service, it targets the service itself. If compliance with the IFPA's Automatic Process is even technologically feasible—a question the District Court described as "open." RSA.14—it will come with price tags measured in the tens of millions of dollars for large banks and comparably burdensome in relative terms for small banks. Dist.Ct.Dkt.24-8 ¶¶ 19-20; Dist.Ct.Dkt.24-6 ¶ 17; *see* RSA.14 (describing "numerous declarations" detailing potential costs that could be "extraordinarily expensive" and "drive institutions out of the market").

The Manual Process is even worse. To start, it is far from clear how this process could meaningfully work. Issuers seldom have direct commercial relationships with Acquirers, let alone with the merchants where their cardholders shop. SA.55. Acquirers thus have no systems or

staffing that would allow them to transmit tax documentation they receive to Issuers. Indeed, modern payment receipts, which vary widely in size, format, and detail, seldom include sufficient information for an Acquirer to identify the cardholder's Issuer. RSA.14; *see* Dist.Ct.Dkt.24-12 ¶ 43. For their part, Issuers have no systems or staffing in place to manually determine the precise amount of interchange fees for which a "credit" is due or to provide such a credit to a merchant—particularly since "the statute does not indicate how [Issuers and Acquirers] transmit the information to one another." *See* RSA.27.

Even if developing, implementing, and staffing such systems by the IFPA's effective date were theoretically possible, doing so would require enormous technical, financial, and personnel resources. *See, e.g.*, RSA.14 ("There are difficult questions of staffing, resources, implementation timelines, … and practicality."). The burden on smaller Issuers would be especially destructive. As the president of one such bank explained, the Manual Process "creates an unsustainable burden on debit card issuers of our size," and would likely lead the bank to exit the debit card market altogether. Dist.Ct.Dkt.24-4 ¶ 25 (cited at RSA.14). Even though the bank has only 3,500 debit cardholders, a manual process capable of handling the

625,000 debit card transactions it processes annually would require at least two new full-time employees, at a cost of $150,000 or more once salaries, benefits, and hardware and software support are considered. Dist.Ct.Dkt.24-4 ¶¶ 5-6, 24 (cited at RSA.14); *see also* Dist.Ct.Dkt.24-15 ¶¶ 4, 24 (credit union with approximately 100 Illinois employees would have to hire or divert 28 employees and spend almost $1.3 million to try to implement the Manual Process) (cited at RSA.14). Such additional costs—combined with the irrevocably lost revenue from the tax and gratuity portions of transactions—would render debit-card services a money-losing line of business. Dist.Ct.Dkt.24-4 ¶ 25).[6]

Moreover, the IFPA's Manual Process precludes sufficient safeguards against errors and fraud. Manually reviewing billions of transactions and

---

[6] In the District Court, the Attorney General persistently attempted to characterize this forgone revenue as insubstantial. *See, e.g.*, Dist.Ct.Dkt.174 at 47 ("a very small percentage of the overall amount of interchange fee"). In reality, the "common sense" that *Cantero* directs courts to use, *see* 602 U.S. at 220 n.3, makes plain that with a state-wide 6.25% sales tax rate, additional taxes imposed by Illinois' numerous local taxing jurisdictions, and gratuities of all kinds, the amounts at issue will be substantial indeed. Indeed, the average combined state and local sales tax in Illinois is nearly 9%, and in Chicago it is 10.25%, to say nothing of tips. *See generally* Ill. Dep't of Revenue, Tax Rate Database, https://tax.illinois.gov/research/taxrates.html.

processing credits for them opens the door to both, particularly in a setting where a financial incentive exists to characterize as much of a transaction as possible as gratuity or tax.  Because no such systems currently exist, banks have no procedures or staff in place to audit or otherwise ensure the accuracy of credits provided under the Act.  Developing procedures and hiring staff will carry additional costs, as will the increase in errors and fraud that will inevitably result from introducing billions of manual points of potential failure.  *See* RSA.14.

These effects of Illinois' law—which the District Court acknowledged would be "indisputably disruptive," with "complicated compliance challenges" and "potentially business-ending consequences for some members of the market," RSA.12, 14, 26—are miles beyond the hindrance to advertising in *Franklin National Bank*'s "paradigmatic" example.  *See Cantero*, 602 U.S. at 216.  The "common sense" that *Cantero* commands courts to use dictates that this interference is easily sufficient to trigger preemption.  *See id.* at 220 n.3.

**b.** **The Interchange Fee Prohibition's direct restriction on national banks' compensation for providing authorized services prevents or significantly interferes with their exercise of their federal powers.**

As explained above, inherent in national banks' deposit-holding and credit-extending powers is the power to earn compensation by charging and receiving fees for those services. Indeed, it is hard to imagine a component of a federal power more necessary to "the business of banking" than the ability to charge and receive fees for services. That is especially the case for services like those involving payment cards, where anticipated fee revenue directly correlates to how broadly the service will be available, and the benefits it will include.

Recognizing national banks' power to receive compensation for providing core banking services makes this an easy case. Courts—including the Supreme Court in cases cited by *Cantero* as emblematic of preemption—routinely recognize that the NBA preempts state laws that limit when or how national banks may take an action the NBA authorizes. And in the fee context specifically, the circuit courts agree that states may not dictate the circumstances or manner in which national banks may receive compensation for providing federally authorized services.

**1.** *Barnett Bank* itself and *Fidelity Federal Savings & Loan* (another case *Cantero* identified as critical) govern here. In *Barnett Bank*, the NBA provided that national banks "may" sell insurance in small towns. 517 U.S. at 28. A state law prohibited certain national banks from selling most types of insurance. *Id.* at 29. The Supreme Court held that, while federal and state law were not irreconcilable (because federal law did not *require* national banks to sell insurance in small towns), where federal law grants national banks a power, a state law that "forbid[s], or impair[s] significantly, the exercise of" that power is invalid. 517 U.S. at 33. It emphasized that "grants of both enumerated and incidental 'powers'" to national banks are "not normally limited by, but rather ordinarily preempt[], contrary state law." *Id.* at 32. Here, national banks' power to receive compensation for providing credit, deposit, and payment-processing services must "ordinarily preempt[]" a state law prohibiting them from doing so in certain circumstances.

Similarly, in *Fidelity*, federal law allowed, but did "not compel, federal savings and loans to include due-on-sale clauses in their [mortgage] contracts." 458 U.S. at 155. California sought to "limit[]" that right by allowing enforcement of such clauses only when "reasonably necessary" to

protect a security interest.  *Id.* at 149, 154-55.  Again, although the federally chartered entities *could* comply with both federal and state law, the Court held that the state law was preempted because it "deprived [them] of the 'flexibility' given" by federal law.  *Id.* at 155.  Just so here.  The Interchange Fee Prohibition "deprive[s] [national banks] of the 'flexibility'" the NBA offers by barring national banks from receiving a portion of the compensation that the NBA authorizes.

**2.**  A circuit-court consensus on states' lack of authority to dictate fee-related matters to national banks further reinforces the conclusion that the Interchange Fee Prohibition significantly interferes with national banks' federal power.  In *Baptista v. JPMorgan Chase Bank, N.A.*, for example, the Eleventh Circuit held that the NBA preempted a Florida law barring banks from imposing check-cashing fees on non-account holders because OCC regulations had "the significant objective of … allow[ing] national banks to charge fees and [allowing] banks latitude to decide how to charge them." 640 F.3d 1194, 1198 n.2 (11th Cir. 2011); *see also Wells Fargo Bank of Tx. NA v. James*, 321 F.3d 488, 495 (5th Cir. 2003) (similar Texas law was "in irreconcilable conflict with the federal regulatory scheme").  Likewise, in *Bank of America v. City & County of San Francisco*, the Ninth Circuit held that

municipal ordinances prohibiting ATM fees on non-depositors were preempted, because federal law permitted national banks to charge such fees without limiting that permission to depositors. 309 F.3d 551, 562-64 (9th Cir. 2002). Similar logic applies here: national banks have the power to receive interchange fees as part of their authority to exercise core banking powers, and Illinois may not tell them how or for what to do so.[7]

###### c. The Interchange Fee Prohibition in No Way Resembles the State Laws the Supreme Court Has Held Not Preempted.

While the IFPA's interference with federal powers resembles or exceeds that at issue in *Barnett Bank*, *Fidelity*, and *Franklin National Bank*, the Interchange Fee Prohibition looks nothing like the three state statutes upheld in the cases *Cantero* cited as illustrating the scope of NBA preemption. Two of these three cases, *McClellan v. Chipman*, 164 U.S. 347 (1896), and *National*

---

[7] Alternatively, the power to charge and receive fees for banking services could be understood as a power "incidental to the business of banking." That would not matter to the preemption analysis because, as *Barnett Bank* makes clear, NBA preemption applies with equal force regardless of whether the state law impairs an enumerated or an incidental power. 517 U.S. at 32. Indeed, if the power to charge and receive fees is understood as a separate, incidental power—like the power to advertise at issue in *Franklin National Bank*, 347 U.S. at 377—then the IFPA is directly forbidding its exercise with respect to tax and gratuity payments in Illinois, which is plainly a significant impairment.

*Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353 (1870), simply held that "generally applicable state contract, property, and debt-collection laws" that do not "hinder[] … the national bank's banking operations" are not preempted. *Cantero*, 602 U.S. at 219. The Interchange Fee Prohibition, which targets banks and seeks to actively reorder their business relationships and diminish their revenue, does not remotely resemble this kind of "generally applicable" background rule.

The third case where preemption was not found, *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944), also involved a statute quite distinct from the Interchange Fee Prohibition. There, Kentucky's unclaimed property law "simply allowed the State to 'demand payment of the accounts in the same way and to the same extent that the depositors could' after the depositors abandoned the account." *Cantero*, 602 U.S. at 217-18 (quoting *Anderson*, 321 U.S. at 249). By contrast, in *First National Bank of San Jose v. California*, 262 U.S. 366 (1923), the Supreme Court held preempted a "seemingly similar California law" that "allowed the State to claim deposits that went unclaimed for more than twenty years," albeit without "proof that the account was abandoned." *Cantero*, 602 U.S. at 218. As *Cantero* explained, the difference was that the California law "attempt[ed] to qualify in an unusual

way agreements between national banks and their customers," whereas "the Kentucky law in *Anderson* demanded proof that the accounts were abandoned," making "its rule … 'as old as the common law itself.'" *Id.*

Here, the Interchange Fee Prohibition resembles the "unusual" law in *First National Bank of San Jose* far more than the Kentucky law, which had roots deep in the common law. The IFPA reflects no common-law principle, has no statutory analog in any other state, and seeks "to qualify in an unusual way" national banks' business relationships, including their contracts with Networks. The Interchange Fee Prohibition is thus more akin to the preempted California law than the valid Kentucky law in *Anderson*.

> **3. The District Court erred in concluding that the Interchange Fee Prohibition does not prevent or significantly interfere with national banks' federal powers.**

As explained above, the analysis *Cantero* requires yields the conclusion that the Interchange Fee Prohibition is preempted in multiple ways. But although it found the issue "close," RSA.11, the District Court concluded the opposite. Its conclusion rests on two fundamental errors.

*First*, the District Court appears to have mistakenly believed that the fact that Networks set default interchange fee rates means that any limits on

those fees do not implicate national bank powers. Indeed, the District Court went so far as to say that the IFPA does not directly regulate national banks at all—a conclusion belied by the statute's plain text. In reality, national banks' power to get paid for the banking services they provide does not dissipate simply because they choose to charge and receive fees in a default amount. Indeed, the system could scarcely work any other way.

*Second*, the District Court appeared to believe that regulatory costs and burdens are categorically irrelevant in assessing NBA preemption. That conclusion cannot be squared with the *Barnett Bank* significant interference test that the Supreme Court recently reaffirmed in *Cantero*.

### a. Card Networks' setting of default interchange rates is irrelevant to the NBA preemption analysis.

**1.** As noted above, there is no dispute that national banks' federal powers to receive deposits and loan money on personal credit encompass the power to issue payment cards to their banking customers. Nor could there be any serious dispute that the NBA empowers national banks to get paid for the services they provide as part of the "business of banking." Indeed, the District Court itself appeared to agree that such compensation would lie within the heartland of national-bank Issuers' powers if only the

banks had bilaterally negotiated the fee amount with each merchant or Acquirer. *See* RSA.20, 22-23. In the District Court's view, however, the fact that Card Networks set default fees means that the Interchange Fee Prohibition does not implicate any national-bank powers. That view misunderstands both the facts of how the system works and the legal implications of those facts.

To start, it ignores the active role that national banks play in deciding the interchange fees that apply to their payment-card transactions. Although Networks set default interchange rates, national-bank Issuers retain the authority to decide whether to opt in by issuing cards under any Network's banner. SA.54. National-bank Issuers also can, and sometimes do, negotiate different interchange rates with particular merchants or Acquirers. But national banks do not lose their federal power to receive compensation for their core payment-card services by deciding to exercise that power more efficiently by choosing to employ a default value rather than engaging in millions of bilateral negotiations—which, after all, is hardly workable. It therefore makes sense that, as noted above, both Congress and the OCC have readily recognized that receiving interchange fees falls within

the scope of national banks' federal powers, notwithstanding the well-known role that Networks play in the process.  *See supra* at 35.

The District Court's entire analysis was permeated by its fundamental error of believing that national banks have federally granted power to charge or receive fees only *that they themselves set*, without any third-party default.  As described below, variations on the theme recur throughout the District Court's decision, but the underlying theory is wrong for essentially the same reasons throughout.

**2.**  For instance, the District Court appeared to believe that national banks' power to receive non-interest compensation for banking services was limited to the scope of a particular regulation that Plaintiffs had cited as a non-exhaustive example of that power.  *See* RSA.19.  That regulation provides that "[a] national bank may charge its customers non-interest charges and fees, including deposit account service charges."  12 C.F.R. § 7.4002(a).  But again, national banks have *statutory* powers to receive deposits and make loans on personal credit—exercised as relevant here through payment cards—and these powers carry with them the power to receive compensation for doing so.  As the OCC stated, it is a "fundamental principle that the authority conferred by federal banking law to provide a

banking service necessarily carries with it the authority to charge for that service." Dist.Ct.Dkt.61-1 at 7. The regulation is illustrative but ultimately ancillary to the NBA preemption analysis.

**3.** The District Court's same focus on who sets interchange fees led it to misapply *Fidelity*. Again, *Fidelity* found "significant interference" with federal powers where state law restricted the circumstances in which federally chartered institutions could include due-on-sale clauses in mortgage agreements—a power federal law granted them. *See Cantero*, 602 U.S. at 216-17 (describing *Fidelity*). As the District Court itself concluded at the preliminary-injunction stage, the Interchange Fee Prohibition "more dramatically limits national banking powers than the state law did in *Fidelity*" because it flatly prohibits receiving or charging interchange fees on entire portions of virtually every Illinois transaction, whereas the state law in *Fidelity* simply restricted national banks' "flexibility" in enforcing due-on-sale clauses. SA.20. In its permanent-injunction order, however, the District Court backtracked.

The District Court still recognized that "just as the State law [in *Fidelity*] restricted the circumstances in which a federal financial institution could exercise a specific federal power, the Interchange Fee Provision restricts

banks from charging these fees on the portion of a transaction that includes state and local taxes and gratuities." RSA.25. But this time, it held that such interference does not trigger preemption under *Fidelity*. The District Court reached this new conclusion by recharacterizing *Fidelity* as an instance of an "express conflict[]" between federal and state law, and then reasoning that there is no such conflict here because, in its view, "the interchange fees are set and calculated by Payment Card Networks like Visa and Mastercard." RSA.21.

