**Nos. 26-1354 (lead), 26-1371, 26-1440, 26-1441**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS
ASSOCIATION, AMERICA'S CREDIT UNIONS, &
ILLINOIS CREDIT UNION LEAGUE,

Plaintiffs-Appellants and Cross-Appellees,

v.

KWAME RAOUL, in his official capacity as Illinois Attorney General,

Defendant-Appellee and Cross-Appellant.

---

**On Appeal from the United States District Court
for the Northern District of Illinois
(D.C. No. 24-cv-7307)**

---

**BRIEF OF AMICUS CURIAE
THE OFFICE OF THE COMPTROLLER OF THE CURRENCY
IN SUPPORT OF PLAINTIFFS-APPELLANTS AND
SEEKING REVERSAL IN PART AND AFFIRMANCE IN PART**

---

WILL C. GILES, Principal Deputy Chief Counsel
BRIAN P. HUDAK, Deputy Chief Counsel
PETER C. KOCH, Director for Litigation
AMBER N. MELTON, Assistant Director for Litigation
ASHLEY W. WALKER, Special Counsel
HANNAH HICKS, Counsel
KRISTIN M. MCMANUS, Attorney
400 7th Street S.W.
Washington, D.C. 20219
(202) 649-6300
Counsel for Amicus Curiae
the Office of the Comptroller of the Currency

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ iii

**INTRODUCTION** ............................................................................................................. 1

**STATEMENT OF INTEREST** ......................................................................................... 2

**BACKGROUND** ............................................................................................................... 3

    I.    National Bank Act ..................................................................................................... 3

    II.   The Card Payment System .......................................................................................... 5

        A. Banks Developed the Modern Card Payment System as a Means to
        Exercise Their Federal Powers to Lend and Provide Deposit Services
        to Customers ....................................................................................................... 5

        B. The Use of Card Payment Networks to Exercise Federal Powers
        Promotes Interoperability and Enhances the Efficiency of Banks ......................... 5

        C. Banks Fund Costs of Card Payment Services Through Interchange
        and Other Fees ................................................................................................... 7

    III.   Illinois Interchange Fee Prohibition Act .................................................................... 7

**ARGUMENT** .................................................................................................................... 8

    I.    The District Court Applied a Legally Erroneous Standard in Assessing National Bank
        Act Preemption ................................................................................................... 9

    II.   The Interchange Fee Prohibition Prevents or Significantly Interferes with National
        Banks' Powers ....................................................................................................11

        A. The District Court Erred by Focusing on the "Setting" of the
        Interchange Fee .................................................................................................. 11

        B. The Use of Third Parties to Assist National Banks in Exercising
        Their Federal Powers Does Not Allow the State to Prevent or
        Significantly Interfere with Those Powers .......................................................... 14

    III.   The District Court Misunderstood How the IFPA's Interchange Fee Prohibition Will
        Apply to National Banks ........................................................................................ 16

    IV.   The Court Correctly Held that the National Bank Act Preempts IFPA's Data Usage
        Limitation ............................................................................................................. 18

        A. National Banks Have the Power to Use Electronic Payment
        Transaction Data ............................................................................................... 19

B. The Data Usage Limitation Prevents or Significantly Interferes with National Banks' Exercise of Their Power Under the National Bank Act to Use Electronic Payment Transaction Data ...................................................... 20

**CONCLUSION** ................................................................................................... 22

**CERTIFICATE OF SERVICE** ...................................................................... 23

**CERTIFICATE OF COMPLIANCE** ............................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Anderson Nat'l Bank v. Luckett*, 321 U.S. 233 (1944)..................................................8

*Bank of America, N.A. v. City and Cnty. of San Francisco*, 309 F.3d 551 (9th Cir. 2002) ............ 13

*Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194 (11th Cir. 2011) .................................. 13

*Barnett Bank of Marion Cnty. v. Nelson*, 517 U.S. 25 (1996) ...................................................... 4

*Cantero v. Bank of Am., N.A.*, 602 U.S. 205 (2024)........................................................... passim

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)................... 3, 8

*First Nat'l Bank of San Jose v. California*, 262 U.S. 366 (1923) .......................................... 8, 9, 14

*Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373 (1954) ............... 8, 10, 14, 21

*Geier v. Am. Honda Motor Co.*, 529 U.S. 86 (2000) .................................................................... 9

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978).......... 3

*Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009) .............................. 13, 14

*Nat'l Bank v. Commonwealth*, 76 U.S. 353 (1869)................................................................. 8, 10

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995) ...................... 3

*Sanders v. Jackson*, 209 F.3d 998 (7th Cir. 2000) ...................................................................... 17

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).............................................................................. 9

*United States v. Wilson*, 159 F.3d 280 (7th Cir. 1998) ................................................................ 17

*Wells Fargo Bank of Tex., N.A. v. James*, 321 F.3d 488 (5th Cir. 2003) ..................................... 12

**Statutes**

12 U.S.C. § 1 ................................................................................................................................ 2

12 U.S.C. § 1464 ......................................................................................................................... 2

12 U.S.C. § 1465 ......................................................................................................................... 2

12 U.S.C. § 24 (Seventh) .................................................................................................... passim

12 U.S.C. § 24 (Third) .............................................................................................................. 15

12 U.S.C. § 25b .......................................................................................................................... 9

12 U.S.C. § 93 ............................................................................................................................. 3

12 U.S.C. § 93a ........................................................................................................................... 3

15 U.S.C. § 1693*o* ..................................................................................................................... 18

815 Ill. Comp. Stat. 151/150.............................................................................................. passim

**Federal Regulations**

12 C.F.R part 30 ....................................................................................................................... 15

12 C.F.R. § 145.17 ...................................................................................................................... 2

12 C.F.R. § 155.200 .................................................................................................................... 2