As an initial matter, "express conflict" is not the standard under *Fidelity* or any other NBA precedent foregrounded in *Cantero*. The District Court relied for this characterization of *Fidelity* on the First Circuit's recent decision in *Conti v. Citizens Bank, N.A.*, 157 F.4th 10 (1st Cir. 2025). RSA.21. But as *Cantero* itself emphasized, the problem with the state law in *Fidelity* was that it "interfered with 'the flexibility given' ... by federal law"—even if it was entirely possible for the federal institutions at issue to "comply with both the state and federal laws." 602 U.S. at 217 (quoting *Fidelity*, 458 U.S. at 155). To the extent the First Circuit in *Conti* applied a more demanding

standard than the Supreme Court, it erred, and the District Court erred in following it.[8]

More fundamentally, however, the District Court erred (again) by defining away the relevant banking power. Of course if one posits that the power to charge and receive fees for deposit and credit services only encompasses *bank-set* fees (and further assumes erroneously that, here, national banks have no role in choosing the interchange rate), then there is no conflict or even tension between the NBA and a state law limiting banks' ability to receive and charge interchange fees at the Networks' default rates. But as explained above, national banks' powers include the authority to receive and charge fees whether or not they choose to opt into a system of default rates. That makes the IFPA's interference with national banks' powers inescapable.

---

[8] The District Court also expressed concern that if the fact that the Interchange Fee Prohibition "deprives banks of flexibility, as in *Fidelity*, [was] sufficient grounds for preemption, … it 'would obviate the need for an inquiry into whether a state law's interference with federal-banking powers was significant.'" RSA.25 (quoting *Conti*, 157 F.4th at 25). But the Supreme Court's holding in *Fidelity* was that depriving federal institutions of flexibility by restricting their exercise of federally granted powers *is* a significant interference.

In refusing to rely on *Fidelity*, the District Court also stated that, "under the IFPA, the bank can still charge the fee as it would in any other state, which might fairly distinguish the IFPA from the intervention in *Fidelity*." RSA.25. Hardly. In "any other state," a "bank can still charge the fee" based on the full amount of a transaction, while the IFPA requires banks to forgo an often-significant portion of the fee in virtually all transactions it governs. If anything, the interference with national bank powers is more significant here than in *Fidelity*. The result is preemption.

**4.** The District Court's misunderstanding of the full scope of the national-bank powers at issue also led it to incorrectly dismiss the relevance of the circuit-court consensus forbidding state interference with national banks' fee power. In analyzing those cases, the District Court admitted that preemption would result "[i]f the IFPA directly interfered with fees the banks directly charged," or if it "directly restricted banks' ability to charge fees for their direct services." RSA.20. But it emphasized its characterization that "banks do not set, or arguably charge, interchange fees; rather, they receive them." RSA.20. The District Court failed to explain why any distinction between charging fees and receiving them matters. The ability to *get paid* is if anything more integral to the "business of banking" than the

ability to *ask someone to pay you.* And again, the District Court ignored that national banks have the ability to deviate from the default interchange fee rates via bilateral negotiation, meaning that the choice to use the default fees is theirs as well. In short, there should be no doubt that national banks' powers to provide core banking services, including through payment cards, includes the power to receive payment for doing so, however that payment is structured.

The District Court also puzzlingly deemed these circuit cases "not all that compelling" because, it said, "the regulated entity in those cases was the bank itself." RSA.21. By contrast, the District Court thought that "the Interchange Fee Provision … does not directly regulate banks," apparently because "banks do not set, or arguably charge, interchange fees; rather, they receive them." *See* RSA.12, 20. But that ignores the Interchange Fee Prohibition's plain text. On pain of $1,000-per-transaction civil penalties, *see* 815 ILCS 151/150-15(a), the IFPA (1) makes it unlawful for entities including "[a]n issuer" or "an acquirer bank" to "*receive* … any interchange fee on the tax amount or gratuity," *id.* § 150-10(a) (emphasis added); (2) requires an "issuer" to "credit to the merchant the amount of interchange fees charged on the tax or gratuity amount," *id.* § 150-10(b); and (3) makes it illegal for

"issuer[s]," "acquirer bank[s]," and others to "circumvent the effect of this section" by means including "increasing the rate or amount of the fees applicable to or imposed upon the portion of a credit or debit card transaction not attributable to taxes or other fees charged to the retailer," *id.* § 150-10(d). The Interchange Fee Prohibition's direct regulation of national banks could hardly be clearer.

**5.** Finally, the District Court was likewise wrong that the Interchange Fee Prohibition is not preempted because it supposedly would not "functionally require[] the national banks to provide their services for free to a wide swath of the populace." RSA.20. That is not the standard under *Cantero.* But even if it were, it would be satisfied, because the Interchange Fee Prohibition *does* require national bank Issuers to process and underwrite the tax and tip portion of all Illinois card transactions for free, even though they bear the same risk of fraud or non-payment on those parts of the transaction as on any other portions.

> **b.** **The District Court's dismissal of regulatory burdens and compliance costs as a basis for preemption was also error.**

The District Court's rejection of the regulatory burdens and compliance costs the Interchange Fee Prohibition imposes as an independent

basis for preemption is also unpersuasive. As noted above, the District Court acknowledged "undeniable" "compliance costs" that would flow from the Interchange Fee Prohibition, which could well include driving some participants from the market entirely. RSA.12, 27, 46; *see also supra* Section I.A.2.a. But the District Court thought none of that mattered because "State (and federal) laws will always require some kind of compliance cost," and because, in its view, "these costs, however staggering, do not speak to the core snag in Plaintiffs' case—third parties set the fees." RSA.27. Neither of these reasons overcomes preemption.

Start with the District Court's refrain that "third parties set the fees." RSA.27. As described above, that is both factually wrong and legally irrelevant. *See supra* Section I.A.3.a. But regardless of that, even the District Court never doubted national banks' powers to make loans and receive deposits, or to do so by issuing payment cards and processing card transactions. The Interchange Fee Prohibition significantly interferes with those undisputed powers through its extreme regulatory burdens and compliance costs, independent of any interference with the compensation portion of the powers.

As to that interference, the District Court's observation that all laws have compliance costs may be true, but it is irrelevant. *Cantero* directs courts to examine how *significant* the interference with national banks' exercise of their powers will be. On any plausible understanding of that standard, the Interchange Fee Prohibition interferes far more "significant[ly]" with that power than the restriction on using a single word in advertising—the state law that presented *Franklin National Bank*'s "paradigmatic example of significant interference." *Cantero*, 602 U.S. at 216 (citing *Franklin Nat'l Bank*, 347 U.S. 373); *see supra* Section I.A.2.a (describing extreme burdens imposed on national banks by the Interchange Fee Prohibition).

**B.    The HOLA Preempts the Interchange Fee Prohibition.**

The HOLA preempts the IFPA as to Federal savings associations just as the NBA preempts its application to national banks. The preemption standard governing the two statutes is the same, and the HOLA gives Federal savings associations comparable powers to those the NBA grants national banks. *See, e.g.*, RSA.15 n.2 (citing 12 U.S.C. § 1465(a)).

Under the HOLA and its implementing regulations, Federal savings associations enjoy the powers to offer credit cards, 12 U.S.C. § 1464(c)(1)(T), "raise funds through … deposit[s]" and "issue … evidence of accounts"

such as debit cards, *id.* § 1464(b)(1)(A)(i)-(ii), and charge fees, including "to transfer … its customers' funds," *see, e.g.*, 12 C.F.R. § 145.17. For all the same reasons that the IFPA's Interchange Fee Prohibition "prevents or significantly interferes with" national banks' exercise of their federally granted powers, it does the same with respect to Federal savings associations' corresponding powers. *See supra* Section I.A.

### C. The FCUA Preempts the Interchange Fee Prohibition.

As federal instrumentalities, federal credit unions are entitled to exercise their federally granted powers free from prevention or significant interference by state law, just as national banks and Federal savings associations are. And because they enjoy powers comparable to those of other federal financial institutions, the Interchange Fee Prohibition is preempted as to federal credit unions for similar reasons.

#### 1. The *Barnett Bank* significant-interference standard applies to federal credit unions.

The *Barnett Bank* standard developed from the recognition that national banks are instrumentalities of the federal government, and that "grants of authority" to them are "not normally limited by, but rather ordinarily preempt[], contrary state law." *Barnett Bank*, 517 U.S. at 32 (citing

preemption cases from the late-nineteenth and early-twentieth centuries). The ordinary presumption against preemption has no place "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000); *see also Bank of Am.*, 309 F.3d at 559 ("[B]ecause there has been a 'history of significant federal presence' in national banking, the presumption against preemption of state law is inapplicable." (quoting *Locke*, 529 U.S. at 108)).

Courts, including the Supreme Court, routinely extend this approach to other federal instrumentalities. Perhaps most notably, as its caption suggests, *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta* involved preemption in favor of a federal savings and loan association (the predecessor of the modern Federal savings association).[9] Courts look to case law involving NBA preemption in the context of other federal instrumentalities because "[d]esignating an entity a federal instrumentality colors the typical preemption analysis by requiring the court to presume, in

---

[9] *Fidelity* was decided before the statutory provision making HOLA preemption coextensive with NBA preemption was enacted. Prior to the Dodd-Frank Act, institutions chartered under the HOLA enjoyed *broader* preemption than national banks; Dodd-Frank amended HOLA to limit its preemptive force.

the absence of clear and unambiguous congressional authorization to the contrary, that Congress intended to preempt state or local regulation of the federal instrumentality." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998); *see, e.g., Fed. Nat. Mortg. Ass'n v. Lefkowitz*, 390 F. Supp. 1364, 1371 (S.D.N.Y. 1975) (applying standard from national bank case to Fannie Mae).

That logic applies fully to federal credit unions. Congress enacted the FCUA over 90 years ago "to make more available to people of small means credit … , thereby helping to stabilize the credit structure of the United States." *DelBonis*, 72 F.3d at 931. Federal credit unions "were intended to perform a variety of governmental functions," and "still do." *Id.* at 932. Indeed, this Court has observed that "the history of the [FCUA] reveals that the uniform administration of federal credit unions, which can be achieved only by application of federal law, was of paramount importance to Congress when it enacted [it]." *Barany v. Buller*, 670 F.2d 726, 731 (7th Cir. 1982). As federal instrumentalities with a long history of federal involvement, federal credit unions are just like national banks and Federal savings associations with respect to triggering *Barnett Bank*'s standard.

The District Court agreed that federal credit unions are federal instrumentalities, but doubted *Barnett* Bank's applicability. RSA.32-33. In support, it noted that the Dodd-Frank Act codified *Barnett Bank* in some NBA and HOLA contexts, but did not do the same for the FCUA. That analysis, however, is flawed. The expansive preemption that protects both national banks and Federal savings associations long predates any codification; if it did not, there would have been no *Barnett Bank* to codify. And the Supreme Court has already recognized that Dodd-Frank's partial codification of NBA preemption creates no negative implication. *See Cantero*, 602 U.S. at 214 n.2 (*Barnett Bank* standard applies equally to conduct occurring before and after Dodd-Frank's effective date).

Accordingly, the FCUA need not expressly reference the *Barnett Bank* standard—or use any other magic words—for *Barnett Bank*'s standard to apply. The proper preemption standard for federal credit unions was *Barnett Bank* before Dodd-Frank, and it remains *Barnett Bank* after Dodd-Frank.

**2. The Interchange Fee Prohibition prevents or significantly interferes with powers federally guaranteed by the FCUA.**

The FCUA and its implementing regulations grant federal credit unions extensive powers, the exercise of which the Interchange Fee Prohibition would prevent or significantly interfere with. Among these are the "power … to make loans … and extend lines of credit to [their] members," 12 U.S.C. § 1757(5), which expressly "includ[es] credit cards," 12 C.F.R. § 701.21(a), and the "incidental power[]" to issue "debit cards," 12 C.F.R. § 721.3(k). And as with national banks, the authority to provide a service includes the authority to charge for it—especially where NCUA regulations expressly permit federal credit unions to "earn income from those activities determined to be incidental to [their] business." 12 C.F.R. § 721.6.

The Interchange Fee Prohibition thus prevents or significantly interferes with those powers in the same way it prevents or significantly interferes with the NBA's and HOLA's grants of similar powers. *See supra* Sections I.A-B. The FCUA therefore preempts the Interchange Fee Prohibition as well.

**D.     The District Court's Riegle-Neal and Equity Analysis Applies with Full Force to the Interchange Fee Prohibition.**

While the District Court concluded that the NBA, HOLA, and FCUA do not preempt the Interchange Fee Prohibition, it also concluded that all of these statutes preempt the Data Usage Limitation.  RSA.28-30, 34.  After doing so, the District Court further concluded that non-Illinois state-chartered banks are entitled to protection under Riegle-Neal, RSA.30-31, and that equity justifies according protection to Card Networks and other participants in the payment system "when they facilitate the preempted institutions' powers implicated by the Data Usage Limitation."  RSA.42-44.  That analysis was correct on both counts, and it applies equally to the Interchange Fee Prohibition if this Court finds that provision preempted.

**1.     Riegle-Neal extends NBA preemption to out-of-state state banks.**

Under Riegle-Neal, 12 U.S.C. § 1831a(j), "[t]he laws of a host State … shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank."  As the District Court explained, "[t]he statute's plain language clearly suggests that § 1831a(j)(1) is meant to ensure that out-of-state State banks can compete with nationally chartered banks."

RSA.30.  In reaching that conclusion, the District Court joined a consensus of courts reading the statute the same way.  *See, e.g. Johnson v. First Banks, Inc.*, 889 N.E.2d 233, 238 (Ill. App. Ct. 2008) (§ 1831a(j)(1) gives "an out-of-state, state bank … the same power and authority as a national bank," and interference with those powers is likewise "preempted"); *see also Pereira v. Regions Bank*, 752 F.3d 1354, 1357 (11th Cir. 2014) (per curiam).  Accordingly, NBA preemption of the Interchange Fee Prohibition as to national banks would also trigger Riegle-Neal preemption of that provision as to non-Illinois state-chartered banks.

> **2.  Equity calls for enjoining enforcement against other payment-system participants to the degree they are facilitating the exercise of federal powers by federally protected institutions.**

With respect to the Data Usage Limitation, the District Court properly recognized that "the preemptive effect must run to the Payment Card Networks and others involved in the payment process, at least so far as necessary for the preempted entities to experience complete relief."  RSA.44.  In doing so the District Court noted that "[i]t is widely accepted … that a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties."  RSA.44

(quoting *City of Chi. v. Barr*, 961 F.3d 882, 920-21 (7th Cir. 2020)); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (court may "extend[] [the] benefit or protection" of an injunction "to persons other than prevailing parties in the lawsuit … *if such breadth is necessary to give prevailing parties the relief to which they are entitled*").

The District Court's reasoning applies with even greater force to the Interchange Fee Prohibition. As Plaintiffs demonstrated with unrebutted evidence, the amount of interchange fee received by the Issuer is necessarily equal to the amount transferred through the Card Network. SA.55. For example, as the figure on the following page reflects, if an Acquirer or Card Network were allowed to apply interchange on only $75 of a $100 transaction, the Issuer could not receive the full amount to which it is entitled:



SA.55.    Absent relief for Card Networks and other payment-system participants, then, there is no way for protected Issuers to receive the benefit of preemption of the state law.