12 C.F.R. § 7.1000 .................................................................................................................... 19

12 C.F.R. § 7.1004 .................................................................................................................... 16

12 C.F.R. § 7.4002 ............................................................................................................. passim

12 C.F.R. § 7.5006 ................................................................................................ 4, 19, 20

**Other Authorities**

63 Fed. Reg. 65673 .......................................................................................................... 2

Andrew P. Scott, *Credit Card Swipe Fees and Routing Restrictions*, Congressional Research
    Service Report 48216 (Oct. 8, 2024) ................................................................... 6, 7

Black's Law Dictionary (12th ed. 2024) ....................................................................... 17

Christine Zumello, *The "Everything Card" and Consumer Credit in the United States in the
    1960s*, 85 Bus. Hist. Rev. 551 (2011) ..................................................................... 5

Comptroller's Handbook, Credit Card Lending (Apr. 2021) ................................... 6, 7, 18

Comptroller's Handbook, Merchant Processing (Aug. 2014) ............................. 5, 6, 7, 18

Comptroller's Handbook, Payment Systems (Oct. 2021) ..................................... 5, 6, 7, 19

Darryl E. Getter, *Regulation of Debit Interchange Fees*, Congressional Research Service Report
    41943 (May 16, 2017) .............................................................................................. 6, 7

*Interagency Statement on the Use of Alternative Data in Credit Underwriting*, News Release
    2019-143 (Dec. 3, 2019) ........................................................................................... 19

OCC Bulletin 2019-37 ............................................................................................... 19, 20

OCC Conditional Approval No. 248 (June 27, 1997) ....................................................... 4

OCC Conditional Approval No. 773 (Nov. 30, 2006) ...................................................... 4

OCC Corporate Decision No. 99-50 (Dec. 23, 1999) ...................................................... 4

OCC Interpretive Letter No. 932, 2001 WL 1869811 (Aug. 17, 2001) ...........................11

OCC. Interpretive Letter No. 928, 2001 WL 1835017 (Dec. 24, 2001) ......................... 19

OCC Interpretive Letter No. 1077, 2007 WL 1792535 (Jan. 11, 2007) ......................... 19

Operational Risk Description: Fraud Risk Management Principles, 2019 WL 3408595 (July 24,
    2019) ......................................................................................................................... 20


**U.S. Constitution**

U.S. CONST., art. VI, cl. 2 ................................................................................................. 4

## INTRODUCTION

The Illinois Interchange Fee Prohibition Act, 815 Ill. Comp. Stat. 151/150, ("IFPA") is an unworkable state law that threatens to upend the nation's intricately-designed payments system—a system in which national banks and Federal savings associations play critical roles. If IFPA is not permanently enjoined, it will erode the essential infrastructure of the payments system and require national banks, Federal savings associations, and others to expend "staggering" sums, RSA.27, to accommodate a single state's regime. This "indisputably disruptive" law, RSA.26, represents an improper and "undeniable" state interference with federally authorized banking powers that drive the nation's economy. RSA.26, 27.

In our modern economy, interchange fees are essential in enabling banks to provide credit and debit card services that facilitate their lending and deposit-taking powers, to protect against fraud, and to cover the costs of transaction processing. As the district court itself observed, IFPA's interchange fee prohibition would impose "business-ending consequences" for some national banks and Federal savings associations. RSA.12. Once the district court's myriad analytical errors with respect to IFPA's prohibition on interchange fees are corrected, it is clear the provision prevents or significantly interferes with federally authorized banking powers and is thus preempted by the National Bank Act.

In addition to unenforceable restrictions on interchange fees, IFPA's data usage limitation will weaken the abilities of national banks and Federal savings associations to prevent fraud, manage risk, and provide critical services to consumers. The district court correctly concluded that this provision is preempted under the standard in *Barnett Bank of Marion Cnty v. Nelson*, 517 U.S. 25 (1996), because it constrains, and "in many respects, wholly eliminate[s]" national banks' and Federal savings associations' federal power to process and use transaction data for critical

purposes such as monitoring credit card fraud, addressing payment disputes, and facilitating cardholder loyalty programs. RSA.29-30.

If IFPA is not permanently enjoined, it may well trigger a cascade of similar state and local laws that would give rise to a fractured, highly inefficient, and unworkable nationwide payment system—defeating a core promise of the federal banking system in this country. IFPA and laws like it would dismantle the uniform rules and interoperability that are necessary for the smooth and effective delivery of banking services across the country and the uninterrupted flow of national commerce.

For these reasons and those explained below, this Court should hold that IFPA is preempted and remand this case to the district court with instructions to enter a permanent injunction enjoining both IFPA's interchange fee prohibition and data usage limitation.

## STATEMENT OF INTEREST

The Office of the Comptroller of the Currency ("OCC") is an independent bureau of the U.S. Department of the Treasury charged with administration of the National Bank Act, 12 U.S.C. § 1 *et seq.*, and the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461 *et seq.*[1] The OCC is

---

[1]     Federal savings associations derive their powers from HOLA, and its implementing regulations, which the OCC administers. HOLA directs courts to apply "the laws and legal standards applicable to national banks" in determining whether federal law preempts state regulation of Federal savings associations. 12 U.S.C. § 1465(a). Because IFPA prevents or significantly interferes with Federal savings associations' exercise of federally authorized powers, it would be similarly preempted by HOLA. *See, e.g.*, 12 U.S.C. § 1464(c)(1)(T) (authorizing Federal savings associations to offer credit cards); *id.* § 1464(b)(1)(A)(i)-(ii) (authorizing Federal savings associations to "raise funds through . . . deposit . . . accounts" and "issue . . . evidence of accounts"); 12 C.F.R. § 145.17 (authorizing Federal savings associations "to transfer, with or without a fee, its customers' funds"); *id.* § 155.200 (authorizing Federal savings associations to use electronic means and facilities, which includes data processing); *see also* 63 Fed. Reg. 65673, 65676 (Nov. 30, 1998) (stating that 12 C.F.R. § 155.200 (then codified at 12 C.F.R. § 555.200) authorizes data processing and transmission services). This brief focuses primarily on national bank powers and preemption of IFPA by the National Bank Act, but the analysis of such issues is equally applicable to Federal savings associations and preemption of IFPA by HOLA.