Under circumstances such as this, the propriety of extending an injunction to third parties is "widely accepted." *City of Chi.*, 961 F.3d at 920; *see id.* at 921 (collecting cases); *Bresgal*, 843 F.2d at 1170-71. An injunction must "be broad enough to be effective." *Russian Media Grp., LLC v. Cable Am., Inc*, 598 F.3d 302, 307 (7th Cir. 2010). A narrow injunction against enforcement of the Interchange Fee Prohibition that fails to effectuate federal preemption would flunk this standard.

**II.** **The Dormant Commerce Clause Prohibits Illinois From Imposing The IFPA's Burdens On Financial Entities Other States Charter, But Not On Those It Charters.**

The dormant Commerce Clause forbids states from discriminating against out-of-state commerce or businesses. *See, e.g.*, *Ross*, 598 U.S. at 369. The IFPA, in combination with Illinois' parity statutes, does precisely that, imposing burdensome regulation and a direct loss of revenue on financial institutions chartered by states other than Illinois, but not on those Illinois itself charters. In the District Court, the Attorney General asserted that the statutory scheme treats Illinois-chartered financial institutions no better than their out-of-state counterparts, but "did not meaningfully attempt to defend" the position that the dormant Commerce Clause permits such discrimination if it exists. *See* RSA.36. The District Court, for its part, recognized that the parity statutes' plain language produces this discriminatory result, but nonetheless concluded that the dormant Commerce Clause permits it. This Court should reject both the Attorney General's and the District Court's reasons for finding no dormant Commerce Clause violation.

**A.   Illinois Parity Statutes Extend the Benefit of Federal Preemption to Illinois-Chartered Financial Institutions.**

Like most states, Illinois has enacted parity statutes that give financial institutions it charters all of the powers and protections enjoyed by their federal counterparts.  As the District Court explained, such laws "generally grant state-chartered banks the same powers given to national banks and treat state banks like national banks in other ways."  RSA.35 (internal quotation marks omitted).

Thus, for example, Illinois grants banks it charters authorization, "[n]otwithstanding any other provisions of [the Illinois Banking Act] or any other law, to do any act … that is at the time authorized or permitted to national banks by an Act of Congress."  205 ILCS 5/5(11).  Under this provision, "Illinois state banks for [decades] have enjoyed parity with national banks."   Ill. Dep't of Financial & Professional Regulation, Interpretive Ltr. 2000-02, at 1 (Jan. 12, 2000)[10]; *see Johnson*, 889 N.E.2d at 238 (citing 205 ILCS 5/5(11)).  Illinois has made the same choice with respect to savings banks and credit unions it charters.  Thus, with exceptions not

---

[10] https://idfpr.illinois.gov/content/dam/soi/en/web/ idfpr/banks/cbt/legal/intrltr/btil0002.pdf.

relevant here, Illinois gives its savings banks authority, "[a]ny provision of this Act or any other law … to the contrary notwithstanding," to "make any loan or investment or engage in any activity that it could make or engage in if it were organized … under federal law as a federal savings and loan association or federal savings bank. 205 ILCS 205/6002(a)(11). Similarly, Illinois grants its credit unions "all of the rights, privileges and benefits which may be exercised by a federal credit union," subject only to a prohibition on "violat[ing] any provision of [the Illinois Credit Union Act]." 205 ILCS 305/65.

As the District Court correctly understood, "the plain terms of the[se] parity statutes would result in preemption of the IFPA[] … as to Illinois-chartered financial institutions" to the same extent that comparable federal institutions enjoy preemption. RSA.40. For although the IFPA contains a general severability clause, "the Illinois Supreme Court has been explicit in determining that a 'notwithstanding' clause clearly means the accompanying 'Act prevails over any conflicting provision of law.'" RSA.40 (quoting *People v. Molina*, 266 N.E.3d 1031, 1040 (Ill. 2024)). Because the parity statutes each contain such a clause or its functional equivalent, the District Court correctly rejected the Attorney General's attempt to invoke the

IFPA's general severability clause or various statutory interpretation precepts that apply only "where statutory text is less than clear."  RSA.40.

> **B.**     **The Dormant Commerce Clause Prevents Illinois From Granting Such Protection to Illinois Institutions, but Not out-of-State Institutions.**

The District Court recognized that the plain language of Illinois' statutory scheme "lead[s] to a confusing conundrum: out-of-State chartered institutions are left, functionally, as the only relevant entities subject to" the IFPA when federal preemption applies.  RSA.40-41.  The District Court further recognized that "[t]he Attorney General's office did not meaningfully attempt to defend against the Dormant Commerce Clause arguments in briefing nor on the record at oral argument."  RSA.36.  That is for good reason.  The blatant discrimination this "confusing conundrum" embodies flagrantly violates the dormant Commerce Clause, which forbids "regulatory measures" that "benefit in-state economic interests by burdening out-of-state competitors."  *Ross*, 598 U.S. at 369 (internal quotation marks omitted).

The District Court, however, sua sponte reached a different conclusion.  In that court's view, the "problem with [Plaintiffs'] Dormant Commerce Clause argument" was "that Plaintiffs effectively allege

discrimination in a State's inability to legislate nationally," noting that "[t]he Illinois General Assembly cannot bestow powers upon Iowa and Kentucky banks any more than the Texas legislature can direct California banks on how to run their savings accounts." RSA.36. That, however, misses the point. The facial discrimination at play here arises not from the financial institutions' underlying powers, but from the burdens the IFPA places on them—and the choice that Illinois has made, through the parity statutes, to exempt only Illinois-chartered institutions from those burdens.

Contrary to the District Court's belief, it is not true that "[t]o follow [Plaintiffs'] logic would be to impede any State's ability to put its own financial institutions on comparable footing to their federal counterparts." RSA.37-38. Illinois is free to do so. But the dormant Commerce Clause *does* forbid Illinois putting its own institutions on facially *better* footing than their *out-of-state state-chartered* counterparts. In other words, once Illinois has chosen to "put[] its own institutions on comparable footing to their federal counterparts," it cannot leave other States' institutions out in the cold. *See* RSA.38.

Finally, to the degree that the District Court relied on the absence of an explicit discriminatory purpose in upholding the statutory scheme against

dormant Commerce Clause challenge, *see* RSA.41, that was error. Where, as here, a statutory scheme discriminates on its face between in-state and out-of-state commerce or market participants, it is presumptively invalid, even if enacted for non-discriminatory purposes, such as "protecting consumers." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 352-53 (1977); *see also, e.g.*, *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 204 n.20 (1994) ("[E]ven if environmental preservation were the central purpose of the [challenged] order, that would not be sufficient to uphold a discriminatory regulation.").

In short, because the parity provisions of Illinois law essentially extend federal preemption to in-state institutions, the dormant Commerce Clause requires equivalent treatment for out-of-state state institutions. Otherwise, Illinois law would violate the "cardinal principle that a State may not benefit in-state economic interests by burdening out-of-state competitors." *W. Lynn Creamery*, 512 U.S. at 199 (internal quotation marks omitted); *see also id.* at 194 (collecting a "legion" of cases).[11]

---

[11] Because the District Court found federal preemption of the Data Usage Limitation, but not the Interchange Fee Prohibition, its dormant Commerce Clause analysis focused on the Data Usage Limitation. But nothing about that analysis or the arguments in this Section turn on the underlying regulation. If this Court determines that the Interchange Fee Prohibition is preempted, the dormant Commerce Clause should extend that

**CONCLUSION**

Plaintiffs respectfully request that the Court reverse the District Court's denial of permanent injunctive relief and remand with instructions to enter a permanent injunction against enforcement of both IFPA components against banks, savings associations or savings banks, and credit unions chartered by the federal government or states other than Illinois, as well as against other payment-system participants to the extent those participants are facilitating protected activities by protected issuers.

---

protection to the corresponding financial institutions chartered by states other than Illinois, just as it should with respect to the Data Usage Limitation. Moreover, while the District Court correctly found that out-of-state state-chartered banks enjoy the benefits of federal preemption through Riegle-Neal, 12 U.S.C. § 1831a(j), *see* RSA.30-31, the dormant Commerce Clause provides an additional independent basis for that result.

Dated: March 6, 2026

Respectfully submitted,

*/s/ Charlotte H. Taylor*

Boris Bershteyn
Kamali P. Willett
Sam Auld
Skadden, Arps, Slate,
Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Telephone: 212-735-3000
boris.bershteyn@skadden.com
kamali.willett@skadden.com
sam.auld@skadden.com

Charlotte H. Taylor
 *Counsel of Record*
Anthony J. Jeffries
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: 202-879-3939
ctaylor@jonesday.com
ajjeffries@jonesday.com

Matthew J. Rubenstein
Jones Day
90 S. Seventh St., Suite 4950
Minneapolis, MN 55402
Telephone: 612-217-8846
mrubenstein@jonesday.com

*Attorneys for Plaintiffs-Appellants-Cross-Appellees*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with (1) the type-volume limitation of Circuit Rule 32(c) because, as calculated by Word for Microsoft 365, it contains 13,967 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f); and (2) the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in a 14-point Book Antiqua font.

Dated: March 6, 2026          */s/ Charlotte H. Taylor*
Charlotte H. Taylor

**CERTIFICATE OF SERVICE**

In accordance with Circuit Rule 25(a), I hereby certify that on March 6, 2026, I electronically filed Plaintiffs-Appellants-Cross-Appellees' Opening Brief and Required Short Appendix with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 6, 2026

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor

REQUIRED SHORT APPENDIX

## RULE 30(d) STATEMENT

In accordance with Circuit Rule 30(d), I hereby certify that Plaintiffs-Appellants-Cross-Appellees' Required Short Appendix and Separate Appendix contain all of the materials required by Circuit Rule 30(a) and (b).

*/s/ Charlotte H. Taylor*

Charlotte H. Taylor

# TABLE OF CONTENTS

**Page**

Summary Judgment Order (Dkt. 179)
(Feb. 10, 2026) ...................................................................RSA.1

Final Judgment (Dkt. 193) (Feb. 27, 2026) ..............................................RSA.48

Permanent Injunction Order (Dkt. 194)
(Feb. 27, 2026) ................................................................... RSA.51

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS BANKERS ASSOCIATION )
et al. )
  )
  ) No. 24 7307
*Plaintiffs*, )
v. ) Chief Judge Virginia M. Kendall
  )
KWAME RAOUL, in his official capacity as )
Illinois Attorney General, )
  )
*Defendant*. )

## MEMORANDUM OPINION & ORDER

In its 2024 spring session, the Illinois General Assembly passed what is broadly credited as a first-of-its-kind intervention into payment card transactions: the Illinois Interchange Fee Prohibition Act ("IFPA"). 815 ILCS 151/150-1 *et seq*. In doing so, it also set off a chain of extensive litigation about the scope of a State's ability to regulate national banking entities. Currently before the Court are the parties' cross-motions for summary judgment. *See generally* Plaintiffs' Motion for Summary Judgment (Dkt. 123); Attorney General's Cross-Motion for Summary Judgment (Dkt. 136). Oral argument took place October 22, 2025. (Dkt. 173). Upon careful consideration of the parties' submissions, the Court grants both Motions in part.

## BACKGROUND

### I.      The Global Payment Card Ecosystem

Early humans' first venture into barter and economic exchange set off millennia of societal development; not to be outdone, the modern swipe of a credit card triggers its own complex set of events equal parts miraculous and mundane. When a consumer uses a card to pay a business—be it a burger or a bill—the transaction typically involves five actors, not just the two physically present: the Consumer, the Merchant, the Acquirers, the Issuers, and the Payment Card Networks.

1

RSA.1

("Attorney General's Response to Plaintiffs' Statement of Material Facts," Dkt. 137 at ¶¶ 18–32, all admitted unless otherwise indicated). Acquirers are the financial institutions that claim the Merchants and their associated payment transactions, setting the prices Merchants pay for card acceptance and underwriting the delivery of goods and service. In some circumstances, Acquirers may also work with a separate entity, such as Global Payments or Paysafe, to do the actual work of providing transaction processing and settlement, though the service can also be done in-house. (*Id.* at ¶ 22). Issuers are the 9,000 nationwide financial institutions that issue payment cards to Consumers and other entities, assessing cardholder risk and providing customer-facing services. Payment Card Networks connect Acquirers and Issuers, enabling electronic payment authorization, clearing, and settlement. American Express, Discover, Mastercard, and Visa dominate the Payment Card Networks market for credit card transactions, though there are additional competitors in the debit card market. The Payment Card Networks are responsible for setting the rules that govern the payment card transactions on those networks, including many aspects of the flow of funds. (*Id.* at ¶ 29).

In other words, the swipe sets off an elaborate dance. The Merchant sends information about the Card, the Merchant, and the total purchase amount to the Merchant's Acquirer, who in turn conveys it to the Payment Card Network, which then requests authorization of the transaction from the Issuer (e.g., to determine whether a cardholder has enough money or credit available to cover the purchase, or if there are any indicia of fraud). (*Id.* at ¶¶ 35–36). The Issuer then applies its policies to determine whether to authorize the transaction, a determination that flows back to the Card Network, to the Acquirer, and then to the Merchant, allowing the Consumer to walk away with the goods and services within a matter of seconds. (*Id.* at ¶¶ 36–37). After transactions are

2

**RSA.2**

authorized, approved, and posted, the Payment Card Networks facilitate the flow of funds between Consumers (via Issuers) and Merchants (via Acquirers) to settle the transactions. (*Id.* at ¶ 38).

If all goes as planned, the Consumer experiences this convenience without cost. But free, it is not. Payment Card Networks establish fee schedules for transactions that utilize the network based on factors such as card and merchant type—a transfer payment from the Acquirer to the Issuer for every individual transaction. (*Id.* at ¶ 39). Barring separately negotiated rates, these defaults rates apply in all transactions. (*Id.* at ¶ 41). Interchange fees typically comprise both a fixed fee and a percentage of the transaction amount (including tax and gratuity, if any). (*Id.* at ¶ 40). Though the Payment Card Networks set the default interchange fees, they do so on behalf of the other entities; Payment Card Networks' revenue primarily comes from charging a fee to both the acquirer and to the Issuer for the transactions. (*Id.* at ¶ 44). Instead, Acquirers collect merchant discount fees to fund the interchange fee, then pass the cost on to Issuers through the Payment Card Networks' settlement mechanisms. (*Id.* at ¶ 42). Issuers then use the interchange that they receive on credit and debit transactions to pay for operating expenses associated with their card programs (including processing transactions, monitoring for fraud, administering



*Figure 1: Plaintiffs' Illustration (Simplified)*

3

**RSA.3**

accounts, funding customer service and so forth), and to fund services and benefits that they offer cardholders, including rewards programs and checking accounts. (*Id.* at ¶ 43).

This complicated system is a dominant one. In 2022, there were 89.1 billion debit card transactions worth $4.0 trillion, 55.3 billion credit card transactions worth $5.4 trillion, and 9.0 billion prepaid card transactions worth $0.4 trillion. (Dkt. 137 at ¶ 20). In 2023, 99 percent of U.S. consumers had a credit card and/or a debit card and/or a prepaid card. (*Id.* at ¶ 19). The question of the IFPA's validity, thus, more broadly also asks if and how a State can impose on a digital financial web that exists far beyond its borders.