authorized generally to represent itself in litigation, 12 U.S.C. § 93(d), and is charged with "primary responsibility for surveillance of 'the business of banking . . ..'" *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995). As the agency charged with implementing the National Bank Act and overseeing national banks' exercise of powers thereunder, the OCC has broad authority from Congress to prescribe rules and regulations to carry out its responsibilities. 12 U.S.C. § 93a. This includes authority to define "incidental powers" of national banks and to authorize activities beyond those enumerated by statute. *NationsBank*, 513 U.S. at 258 n.2. As the administrator of the national banking system, the OCC has a paramount interest in ensuring that the *Barnett Bank* standard for preemption is properly understood and applied. In addition, under the Supremacy Clause, OCC regulations "have no less pre-emptive effect than" the National Bank Act itself. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). If the district court's decision is left uncorrected and IFPA goes into effect, the Illinois law will disrupt a nationwide payment system, and it will prevent or significantly interfere with federally authorized national bank powers to lend, receive deposits (including through the issuance of credit and debit cards), and be compensated for payment processing. The OCC respectfully submits this brief to address the permissible scope of state limitations on these powers.

## BACKGROUND

### I.     National Bank Act

When Congress enacted the National Bank Act, it "intended to facilitate . . . a 'national banking system.'" *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314-15 (1978) (quoting Cong. Globe, 38th Cong., 1st Sess. 1451 (1864)). Congress granted national banks enumerated powers, including to "loan[] money on personal security" and to "receiv[e] deposits," as well as "all such incidental powers as shall be necessary to carry on the business of

banking." 12 U.S.C. § 24 (Seventh). As the OCC and courts have long recognized, national banks thus have broad power to engage in activities that are part of, or incidental to, the business of banking, including issuing debit and credit cards, processing payments, and data processing. *See, e.g.*, OCC Conditional Approval No. 773, 2006 WL 4589434, at *1 (Nov. 30, 2006) ("merchant processing activities are part of, or incidental to, the business of banking"); OCC Corporate Decision 99-50, at 4 (Dec. 23, 1999) ("processing credit and debit card transactions and other electronic payments are clearly part of the business of banking"), *available at* https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2000/cd99-50.pdf; OCC Conditional Approval No. 248, at 4 (June 27, 1997) ("[i]t is clear that merchant processing activities are permissible for national banks"), *available at* https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/1997/ca248.pdf; *see also* 12 C.F.R. § 7.5006. In addition, national banks necessarily have the authority to be compensated for their provision of banking services—as reflected in the OCC's regulation stating the authority of national banks to impose non-interest charges and fees, 12 C.F.R. § 7.4002—including services related to credit and debit card payments.

The Supreme Court has "interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily preempting, contrary state law." *Barnett Bank*, 517 U.S. at 32. Where a state statute prevents or significantly interferes with national banks' exercise of their federally authorized powers, the state statute conflicts with federal law and is preempted by operation of the Supremacy Clause. U.S. Const., art. VI, cl. 2; *Cantero v. Bank of Am., N.A.,* 602 U.S. 205, 219-21 (2024); *Barnett Bank,* 517 U.S. at 31-34.

## II.     The Card Payment System

### A.     Banks Developed the Modern Card Payment System as a Means to Exercise Their Federal Powers to Lend and Provide Deposit Services to Customers

In the modern economy, credit and debit cards are a means for national banks to exercise their lending and deposit-taking powers enumerated at 12 U.S.C. § 24 (Seventh). Today's card-payment system traces its origins to the 1958 issuance of the first general purpose credit card, by Bank of America, later rebranded as Visa. *See Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1238-39 (S.D. Fla. 1984). In 1967, an association of banks launched a competitor, that later became MasterCard. *See* Christine Zumello, *The "Everything Card" and Consumer Credit in the United States in the 1960s*, 85 BUS. HIST. REV. 551, 564 n.55 (2011). In their present forms, these two companies serve as the nation's largest bank card associations that provide network services to banks and other financial institutions for the processing of credit and debit card payments through issuer and acquirer agreements. *See* Comptroller's Handbook, Merchant Processing (Aug. 2014)[2] ("Merchant Processing Handbook") at 2-3, 80 (card issuers are financial institutions that are members of the bank card associations and "[b]anks must be members of an association to offer the association's card services").

### B.     The Use of Card Payment Networks to Exercise Federal Powers Promotes Interoperability and Enhances the Efficiency of Banks

Under 12 U.S.C. § 24 (Seventh), national banks' power to lend includes the power to issue credit cards for customers' use in making purchases derived from the credit line of an underlying loan agreement. *See* Comptroller's Handbook, Payment Systems (Oct. 2021) ("Payment Systems Handbook") at 14. Similarly, as part of their powers to receive deposits under section 24 (Seventh),

---

[2]     All portions of the Comptroller's Handbook are available on the OCC's website. *See* Comptroller's Handbook, *available at* https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/index-comptrollers-handbook.html.

banks may issue debit cards for customers to use in making purchases with the transaction amount debited directly from the customer's deposit account. *See id.* at 15. Banks are also permitted to offer merchant payment services. *See id.* at 13.