## II. The Statute

Back to the concrete: the IFPA has two key provisions. The Interchange Fee Provision bans Issuers, Payment Card Networks, Acquirers, and any other transaction processors from receiving from or charging Merchants any interchange fees on the portion of a transaction made up of state and local taxes and gratuities. 815 ILCS 151/150-10. The onus is on the Merchant to identify this portion and transmit the relevant data to avoid being charged interchange fees on the tax or gratuity amount of an electronic payment transaction. *Id.* The statute directs Merchants to transmit this information as part of the transaction; however, the Merchant can submit the relevant documentation up to 180 days after the date of the transaction, which in turn triggers a 30-day window in which the Issuer must credit the Merchant for the excess interchange fees. *Id.* The Interchange Fee Provision expressly excludes Payment Card Networks from liability for the accuracy of the Merchant's data reporting. *Id.* Nonetheless, any relevant entity, including Payment Card Networks, is subject to a civil penalty of $1,000 per electronic payment transaction if they have received the data and still violate the requirements. 815 ILCS 151/150-15(a).

**RSA.4**

The Interchange Fee Provision, then, seeks to limit the base sum upon which the interchange fee could be calculated, keeping state and local taxes and gratuities out of the picture. Plaintiffs note that the average combined state and local sales tax in Illinois is nearly 9 percent, and in Chicago, 10.25 percent—separate from the impact of any gratuities. (Dkt. 146 at 8). The Attorney General, for his part, emphasizes that "9 percent of anything is still a small share of the whole." (Dkt. 154 at 5). To oversimplify: before the IFPA, a 3 percent interchange fee rate on top of a $100 base transaction would be $3; after the IFPA, it would be 3 percent of the eligible non-state-and-local-tax sum of $91: $3 becomes $2.73.



*Figure 2: Plaintiffs' Illustration (Simplified)*

The Plaintiffs insist that the loss of the interchange fees, paired with compliance costs, will drive some financial institutions out of the market entirely and force the ones that remain to raise consumer prices and cut down on helpful services such as fraud monitoring. (*See* Dkt. 125 at 1). In their telling, the IFPA is "drastic and "draconian" in its commitment to "force Issuers to forgo a portion of the revenue that compensates them for taking on credit risk, monitoring for fraud,

5

**RSA.5**

providing benefits to cardholders, and otherwise greasing the wheels of the state and national economy." (*Id.*)

The Attorney General, meanwhile, contends that the Plaintiffs already force consumers to eat the costs of interchange fees through higher prices as a standard practice, and that a marginal reduction in the baseline sum upon which the fees are calculated is a manageable hit to the entities' revenue that pales in comparison to the State's interest in enforcing the IFPA. (*See* Dkt. 138). The Attorney General broadly rejects Plaintiffs' factual claims that financial institutions will be pushed out of the market if forced to comply with the IFPA, though many of the objections are technical and based on an alleged lack of compliance with the Northern District's local rules for summary judgment statements of material fact. (Dkt. 137 at ¶¶ 48–50).

The intertwined nature of the global payment card ecosystem is also of great significance to this litigation. Both parties admit that under the current system, if the Issuer associated with a transaction is exempt from the IFPA with respect to a transaction, then—to give effect to the Issuer's exemption—other participants in the payment card ecosystem would need relief from the requirements of the IFPA for purposes of that transaction, though the Attorney General notes that said result may not be necessary were the global payment card ecosystem structured a different way. (Dkt. 137 at ¶ 45). Thus, in addition to duking it out over whether financial institutions such as banks and credit unions are exempt from the IFPA, the parties also dispute whether a potential exemption would extend to the other entities as a matter of law, functionality, or equity.

**RSA.6**

The IFPA also contains a Data Usage Limitation provision. This section requires all entities in the transaction—other than Merchants—to "not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). Violations are actionable under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.*

In two separate rulings, this Court granted Illinois Bankers Association's request for a preliminary injunction as to national banks, federal savings institutions, and out-of-state State banks, while denying the request as to federal credit unions, affiliate actors such as card networks, debit card transactions, and out-of-state State financial institutions generally. (Dkts. 104, 115).[1] Specifically, in its merits analysis, this Court found that the National Bank Act and the Home Owners' Loan Act likely preempted the IFPA's application to national banks and federal savings associations, while the Riegle–Neal Interstate Banking and Branching Efficiency Act likely preempted the IFPA's application to out-of-state State banks. (Dkt. 104 at 15–24; Dkt. 115 at 7). This Court rejected the injunctive relief as to federal credit unions under the preemptive standard accorded to the Federal Credit Union Act, as well as to debit card transactions after analyzing the preemptive effect of the Durbin Amendment to the Dodd-Frank Act. (Dkt. 104 at 28–30; Dkt. 115 at 3–7). Nor did the Court agree with Illinois Bankers' arguments as to extending preemptive effect to other entities such as Payment Card Networks, or the Plaintiffs' Dormant Commerce Clause dance as to out-of-state State financial institutions (beyond banks, addressed above). (Dkt. 104 at 30–31; Dkt. 115 at 7–8). Illinois Bankers' state law claims were dismissed under sovereign immunity. (Dkt. 104 at 14). Thus, by February 2025, the IFPA was set to go into effect only as to a handful of the financial actors lawmakers initially set out to regulate.

---

[1] The Court assumes familiarity with those Orders, including its analysis as to the private right of action question not raised by the Parties. (Dkt. 115 at 2).

**RSA.7**

In turn, the Illinois General Assembly extended the effective date of the IFPA from July 1, 2025, to July 1, 2026, likely to account for compliance considerations ahead of this Court's final determination on the merits (and Parties' indication that one or the other or both would inevitably appeal). With that, the Court turns to the development of that determination.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The existence of cross-motions for summary judgment does not "imply that there are no genuine issues of material fact;" rather, the Court must "tak[e] the facts in the light most favorable to the non-movant, first for one side and then for the other," with different legal theories determining which facts are material. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003). A material fact is genuinely disputed when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

At this stage, the Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Summary judgment should be denied when "a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted[.]" *White*, 829 F.3d at 841. In this case, however, the clashes are broadly legal and not factual in nature.

Plaintiffs seek a permanent injunction against the Illinois Attorney General to prevent enforcement of the IFPA against various federal and state financial institutions, as well as the various other participants in the "tightly intertwined payment system," such as card issuers and acquirers. (Dkt. 125 at 3). "Permanent injunctive relief is appropriate if the party seeking the injunction demonstrates (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Vaughn v. Walthall*, 968 F.3d 814, 824 (7th Cir. 2020) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)) (citation modified). Whereas a preliminary injunction requires a probability of success on the merits, permanent relief requires actual success. *Vaughn*, 968 F.3d at 824–25.

## **DISCUSSION**

### I. **Justiciability**

Neither party returned to the drawing board since arguments took place on justiciability at the preliminary injunction stage, when the Court rejected the State's arguments regarding standing and sovereign immunity. (December 20, 2024, Order, Dkt. 104). This Opinion incorporates that analysis in full. (*Id.* at 6–14). At bottom, the State's argument that the Illinois Attorney General lacks the authority to enforce the Interchange Fee Provision sits uncomfortably alongside the Office's longstanding common law authority. (*Id.* at 7–11). While that common law authority does not include the ability to direct the enforcement priorities of States' Attorneys, the redressability prong is nonetheless satisfied when the relief sought would "reduce the probability" of injury."

9

(*Id.* citing *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023)). Thus, Plaintiffs' claims are legitimately before the Court regarding the Interchange Fee Limitation.

The State next contends that the Data Usage Limitation's carve-out for data usage practices that "facilitate or process the electronic payment transaction" sufficiently covers Plaintiffs' conduct and thus invalidates their claims of Article III injury as to that provision of the IFPA. (Dkt. 138 at 6). It is true that it is a threshold requirement in a preenforcement challenge is that the statute "actually cover[s] . . . the desired conduct." *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023). But this Court already determined that Illinois Bankers had sufficiently demonstrated injury for the purposes of standing, and the "burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (internal citations omitted). And the State offers nothing more concrete than the bare assertion that Plaintiffs' activities—such as data usage for rewards programs, fraud protection, and anti-money laundering monitoring—are "probably [] not forbidden" under the statute. (Dkt. 138 at 6; *see also* Transcript of Summary Judgment Oral Argument, Dkt. 174 at 42:6–11). In short: the record on this point remains unchanged since the December 20, 2024, determination.

Of course, given that the IFPA is not yet in effect, Illinois' enforcement track record offers no insights as to the scope of the exception to the Data Usage Limitation, nor has any Illinois court interpreted the statute as a matter of state law. Yet, the Illinois Supreme Court has emphasized the basic principle of interpretation that the "language of the statute must be given its plain and ordinary meaning," *People v. Pullen*, 733 N.E.2d 1235, 1238 (Ill. 2000), considering "the legislature's apparent objective" and presuming it "did not intend to create absurd, inconvenient

10

**RSA.10**

or unjust results." *People v. Christopherson*, 899 N.E.2d 257, 260 (Ill. 2008). Here, the Illinois General Assembly chose not to limit the IFPA to the Interchange Fee Provision, and instead added the Data Usage Limitation. While the Data Usage Limitation does not apply where necessary to "facilitate or process" the transaction itself, a reading that conceives of all of Plaintiffs' conduct as fitting neatly within the exception—as the State suggests—would render the Limitation meaningless. *See Michigan Ave. Nat. Bank v. Cnty. of Cook*, 732 N.E.2d 528, 535 (Ill. 2000); *People v. Jones*, 861 N.E.2d 967, 982 (Ill. 2006). The State's inability to identify where this line would be underscores the unbounded and illogical nature of such an interpretation. The existence of the Data Usage Limitation suggests that the Illinois General Assembly was indeed interested in reigning in financial data usage outside of conduct formally necessary to facilitate a transaction from Point A to Point B. The same conclusion brings Plaintiffs over the finish line with regard to standing.

Finally, the Attorney General maintains that Plaintiffs have not satisfied the "narrow" *Ex parte Young* exception to sovereign immunity. (Dkt. 138 at 4). This Court stands behind the analysis offered in its December 20, 2024, Order. (Dkt. 104 at 13–14). Because the Attorney General has the power to enforce the IFPA, sovereign immunity does not bar Illinois' Bankers federal claims. Illinois Bankers' state law claims, to which sovereign immunity was not waived, were properly dismissed. (*Id.*)

## II. Merits

This is a close case. That is true in part because the law it addresses is novel. The Parties have indicated that no other State has an equivalent to the IFPA, and thus no precedent sits directly on point. That, of course, is a familiar challenge in the judicial system—analogizing from case-to-

11

case sits at the heart of what we do. But what truly makes this case complicated is that the IFPA—specifically the Interchange Fee Provision—does not directly regulate banks.

Of course, the law does say that Issuers and Acquirers "may not receive or charge a [M]erchant any interchange fee" on the portion of a transaction made up of state and local taxes and gratuity. 815 ILCS 151/150-10. As described above, though, all Parties agree that the Issuers and Acquirers do not set those fees; the Payment Card Networks do. And the IFPA puts the onus on Merchants to transmit information about exactly what portion of the transaction that is. *Id.* Further, the statute protects Payment Card Networks—the actual determiners of the fees—from liability based on the Merchants' actions. *Id.* The banks are undoubtedly necessary to the transaction—which, without the banks, could not take place at all—and the interchange fees ostensibly compensate those operations. But the banks do not set those fees.

The heady nature of this case compelled the Court's granting of Illinois Bankers Association's request for a preliminary injunction as to national banks, federal savings institutions, and out-of-state State banks, while denying the request as to federal credit unions, affiliate actors such as card networks, debit card transactions, and out-of-state State financial institutions generally. Compliance with the IFPA will be costly, with declarations indicating potentially business-ending consequences for some members of the market; additionally, Illinois Bankers fairly demonstrated the risk of non-recoverable costs due to State immunity. (Dkt. 104 at 33–34). Public interest considerations weighed on the side of letting a full factual record develop before the IFPA could take effect in the interests of fairness and justice. *Id.* at 35.

At the preliminary injunction stage, the Court's merits analysis favored the Plaintiffs, though it did not grant the injunction as to the requested entities subject to different legal frameworks than national banks, federal savings institutions, and out-of-state State banks. This

12

**RSA.12**

determination reflected the clear downstream impact of the IFPA on national banks and related entities, and erred on the side of honoring Congress' clear intent that whatever State regulation national banks be subjected to not include those that amount to impermissible intrusions. *See Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314–15 (1978) (discussing Cong. Globe, 38th Cong., 1st Sess., 1451 (1864)).

That full factual record has arrived. It makes clear that the facts of this case are unlike any of the key Supreme Court precedents, discussed below, that govern the interplay between State regulation and national financial entities because those cases broadly involve direct interventions into banking operations. Here, the IFPA impacts fees that banks benefit from, but do not set. This fact is underscored by Plaintiffs' own admission that even if national banks *were* exempt from the IFPA, they still would not receive the exempt fee unless every other participant in the transaction, down to completely private entities like Visa and Mastercard, were also exempted from the IFPA's impact. (Dkt. 137 at ¶ 45) (emphasis added). This point is driven home further in Plaintiffs' arguments regarding the portion of the Dodd-Frank Act that states that "[n]o provision of [the NBA] shall be construed as "preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." 12 U.S.C. § 25b(h)(2). That argument is reproduced here:

> Nor are Card Networks such as Visa and Mastercard agents of national banks. "An agent is a person authorized by another, the principal, to act for him or in his place." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 735 (7th Cir. 2011). The Card Networks are the ones that establish rules for their payments systems; they do not carry out the directives of national banks. SOUF ¶¶ 29-30.

(Dkt. 125 at 36).

**RSA.13**

There is no doubt that the IFPA presents complicated compliance challenges. Illinois Bankers submitted numerous declarations from various stakeholders who claim that preparing for the deadline on July 1, 2025, (the original IFPA effective date, now extended one year) is extraordinarily expensive and will drive institutions out of the market. (*See* Dkt. 137 at ¶ 48; *see also* Dkt. 24-2 at 59; Dkt. 24-4 at 5; Dkt. 24-10 at 5; Dkt. 24-15 at 6). Other financial institutions have expressed concerns that compliance costs associated with the 30-day "manual processing" piece of the Interchange Fee Prohibition provision will also be particularly onerous. (Dkt. 24-7 at 4; Exhibit 7, Declaration of Hoyne Savings Bank's CFO); (Dkt. 24-10 at 4) (Exhibit 10, Declaration of Raju Sitaula, Head of Business Execution and Networks at Citibank). If a particular system does not identify a cardholder's account number, for example, a given financial institution may not be able to begin the manual interchange reimbursement process. (Dkt. 24-10 at 4). There are difficult questions of staffing, resources, implementation timelines, enforcement, and practicality. While declarations from Visa and Mastercard executives indicate compliance could theoretically be possible, they suggest it might take months if not years to achieve, be extraordinarily expensive, and require system-wide modifications. (*See generally* Dkt. 24-13, Exhibit 13, Declaration of Visa Senior Vice President; Dkt. 24-12, Exhibit 12, Declaration of Mastercard Co-President, United States). It is an open question whether the transaction process could adapt to the impact of the IFPA in time.

Ultimately, though, that is not the question in front of this Court. Instead, the question is whether or not federal law preempts the IFPA, to what entities, and to what extent. Addressing

14

**RSA.14**

Plaintiffs' request for permanent injunction, the Court broadly grants the request as to the Data Usage Provision, while denying the request as to the Interchange Fee Provision.