Rather than develop and maintain their own proprietary networks to process transactions, almost all banks utilize card payment networks because of efficiencies of scale and interoperability offered by them. *See generally* Andrew P. Scott, *Credit Card Swipe Fees and Routing Restrictions*, Congressional Research Service Report 48216 (Oct. 8, 2024) at 1-2; Darryl E. Getter, *Regulation of Debit Interchange Fees*, Congressional Research Service Report 41943 (May 16, 2017) at 2-3. Banks utilize payment networks with the objective of reducing costs and providing credit and debit services in a fast, secure, and reliable manner. *See generally* Scott, *supra* at 10, 12.

When a consumer presents a credit or debit card for payment, a complex processing of an electronic card payment begins. Each card transaction involves electronic transmission and exchange of multiple data points among the participating parties over a card payment network to authorize the payment card transaction, complete clearing and settlement, and, if necessary, process chargebacks. *See* Merchant Processing Handbook at 7-13. In the four-party model, which characterizes the Visa and MasterCard networks, the four parties involved are "the card issuers (financial institutions that are members of the association), the acquirers, the cardholders, and the merchants." *Id.* at 2. Following receipt of transaction information from the acquirer, the issuer remits funds, through the card payment network, to the acquirer and posts the charges to the cardholder's account. *Id.* at 10. After the acquirer receives the proceeds via the network, it pays the merchant. *Id.* Banks utilize data and information received through the card payment network to address the risk of fraudulent activities in the card payment system and support safety and soundness. *See* Comptroller's Handbook, Credit Card Lending (Apr. 2021) ("Credit Card Lending

Handbook") at 50-53; Payment Systems Handbook at 47-48 (explaining that banks use real-time monitoring of customer behavior to identify irregular payment patterns, prevent fraud, and implement fraud awareness programs).

    **C.    Banks Fund Costs of Card Payment Services Through Interchange and Other Fees**

Issuing banks, acquiring banks, and payment card networks receive fees for their roles in the card payment system. The acquiring bank receives compensation by charging a merchant discount on the transaction amount and other fees. Merchant Processing Handbook at 31; Scott, *supra* at 8. The issuing bank receives compensation by charging an interchange fee. *See* Merchant Processing Handbook at 32, 82; Payment Systems Handbook at 97 (the interchange fee is a "fee paid by one bank to another to handle costs and credit risk"); Credit Card Lending Handbook at 60, 172 ("The [interchange] fee takes into account authorization costs, fraud and credit losses, and the average bank cost of funds."). The card payment network is compensated by a network access fee. Scott, *supra* at 10.

**III.    <u>Illinois Interchange Fee Prohibition Act</u>**

IFPA threatens to disrupt the nation's intricate credit and debit card payments systems. IFPA (i) prohibits credit and debit card issuers, payment card networks, acquirer banks, and processors (entities that include national banks and Federal savings associations) from receiving or charging a merchant any interchange fees on the state and local tax portions and on any gratuity portion of the transactions (the interchange fee prohibition), and (ii) prohibits those same entities from using transaction data for purposes other than to process the transactions or as otherwise "required by law" (data usage limitation). 815 Ill. Comp. Stat. 151/150-10(a), 150-15(b). As

explained below, both the interchange fee prohibition and data usage limitation would prevent or significantly interfere with national banks' exercise of their federally authorized powers.

## ARGUMENT

In *Barnett Bank*, 517 U.S. at 33, the Supreme Court considered conflict preemption in the national banking context and held that state law is preempted where it prevents or significantly interferes with a national bank's exercise of its federal powers. In *Cantero*, 602 U.S. at 219-20, the Court reaffirmed the *Barnett Bank* standard and held that its application is based on "a practical assessment of the nature and degree of the interference caused by a state law." *Id.* The *Cantero* Court explained that such an assessment includes consideration of *Barnett Bank* and its antecedents, in which the Court reached conclusions about the interference "based on the text and structure of the laws, comparison to other precedents, and common sense." *Id.* at 220 & n.3. In so doing, the *Cantero* Court cited six of *Barnett Bank's* antecedent cases: *Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141 (1982); *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954); *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944); *First National Bank of San Jose v. California*, 262 U.S. 366 (1923); *McClellan v. Chipman*, 164 U.S. 347 (1896); and *National Bank v. Commonwealth*, 76 U.S. 353 (1869). The Court found state law to be preempted in *Fidelity*, *Franklin*, and *San Jose* and not to be preempted in *Anderson*, *McClellan*, and *Commonwealth*.

While the Court's precedent does not "establish a clear line to demarcate" whether state law is preempted by federal law, *Cantero*, 602 U.S. at 215 (internal citations omitted), it demonstrates that a state law prevents or significantly interferes with a federal power, at a minimum, when it (1) interferes with critical flexibility granted to a national bank under federal law, *Fidelity*, 458 U.S. at 155, 159; (2) interferes with a national bank's efficiency or effectiveness

in exercising its federal power, *Cantero*, 602 U.S. at 216 (discussing *Franklin*); or (3) qualifies a federal power in an unusual way, *San Jose*, 262 U.S. at 370.

The OCC's judgment as to whether a state law prevents or significantly interferes with a national bank's exercise of its federally authorized powers is entitled to "weight" by a reviewing court. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); 12 U.S.C. § 25b(b)(5) (codifying the *Skidmore* standard); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000) (noting that agencies are "uniquely qualified" to comprehend the likely impact of state requirements when their delegated authority concerns subject matters that are "technical" and "the relevant history and background are complex and extensive"). By operation of the Supremacy Clause of the United States Constitution, IFPA is preempted.

## I.     The District Court Applied a Legally Erroneous Standard in Assessing National Bank Act Preemption

In holding that the interchange fee prohibition is not preempted by the National Bank Act, the district court engaged in a convoluted and unworkable analysis, determining that IFPA is not preempted because it does not "directly" regulate national banks and because national banks do not "set" the interchange fees. *See, e.g.,* RSA.12, 20-22 (examining whether the law "directly" restricted or interfered with national bank activities). This reasoning relies on flawed readings of relevant precedents and of IFPA. This Court should correct the district court's legally erroneous "directness" inquiry (which is not derived from relevant caselaw).