    *a. Applicability of the Interchange Fee Provision to Nationally Charted Banks and Federal Savings Institutions*

The bulk of this dispute rises and falls with one question: whether the National Bank Act, 12 U.S.C. § 1 *et seq.*—and the legal standard for preemption it carries—protects nationally chartered banks from IFPA enforcement.[2] A bank that obtains a federal charter under the National Bank Act gains express powers that include the power to "make contracts," to "sue and be sued," and to "elect or appoint" a "board of directors; it also gains "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24.

Under the NBA, Congress created a "mixed state/federal regime[ ] in which the Federal Government exercises general oversight while leaving state substantive law in place." *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 530 (2009). While once upon a time the Court indicated that the NBA functionally indicated field preemption, *see Easton v. Iowa*, 188 U.S. 220, 230 (1903) ("Such being the nature of these national institutions, it must be obvious that their operations cannot be limited or controlled by state legislation"), the case law has evolved to permit some State control over federally chartered banks. *See, e.g.*, *Van Allen v. Assessors*, 70 U.S. (3 Wall.) 573, 589

---

[2] Dodd-Frank also placed federal savings associations on equal footing with national banks with respect to preemption by providing that any determination regarding the preemption of state law by the Home Owners' Loan Act must "be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law." 12 U.S.C. § 1465. As noted in the Court's earlier rulings, the parties agree that the preemption standard governing the NBA and HOLA is the same, *see* 12 U.S.C. § 1465(a), and that HOLA gives federal savings associations comparable powers to those the NBA grants national banks. (Dkt. 24 at 28; Dkt. 76 at 19). Thus, the fate of federal savings associations is tied to that of national banks.

(1865); *Anderson Nat. Bank v. Luckett,* 321 U.S. 233, 247–252 (1944); *Franklin Nat. Bank of Franklin Square v. New York,* 347 U.S. 373, 375–379 (1954).

Then, after the 2008 financial crisis, Congress and President Obama enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, one provision of which established the applicable preemption standard for when a "State consumer financial law" is preempted as to national banks. *Cantero v. Bank of Am., N. A.*, 602 U.S. 205, 210 (2024) (addressing 12 U.S.C. § 25b). The statute explicitly ruled out field preemption. § 25b(b)(4). Rather, Congress stated that the National Bank Act preempts a state law "'only if the state law (i) discriminates against national banks as compared to state banks; or (ii) 'prevents or significantly interferes with the exercise by the national bank of its powers,' " in accordance with the *Barnett Bank* standard. *Cantero*, 602 U.S. at 213–14. While "national banks are not wholly withdrawn from the operation of State legislation," they are "exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions" that federal law authorizes them to perform." *Cantero*, 602 U.S. at 219 (cleaned up).

*Cantero* itself came about in light of a circuit split over how exactly to implement the Dodd-Frank *Barnett Bank* directive. The Supreme Court granted certiorari after the Second Circuit conceived of the test as "whether enforcement of the law at issue would exert control over a banking power—and thus, if taken to its extreme, threaten to 'destroy' the grant made by the federal government." *Cantero v. Bank of Am., N.A.*, 49 F.4th 121, 132 (2d Cir. 2022). While the Court did not specifically combine its review of *Cantero* with any other case, the Second Circuit's approach stood in stark contrast to analysis coming out of the Ninth Circuit, which focused on the economic impact of State intervention, suggesting in one case that a state law setting certain rates must be "punitively high" to not comply with *Barnett Bank*. *See Kivett v. Flagstar Bank, FSB,*

16

2022 WL 1553266, at *1 (9th Cir. May 17, 2022), *cert. granted, judgment vacated sub nom.* *Flagstar Bank, N.A. v. Kivett*, 144 S. Ct. 2628 (2024); *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1195 n.7 (9th Cir. 2018). Both the New York law and the California law at issue in those cases dealt with interest-on-escrow laws that required banks and other mortgage lenders to pay a minimum annual interest on borrowers' deposited funds. The Second Circuit determined the New York law preempted under NBA *Barnett Bank* analysis, whereas the Ninth Circuit found the California law amounted to acceptable State interference.

The Supreme Court in *Cantero* rejected the Second Circuit's brightline approach as too favorable to national banks, deeming it a "categorical test that would preempt virtually all state laws," while simultaneously holding that the petitioners' position "would yank the preemption standard to the opposite extreme and would preempt virtually no non-discriminatory state laws." *Cantero v. Bank of Am., N. A.*, 602 U.S. 205, 220–21 (2024). Beyond that direction, though, the Court did not specifically answer the preemption question with regard to the New York law. Instead, the Court instructed that courts must make "a practical assessment of the nature and degree of the interference caused by a state law" in light of the preemption cases relied on in *Barnett Bank. Id.* at 219–21. These cases, totaling seven, provided four examples of preempted interference: *Franklin National Bank of Franklin Square v. New York,* 347 U.S. 373 (1954); *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982); *First National Bank of San Jose v. California*, 262 U.S. 366 (1923); as well as *Barnett Bank* itself. The second category consists of cases of acceptable interference: *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944); *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353 (1869); and *McClellan v.*

17

**RSA.17**

*Chipman*, 164 U.S. 347 (1896). *Id.* at 220. *Cantero* further detailed the interplay between these precedents:

> In *Barnett Bank* and each of the earlier precedents, the Court reached its conclusions about the nature and degree of the state laws' alleged interference with the national banks' exercise of their powers based on the text and structure of the laws, comparison to other precedents, and common sense. *See, e.g., Barnett Bank of Marion Cty., N. A. v. Nelson*, 517 U.S. 25, 33–35 (1996) (comparing Florida law at issue to New York law in *Franklin*); *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373, 378 (1954) (concluding that New York law interfered with ability to use "a particular label" that federal law "specifically selected"); *First National Bank of San Jose v. California*, 262 U.S. 366, 370 (1923) (reasoning that customers "might well hesitate" to subject their deposits to "unusual" California law); *Anderson National Bank v. Luckett*, 321 U.S. 233, 247–248 (1944) (determining that no "word in the national banking laws ... expressly or by implication conflicts with the provisions of the Kentucky statutes"); *id.*, at 249–252, (comparing the likely effect of the Kentucky law to the likely effect of the California law in *First National Bank of San Jose*).

*Id.* at 220 n.3.

The Court remanded *Cantero* to the Second Circuit to conduct this "nuanced comparative analysis." *Id.* It also vacated the Ninth Circuit's decision in *Flagstar* and remanded "for further consideration in light of *Cantero*[.]" *Flagstar Bank, N.A. v. Kivett*, 144 S. Ct. 2628 (2024). The Second Circuit heard oral argument on March 3, 2025, with its ruling apparently forthcoming as of writing.[3] The Ninth Circuit, similarly, has not revisited the merits of its decision in *Flagstar* in light of *Cantero*.[4] Indeed, at this Court's preliminary injunction determination, it was one of the first courts in the country to apply *Cantero*.

This September, the First Circuit became the first Court of Appeals to dive into the meat of a *Barnett Bank* analysis post-*Cantero*. *Conti v. Citizens Bank, N.A.*,

---

[3] Oral Argument, *Cantero v. Bank of Am., N.A.; Hymes v. Bank of Am., N.A.*, Nos. 21-400, 21-403 (2d Cir. Mar. 3, 2025), audio and transcript available at https://www.courtlistener.com/audio/97514/cantero-v-bank-of-america-na-hymes-v-bank-of-america-na/.

[4] Subsequent developments in this case involve technicalities related to Ninth Circuit precedential procedures and are thus not particularly informative for the present matter. On initial remand, the Ninth Circuit affirmed its decision in *Flagstar* because *Flagstar* was governed by *Lusnak*, and *Lusnak* was not "clearly irreconcilable" with intervening higher authority. *Kivett v. Flagstar Bank, FSB*, 154 F.4th 640, 644 (9th Cir. 2025). In October 2025, a Ninth Circuit

18

157 F.4th 10, 13 (1st Cir. 2025). Like *Flagstar* and *Cantero*, *Conti* dealt with an interest-on-escrow State law, this one out of Rhode Island. There, the district court had granted Citizens Bank's motion to dismiss a breach of contract suit for violating the Rhode Island ground, determining—pre-*Cantero*—that the state law failed on preemption grounds. The First Circuit noted that that in *Barnett Bank* and *Fidelity*, the Supreme Court's preemption inquiry turned on an express conflict between federal and state law, whereas Citizens Bank's argument required an intent-by-silence analysis—that Congress's silence reflected a "deliberate choice" to exempt national banks from State interest-on-escrow laws. *Conti*, 157 F.4th at 20–21. The First Circuit found that not only did the intent-by-silence argument have no parallel in the precedents, but that neither had Citizens established that Rhode Island's statute was out of step with the federal statutory scheme in the mold of *First National Bank of San Jose* and *Franklin*. The First Circuit further noted that Citizens incorrectly characterized NBA preemption as applying "whenever a state law dictates the terms of banking product in a manner that limits a national bank's flexibility and efficiency," instead highlighting the practical analysis at play in *First National Bank of San Jose, Anderson*, and *Franklin*. *Id.* at 26, 28.

Turning then back to the IFPA: Illinois Bankers identify two key powers with which the IFPA's Interchange Fee Provision interferes. First, a "national bank may charge its customers non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002(a). Second, Plaintiffs argue that the Interchange Fee Prohibition prevents or significantly interferes with the powers to process card transactions, receive deposits, and make loans through credit cards,

---

panel determined on rehearing that the "clearly irreconcilable" question was properly decided, holding that "*Cantero* is not clearly irreconcilable either with the reasoning or the result in *Lusnak*." *Id.* at 645. Thus, the panel could not address the preemptive question anew, noting that "We do not hold that *Lusnak* was correctly decided, only that we have no authority to overrule it. Correction in this court, if any is warranted, is only appropriate through our en banc procedures." *Id.*

19

RSA.19

powers incidental to the business of banking under the NBA. 12 C.F.R. § 7.1000(d)(1); *see also* OCC Inter. Ltr. 689, 1995 WL 604271, at *1 (Aug. 9, 1995). This Court found that Plaintiffs made the necessary "strong showing" of preemption due to a conflict between the IFPA's Interchange Fee Provision and these powers in its December 20, 2024, Order. (Dkt. 104 at 16). That holding was necessary in order to let a full record develop, now in front of the Court today.

If the IFPA directly interfered with fees the banks directly charged, this would be a far simpler case. That hypothetical looks far more like cases out of the Ninth and Eleventh Circuits that executed preemptive analyses on 12 C.F.R. § 7.4002(a) and found in favor of the financial institutions. The Ninth Circuit found municipal ordinances prohibiting ATM fees on non-depositors preempted under the NBA because federal law made "no distinction between depositors and non-depositors with respect to a national bank's authority to collect fees for provision of authorized services." *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 20, 2002). Similarly, the Eleventh Circuit found NBA preemption applied where a Florida law banned banks from imposing check cashing fees on those without accounts at the bank because 12 C.F.R. § 7.4002 had the "significant objective [of allowing] national banks to charge fees and [allowing] banks latitude to decide how to charge them." *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.2 (11th Cir. 2011).

But in both *Baptista* and *San Francisco*, the regulations directly restricted banks' ability to charge fees for their direct services—the exact power that the federal regulation protects. But banks do not set, or arguably charge, interchange fees; rather, they receive them. Further, the laws that the Ninth and Eleventh Circuits analyzed functionally required the national banks to provide their services for free to a wide swath of the populace, serving as the "effective deterrent to depositors"

20

**RSA.20**

that the Supreme Court has repeatedly emphasized as a factor indicating NBA preemption, *see infra*. The IFPA, by contrast, does not impact a customer's decision of whether or not to use a bank's services, because all financial entities are subject to the law. Thus, *Baptista* and *San Francisco* are helpful, but not all that compelling in that the regulated entity in those cases was the bank itself.

The *Conti* decision deemed *Barnett Bank* and *Fidelity* "generally inapposite" in that those cases dealt with express conflicts between federal and state law. *Conti*, 157 F.4th at 20.[5] *Franklin* also contained clear textual conflict, though the Court also relied on "the overall federal scheme established by Congress." *Id.* at 23. This is where the IFPA and the Rhode Island law in *Conti* start to diverge.

As noted above, the Court's earlier order found express conflicts between the aforementioned powers and the NBA. As the Attorney General has since pointed out, however, the conflict is not so black-and-white. The parties all agree that the interchange fees are set and calculated by Payment Card Networks like Visa and Mastercard, not by national banks themselves. Plaintiffs' best argument is that payment networks set rates so that national banks can "charge [their] customers non-interest charges and fees." 12 C.F.R. § 7.4002(a). It is a fair contention. On one hand, it would be illogical for a national bank to lose its fee-related powers in any activity that inherently involves interaction with third-party actors such as Payment Card Networks. But on the other: by that reasoning, national banks could shield a vast amount of their otherwise regulatable activities from State regulation by hiding behind third-party entities like the credit card companies.

---

[5] As the First Circuit did in *Conti*, this Court can broadly dispose of the *McClellan* and *Commonwealth* precedents, as each dealt with generally applicable state laws and not those that specifically sought to regulate banks.

21

**RSA.21**

And it is these companies that are doing the calculations on behalf of the banks, which only have a passive role in the rate-setting. As Plaintiffs' expert detailed:

> Networks develop fee schedules that establish the applicable interchange rate for transactions that utilize the network, based on various factors such as the card type and merchant type. Interchange fees are a function of various considerations, including the card product (credit, debit, prepaid), card type (premium rewards card vs. standard, etc.), issuer (financial institutions covered by the Durbin Amendment vs. those that are exempt), merchant category (grocery store, restaurant, etc.), and use method (card-present vs. card-not-present), among other considerations. Interchange fees vary across card brands, card products, card types, and authorization methods. Interchange fees typically comprise both a fixed fee and a percentage of the transaction amount, where the transaction amount represents the entire amount of a given transaction (including tax and gratuity, if any).

(Exhibit A, Plaintiffs' Expert Report of Tony Hayes; Dkt. 124 at 14).

It is undeniable that State intervention into national bank fee arrangements should be subject to legitimate scrutiny. After all, it involves an express power, and the decisions in *Baptista* and *San Francisco* offer further insight into the necessity of ensuring national banks can operate at their full, congressionally authorized scope. But while that argument definitively protects national banks from intrusion into the fees they charge on their ATMs and savings account services, it is hard to square with a state law that impacts a fee that those same banks do not set and that are not keyed to their particular services. 12 C.F.R. § 7.4002(b) specifically directs that the "establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." That is hard to square with a system where Visa and Mastercard do the actual work of fee-setting all for the banks to collect a check. It is even

22

**RSA.22**

harder to say that type of fee-setting is such a cornerstone of national banking power as to preempt all State intervention.

In fact, if the IFPA is not a viable legislative choice, it is hard to see *any* route by which a State could impact a national bank's fees. That is not a matter for this Court as an issue of policy, but in a world where Congress explicitly ruled out field preemption by adopting the *Barnett Bank* standard, it is a note worthy of consideration. Thus, the Court is left with the conclusion that the IFPA's Interchange Fee Provision does not directly conflict with NBA powers—but nor is that the end of the road. The Supreme Court has explicitly highlighted that express conflict is not a requirement for NBA preemption to apply. *See Cantero*, 602 U.S. at 220 n.3 (identifying other relevant considerations as "the text and structure of the laws, comparison to other precedents, and common sense").