While the district court cited the *Barnett Bank* standard and acknowledged *Cantero*'s directive to engage in a comparative analysis of relevant precedent, RSA.17, the district court effectively applied an incorrect standard by analyzing the "directness" of IFPA's regulation of national banks. The correct inquiry is not whether the state law "directly regulates" a national bank

but whether the state law "prevents or significantly interferes" with national banks' exercise of their federally authorized powers. *Cantero*, 602 U.S. at 214-15.

Also, whether a state law prevents or significantly interferes with a national bank power is determined by "the text and structure of the laws, comparison to other precedents, and common sense." *Id.* at 220 & n.3. The instructive holdings from *Franklin*, *McClellan*, and *National Bank* fail to support the district court's focus on directness. Instead, these authorities demonstrate that the interchange fee prohibition prevents or significantly interferes with the exercise of national banks' federally authorized powers.

In *Franklin*, the Supreme Court held that the National Bank Act preempted a statute that prohibited all but state-chartered savings banks from using "saving" or "savings" in their advertisements because the law interfered with national banks' ability to exercise their federal powers "effectively" and "efficiently." *Franklin*, 347 U.S. at 377-78; *see also Cantero*, 602 U.S. at 216 (discussing *Franklin*). In *National Bank*, the Court explained that national banks are "exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions" authorized by federal law. 76 U.S. 353, 362 (1869). The Court expounded this point in *McClellan*:

> As long since settled in the cases already referred to, the purpose and object of congress in enacting the national bank law was to . . . preserv[e] [such banks] from undue state interference wherever congress, within the limits of its constitutional authority, has expressly so directed, or wherever such state interference frustrates the lawful purpose of congress, or impairs the efficiency of the banks to discharge the duties imposed upon them by the law of the United States.

164 U.S. at 359. These precedents highlight that the preemption inquiry is properly focused on the nature and degree of the state law's interference with the exercise of national bank powers, regardless of whether this interference is direct or indirect. As discussed more fully below, the interchange fee prohibition prevents or significantly interferes with national banks' exercise of

their federally authorized powers, particularly the powers to lend, take deposits, and collect fees for payment processing.

The district court appears to have wandered from the trail blazed from these binding precedents based on a fear that "if the IFPA is not a viable legislative choice, it is hard to see *any* route by which a State could impact a national bank's fees" when "Congress explicitly ruled out field preemption by adopting the *Barnett Bank* standard[.]" RSA.23. The district court's fear is misplaced. Finding that IFPA is an improper attempt by Illinois to regulate national banks' fee powers—an express power of national banks as the district court recognized, RSA.22—does not mean a national bank is "'wholly withdrawn from the operation of State legislation[.]'" *Cantero*, 602 U.S. at 219 (discussing *National Bank*, 76 U.S. at 361-63). Instead, it recognizes that charging (which includes receiving) and determining the amount of and the method of setting fees are powers reserved for national banks. State law may not prevent or significantly interfere with these powers. That fee charging, a core business of banking power, may be one part of national bank activity that is subject only to de minimis state law limitations, does not indicate that federal law occupies the field with respect to national banks—i.e., this does not equate to field preemption.

## II.    The Interchange Fee Prohibition Prevents or Significantly Interferes with National Banks' Powers

### A.    The District Court Erred by Focusing on the "Setting" of the Interchange Fee

National banks' enumerated powers include "loaning money" and "receiving deposits," 12 U.S.C. § 24 (Seventh), and national banks may offer credit and debit cards as part of their exercise of these powers. The OCC has long recognized that processing credit and debit transactions is clearly part of the business of banking. Moreover, national banks necessarily have the authority to be compensated for their banking services. *See* 12 C.F.R. § 7.4002; OCC Interpretive Letter No. 932, 2001 WL 1869811, at *1 n.2 (Aug. 17, 2001) (stating that national

banks are authorized to charge non-interest fees and charges as an "inherent element of their authority to conduct the business of banking").

The district court's failure to properly analyze whether the interchange fee prohibition prevents or significantly interferes with these powers misses the proverbial forest for the trees. That is, the district court's focus on the "setting" of interchange fees and whether the interchange fee prohibition "directly" regulates national banks eclipsed full consideration of the nature and degree of the law's interference with national banks' powers, including their lending and deposit-taking powers.

Specifically, the district court erred by conflating the language in 12 C.F.R. § 7.4002(b) about national banks' considerations in arriving at and establishing fees with the fee-setting role of payment networks. *See* RSA.22-23, 27-28. The district court then confined its analysis of bank powers to that discrete fee-setting aspect of the card payment system. *Id.* But the considerations outlined in 12 C.F.R. § 7.4002(b) do not limit the scope of the express "authority to impose charges and fees." 12 C.F.R. § 7.4002(a); *see also Wells Fargo Bank of Tex. NA v. James*, 321 F.3d 488, 493 (5th Cir. 2003) ("we think it plain that the OCC has been delegated the authority to determine, with a considerable discretionary birth, whether and which fees the national banks may assess").[3] As multiple circuits have recognized in sufficiently analogous cases, section 7.4002(a) makes express national banks' federal power to charge and receive fees in the manner undertaken by issuer banks and acquirer banks in the processing of credit and debit card payments over payment

---

[3]    The authority of a national bank to charge and receive fees extends not just to its accountholders but rather anyone to whom provides a product or service, including those who seek payments from a national bank's accountholders. *See Wells Fargo*, 321 F.3d at 495 (customers includes non-account holding payees).

networks.[4] *See Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 (11th Cir. 2011) ("the OCC specifically authorizes banks to charge fees to non-account-holders presenting checks for payment. The state's prohibition on charging fees to non-account-holders, which reduces the bank's fee options by 50%, is in substantial conflict with federal authorization to charge such fees"); *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283-84 (6th Cir. 2009) (agreeing that a bank is authorized by 12 C.F.R. § 7.4002 and 12 U.S.C. § 24 (Seventh) to "exact[]" or "collect" garnishment fees by debiting a depositor); *Bank of Am. v. City of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002) (holding "that the National Bank Act and OCC regulations[, namely Section 7.4002(a),] together preempt conflicting state limitations on the authority of national banks to collect fees for provision of deposit and lending-related electronic services . . .."). These powers do not turn on who determines the amount of the fee—be it the bank itself or a third party. The power to charge and receive a fee, not just determine its amount,[5] are express powers of national banks that IFPA seeks to improperly confine.