The Court's analysis turns next to the seminal case for which NBA preemption is named. The conflict present in *Barnett Bank* itself dealt with a Florida state law stating that "banks cannot sell insurance in Florida—except that an *unaffiliated* small town bank (*i.e.,* a bank that is not affiliated with a bank holding company) may sell insurance in a small town," which the Court found to be in direct conflict with "a federal statute that sa[id] that certain national banks "may" sell insurance in small towns." *Barnett Bank of Marion Cnty., N.A.*, 517 U.S. at 28–29.

In *Fidelity*, California law "limited a federal [financial] association's right to exercise a due-on-sale provision to those cases where the lender can demonstrate that the transfer has impaired its security," which the Court deemed a conflict with federal regulation that "plainly provide[d] that a federal savings and loan 'continues to have the power' to include a due-on-sale clause in a loan instrument and to enforce that clause 'at its option.' " *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 154–55. Finally, in *Franklin*—which *Cantero* deemed the "paradigmatic example of

23

**RSA.23**

significant interference"—the Court found that a New York law prohibiting banks from using the words "savings" or "savings" in their advertising and business operations conflicted with federal law authorizing national banks to receive savings deposits. *Franklin*, 347 U.S. at 374.

*Fidelity* was an earlier case, but notably, the relevant conflict was not as extreme as the California law at issue in *Barnett Bank*. The Court noted that "compliance [with both] may not be a 'physical impossibility' " but noted that the California law deprived the federal financial institutions of the flexibility provided by federal law. *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 155. It also noted that the federal regulators had recently "reiterated [a] long-standing policy of authorizing federal savings and loan associations to enforce due-on-sale clauses subject only to express limitations imposed by the Board." *Id.* (cleaned up). Similarly, in *Franklin*, the New York law did not actually impede national banks' ability to take savings deposits, it just impacted the advertising and business operations around them. *Franklin*, 347 U.S. at 378. Nevertheless, the Supreme Court found significant interference, noting that advertising is "one of the most usual and useful of weapons" in business and that "[i]t would require some affirmative indication [from Congress] to justify an interpretation that would permit a national bank to engage in a business but g[i]ve no right to let the public know about it." *Id*. at 377–78.

The conflict at issue in *Barnett Bank* itself involved a ban on most national banks from selling insurance in places that federal law permitted them to do so, whereas the Interchange Fee Provision does not ban national banks from charging fees. Neither does it ban them from utilizing their powers to process card transactions, receive deposits, and make loans through credit cards. Thus, the facts of the case itself do not offer a particularly helpful parallel. Instead, *Franklin* and

24

**RSA.24**

*Fidelity* are more analogous. In both cases, the State law impeded, but did not ban, exercise of a federal power.

Looking first to *Fidelity*: just as the State law there restricted the circumstances in which a federal financial institution could exercise a specific federal power, the Interchange Fee Provision restricts banks from charging these fees on the portion of a transaction that includes state and local taxes and gratuities. This Court noted in its December 20, 2024, Opinion that this part of the IFPA deprives banks of flexibility as in *Fidelity*, but as the First Circuit also observed, that alone cannot be sufficient grounds for preemption, for it "would obviate the need for an inquiry into whether a state law's interference with federal-banking powers was significant." *Conti*, 157 F.4th at 25.

It is also relevant that under the IFPA, the bank can still charge the fee as it would in any other state, which might fairly distinguish the IFPA from the intervention in *Fidelity*. Yet it is also true that the *Fidelity* Court highlighted the federal regulatory agency's observation that the elimination of the due-on-sale clause would "have an adverse effect on the earning power and financial stability of Federal associations," *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 168, a note that might suggest *any* impact on the earning power of national banks would be sufficient to find preemption. But that can't be right, as the *Cantero* Court identified multiple examples of acceptable State intervention that would inherently impact national bank revenues, nor do courts maintain the same deference toward agency assertions as in decades past. *Compare Fid. Fed. Sav. & Loan Ass'n* at 169–70 ("As judges, it is neither our function, nor within our expertise, to evaluate the economic soundness of the Board's approach) *with Loper Bright Enters. v. Raimondo*, 603 U.S.

**RSA.25**

369, 386 (2024) ("The views of the Executive Branch could inform the judgment of the Judiciary, but did not supersede it.").

That leaves *Franklin*, which is best put into conversation with the State laws addressed in *First National Bank of San Jose* and *Anderson.* In *First National Bank of San Jose*, California law required deposits unclaimed for over twenty years to escheat to the state. 262 U.S. at 366. The Court found the law preempted, noting that the law would "directly impair" national banks' deposit collection, and reasoning that "[t]he success of almost all commercial banks depends upon their ability to obtain loans from depositors, and [banks] might well hesitate to subject their funds to possible confiscation." *Id.* at 369–370. But unlike the California law, the Kentucky law in *Anderson* required the state to produce proof that seized accounts had been abandoned. *Anderson*, 321 U.S. at 250. While the California law allowed a "confiscation"—"so unusual and so harsh" that it would serve as an "an effective deterrent to depositors"—the law in *Anderson* was "nothing more than performance of a duty by the bank" that is "as old as the common law itself," one that would not run the risk of deterring customers from placing funds in national banks. *Id.* at 250–252. The New York law in *Franklin*, by comparison, functionally deterred depositors, in the sense that without the word "savings," they might not know to what type of accounts the national banks provided access.

*Franklin*, as well as the commentary from *First National Bank of San Jose* and *Anderson*, ultimately sways this Court. The New York law at issue in *Franklin* did not impede national banks' powers directly, but proved so disruptive to the advertising and business practices around those powers that the Court found NBA preemption applied anyway. The Interchange Fee Provision is indisputably disruptive, requiring additional investments, hires, and new procedures to replace the current process for authorizing and settling debit and credit card transactions. But those procedural

26

**RSA.26**

changes are the product of an ecosystem built by Payment Card Networks and financial institutions to facilitate consumer transactions. And these entities understand the onus of IFPA compliance is on them. The Mastercard Co-President, for instance, noted that Mastercard faces millions of dollars in technical compliance costs to create new data fields and processes to distinguish the tax and gratuity amounts from the base transaction, a process that would be "largely fruitless" if not matched by Merchants' investments of their own. (Dkt. 24-12 at 9–10).

The statutory scheme does put national banks directly in the spotlight in the manual provision of merchant reimbursement. Recall, merchants have six months to submit tax documentation if they do not automatically provide it as part of the initial process (a technical capacity that the Mastercard and Visa Declarations indicate does not currently exist, but could possibly exist through additional investment). If Merchants opt into the manual option, they must submit tax documentation to the Acquirer bank or its designee. 815 ILCS 151/150-10(b). This triggers a monthlong window for the Issuers to credit the Merchant the amount of interchange fees charged on the tax or gratuity amount of the transaction. *Id.* But the statute does not indicate how the two entities transmit the information to one another.

These compliance costs, among others, are undeniable. But State (and federal) laws will always require some kind of compliance cost, no matter who bears it. And these costs, however staggering, do not speak to the core snag in Plaintiffs' case—third parties set the fees. That is fundamentally different from banks' procedures relating to *Franklin*'s savings accounts that Congress explicitly authorized them to offer to the public.

The Payment Card Networks built this ecosystem, and the Payment Card Networks set these fees. To claim that the IFPA Interchange Fee Provision impermissibly interferes with the powers set out in 12 C.F.R. § 7.4002—which "should be arrived at by each bank on a competitive

27

**RSA.27**

basis and not on the basis of any agreement" —does not add up in the face of that reality. The thrust of 12 C.F.R. § 7.4002 is not to protect fees centrally established by a third-party company. The Office of the Comptroller of the Currency labeled the IFPA "bad policy." (Amicus Brief, Dkt. 61-1 at 1). That may well be true. But even the Office of the Comptroller does not meaningfully contest that the third parties set the fees, instead highlighting that national banks' incidental powers to include the settlement of credit and debit card payment transactions by banks for Merchants through various card associations. (*Id.* at 7).

Accordingly, Illinois Bankers request for a permanent injunction finding that the IFPA's Interchange Fee Limitation violates the federal rights of national banks under the *Barnett Bank* standard—and therefore also federal savings associations—is denied.

b. *Applicability of the Data Usage Limitation Provision to Nationally Charted Banks and Federal Savings Institutions*

Illinois Bankers also seek to make permanent this Court's determination at the preliminary injunction stage that the NBA preempts the IFPA's Data Usage Limitation provision. (Dkt. 104 at 22–24). The Data Usage Limitation makes it unlawful for "[a]n entity, other than the merchant" involved in a transaction to "distribute, exchange, transfer, disseminate, or use" the associated data "except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). Violations are actionable under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.* Illinois Bankers argue this part of the IFPA conflicts with national banks' broad power to process data—which includes "anything of value in banking and financial decisions"—as well as the role of data-processing in providing credit and debit card processing services. 12 C.F.R. §§ 7.5006; 7.1000(d)(1). (As described above, the preemptive analysis for federal savings institutions mirrors that of the NBA under HOLA. Federal savings

28

**RSA.28**

associations enjoy the power to engage in "data processing" that is "generally finance-related." 12 C.F.R. § 5.59(f)(2)(vi). Therefore, the below analysis applies to both types of federal institutions.)

The IFPA's Data Usage Limitation provision directly constrains these powers. The state law makes it unlawful for "[a]n entity, other than the merchant" involved in a transaction to "distribute, exchange, transfer, disseminate, or use" the associated data "except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). The IFPA's Data Usage Limitation would not only limit the federal institution's power, but, in many respects, wholly eliminate it. For example, according to the American Bankers Association, which includes over 1,100 banks headquartered in Illinois alone, data from credit card transactions is used for many purposes beyond "facilitate[ing] or process[ing]" electronic payment transactions. (Dkt. 24-2 at 7). These purposes include aggregating transaction data to monitor credit card fraud, address payment disputes, and facilitate cardholder loyalty programs. (Dkt. 24-2 at 7–8).

The Attorney General recycles many of the aforementioned standing arguments about the Data Usage Limitation, claiming that Plaintiffs cannot demonstrate any interference where they have not shown that the limitation covers their conduct. (Dkt. 138 at 13). But the federal power to use data is express, and it permits the processing and use of data whether or not it comes from particular transactions. Unlike the prior provision, the scope of the conflict is not a close call.

The Illinois General Assembly may have fair questions about the privacy and usage of its citizens' data. Those questions are well within policymakers' purview. But the answers need be confined within the bounds set out by the Supremacy Clause and downstream doctrines, including federal preemption. That mark was not met here. Thus, Illinois Bankers have demonstrated as a matter of law that the IFPA's Data Usage Limitation violates the federal rights of national banks—

29

**RSA.29**

and therefore also federal savings associations—and is preempted by the NBA under the *Barnett Bank* standard. The permanent injunction as to the Data Usage Limitation is granted.

### c. Out-of-State State Banks

Illinois Bankers also assert that part of the Riegle–Neal Interstate Banking and Branching Efficiency Act's statutory framework—codified at 12 U.S.C. § 1831a(j)(1)—preempts the IFPA with respect to out-of-state State banks to the extent it is preempted to national banks. (Dkt. 24 at 9).

The federal statute states:

> The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank. To the extent host State law is inapplicable to a branch of an out-of-State State bank in such host State pursuant to the preceding sentence, home State law shall apply to such branch.

12 U.S.C. § 1831a(j)(1).

The statute's plain language clearly suggests that § 1831a(j)(1) is meant to ensure that out-of-state State banks can compete with nationally chartered banks. This means that any injunctive relief the Court grants with respect to nationally chartered banks, excluding out-of-state State banks from that relief would run afoul of § 1831a(j)(1).

Additionally, other courts have applied the statute similarly. In *Pereira v. Regions Bank*, the Eleventh Circuit concluded that § 1831a(j) preempted a Florida statute as to out-of-state State banks, after it previously determined that the state law was preempted with respect to nationally chartered banks. 752 F.3d 1354, 1356 (2014). Like in *Pereira*, here, the Court previously concluded that the NBA likely preempts a state statute, (Dkt. 104 at 37), and therefore, it follows that § 1831a(j) preempts the law as to out-of-state State banks. Indeed, even the State concedes

30

**RSA.30**

that § 1831a(j)(1) is applicable if the Court finds that the NBA preempts IFPA—which the Court did in its December 2024 Order. (Dkt. 76 at 35, n. 15; Dkt. 104 at 16–22).

Because the Court found that the NBA preempts the IFPA's Data Usage Limitation with respect to federal banks, applying § 1831a(j)(1), this portion of the IFPA is also preempted with respect to out-of-state State banks. As with national banks, the request for an injunction as to the IFPA's Interchange Fee Provision is denied.

### d. Federal Credit Unions

Illinois Bankers also seek an injunction as to federal credit unions. The FCUA authorizes federal credit unions to make contracts and loans and to issue lines of credit to its members. 12 U.S.C. §§ 1757(1), (5); 12 C.F.R. § 701.21. The Act "preempts any state law purporting to limit or affect" certain aspects of "Federal credit union loans and lines of credit (including credit cards) to members." 12 C.F.R. § 701.21(b). Illinois Bankers claim that FCUA preempts the IFPA because the federal statute gives (i) the National Credit Union Administration (NCUA) "exclusive authority [...] to regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members" and (ii) the "incidental power" to engage in data processing. 12 C.F.R. §§ 701.21(a)–(e); *see also Nat'l Ass'n of State Credit Union Sup'rs v. Nat'l Credit Union Admin.*, 188 F.3d 228 (4th Cir. 1999) (affirming district court decision, which explained that the NCUA can promulgate preemptive regulations).

As previously noted, the Court's preliminary injunction as to both provisions of the IFPA did not apply to federal credit unions under the preemptive standard accorded to the Federal Credit Union Act ("FCUA"). The Court's decision rested on ordinary principles of conflict preemption in accordance with Illinois Bankers' contentions. (Dkt. 24 at 30–31). The Court found that neither

31

**RSA.31**

provision of the IFPA conflicted with Plaintiffs' proposed express and incidental federal credit union powers to such an extent that the State law could not still stand.

Now, Illinois Bankers present a new argument: that the FCUA is not governed by ordinary preemption principles but instead is subject to the *Barnett Bank* standard despite the lack of textual reference in the governing statute. Plaintiffs suggest that the express preemption provisions in the NBA and HOLA codify longstanding preemption principles for federal instrumentalities, of which federal credit unions also benefit. But Plaintiffs' main citation for the claim that courts "routinely extend" NBA preemption to other federal instrumentalities is *Fidelity*, which itself dealt with the predecessor of the federal savings associations that the HOLA governs, and dealt with circumstances more akin to express preemption. (Dkt. 125 at 24). At the same time, Illinois Bankers espouse the view that the express preemption provision in HOLA is a limiting statute, not an expansion statute, because federal savings associations had been receiving a broader preemptive deference than national banks. (Dkt. 174 at 35). The two concepts do not cleanly align—if there was a consistent understanding that all federal financial instrumentalities received *Barnett Bank* preemption, then there would have been no need to limit the historic preemption status of federal savings associations.