Moreover, national banks have long received compensation for assumption of risk and the provision of other ancillary customer benefits in the form of interchange fees. For certain banks, this activity may be a key business line that provides an important source of income. Under IFPA,

---

[4]     While the powers to lend, take deposits, and charge non-interest fees are express, 12 U.S.C. § 24 (Seventh); 12 C.F.R. § 7.4002, the National Bank Act preempts state laws that prevent or significantly interfere with a national bank's exercise of its federally authorized powers, regardless of whether those powers are specifically enumerated.

[5]     Of course, determining the amount of fees is also a national bank power, as is the method of calculating them. *See, e.g., Monroe*, 589 F.3d at 283 (finding persuasive argument that "[a]ttendant to this authority to charge fees is the authority and discretion to determine the amount and method of charging those fees. By preventing the banks from exacting a fee for processing the garnishment orders through freezing the accounts, the Ohio garnishment laws 'significantly interfere' with this fundamental national bank function by de facto mandating a $1 fee and the method by which that fee is extracted." (citation omitted)).

- 13 -

a national bank that processes a debit or credit transaction would be prevented from charging a fee on the tax and any gratuity portion of the transaction, even though it processes the entire transaction. As such, IFPA prevents national banks from charging a fee for services they provide despite clear federal authority to do so. By requiring national banks to provide services for free, Illinois seeks to impose an "unusual qualification" on national banks that would interfere with national banks' flexibility and their ability to exercise their powers effectively and efficiently. *Cf. San Jose*, 262 U.S. at 370 (holding that a state law that qualified a national bank power in an "unusual" way was preempted). Upon consideration of the text and structure of the laws, comparison to other precedents, and common sense, *Cantero*, 602 U.S. at 220, n.3, this Court should conclude that the interchange fee prohibition prevents or significantly interferes with national bank powers and is preempted. *Cf. Monroe, N.A.*, 589 F.3d at 283 ("We have found that the level of 'interference' that gives rise to preemption under the [National Bank Act] is not very high.").

**B.      The Use of Third Parties to Assist National Banks in Exercising Their Federal Powers Does Not Allow the State to Prevent or Significantly Interfere with Those Powers**

As demonstrated above, the interchange fee prohibition prevents or significantly interferes with a national bank's exercise of its powers under the National Bank Act, including the power to charge and receive fees for its banking products and services. Like the prohibitions on selling insurance in small towns addressed in *Barnett Bank*, 517 U.S. at 32, using "savings" in advertisements addressed in *Franklin*, 347 U.S. at 377, and setting limitations on due-on-sale clauses addressed in *Fidelity*, 458 U.S. at 159, IFPA "undeniabl[y]" prevents or significantly interferes with national bank powers, including to lend and to take deposits, as well as to charge and to receive fees for processing of debit and credit card transactions. 12 U.S.C. § 24 (Seventh);

- 14 -

12 C.F.R. § 7.4002(a). Yet the district court effectively concluded that any involvement of a third-party in a national bank's exercise of its powers effectively severs the preemptive effect of the National Bank Act for the national bank itself. This is an unworkable conclusion in the modern banking era and runs contrary to controlling law.

National banks play a vital role in processing credit and debit transactions, which are essential to the functioning of the nation's economy. IFPA does not account for the complexities of the national payments system nor the various roles of participants operating within that system. In a highly complex economy, national banks' powers to lend, take deposits, and to charge and receive fees have come to necessarily encompass some involvement of third parties. Card payment networks provide services that establish a common set of operating expectations that govern use of the network and interactions among financial institutions and other participants. These networks also maintain and improve on existing technological infrastructure to promote safety, efficiency, consistency, and interoperability, as well as to provide risk management services that are intended to detect and prevent fraud. Card payment networks perform these functions on behalf of banks and do so in a more efficient manner than client banks could perform individually.

National banks are authorized to enter contracts. 12 U.S.C. § 24 (Third). And regulations dictate that national banks are responsible for the activities of their service providers and have the obligation to "[e]xercise appropriate due diligence in selection its service providers[.]" 12 C.F.R part 30, app'x B, § D.1. Accordingly, federal law not only contemplates that national banks will use third parties to assist them in the exercise of their federally authorized powers but also expressly provides national banks with the power to do so.[6] Moreover, exercising a power

---

[6]     Moreover, Congress has afforded the OCC the right to regulate and examine third parties performing authorized national bank services "to the same extent as if such services were being performed by the depository institution itself on its own premises[.]" 12 U.S.C. § 1867(c)(1); *see*

authorized under the National Bank Act necessarily encompasses the flexibility to make business judgments to ensure the safe, sound, efficient, and effective discharge of that power. That includes making decisions about whether and to what extent to use third parties to facilitate the exercise of a power. *Cf. Fidelity*, 458 U.S. at 155.

At bottom, the district court's ultimate conclusion that IFPA's interchange fee prohibition is not preempted because third parties (i.e., credit card companies having contracts with national banks to facilitate the processing of payments) set the rates charged on transactions is erroneous. This Court should correct that error and reverse the district court's holding in that regard.