Other circuits have fairly held that federal credit unions are federal instrumentalities. *See TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 935 (1st Cir. 1995) (addressing the bankruptcy context); *United States v. Michigan*, 851 F.2d 803, 807 (6th Cir. 1988) (addressing the Supremacy Clause context). But that leaves a gap between federal instrumentality status, and whether some special preemption applies. This is where Illinois Bankers fall short. They ask the Court to read— in the absence of specific Congressional designation—the full strength of NBA preemption into the FCUA based on vague gestures at other federal entities. Yet Congress could have explicitly

given federal credit unions comparable treatment to national banks and federal savings associations and chose not to do so. The omission is all the more glaring in the context of the Supreme Court's 2007 decision in *Watters v. Wachovia*, which for the first time extended the preemptive reach of the NBA to a subsidiary of a national bank when engaged in the "business of banking." 550 U.S. 1, 21 (2007).

In the Dodd-Frank Act of 2010, Congress reached past *Watters* to pull the *Barnett Bank* standard back to the statutory forefront of the NBA for State consumer protection laws, while also specifically including that the express preemption clause must not "be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." 12 U.S.C. § 25b(h)(2). It would be quite the stretch to assume that Congress was incorrectly specific in determining which entities received the NBA preemption standard, and no court has held that the *Barnett Bank* preemption standard applies to federal credit unions in the face of this statutory absence. This Court declines to be the first. *See also Fed. Nat. Mortg. Ass'n v. Lefkowitz*, 390 F. Supp. 1364, 1371 (S.D.N.Y. 1975) (holding that the state statute at issue "does not impose such a burden on the performance of [Fannie Mae's] function as to invalidate the statute," an analysis that reads like conflict preemption analysis, despite Plaintiffs' contentions to the contrary).

The Court's conflict preemption analysis at the preliminary injunction stage remains its final assessment of the IFPA's Interchange Fee Provision as it applies to federal credit unions. (Dkt. 115 at 3–7.) As the Court previously found, the FCUA's preemption clause for state laws addressing "[c]losing costs, application, origination, or other fees" does not appear to implicate the substance of the Interchange Fee Provision. 12 C.F.R. § 701.21(b)(1)(i)(C). Illinois Bankers highlight that this preemptive effect includes state laws "purporting to limit or affect . . . "[r]ates

33

**RSA.33**

of interest and amounts of finance charges," "[c]losing costs, application, origination, or other fees," and "[c]onditions related to … [t]he amount of the loan or line of credit." *Id.* § 701.21(b)(1)(i)(A), (i)(C), (iii)(A). But not unlike the downfalls for the NBA analysis, laid out above, the Interchange Fee Provision does not so intrude on the FCUA powers as to justify a finding of preemption. (*See also* Dkt. 115 at 3–7).

Upon further review of the Data Usage Limitation preemption analysis, however, this Court finds that the FCUA's grant of incidental power to federal credit unions does, in fact, preempt this part of the IFPA's application. Illinois Bankers point to named powers such as the power to engage in "[e]lectronic financial services," including "account aggregation services" and "data processing," activities that Plaintiff utilize for fraud detection and developing reward programs. 12 C.F.R. § 721.3(d), (e).

Conflict preemption occurs when "state law . . . constitutes an 'obstacle' to satisfying the purposes and objectives of Congress." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 650 (7th Cir. 2019). Here, the Data Usage Limitation disrupts federal credit unions' ability to proceed in those named powers in a meaningful way. And Illinois Bankers have shown that applying the statute would "do 'major damage' to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020); (*see* Dkt. 125 at 28).

e. *Debit Card Transactions*

Illinois Bankers also seek an injunction against the IFPA Interchange Fee Prohibition as applied to debit card transactions. At the preliminary injunction stage, the Court determined there was no conflict between the Dodd Frank Act's Durbin Amendment and the Interchange Fee Prohibition because the federal regulation creates only a "maximum permissible" interchange fee. (Dkt. 104 at 30). Illinois Bankers maintain their argument for appeal that this is a fixed standard

with which the IFPA conflicts. (Dkt. 125 at 38). Finding no reason to stray from its prior determination, this Court adopts its preliminary analysis on this point in full. (Dkt. 104 at 28–30).

### f. Out-of-State State Financial Institutions (Beyond Out-of State State Banks, addressed in Subsection C)

Since the National Banking Act's enactment in 1893, the United States has been home to a dual banking system. In line with this tradition, nearly every State has enacted what are termed "wildcard" or parity statutes—state laws that "generally grant state-chartered banks the same powers given to national banks and treat state banks like national banks in other ways." U.S. GOV'T ACCOUNTABILITY OFF., GAO-06-387, OCC PREEMPTION RULES: OCC SHOULD FURTHER CLARIFY THE APPLICABILITY OF STATE CONSUMER PROTECTION LAWS TO NATIONAL BANKS (2008). Illinois is one such state, with State law giving in-state State banks, savings and loan associations, and credit unions powers coterminous with the powers of their national counterparts. *See* 205 ILCS 5/5(11); 205 ILCS 205/6002(a)(11); 205 ILCS 305/65. Both parties agree on this. (Dkt. 174 at 17, 73). Illinois Bankers contend, however, that these Illinois parity statutes amount to a violation of the Dormant Commerce Clause when paired with the IFPA. (Dkt. 125 at 21). In their view, the parity statutes extend the preemptive effect of the NBA to in-state Illinois financial institutions, thus exempting them from the Data Usage Provision alongside their national counterparts. This, in turn, leaves out-of-state State financial institutions—other than those exempted via Riegle–Neal at 12 U.S.C. § 1831a(j)(1)—out in the cold. Illinois Bankers deems this "blatant discrimination" unconstitutional. (Dkt. 125 at 21).

Congress has the power to "regulate Commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. But the Commerce Clause has long been understood to include a negative command, one that prohibits states from passing laws that "unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). The dormant

35

**RSA.35**

Commerce Clause's existence is mostly uncontroversial; its boundaries are not. This case is no exception.

For its part, the Attorney General insists that Illinois Bankers' interpretation of the parity statutes involves the state law claims that this Court previously dismissed on sovereign immunity grounds, barring this Court's adjudication of the issue in its entirety. (Dkt. 138 at 31). Alternatively, the State contends that if the Court does reach the issue, Illinois statutory interpretation principles would lead the severability clause of the IFPA to override the parity statutes and equally subject in-state Illinois financial institutions and out-of-state State counterparts to the law's applicability. (Dkt. 174 at 78). The Attorney General's office did not meaningfully attempt to defend against the Dormant Commerce Clause arguments in briefing nor on the record at oral argument. (*See id.* at 72–75).

The problem with the Dormant Commerce Clause argument, though, is that Plaintiffs effectively allege discrimination in a State's inability to legislate nationally. That makes no sense. The Illinois General Assembly cannot bestow powers upon Iowa and Kentucky banks any more than the Texas legislature can direct California banks on how to run their savings accounts. Indeed, the very existence of the Riegle–Neal protections at 12 U.S.C. § 1831a(j)(1) indicate that Congress wanted to offer out-of-state State banks the same parity principles that states would offer their in-state banks through parity statutes; Congress' lack of comparable statutes for credit unions and savings associations does not override that logic.

A handful of outlier states, such as Michigan, go beyond parity with the federal government in their statutes to include the powers granted by "any state or political subdivision," but this is still inapposite of what Plaintiffs suggest—the Michigan legislature is not attempting to grant powers to other states' financial entities, only mirroring those powers in its own state. MICH. COMP.

LAWS ANN. § 487.14101(2)(b) (West 1998 & Supp. 2001). And it's not that the IFPA itself discriminates against any out-of-state State financial institutions—indeed, the law imposes the same burdens on in-state and out-of-state entities. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370 (2023) ("Even under our received dormant Commerce Clause case law, petitioners begin in a tough spot. They do not allege that California's law seeks to advantage in-state firms or disadvantage out-of-state rivals."). So Illinois Bankers instead attempt to shoehorn this argument through the parity statutes. Neither party presented, nor did this Court independently find, any prior attempt to construe state parity statutes as unconstitutional under the dormant Commerce Clause in any other litigation.

Illinois Bankers point to the seminal decision in *West Lynn Creamery* as illustrative of the type of discriminatory statute that the Illinois parity statutes represent. (Dkt. 125 at 21). But in *West Lynn Creamery*, the Supreme Court struck down a Massachusetts legislative scheme that collected taxes on all milk sold in-state, from in- and out-of-state farmers alike, because Massachusetts then distributed all of the funds back to in-state dairy farmers—a subsidy that came at the cost of endangering the national market through tariff-like barriers. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 197 (1994). In comparison, the Illinois statute involves no downstream workaround to advantage in-state financial institutions over their out-of-state counterparts.

The *West Lynn* petitioners attempted to save their program by dissecting it into two separate constitutional means: a nondiscriminatory tax and a local subsidy. *Id*. at 201. Illinois Bankers do not acknowledge a version of the Illinois law as neutral or nondiscriminatory, instead continuously characterizing it as facially discriminatory. (Dkt. 174 at 20). Even if they had, however, it would still fall short of the type of State intervention at issue in *West Lynn*. To follow that logic would be

37

**RSA.37**

to impede any State's ability to put its own financial institutions on comparable footing to their federal counterparts, which is not what the Commerce Clause—dormant or not—demands.

Returning to *Ross*: faced with a law that did not implicate the dormant Commerce Clause's anti-discrimination principle, petitioners sought to pursue first an "extraterritoriality" theory,[6] and then a *Pike* balancing theory of discriminatory practical effects, both of which the Supreme Court rejected. *Nat'l Pork Producers Council*, 598 U.S. at 378. Under *Pike*, a facially neutral state law that serves a legitimate local interest may nonetheless violate the dormant Commerce Clause if the burden it imposes on out-of-state commerce is "clearly excessive in relation to the putative local benefit." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Asked on the record at oral argument whether they would like to argue a comparable theory, Illinois Bankers declined, again resting on the facial discrimination argument. (Dkt. 174 at 21).

This Court is unpersuaded by the primary contentions of both parties. Illinois Bankers' dormant Commerce Clause argument is underdeveloped and strains against existing case law. And the Attorney General's suggestion that this Court cannot interpret state law because related claims can only proceed in state court is at odds with the longstanding tradition of federal court jurisdiction. The question in front of the Court is not the specific state law issues barred by sovereign immunity but rather the downstream consequences of those issues for out-of-state State financial entities. Thus, the Court turns to the Attorney General's second contention: whether or not the parity statutes must be interpreted as Illinois Bankers suggests in the first place.

As determined above, the IFPA's Data Usage Limitation is preempted as to federal financial institutions. The IFPA contains a severability clause. *See* 815 ILCS 151/150-95. Under

---

[6] In separate litigation, this Court found that recent Supreme Court jurisprudence, including *Ross*, severely undercuts the continuing viability of the extraterritoriality theory. That case is currently pending on appeal at the Seventh Circuit. *See Ass'n for Accessible Medicines v. Raoul*, 2025 WL 2764558, at *5 (N.D. Ill. Sept. 26, 2025).

**RSA.38**

the Attorney General's view, the severability clause's existence means that the Illinois General Assembly sought to apply the Data Usage Limitation to in-state state financial institutions regardless of the parity statutes' existence. Illinois Bankers argues that the parity statutes trump the severability clause—teeing up their dubious dormant Commerce Clause argument.

The relevant statutes for Illinois-chartered banks and savings associations include prefatory clauses declaring the parity power to the tune of "notwithstanding any other provisions of this Act or any other law." *See* 205 ILCS 5/5(11); 205 ILCS 205/6002(a)(11). The parity provision for Illinois-chartered credit unions does not contain similar language; instead, it carves out from parity with the Federal Credit Union Act only those national powers that would conflict with any provision of the Illinois Credit Union Act (ICUA) specifically. 205 ILCS 305/65. The Attorney General deems this omission conclusive in that no part of the statute "purports to override the IFPA's severability clause;" Illinois Bankers does the same but for the opposite conclusion, suggesting that the specific exception for the ICUA proves that the parity statute overrides the applicability of the IFPA. (Dkt. 138 at 33; Dkt. 146 at 18).

The Supreme Court has warned that "premature adjudication of constitutional questions bear[s] heightened attention when a federal court is asked to invalidate a State's law." *McKesson v. Doe*, 592 U.S. 1, 6 (2020) (citations omitted). That caution is especially justified where a challenging party seeks to construe a not-yet-in-effect State law in a way that creates a conflict with federal law. *See Arizona v. United States*, 567 U.S. 387, 415 (2012) (*citing Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 446 (1960) ("To hold otherwise would be to ignore the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal

**RSA.39**

regulation where none clearly exists")). While this Court heeds that warning, it also cannot ignore the clear interpretation principles of Illinois state law.

The Illinois Supreme Court has adopted the position that "the use of a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *People v. Molina*, 266 N.E.3d 1031, 1040 (Ill. 2024) (citation omitted). But because "where possible, [Illinois] courts are to interpret statutes and ordinances in such manner as to avoid raising serious constitutional questions," *Villegas v. Bd. of Fire & Police Comm'rs of Vill. of Downers Grove*, 656 N.E.2d 1074, 1082 (Ill. 1995), the Attorney General makes three statutory interpretation arguments in support of the argument that the IFPA Data Usage Provision applies to in-state financial institutions despite the parity statutes. First, "more-specific statutes control over general acts;" second, "later-enacted statutes control over earlier statutes;" and third, "it is axiomatic that one legislature cannot bind a future legislature." (Dkt. 138 at 33) (citing *McDonald v. Symphony Bronzeville Park, LLC*, 193 N.E.3d 1253, 1268 (Ill. 2022) and *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 957 N.E.2d 876, 884 (Ill. 2011)).

But these principles all come into play where statutory text is less than clear—and the Illinois Supreme Court has been explicit in determining that a "notwithstanding" clause clearly means the accompanying "Act prevails over any conflicting "provision of law.' " *See Molina*, 266 N.E.3d at 1040. With that guidance in hand, the Court finds that the plain terms of the parity statutes would result in the preemption of the IFPA's Data Usage Limitation as to Illinois-chartered financial institutions. That case is for Illinois state courts to decide, but for present purposes, it

40

**RSA.40**

does lead to a confusing conundrum: out-of-state State-chartered institutions are left, functionally, as the only relevant entities subject to the Data Usage Limitation.[7]

Illinois Bankers have not raised a cognizable challenge to that conundrum in their depictions of the parity statutes as facially discriminatory—not in a world where Congress has consistently and extensively legislated around the dual banking system that parity statutes inherently uphold. And while the Supreme Court has historically struck down neutral laws that impermissibly controlled commerce beyond a State's borders, *see, e.g.*, *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), the *Ross* Court clarified that these cases did not prohibit extraterritorial legislation writ large, but only legislation with a "*specific* impermissible extraterritorial effect" tracing directly back to the antidiscrimination principle. *Ross*, 598 U.S. at 374. The law in *Baldwin*, for example, was plainly designed to protect an in-state industry.

The parity statutes are, in one viewing, designed to protect Illinois financial institutions—but not at the cost of out-of-state interests. The law dictates the relationship between Illinois entities and their federal counterparts. The inclusion of the IFPA's Data Usage Limitation complicates this story. But the Act in no way discourages consumers from engaging with merchants across state lines. *See N.J. Staffing Alliance v. Fais*, 110 F.4th 201, 207 (3d Cir. 2024) ("[T]he dormant Commerce Clause does not prohibit laws solely because they have extraterritorial reach absent protectionist intent or effect."). The "specific impermissible extraterritorial effect" *Ross* observed of the state laws at issue in the *Baldwin* line of cases was that each "deliberately prevented out-of-state firms from undertaking competitive pricing or deprived businesses and consumers in other States of whatever competitive advantages they may possess." *Ross*, 598 U.S. at 374, 143 S.Ct.