## III.    The District Court Misunderstood How the IFPA's Interchange Fee Prohibition Will Apply to National Banks

Even were the district court correct that preemption only applies when a state law directly regulates a national bank, the district court's statement that the interchange fee prohibition "does not directly regulate banks," RSA.12, is plainly mistaken. IFPA prohibits national banks from "receiv[ing] or charg[ing] a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction if the merchant informs the acquirer bank or its designee of the tax or gratuity amount as part of the authorization or settlement process for the electronic payment transaction." 815 Ill. Comp. Stat. 151/150-10(a). National banks do "receive" or "charge a merchant" interchange fees within the meaning of the interchange fee prohibition. Simply put, Plaintiffs'-Appellants' action is in fact the "far simpler case," RSA.20, for preemption that the district court discussed.

The district court described the role of payment card networks in setting interchange fees as the "core snag" in Plaintiffs'-Appellants' case. RSA.27. To the contrary, the inordinate attention

---

*also* 12 C.F.R. § 7.1004(b) ("A national bank may use the services of, and compensate, persons not employed by the bank in its loan production activities.").

to the role of networks in "setting" interchange fees, *id.* 12-13, 20-23, 27-28, is a fatal snag in the district court's opinion. IFPA reveals no exclusive concern with how interchange fees are set or which entity sets them.[7] Instead, IFPA prohibits all participants in the card payments networks— explicitly including issuers (i.e., banks), payment card networks, acquirers (i.e. banks), or processors—from "receiv[ing] or charg[ing]" a merchant interchange fees on tax and gratuity. 815 Ill. Comp. Stat. 151/150-10(a).

"Receive" and "charge" are undefined in IFPA, *id.* at 150-5, and as a result should be interpreted according to their ordinary and plain meaning. *See Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000) (citing *United States v. Wilson,* 159 F.3d 280, 291 (7th Cir. 1998)). Courts have "frequently look[ed] to dictionaries to determine the plain meaning of words[.]" *Id.* (citations omitted). The ordinary and plain meaning of "receive" includes "[t]o take (something offered, given, sent, etc,); to come into possession of or get from some outside source." *See Receive*, Black's Law Dictionary (12th ed. 2024). As the district court acknowledged, when national banks act as acquirers or issuers, they come into possession, and thereby receive, interchange fees. RSA.20 (stating that banks "receive" interchange fees).

To "charge," in its ordinary and plain meaning, includes "to demand a fee; to bill[.]" *See Charge*, Black's Law Dictionary (12th ed. 2024). An acquirer bank, having contracted with a merchant to process card transactions, demands the merchant discount fee that includes the applicable interchange for each transaction. *See* Merchant Processing Handbook at 2-3, 9-10, 31-

---

[7]     The expert report, upon which the Plaintiffs'-Appellants' 56.1 Statement of Undisputed Facts was largely based, explained that describing the card payment networks as "setting" the interchange fee was a "shorthand." *See* SA.76 (Expert Report of Anthony Hayes Dkt. 124-1) at ¶ 32 n.22  ("Although this report refers to payment card networks as setting interchange rates, this is shorthand. In fact, payment card networks establish default interchange rates, which apply in the absence of separately negotiated rates.").

32, 81-82. Similarly, issuing banks demand interchange fees, "extracted from the discount fee paid by the merchant who accepts a [payment] card transaction," that produce income for payment card operations. Credit Card Lending Handbook at 4, 60, 172. Moreover, Congress has clearly indicated that banks acting as issuers do, indeed, "receive or charge" interchange fees. *See* 15 U.S.C. § 1693*o*-2 (Durbin Amendment to Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, concerning reasonable fees to be "receive[d] or charge[d]" by an "issuer" with respect to electronic debit transactions over payment card networks). Contrary to the district court's implication, national banks are not merely passive beneficiaries of the payment card networks' operations. RSA.12. Rather, fees are a critical component of national banks' compensation for their payment processing activities, and national banks actively demand, negotiate, charge, and receive these fees as part of the payment process. These activities are federally authorized powers of national banks that the interchange fee prohibition seeks to improperly cabin.

Ultimately, contrary to the district court's view, the interchange fee prohibition "involve[s] direct interventions into banking operations." RSA.13. Not only are these interventions direct (which has no legal significance in the preemption analysis as explained above), they also prevent or significantly interfere with national banks' exercise of their federally authorized powers to set, charge, or receive non-interest fees (and their power to contract with third parties to do the same).

## IV. The Court Correctly Held that the National Bank Act Preempts IFPA's Data Usage Limitation

IFPA contains a second key provision: the data usage limitation. The data usage limitation makes it unlawful for any entity, other than a merchant, involved in facilitating or processing an electronic payment transaction "to distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." 815 Ill. Comp. Stat. 151/150-15(b). The district court correctly concluded that

- 18 -

the data usage limitation is preempted because it "in many respects wholly eliminate[s,]" "national banks' broad power to process data —which includes 'anything of value in banking and financial decisions' —as well as the role of data-processing in providing credit and debit card processing services." RSA.28-29 (citing 12 C.F.R. §§ 7.5006, 7.1000). This Court should affirm that holding and conclude that the data usage limitation is preempted.

A.    **National Banks Have the Power to Use Electronic Payment Transaction Data**

The OCC has consistently held that "as part of the business of banking, national banks may collect, transcribe, process, analyze, and store for itself and others banking, financial, or economic data." OCC. Inter. Ltr. 928, 2001 WL 1835017, at *4 (Dec. 24, 2001); *id.* n.12 (listing OCC interpretive rulings and letters that support this view); *see also* OCC Inter. Ltr. 1077, 2007 WL 1792535, at *4 (Jan. 11, 2007). Indeed, 12 C.F.R. § 7.5006 codifies these OCC interpretations and states, in part, that "[i]t is part of the business of banking under 12 U.S.C. § 24 (Seventh) for a national bank to provide data processing, and data transmission services . . . and access to such services . . . for itself and for others, where the data is banking, financial, or economic data," which "includes anything of value in banking and financial decisions." 12 C.F.R. § 7.5006.