---

[7] That is, other than those banks impacted by the analysis under the Riegle–Neal Interstate Banking and Branching Efficiency Act's statutory framework—codified at 12 U.S.C. § 1831a(j)(1).

41

**RSA.41**

1142 (citation omitted). In other words, they were discriminatory and protectionist, to an extent that is not present here.

But if the IFPA is unconstitutional for some other reason—such as failing *Pike* balancing, violating the Due Process Clause, or running afoul of horizontal separation of powers—the Parties still have to raise it. *See Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 681 (4th Cir. 2018) (Wynn, J., dissenting) (noting the "the availability of potentially more appropriate constitutional provisions, like the Due Process Clause, to ensure that States do not unduly extend their regulatory authority beyond their borders"); *see also Ross*, 598 at 376 n.1 ("Some have questioned whether the state law at issue in [the Supreme Court's 1982 plurality decision on an extraterritoriality issue] posed a dormant Commerce Clause question as much as one testing the territorial limits of state authority under the Constitution's horizontal separation of powers."). The same goes for any potential argument that these institutions are saved by their own states' respective parity statutes. As it stands, the Court cannot—on the present arguments—invalidate the Data Usage Limitation of the IFPA as to out-of-state State-chartered financial institutions beyond those separately exempted under Riegle–Neal. 12 U.S.C. § 1831a(j)(1).

g.  *Extension of Preemptive Effect to Other Participants*

Finally, Illinois Bankers argues that in order to effectuate federal preemption, the IFPA cannot be applied to Card Networks or others involved in the payment process. (Dkt. 125 at 32). Because the Court has determined only the Data Usage Provision has been preempted, the question becomes whether the preemption extends to other entities involved in processing transactions. Illinois Bankers contend that any determination that a State law would significantly interfere with a national bank's exercise of its federally granted powers may necessitate expanding the scope of the NBA's preemptive effect to include other participants in credit and debit card transactions. As

42

**RSA.42**

an alternative to the statutory argument, Illinois Bankers argue that equitable principles would compel the same result in order to afford complete relief to the impacted parties.

The Court rejected this argument at the preliminary injunction stage. As noted then, Congress specifically addressed other participants in the national banking system and explicitly did not extend preemptive effect to non-national bank entities:

> No provision of title 62 of the Revised Statutes or section 371 of this title shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).

28 12 U.S.C. § 25b(h)(2).

Plaintiffs continue to argue that § 25b(h)(2) is best read as narrowly overruling the categorical approach to preemption espoused in *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 18 (2007). And they are correct that Section 25b(h)(2) did not purport to alter the scope of NBA preemption for national banks, which remain protected against state laws that "significantly impair" their own activities by targeting third parties. (Dkt. 125 at 35). But the IFPA does not pursue national banks via Payment Card Networks, or vice versa. It seeks to regulate all of those actors of their own accord. The Data Usage Provision dictates that "an entity, other than the merchant, involved in facilitating or processing an electronic payment transaction, including, but not limited to, an issuer, a payment card network, an acquirer bank, a processor, or other designated entity, may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151.150-15(b).

Even so: this Court found that the IFPA's Interchange Fee Provision was not preempted in large part because it was the Payment Card Networks, and not the banks, doing the actual work of

43

**RSA.43**

fee setting and charging. That distinguishes these entities from those acknowledged in § 25b(h)(2). *See Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 735 (7th Cir. 2011) ("An agent is a person authorized by another, the principal, to act for him or in his place."). And "[i]t is widely accepted—even by self-professed opponents of universal injunctions—that a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties." *City of Chicago v. Barr*, 961 F.3d 882, 920–21 (7th Cir. 2020).

On this record, Illinois Bankers have successfully demonstrated that the Data Usage Limitation is so tied up in the federal entities' powers that the preemptive effect must run to the Payment Card Networks and others involved in the payment process, at least so far as necessary for the preempted entities to experience complete relief. *See Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 48 (E.D.N.Y. 2020) ("subjecting [non-national-bank] Defendants to interest rate limits imposed by New York law would significantly interfere with [national bank's] exercise of its powers as a national bank"). That does not mean that the Data Usage Limitation is preempted as to these entities of their own accord; the law still applies to the extent relevant to their independent, third-party usage. But in keeping with longstanding principles of equity, this Court extends relief to other participants in the payment system when they facilitate the preempted institutions' powers implicated by the Data Usage Limitation.

## III. Injunction

With the merits resolved, the Court turns to Illinois Bankers' request for a permanent injunction. Accounting for the conclusions of the substantive analysis above, Illinois Bankers request a permanent injunction preventing Illinois from enforcing the IFPA's Data Usage Limitation against (1) national banks; (2) banks chartered by states other than Illinois that are subject to Riegle–Neal. 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; (4) federal credit

44

**RSA.44**

unions; and (5) other entities participating in an electronic payment transaction, such as Payment Card Networks and processors, to the extent they are carrying out functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation.[8]

Illinois Bankers is entitled to a permanent injunction if it shows that: (1) it has suffered an irreparable injury; (2) legal remedies, such as monetary damages, cannot adequately compensate for that injury; (3) the balance of hardships between the parties warrants an equitable remedy; and (4) a permanent injunction would not harm the public interest. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 955 (N.D. Ill. 2019). The third and fourth criteria "merge" when the enjoined party is the Government. *See Stevens v. United States Dep't of Health & Hum. Servs.*, 666 F. Supp. 3d 734, 748 (N.D. Ill. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Illinois Bankers have satisfied each factor.

Harm is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.' " *Id.* A mere possibility of irreparable harm will not suffice. *Nken*, 556 U.S. at 434–35 (2009). As laid out in the Background section, Illinois Bankers have sufficiently demonstrated the enormous compliance costs associated with the IFPA. Key among these are the declarations, submitted by Illinois Bankers, in which financial institutions and business owners claim that the money they would have to spend to come into compliance with the IFPA would be so devastating to their business that it may drive them from the market altogether.

---

[8] The analysis did not result in injunctive relief for credit unions, savings associations, or savings banks chartered by states other than Illinois. The statute's applicability to those entities chartered by Illinois is not in front of this Court.

**RSA.45**

Even if compliance costs did not drive any financial institutions out of the market, Illinois Bankers would likely still be able to establish irreparable harm because their costs are non-recoverable. *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (finding that evidence of non-recoverable compliance costs was sufficient to show irreparable harm). This is because if the Court did not issue an injunction, but Illinois Bankers nonetheless prevailed in their ligation at a later stage, Illinois Bankers likely would be unable to recoup their costs because the State would be immune from suit. *James v. Madigan*, 373 F. App'x 619, 621 (7th Cir. 2010) ("[s]overeign immunity prevents a federal court from awarding damages against a state or one of its employees"); *Staffing Servs. Ass'n of Illinois v. Flanagan*, 720 F. Supp. 3d 627, 641 (N.D. Ill. 2024) (finding that, with a pre-enforcement challenge, because State is immune from suit, plaintiffs established irreparable injury by showing "costs of complying").

Next, the balance of hardships and public interest considerations favor the entry of a permanent injunction. The present result, based on the arguments presented, leaves a complicated legacy, with the IFPA's Data Usage Limitation enjoined as to most, but not all, entities. Further, while the Court has previously granted some entities preliminary injunctive relief as to the Interchange Fee Provision, its ultimate determination does require compliance with the law, which now goes into effect July 1, 2026. Compliance with the remaining provision of the law may still prove overwhelmingly arduous for the financial institutions, but a full review of the record requires this result. Relief from compliance with the Data Usage Limitation, however, may allow some financial institutions that predicted being driven from the market to, in fact, remain. Defendants do not identify any hardships they would face from the proposed permanent injunction, and the Court is not required to speculate as to the harms Defendants might face or make arguments on their behalf. *See, e.g., Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721

46

**RSA.46**

(7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them.").

Finally, while there is a strong public interest for the people of Illinois to see their legislative determinations come to fruition, there is a stronger interest still in ensuring the Supremacy Clause is properly effectuated. *Flanagan*, 720 F. Supp. 3d at 642; *Pro. Towing & Recovery Operators of Illinois v. Box*, 2008 WL 5211192, at *14 (N.D. Ill. Dec. 11, 2008) ("the public . . . does not have an interest in the enforcement of state laws that conflict with federal laws"). Consequently, the Court concludes that the balance of equities and public interest considerations weighs in favor of Illinois Bankers.

## CONCLUSION

Illinois Bankers' motion for summary judgment [Dkt. 123] is granted in part, and the Attorney General's cross-motion for summary judgment [Dkt. 136] is granted in part.

Virginia M. Kendall
United States District Judge

Date: February 10, 2026

47

**RSA.47**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ILLINOIS BANKERS ASSOCIATION,<br>AMERICAN BANKERS ASSOCIATION,<br>AMERICA'S CREDIT UNIONS, and<br>ILLINOIS CREDIT UNION LEAGUE,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>KWAME RAOUL, in his official capacity as<br>Illinois Attorney General,<br><br>   *Defendant*. | Case No. 1:24-cv-07307<br><br>Hon. Virginia M. Kendall |

**STIPULATION OF FINAL JUDGMENT SUBJECT**
**TO RESERVATION OF RIGHT TO APPEAL**

WHEREAS, on August 15, 2024, Plaintiffs Illinois Bankers Association, American Bankers Association, America's Credit Unions, and Illinois Credit Union League brought this action against Defendant Kwame Raoul in his official capacity as Illinois Attorney General and challenged the Illinois Interchange Fee Prohibition Act's, 815 ILCS 151/150-1 *et seq*. ("IFPA") Interchange Fee Prohibition and Data Usage Limitation Provisions as unlawful (Dkt. 1);

WHEREAS, after the Court preliminarily enjoined Defendant from enforcing the IFPA's Interchange Fee Prohibition and Data Usage Limitation Provisions in certain respects (Dkt. 104, 115), Plaintiffs moved for summary judgment and a permanent injunction (Dkt. 123), and Defendants cross-moved for summary judgment (Dkt. 132);

WHEREAS, on February 10, 2026, the Court issued a Memorandum Opinion & Order granting in part and denying in part the Parties' summary judgment motions and permanently enjoining Defendant from enforcing the IFPA's Data Usage Limitation in certain respects. (Dkt. 179.) Specifically, the Court ruled: (1) that there are no genuine issues of material fact and that Plaintiffs are entitled to judgment as a matter of law that the IFPA's Data Usage Limitation, H.B.

**RSA.48**

4951, Section 150, 815 ILCS 151/150-15(b), is preempted by the National Bank Act, the Home Owners' Loan Act, the Federal Credit Union Act as to certain entities, and is further invalid under other sources of federal law; (2) that Plaintiffs will suffer irreparable harm absent injunctive relief, that the balance of equites favors permanently enjoining Defendant from enforcing the IFPA's Data Usage Limitation against certain entities, and that the public interest will be served by entry of a permanent injunction; and (3) Plaintiffs are not entitled to a permanent injunction of the IFPA's Interchange Fee Prohibition or of the IFPA's Data Usage Limitation against certain other entities.

WHEREAS, the Parties have agreed to entry of this Stipulation of Final Judgment Subject to Preservation of Right to Appeal to finally resolve all issues in the case while preserving all rights to appeal;

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. Judgment is entered in Plaintiffs' favor on their claims that the IFPA's Data Usage Limitation is preempted or invalid as to (1) national banks; (2) banks chartered by states other than Illinois, *see* 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; (4) federal credit unions; and (5) other entities participating in an electronic payment transaction, such as Payment Card Networks and processors, to the extent they are carrying out the functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation;

2. The Court **DECLARES** that the IFPA's Data Usage Limitation is preempted or invalid as to (1) national banks; (2) banks chartered by states other than Illinois, *see* 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; (4) federal credit unions; and (5) other entities participating in an electronic payment transaction, such as Payment Card Networks and processors, to the extent they are carrying out the functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation;

3. Judgment is entered in Defendant's favor on Plaintiffs' claims that the IFPA's Interchange Fee Prohibition is preempted and Plaintiffs' motion to permanently enjoin Defendant from enforcing the IFPA's Interchange Fee Prohibition is **DENIED**;

4. Judgment is entered in Defendant's favor on Plaintiffs' claims that the IFPA's Data Usage Limitation is preempted or invalid as applied to (1) savings associations or savings banks chartered by states other than Illinois; and (2) credit unions chartered by states other than Illinois, and Plaintiffs' motion to permanently enjoin Defendant from enforcing the IFPA's Data Usage Limitation is **DENIED** as to those foregoing entities;

5. The clerk is directed to enter a separate judgment under Federal Rule of Civil Procedure 58 that is consistent with this Stipulated Final Judgment;

6. The Parties stipulate and agree that they have expressly reserved all their rights on appeal to challenge the Court's opinions and orders entered in this case; and

7. This Court shall retain jurisdiction over the Parties to this Stipulated Final Judgment and over enforcing the terms of this Stipulated Final Judgment, subject to the Parties' rights to appeal set forth above.

SO ORDERED.

Date: February 27, 2026

_____
VIRGINIA M. KENDALL
United States District Judge

3
**RSA.50**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

ILLINOIS BANKERS ASSOCIATION,
AMERICAN BANKERS ASSOCIATION,
AMERICA'S CREDIT UNIONS, and
ILLINOIS CREDIT UNION LEAGUE,

        *Plaintiffs*,

      v.

KWAME RAOUL, in his official capacity as
Illinois Attorney General,

        *Defendant*.

Case No. 1:24-cv-07307

Hon. Virginia M. Kendall

**ORDER ENTERING A PERMANENT INJUNCTION**

WHEREAS, on August 15, 2024, Plaintiffs Illinois Bankers Association, American Bankers Association, America's Credit Unions, and Illinois Credit Union League brought this action against Defendant Kwame Raoul in his official capacity as Illinois Attorney General and challenged the Illinois Interchange Fee Prohibition Act's, 815 ILCS 151/150-1 *et seq*. ("IFPA") Interchange Fee Prohibition and Data Usage Limitation Provisions as unlawful (Dkt. 1);

WHEREAS, on February 10, 2026, the Court issued a Memorandum Opinion & Order granting in part and denying in part the Parties' summary judgment motions and permanently enjoining Defendant from enforcing the IFPA's Data Usage Limitation in certain respects. (Dkt. 179.)

WHEREAS, the Parties have agreed to entry of this Order Entering a Permanent Injunction while preserving all rights to appeal;

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. Defendant Kwame Raoul, in his official capacity as Illinois Attorney General, is **PERMANENTLY ENJOINED** from enforcing the IFPA's Data Usage Limitation against

**RSA.51**

(1) national banks; (2) banks chartered by states other than Illinois, *see* 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; (4) federal credit unions; and (5) other entities participating in an electronic payment transaction, such as Payment Card Networks and processors, to the extent they are carrying out the functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation;

2.      The Parties stipulate and agree that they have expressly reserved all their rights on appeal to challenge the Court's opinions and orders entered in this case; and

3.      This Court shall retain jurisdiction over the Parties to this Order Entering a Permanent Injunction, and over enforcing the terms of this Order Entering a Permanent Injunction, subject to the Parties' rights to appeal set forth above.

SO ORDERED.

Date: February 27, 2026

_____
VIRGINIA M. KENDALL
United States District Judge

2
**RSA.52**