National banks have the power to process and use data for a wide variety of purposes. For example, the OCC has observed that national banks use transaction data in a variety of ways, including to strengthen risk management and for fraud analysis, which enables efficient and effective operations and supports safety and soundness. *See*, *e.g.*, Payment Systems Handbook at 48 (explaining that banks use real-time monitoring of customer behavior to identify irregular payment patterns and prevent fraud); *Interagency Statement on the Use of Alternative Data in Credit Underwriting*, News Release 2019-143 (Dec. 3, 2019); *see also* OCC Bulletin 2019-37, Operational Risk Description: Fraud Risk Management Principles, 2019 WL 3408595, at *4 (July

24, 2019) (stating that national banks may "deploy solutions that serve to detect anomalies and prevent potential fraudulent transactions or activities . . . monitor transactions and behaviors, employ layered or multifactor authentication, monitor networks for intrusions or malware, analyze transactions on internal bank platforms, and compare data with consortium or publicly available data"). Accordingly, federal regulations and guidance afford national banks the flexibility to integrate fraud risk management principles "within the bank's risk management system commensurate with the bank's size, complexity, and risk profile," to include utilizing transaction data in support of fraud prevention. OCC Bull. 2019-37, 2019 WL 4308595, at *3.

**B.     The Data Usage Limitation Prevents or Significantly Interferes with National Banks' Exercise of Their Power Under the National Bank Act to Use Electronic Payment Transaction Data**

The district court correctly held that the data usage limitation is preempted by the National Bank Act under the *Barnett Bank* standard, because it is tantamount to a near-complete ban on national banks' exercise of their power to use transaction data. RSA.29-30 (discussing 12 C.F.R. § 7.5006). In so holding, the district court reasoned that while the Illinois General Assembly may have questions about the privacy and usage of its citizens' data, "the answers need to be confined within the bounds set out by the Supremacy Clause and downstream doctrines, including federal preemption. The mark was not met here." *Id.* This is because, as the district court recognized, federal law permits national banks to process and use transaction data whether or not the data comes from particular transactions. *Id.*

While the district court arrived at the correct holding—that the data usage limitation is preempted—it again took a misguided path to get there. While the district court stated that the data usage limitation is preempted under the *Barnett Bank* standard, the court seemingly did not apply that standard to the provision. Instead, the district court emphasized that IFPA's data usage

limitation is preempted because it "directly constrains" national banks' "express power" to process and use data. As discussed in depth above, *supra* § I, the correct inquiry is not whether the state law "directly constrains" an express power, but whether the state law prevents or significantly interferes with national banks' exercise of their federally authorized powers. As it pertains to the data usage limitation, however, the district court's error is harmless, as the application of *Barnett Bank* to that limitation yields the same result—the provision is preempted.

As previously discussed, federal law authorizes national banks to process and use transaction data in broad ways, including fraud detection, whereas the data usage limitation purports to preclude this federally authorized activity. Because Illinois law cannot prevent or significantly interfere with a national bank's exercise of its federally authorized power to use and process transaction data, just as the Florida law in *Barnett Bank* could not, the data usage limitation of IFPA conflicts with national banks' federal powers and is preempted.

As in *Fidelity*, 458 U.S. at 155, the data usage limitation improperly "deprive[s]" national banks of the "flexibility" federal law accords them to process and use transaction data. And, as was the case in *Franklin*, 347 U.S. at 377, national banks' powers to process and use transaction data should not be construed so narrowly as to preclude national banks' use of data in ways authorized by federal law. By precluding such use, IFPA's data usage limitation interferes with national banks' flexibility to engage in the business of banking "efficiently" and "effectively." *See Cantero*, 602 U.S. at 216 (citing *Franklin*, 347 U.S. at 377-78). Accordingly, the district court correctly concluded that IFPA's data usage limitation is preempted for national banks.

- 21 -

## CONCLUSION

For the reasons discussed herein, the Court should remand this case to the district court with instructions to enter a permanent injunction enjoining IFPA's interchange fee prohibition and affirm the district court's judgment enjoining IFPA's data usage limitation.


Dated: March 13, 2026                    Respectfully Submitted,

                                         WILL C. GILES, Principal Deputy Chief Counsel
                                         BRIAN P. HUDAK, Deputy Chief Counsel
                                         PETER C. KOCH, Director for Litigation
                                         AMBER N. MELTON, Assistant Director for Litigation
                                         ASHLEY W. WALKER, Special Counsel

                                         /s/ Hannah Hicks
                                         HANNAH HICKS, Counsel
                                         KRISTIN M. MCMANUS, Attorney
                                         400 7th Street S.W.
                                         Washington, D.C. 20219
                                         (202) 649-6300
                                         *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I, Hannah Hicks, counsel for Office of the Comptroller of the Currency, served the foregoing Brief and Certificate of Compliance Pursuant to Rule 32(g) on March 13, 2026, by ECF electronic filing system upon the parties.

/s/
_____

Hannah Hicks
Office of the Comptroller of the Currency
400 7th Street SW
Washington, D.C. 20219

## CERTIFICATE OF COMPLIANCE PURSUANT TO RULE 32(g)

The undersigned counsel hereby certifies that:

1. This brief complies with the type-volume limitation of Circuit Rule 29 because this brief contains 6,822 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 12-point Times New Roman font.

/s/
_____
Hannah Hicks
Office of the Comptroller of the Currency
400 7th Street SW
Washington, D.C. 20219