In the

# United States Court of Appeals for the Seventh Circuit

---

Case Nos. 26-1354, 26-1371, 26-1440, 26-1441

---

ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS, and ILLINOIS CREDIT UNION LEAGUE,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

KWAME RAOUL, in his official capacity as Illinois Attorney General,

*Defendant-Appellee/Cross-Appellant*.

---

Appeal from the United States District Court
for the Northern District of Illinois
No. 1:24-cv-07307
The Honorable Virginia M. Kendall, District Court Judge

---

**BRIEF OF THE BANK POLICY INSTITUTE, THE CLEARING HOUSE ASSOCIATION L.L.C., AND THE CONSUMER BANKERS ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS AND AFFIRMANCE IN PART AND REVERSAL IN PART OF THE DISTRICT COURT'S JUDGMENT**

---

H. Rodgin Cohen
Matthew A. Schwartz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
(212) 558-4000
cohenhr@sullcrom.com
schwartzmatthew@sullcrom.com

*Counsel for Amici Curiae*

March 13, 2026

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1354, 26-1371, 26-1440, 26-1441

Short Caption: Illinois Bankers Association v. Raoul

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Bank Policy Institute, The Clearing House Association L.L.C., Consumer Bankers Association

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sullivan & Cromwell LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A.

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A.

Attorney's Signature: /s/ Matthew A. Schwartz    Date: March 13, 2026

Attorney's Printed Name: Matthew A. Schwartz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: 125 Broad Street, New York, NY  10004

Phone Number: 212-558-4000    Fax Number: N/A.

E-Mail Address: schwartzmatthew@sullcrom.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1354, 26-1371,</u> 26-1440, 26-1441

Short Caption: <u>Illinois Bankers Association v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Bank Policy Institute, The Clearing House Association L.L.C., Consumer Bankers Association</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Sullivan & Cromwell LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A.</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A.</u>

Attorney's Signature: <u>/s/ H. Rodgin Cohen</u>    Date: <u>March 13, 2026</u>

Attorney's Printed Name:  <u>H. Rodgin Cohen</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  <u>125 Broad Street, New York, NY  10004</u>

Phone Number: <u>212-558-4000</u>    Fax Number: <u>N/A.</u>

E-Mail Address: <u>cohenhr@sullcrom.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ..................................................................... 1

SUMMARY OF ARGUMENT ................................................................... 3

ARGUMENT ................................................................................................ 9

    I.    The District Court's Reasoning Improperly Sanctions Evasion of the National Bank Act .......................................................... 9

    II.   The Interchange Fee Provision Significantly Interferes With National Banking Powers ................................................... 16

CONCLUSION ........................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am.* v. *City & Cnty. of San Francisco*,
 309 F.3d 551 (9th Cir. 2002) ........................................................ 3, 10

*Baptista* v. *JPMorgan Chase Bank, N.A.*,
 640 F.3d 1194 (11th Cir. 2011) .................................................. 4, 10

*Barnett Bank of Marion Cnty., N.A.* v. *Nelson*,
 517 U.S. 25 (1996) ..................................................................... *passim*

*Cantero* v. *Bank of Am., N.A.*,
 602 U.S. 205 (2024) ................................................................... *passim*

*Conti* v. *Citizens Bank, N.A.*,
 157 F.4th 10 (1st Cir. 2025) ............................................................ 15

*First Nat'l Bank of San Jose* v. *California*,
 262 U.S. 366 (1923) .................................................................. 15, 18

*Franklin National Bank of Franklin Square* v. *New York*,
 347 U.S. 373 (1954) ................................................................... *passim*

*Ill. Bankers Ass'n* v. *Raoul*,
 760 F. Supp. 3d 636 (N.D. Ill. 2024) ...................................... 6, 11, 21

*Ill. Bankers Ass'n* v. *Raoul*,
 2026 WL 371196 (N.D. Ill. Feb. 10, 2026) ............................... *passim*

*Watters* v. *Wachovia Bank, N.A.*,
 550 U.S. 1 (2007) ........................................................................... 23

**Statutes**

12 U.S.C. § 24 ..................................................................................... *passim*

15 U.S.C. § 1693o-2 ...................................................................... 4, 10, 17

**Other Authorities**

12 C.F.R. § 5.20 ................................................................................ 3, 16

12 C.F.R. § 7.4002 ....................................................................... 3, 10, 17

12 C.F.R. § 235.3 ..................................................................................... 5

12 C.F.R. § 235.4 ..................................................................................... 5

815 Ill. Comp. Stat. Ann. 151/150-10 ......................................... 5, 10, 20

Am. Bankers Ass'n, *National Survey:  U.S. Consumers Happy with their Bank, Applaud Banks' Fraud Protection Efforts* (Apr. 8, 2025) ...................... 21

Am. Bankers Ass'n, *The Benefits of Credit Card Rewards:  How Rewards Provide Value to Merchants and Consumers of All Incomes* (June 23, 2021) .............................................................................................. 21

Ass'n for Fin. Pros., *Interchange Fees Explained:  What They Are and How They Work*, Association for Financial Professionals (Jan. 27, 2025) ............. 19

Bd. of Governors of the Fed. Rsrv. Sys., *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Losses Related to Debit Card Transactions* (Dec. 2025) .................................. 19

Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve Payments Study (FRPS)* (last updated Mar. 12, 2025) ................................................................ 19

Brief of *Amici Curiae* The Bank Policy Institute et al. in Support of Defendant-Appellant, *Kivett* v. *Flagstar Bank, FSB*, 154 F.4th 640 (9th Cir. Feb. 13, 2025) (No. 21-15667), Dkt. No. 95-2 ............. 2

Brief of *Amici Curiae* The Bank Policy Institute et al. in Support of Petitioner, *Bank of Am., N.A.* v. *Lusnak*, 139 S. Ct. 567 (Sept. 17, 2018) (No. 18-212) ...................................................... 2

Brief of *Amici Curiae* The Bank Policy Institute et al. in Support of Respondent, *Cantero* v. *Bank of Am., N.A.*, 602 U.S. 205 (Jan. 25, 2024) (No. 22-529) ............................................................ 3

Brief of The Bank Policy Institute et al. as *Amici Curiae* in Support of Defendant-Appellee, *Conti* v. *Citizens Bank, N.A.*, 157 F.4th 10 (1st Cir. Nov. 4, 2024) (No. 22-1770) ............................................ 3

Brief of the OCC as *Amicus Curiae* in Support of Plaintiffs' Motion For a Preliminary Injunction, *Ill. Bankers Ass'n* v. *Raoul*, No. 24-cv-07307 (N.D. Ill. Oct. 2, 2024) ............................................................ 12

Fed. R. App. P. 29 ....................................................................................................... 1

Howard W. Herdon, *The Complexities and Costs of Eliminating Interchange Fees on Sales Tax Portions*, Nat'l L. Rev. (June 14, 2024) ............................. 20

Josh Pynn, *Interchange Legislation Throughout the States*, Merchant Advisory Group (July 1, 2025) ......................................................................... 22

Latham & Watkins LLP, *Federal Court Partially Upholds Illinois Law Limiting Interchange Fees* (Feb. 19, 2026) ...................................................... 22

Mark D. Manuszak & Krzysztof Wozniak, *The Impact of Price Controls in Two-sided Markets: Evidence from US Debit Card Interchange Fee Regulation* (Fed. Rsrv. Bd., Working Paper No. 2017-074, 2017) ............. 21, 22

Natasha Sarin, *Making Consumer Finance Work*,
119 Colum. L. Rev. 1519 (2019)........................................................................ 22

OCC, Corporate Decision #99-50 (Dec. 23, 1999) ................................................. 3, 17

OCC, Interpretive Letter No. 689,
1995 WL 604271 (Aug. 9, 1995).................................................................. 3, 17

Peter Lucas, *The States' Battle to Regulate Interchange* (July 1, 2025) ................... 22

The Attorney General's Reply in Support of His Cross-Motion for Summary
Judgment, *Ill. Bankers Ass'n* v. *Raoul*,
No. 24-cv-07307 (N.D. Ill. May 21, 2025), Dkt. No. 154 ................................... 8

William F. Baxter, *Section 85 of the National Bank Act and Consumer
Welfare*, 1995 Utah L. Rev. 1009 (1995)........................................................ 21

Zachary Milne, *The Economic Impact of State Restrictions on Interchange
Fees*, Common Sense Institute (Feb. 3, 2025) ................................................. 22

## STATEMENT OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 29, the Bank Policy Institute ("BPI"), Consumer Bankers Association ("CBA"), and The Clearing House Association ("TCH") (collectively, "*Amici*"), respectfully submit this brief in support of Plaintiffs-Appellants and of part affirmance and part reversal of the District Court's ruling.[1]

*Amici*'s members have extensive experience working with the nation's core payment networks, maintaining complex compliance and fraud-prevention systems, and serving millions of consumers and businesses across all 50 states. This brief will thus assist this Court by providing unique insight into the broader regulatory and commercial context at issue, while also offering practical perspectives and empirical data regarding the potential consequences of the District Court's proposed framework. All parties consented to the filing of this *amici curiae* brief. *See* Fed. R. App. P. 29(a)(2).

***The Bank Policy Institute.*** BPI is a nonpartisan public policy, research, and advocacy group that represents universal banks, regional banks, and the major foreign banks doing business in the United States. BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry

---

[1]     The undersigned counsel certify that no party's counsel authored this brief in whole or in part, and no party or party's counsel, or any other person or entity, other than *Amici*, their members, or their counsel, contributed money that was intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

with respect to cybersecurity, fraud, and other information security issues.

**The Clearing House Association L.L.C.**  Established in 1853, TCH is a nonpartisan advocacy organization that represents the interests of its member banks by developing and promoting policies to support a safe, sound, and competitive banking system that serves customers, communities, and economic growth.  TCH's sister company, The Clearing House Payments Company L.L.C. ("PaymentsCo"), owns and operates U.S. payments networks that provide safe, sound, and efficient payment clearing and settlement services to financial institutions.  PaymentsCo's CHIPS® wire-transfer system and EPN® automated clearing house ("ACH") network clear and settle more than $2 trillion of payments every business day.

**The Consumer Bankers Association.**  CBA is the trade association for banking services geared toward consumers and small businesses.  Its members include the nation's largest financial institutions, as well as many regional banks, which operate in all 50 states and collectively hold two-thirds of the country's total deposits.

Collectively, *Amici* have a substantial interest in maintaining a predictable and uniform preemption framework under the National Bank Act of 1864 ("NBA").  *Amici* thus routinely submit *amici curiae* briefs in cases that raise questions critical to the U.S. banking system, including questions of federal preemption under the NBA, such as this one.[2]

---

[2]    *See, e.g.*, Brief of *Amici Curiae* The Bank Policy Institute et al. in Support of Petitioner, *Bank of Am., N.A.* v. *Lusnak*, 139 S. Ct. 567 (Sept. 17, 2018) (No. 18-212); Brief of *Amici Curiae* The Bank Policy Institute et al. in Support of Defendant-Appellant, *Kivett* v. *Flagstar Bank, FSB*, 154 F.4th 640 (9th Cir. Feb. 13,

## SUMMARY OF ARGUMENT

This case presents an issue of exceptional doctrinal and practical importance to the system of NBA preemption protection for federally chartered banks: whether a state may circumvent NBA preemption by regulating third parties—not national banks themselves—in a way that significantly interferes with national banks' federally granted powers. The answer is no.

The NBA authorizes national banks to engage in core banking functions, including "[r]eceiving deposits," "paying checks," and "lending money." 12 C.F.R. § 5.20(e)(1)(i); *see* 12 U.S.C. § 24 (Seventh). As part of those core functions, banks also have the power to operate credit and debit card programs. Off. of the Comptroller of the Currency ("OCC"), Corporate Decision #99-50, at 4 (Dec. 23, 1999) ("[P]rocessing credit and debit card transactions and other electronic payments are clearly part of the business of banking."); OCC, Interpretive Letter No. 689, 1995 WL 604271, at *1 (Aug. 9, 1995) ("The processing of credit card transactions for merchants is a part of or incidental to the business of banking within the meaning of 12 U.S.C. 24 (Seventh)."). And the power to provide such services necessarily encompasses the power to receive compensation in connection therewith, including the methods by which banks receive such compensation. 12 C.F.R. § 7.4002(a) ("A national bank may charge its customers non-interest charges and fees . . . ."); *Bank of Am.* v. *City & Cnty.*

---

2025) (No. 21-15667), Dkt. No. 95-2; Brief of The Bank Policy Institute et al. as *Amici Curiae* in Support of Defendant-Appellee, *Conti* v. *Citizens Bank, N.A.*, 157 F.4th 10 (1st Cir. Nov. 4, 2024) (No. 22-1770); Brief of *Amici Curiae* The Bank Policy Institute et al. in Support of Respondent, *Cantero* v. *Bank of Am., N.A.*, 602 U.S. 205 (Jan. 25, 2024) (No. 22-529).

*of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002) ("The establishment of [non-interest fees] 'are business decisions to be made by each bank . . . according to sound business judgment and safe and sound banking principles.'"); *Baptista* v. *JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.2 (11th Cir. 2011) (same); *cf.* 15 U.S.C. § 1693o-2(a)(1), (a)(2) (acknowledging that banks "may *receive*" "interchange transaction fee[s]") (emphasis added).

Banks rely upon payment card networks (*e.g.*, Visa, Mastercard, Discover) in carrying out these core powers. Specifically, the payment card networks provide technology that enables banks to determine whether a customer has sufficient funds or credit available to make certain purchases, monitor for fraudulent activity, and settle any given transaction. Each entity involved in this process is compensated accordingly. For example, banks have historically received "interchange fees," *i.e.*, fees that work their way through a series of payment system participants—the merchant, the merchant's bank ("acquirer bank"), and the payment card network—and ultimately end up with the issuer banks and compensate the issuer banks for providing the card service. Payment card networks are thus essential to banks' technical operations, as well as the means by which banks are compensated for providing such services.

Since 2010, the amount of interchange fees has been capped by federal statute to ensure that the amount of any debit interchange fee that a bank may receive "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). In 2011, the Federal Reserve

limited interchange fees per transaction to no more than a sum of: (i) $0.21; (ii) an *ad valorem* amount of 5 basis points multiplied by the "value of the transaction" (with no carve-outs from the total value of the transaction); and (iii) up to a $0.01 "fraud-prevention adjustment." 12 C.F.R. §§ 235.3, 235.4. But under intense lobbying from merchants, Illinois has attempted to impose further restrictions by enacting the Illinois Interchange Fee Prohibition Act ("IFPA"), which contains an "Interchange Fee Provision" stating that:

> An issuer, a payment card network, an acquirer bank, or a processor *may not receive* or charge a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction if the merchant informs the acquirer bank or its designee of the tax or gratuity amount as part of the authorization or settlement process for the electronic payment transaction.

815 Ill. Comp. Stat. Ann. 151/150-10(a) (emphasis added).

To analyze whether the NBA preempts this provision of the IFPA, the District Court below should have applied the Supreme Court's 2024 decision in *Cantero* v. *Bank of America, N.A.*, and analyzed whether it "prevents or significantly interferes with [a] national bank's exercise of its powers." 602 U.S. 205, 220 (2024) (citing *Barnett Bank of Marion Cnty., N.A.* v. *Nelson*, 517 U.S. 25, 33 (1996)). The District Court was thus required to undertake a "practical assessment of the nature and degree of the interference caused by a state law," including a detailed analysis of "the text and structure of the laws, comparison to other precedents, and common sense." *Id.* at 219-220, 220 n.3. The District Court correctly applied *Cantero* in its preliminary injunction ruling and held that states significantly interfere with national bank powers when they attempt to regulate the prices that national banks

are explicitly authorized to charge on activities that the NBA authorizes them to perform. *Ill. Bankers Ass'n* v. *Raoul*, 760 F. Supp. 3d 636, 654-57 (N.D. Ill. 2024).

At the merits stage, however, the District Court did an abrupt and unexpected about-face. Instead of following *Cantero*, the District Court improperly elevated form over substance, emphasizing that because payment card networks, rather than issuers themselves, set interchange fee rates that merchant acquirers pay, the IFPA does not "directly" regulate national banks, and thus NBA preemption did not apply. *Ill. Bankers Ass'n* v. *Raoul*, 2026 WL 371196, at *9-10, *13 (N.D. Ill. Feb. 10, 2026). As an initial matter, the District Court appears to misunderstand how the payments system operates. *Id.* at *13 (noting the networks "built this ecosystem"). Banks—not networks—provide products to consumers. Banks issue checking accounts, extend credit, and issue the physical cards that consumers use. Networks merely facilitate the provision of such services and process the transaction as service providers to the card issuing banks.

Even setting aside the District Court's mistaken premise, its analysis is incorrect. Allowing states to evade NBA preemption merely by regulating the third parties on which banks rely to carry out their federal powers would create a glaring loophole in the NBA preemption doctrine and essentially render the doctrine meaningless. If that were the rule, a state could not forbid national banks from "loaning money on personal security," 12 U.S.C. § 24 (Seventh), but it could prohibit credit bureaus from furnishing credit reports to national banks for use in underwriting consumer loans, thereby preventing national banks from evaluating

credit risk and issuing loans on personal security. A state could not prohibit national banks from advertising "savings" accounts (as in *Franklin*), but it could bar billboard companies, newspapers, and broadcasters from carrying advertisements using the word "savings." And a state could not prohibit national banks from selling insurance (as in *Barnett Bank*), but it could forbid licensed insurance underwriters from contracting with them. Simply put, there is very little national banks can do without interacting with third parties.

The District Court's logic would also lead to an absurd result. Issuing banks can, and already sometimes do negotiate different interchange fee rates with individual merchants. Presumably, under the District Court's order, the Interchange Fee Provision would be preempted as to transactions with those merchants because it would be the issuing bank that is driving the interchange fee rate, as opposed to the issuing bank simply accepting the default interchange fee rate set by the payment card network. If this is correct, it means that issuing national banks that want to benefit from NBA preemption will now be forced either to (i) engage in the substantially inefficient process of negotiating interchange fees with tens- or hundreds of thousands of Illinois merchants, or (ii) negotiate with each network what fees should be charged to different merchants (as opposed to simply choosing a network in part based on those fees).

Once the District Court's mistaken analysis of third-party regulation is set aside, *Barnett Bank* and its progeny overwhelmingly support the conclusion that the Interchange Fee Provision significantly interferes with national banking powers

and is preempted.  By restricting the fees that national banks receive in connection with card transactions, the Interchange Fee Provision deprives national bank card issuers of their ability to carry out debit and credit programs by imposing substantial financial strain and operating as a *de facto* price control on nationally authorized banking products.  And the Interchange Fee Provision is no mere blip:  it threatens to reduce the portion of a transaction on which national banks can charge an interchange fee by at least as high as 23%.[3]  Nor can those banks make up the fees in other ways, as the IFPA contains an "anti-circumvention" provision.

As a result of the diminished fees, consumers will suffer.  Banks rely on interchange fee revenue to support fraud prevention, data security, transaction processing, customer service, and rewards programs, all of which consumers rely upon day to day.  And although it is impossible to calculate precisely the total amount by which the IFPA will reduce interchange fee revenue, there is no doubt that such reductions will significantly interfere with banks' ability to provide payment card products and services to consumers.

For these reasons, this Court should reverse the District Court's judgment that the NBA does not preempt the Interchange Fee Provision, thereby preserving the uniform national banking framework Congress intended.[4]

---

[3]     Although the Attorney General previously attempted to argue that the IFPA does not constitute "significant interference," he acknowledged that the IFPA would reduce interchange fees by at least 9% in all cases.  The Attorney General's Reply in Support of His Cross-Motion for Summary Judgment at 5, *Ill. Bankers Ass'n*, No. 24-cv-07307 (N.D. Ill. May 21, 2025), Dkt. No. 154.  In purchases involving gratuities, the reduction would be more than double that amount.

[4]     Although this brief does not address the District Court's ruling that the NBA

## ARGUMENT

**I.    The District Court's Reasoning Improperly Sanctions Evasion of the National Bank Act.**

The NBA preempts a state law if the law "prevent[s] or significantly interfere[s] with the national bank's exercise of its power." *Barnett Bank*, 517 U.S. at 33.  Nothing in that standard allows a state to pass laws that interfere with a national bank's exercise of its power simply by regulating a third party, as opposed to the national bank itself.  As part of the preemption assessment, "[t]he Supreme Court has explicitly highlighted that [an] express conflict is not a requirement for NBA preemption to apply." *Ill. Bankers Ass'n*, 2026 WL 371196, at *11 (citing *Cantero*, 602 U.S. at 220 n.3).  Rather, assessing whether a state law "prevent[s] or significantly interfere[s] with [a] national bank's exercise of its power," *Barnett Bank*, 517 U.S. at 33, requires courts to undertake a "*practical assessment* of the nature and degree of the interference caused by a state law," including an analysis of the "text and structure of the law[], comparison to other precedent, and *common sense*." *Cantero*, 602 U.S. at 219-20, 220 n.3 (emphasis added).

The District Court failed to undertake any practical assessment.  Instead, the District Court focused extensively on the fact that the IFPA does not "*directly* interfere[] with fees the banks *directly* charge[]" and so held that NBA preemption did not apply.  *Ill. Bankers Ass'n*, 2026 WL 371196, at *9-11, *13 (emphasis added).  According to the District Court, "the core snag in Plaintiffs' case"

---

preempts the Data Usage Prohibition, *Amici* support affirmance of that part of the District Court's decision.

is that "third parties set the fees." *Id.* at *13. But the statute also explicitly provides that "[a]n issuer [*i.e.*, a bank], . . . *may not receive* . . . any interchange fee on the tax amount or gratuity of an electronic payment transaction," thus directly interfering with national banks' powers to receive those interchange fees. 815 Ill. Comp. Stat. Ann. 151/150-10(a) (emphasis added). The District Court's logic is legally unsound and threatens to make NBA preemption easily avoidable by state legislatures seeking to encroach on federally protected rights.

The District Court's misplaced emphasis on the fact that national banks (at least in many cases) do not independently dictate interchange fee rates with merchants or networks misses the point. The banks are entitled to receive non-interest fees in connection with operating and processing card transactions, regardless of whether banks in all cases independently negotiate or set those fees, and the IFPA directly prohibits banks from doing so. *See* 12 U.S.C. § 24 (Seventh); 12 C.F.R. § 7.4002(a) ("A national bank may charge its customers non-interest charges and fees . . . ."); *Bank of Am.*, 309 F.3d at 562 ("The establishment of [non-interest fees] 'are business decisions to be made by each bank . . . according to sound business judgment and safe and sound banking principles.'"); *Baptista*, 640 F.3d at 1198 n.2 (same); *cf.* 15 U.S.C. § 1693o-2(a)(1), (a)(2) (acknowledging banks "may *receive*" interchange fees) (emphasis added). And although the District Court acknowledged that the "Interchange Fee Provision is indisputably disruptive" to national banks' powers, according to the District Court, any such disruptions to banks' operations are inapposite because they "are the product of an ecosystem built

by Payment Card Networks and financial institutions to facilitate consumer transactions." *Ill. Bankers Ass'n*, 2026 WL 371196, at \*12.  The District Court never explained the significance of this fact under *Barnett Bank*.  Nor could it.  The focus under *Barnett Bank* is only whether state law "prevent[s] or significantly interfere[s] with the *national bank's* exercise of its power."  *Barnett Bank*, 517 U.S. at 33 (emphasis added).  Whether other entities are also burdened because they "understand the onus of IFPA compliance is on them"[5] does not change the disruptive nature of the Interchange Fee Provision on *national banks' exercise of their powers*, which fundamentally includes the ability to receive fees for their services.[6]  *Ill. Bankers Ass'n*, 2026 WL 371196, at \*12.

In any event, the District Court's assessment that "[t]he Payment Card Networks built this ecosystem, and the Payment Card Networks set these [interchange] fees" does not comport with reality.  *Id.* at \*13.  Banks are not just some part of this "ecosystem," and it is inaccurate to suggest that national banks have no

---

[5]     As a factual matter, the IFPA subjects banks to substantial compliance costs ranging up to a billion dollars, which "would be so devastating to [some banks] that it may drive them from the market altogether."  *Ill. Bankers Ass'n*, 760 F. Supp. 3d at 663-64.

[6]     Contrary to the District Court's suggestion, it is also irrelevant that banks could not receive the interchange fees unless "every other participant in the transaction, down to completely private entities like Visa and Mastercard, were also exempted from the IFPA's impact."  *Ill. Bankers Ass'n*, 2026 WL 371196, at \*6.  Again, the focus under *Barnett Bank* is whether the law significantly interferes with national banks' federal powers.  Whether other participants in the transaction chain must be exempted in order to effectuate relief merely reflects the structure of the payments system, not an expansion of NBA preemption.  Exempting those parties from the IFPA is not anomalous.  Rather, consistent with *Cantero*'s directive, such a consequence is necessary to ensure that national banks' federal authority is meaningful in practice.

role in setting the interchange fees.  Banks have the statutory authority to engage in the "business of banking" by, among other things, "receiving deposits" and "loaning money on personal security," 12 U.S.C. § 24 (Seventh), which customers rely upon to use debit and credit cards as payment methods.  And it is a "fundamental principle" that banks "have the authority to charge for" such services.  Brief of the OCC as *Amicus Curiae* in Support of Plaintiffs' Motion For a Preliminary Injunction at 7, *Ill. Bankers Ass'n*, No. 24-cv-07307 (N.D. Ill. Oct. 2, 2024), Dkt. No. 61-1.

Banks sometimes exercise this power by negotiating different interchange rates with certain acquirers.  But banks are not required, as the District Court suggests, to engage in individualized negotiations with thousands upon thousands of merchants to set fees for those services or engage in specific types of negotiations with networks in order to preserve their statutory powers.  In addition, banks—not networks—provide the actual products to consumers.  Banks provide checking accounts, not networks.  Banks issue credit lines, not networks.  And banks issue credit and debit cards, not networks.  Banks carry out all of these services through the networks, who ultimately process the transaction.  In other words, the networks are service providers to the banks, not the other way around.

Taking the District Court's reasoning to its logical end, *any* state regulation that does not *directly* regulate national banks' powers would not be subject to NBA preemption, irrespective of the impact on national banks.  Such a result is unwarranted and contravenes *Cantero*'s requirement that courts "practical[ly] assess[] . . . the nature and degree of the interference caused by a state law," while

also defying "common sense." *Cantero*, 602 U.S. at 219-20, 220 n.3. States cannot bypass *Cantero* and regulate national banks indirectly in ways that they could not directly. National banks are not islands unto themselves. They can only carry out their national bank powers by interacting with other companies, institutions, and people. To function properly, they must receive utilities from utility companies, maintain telecommunications and internet connectivity from service providers, lease or finance physical space from landlords, engage armored transport services for cash handling, and work with technology vendors for cybersecurity and fraud detection, data centers for cloud storage and processing, and card manufacturers to issue physical cards. The exercise of national banking powers is inseparable from an ecosystem of third-party relationships.

The flaws in the District Court's reasoning are highlighted by illustrative examples. It is uncontroversial that a state cannot outlaw national banks from extending unsecured credit, as the power to "loan[] money on personal security" is expressly granted by 12 U.S.C. § 24 (Seventh). It must also be true that a state cannot infringe upon that federal power merely by prohibiting credit bureaus from furnishing credit reports to national banks for use in underwriting consumer loans. Although the statute would formally regulate credit reporting agencies, the law undoubtedly would significantly interfere with a core federal banking power, as it would prevent national banks from evaluating credit risk and issuing loans on personal security. Yet, under the District Court's reasoning, NBA preemption cannot apply because the state merely restricts credit bureaus, not the national banks.

Alternatively, consider the "paradigmatic example of significant interference" in *Franklin National Bank of Franklin Square* v. *New York*, 347 U.S. 373 (1954). *See Cantero*, 602 U.S. at 206. There, the state law at issue prohibited national banks from using the word "savings" in their advertisements. *Franklin Nat'l Bank of Franklin Square*, 347 U.S. at 374. Federal law granted national banks the power to receive savings deposits. *Id.* at 375-76. The Court held that NBA preemption applied. *Id.* at 377-78. Although the law "did not bar national banks from receiving savings deposits, 'or even' from 'advertising that fact,' . . . the [state] law significantly interfered with the banks' [incidental] power because the banks could not advertise effectively." *Cantero*, 602 U.S. at 216. The District Court attempted to distinguish *Franklin* because "third parties set the [interchange] fees" prohibited by the IFPA. *Ill. Bankers Ass'n*, 2026 WL 371196, at *13. But does anyone think that *Franklin* would have turned out differently if, instead of banning national banks from using the word "savings" in their advertisement, New York had simply banned billboard companies, newspapers, and television and radio stations from carrying national bank ads using the word savings? Of course not.

A final example underscores the point. In *Barnett Bank*, Florida directly prevented a national bank from selling insurance in a small Florida town, notwithstanding Congress' grant of authority to do so. 517 U.S. at 27-29. But what if the law instead prohibited any licensed insurance underwriter from contracting with a national bank? It makes no difference. The law would still significantly interfere with national banks' ability to sell insurance.

Whether a state law regulates a national bank directly or indirectly is inapposite, and is precisely why "[t]he Supreme Court has explicitly highlighted that express conflict is not a requirement for NBA preemption to apply." *Ill. Bankers Ass'n*, 2026 WL 371196, at *11. A state law need not regulate an express power or have a direct monetary impact on national banks to constitute "significant interference." *See, e.g.*, *Franklin*, 347 U.S. at 377-78 (NBA preempts a state law prohibiting the use of a single word in advertising); *First Nat'l Bank of San Jose* v. *California*, 262 U.S. 366, 366, 369-70 (1923) (NBA preempts a state law regulating unclaimed deposits). Here, whether the Interchange Fee Provision regulates another entity does not inform whether the law also significantly interferes with national banks' powers. A state law cannot "interfere with the national bank's ability to [engage in a permitted business] efficiently." *Cantero*, 602 U.S. at 216. When properly focused on the Interchange Fee Provision's "practical effect" on the national banking power, rather than the precise method through which the law interferes, it is clear that the Interchange Fee Provision does exactly that. *See Conti* v. *Citizens Bank, N.A.*, 157 F.4th 10, 25 (1st Cir. 2025) (explaining that the Supreme Court's preemption analysis in *First National Bank* and *Franklin* "turned in large measure on the likely practical effects that a state law would have on the ability of national banks to exercise their powers").

In the end, the District Court's approach reduces NBA preemption to an exercise in evasion based on an effort to accomplish a result that is otherwise impermissible. By focusing on which entity formally "sets" interchange fees, the

District Court grounds its analysis in private contracting mechanics rather than in the state statute's interference with national banking powers. Under the District Court's own framework, if issuers tomorrow assumed formal responsibility for publishing interchange fee schedules in the course of their negotiations with card networks, then the Interchange Fee Provision would suddenly be preempted. Yet the interference with the power to receive interchange fees would be identical. Making the application of preemption turn on such a formalistic distinction not only invites end-runs around the NBA, but defies the "common sense" approach the Supreme Court requires. *Cantero*, 602 U.S. at 220 n.3.

The District Court's formalistic reasoning violates *Cantero*. This Court should reverse in part and find that the NBA preempts the Interchange Fee Provision.

## II. The Interchange Fee Provision Significantly Interferes With National Banking Powers.

Once this Court sets aside the District Court's misplaced focus on the fact that the IFPA does not "directly" regulate banks, a proper "practical assessment" clearly demonstrates that the IFPA significantly interferes with national banks' powers, including the power to receive fees and operate credit and debit card programs. *Cantero* thus requires that the NBA preempt the IFPA's Interchange Fee Provision.

The NBA establishes the power of national banks. That power encompasses "three core banking functions": "[r]eceiving deposits," "paying checks," and "lending money." 12 C.F.R. § 5.20(e)(1)(i); 12 U.S.C. § 24 (Seventh). These core

-16-

functions include the power to operate credit and debit card programs, including the power to receive fees related to processing credit and debit card transactions. OCC, Corporate Decision #99-50, at 4 (Dec. 23, 1999) ("[P]rocessing credit and debit card transactions and other electronic payments are clearly part of the business of banking."); *see also, e.g.*, OCC, Interpretive Letter No. 689, 1995 WL 604271, at \*1 (Aug. 9, 1995) ("The processing of credit card transactions for merchants is a part of or incidental to the business of banking within the meaning of 12 U.S.C. 24 (Seventh)."). Banks carry out these powers through the networks. For example, networks provide technology that enables banks to determine whether to approve a transaction, monitor fraud, and settle the transaction. In addition, networks process the transaction and facilitate the flow of funds, including the interchange fees, for the banks.

*First*, although (as to most merchants) the issuing banks do not *set* the interchange fees, they unquestionably *receive* them. Banks are inherently authorized to *receive* non-interest fees in connection with operating and processing card transactions. 12 U.S.C. § 24 (Seventh); 12 C.F.R. § 7.4002(a) ("A national bank may charge its customers non-interest charges and fees . . . ."); *cf.* 15 U.S.C. § 1693o-2(a)(1), (a)(2) (acknowledging banks "may *receive*" interchange fees) (emphasis added). And as the District Court acknowledges, the Interchange Fee Provision explicitly bans banks "from receiving . . . any interchange fees." *Ill. Bankers Ass'n*, 2026 WL 371196, at \*2. Whether a bank formally *sets* the fees that it is entitled to receive is fundamentally irrelevant, and the District Court never purports to

explain why such a distinction matters. *See id.* at *9 (explaining that preemption cannot apply because "banks do not set, or arguably charge, interchange fees; rather, they receive them"). It does not. The Interchange Fee Provision directly bans banks from receiving interchange fees, acting as a *de facto* price control on national banks, and thereby making it more expensive (and difficult) for national banks to provide card products and services.[7] As a result, the Interchange Fee Provision significantly interferes with the national banking powers to receive compensation for operating and processing card transactions.[8]

Even more, the Interchange Fee Provision will impose a material restraint on national banks, thereby reducing their ability to fund and support their core operations more significantly than the laws at issue in *Franklin* and *First National Bank*. For example, the state sales tax in Illinois (before factoring in county and city taxes) is on average "nearly 9 percent." *Id.* at *2. The total sales tax in Chicago is 10.25%. *Id.* State and local governments also impose other types of taxes,

---

[7]    As a price control, the Interchange Fee Provision effectively forces issuer banks to tell networks what rates they ought to charge for the bank to work with them. But as part of selecting which payment network to use, issuers already consider the fee amount that they will receive. Although national banks do not directly set the interchange fee rates themselves, it is a consideration that falls squarely within their discretion in terms of the networks with which they choose to do business. And the amount of these fees is crucial in the decision-making process for national banks in offering services that they are entitled to offer.

[8]    Under the District Court's framework, a state could apparently forbid interchange fees on a wide variety of products or services, including gasoline, groceries, or other categories of transactions, so long as the network, rather than the bank, formally publishes the rate. For example, a state could forbid interchange on the first $X of any payment, or otherwise cap interchange above a specified percentage. And so could any municipality.

such as transportation and excise taxes, and many types of businesses adopt a gratuity-based model. Assuming a 20% gratuity on a meal in Chicago, the Interchange Fee Provision would reduce the portion of that transaction on which banks could charge an interchange fee by, as a conservative estimate, about 23%. National banks depend on this interchange revenue to fund their core operations and consumer benefits, including offering card products and services to consumers, covering authorization, clearing, and settlement costs, offsetting losses from fraudulent card transactions, funding fraud-prevention and data-security efforts, supporting customer service and account-related costs, and funding rewards and incentive programs.[9] Although it is difficult to precisely calculate the extent to which the Interchange Fee Provision will reduce national banks' interchange fee revenue, reductions in revenue will only continue to grow as noncash payment methods become increasingly popular.[10] As a result, the Interchange Fee Provision's profound impact on the economic viability of national banks' card-related activities will become more pronounced over time.

---

[9]     *See generally* Bd. of Governors of the Fed. Rsrv. Sys., *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* 26-29 (Dec. 2025), https://www.federalreserve.gov/paymentsystems/files/debitfees_costs_2023.pdf; Ass'n for Fin. Pros., *Interchange Fees Explained:  What They Are and How They Work*, Association for Financial Professionals (Jan. 27, 2025), https://www.financialprofessionals.org/training-resources/resources/articles/Details/interchange-fees-explained-what-they-are-and-how-they-work?utm_.

[10]     Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve Payments Study (FRPS)* figs. 1 & 2 (last updated Mar. 12, 2025), https://www.federalreserve.gov/paymentsystems/fr-payments-study.htm (indicating a steady increase in debit and credit card transactions between 2000 and 2022 in terms of both transaction volume and transaction value).

At the same time, and as the District Court acknowledges, the IFPA introduces "staggering" compliance costs for banks. *Ill. Bankers Ass'n*, 2026 WL 371196, at *6, *13. Contrary to the District Court's assessment that such costs are not a "question in front of this Court," such obstacles are central to the question of "significant interference." *Id.* at *7. And this is not a question of some tangential effect. The banks are directly impacted. Indeed, as industry analysts have observed, banks will likely need to invest anywhere from hundreds of millions to a *billion* dollars to design and update the technical and human infrastructure that the IFPA demands.[11] Because current payments infrastructure does not support disaggregating tax or gratuity from a total amount in such a manner that the Interchange Fee Provision requires, most or all point-of-sale software and hardware will need to be updated or replaced. Banks therefore must develop systems to exclude taxes and gratuities from interchange fee calculations, and retain and train employees to implement the complex system contemplated by the Interchange Fee Provision for merchants that elect to provide *post hoc* notification of the portion of taxes and gratuities in their transactions. *See* 815 Ill. Comp. Stat. Ann. 151/150-10(b). To complicate the equation even further, banks will need to account for different taxes levied by over 600 tax jurisdictions in Illinois. As the District Court

---

[11]    Howard W. Herdon, *The Complexities and Costs of Eliminating Interchange Fees on Sales Tax Portions*, Nat'l L. Rev. (June 14, 2024), https://natlawreview.com/article/complexities-and-costs-eliminating-interchange-fees-sales-tax-portions ("[I]ndustry analysts suggest that the total costs [of implementing something like the Interchange Fee Provision] could range from hundreds of millions to upwards of a billion dollars or more.").

previously acknowledged, such compliance costs will cause banks irreparable harm and "would be so devastating to [some banks] that it may drive them from the market altogether." *Ill. Bankers Ass'n*, 760 F. Supp. 3d at 663-64.

These consequences also harm consumers. Consumers rely on national banks' fraud prevention and data security services,[12] and benefit from access to a wide variety of products and robust customer service, including the rewards of card cashback and loyalty points programs.[13] Interchange fee revenue helps make all this possible. But faced with a reduction in interchange fee revenue and increased costs of maintaining such services, consumers will likely see national banks' practices change with respect to those services that consumers rely on and benefit from.[14] This is not theoretical. Empirical research, as well as *Amici*'s members' experience, suggests that price controls such as interchange caps may in fact harm consumers and "undermine the structure of the credit card market."[15] As a result, case studies

---

[12]     Am. Bankers Ass'n, *National Survey:  U.S. Consumers Happy with their Bank, Applaud Banks' Fraud Protection Efforts* (Apr. 8, 2025), https://www.aba.com/about-us/press-room/press-releases/national-survey-consumers-happy-with-their-bank-applaud-banks-fraud-protection-efforts.

[13]     *See generally* Am. Bankers Ass'n, *The Benefits of Credit Card Rewards:  How Rewards Provide Value to Merchants and Consumers of All Incomes* (June 23, 2021), https://www.aba.com/news-research/analysis-guides/the-benefits-of-credit-card-rewards.

[14]     The Interchange Fee Provision may also force national banks to reduce free checking accounts and other products and services, beyond those reductions following the Durbin Amendment.  *See* Mark D. Manuszak & Krzysztof Wozniak, *The Impact of Price Controls in Two-sided Markets: Evidence from US Debit Card Interchange Fee Regulation* 13-14 (Fed. Rsrv. Bd., Working Paper No. 2017-074, 2017), https://www.federalreserve.gov/econres/feds/files/2017074pap.pdf (limit on debit card interchange fees decreased banks' free checking offerings).

[15]     Am. Bankers Ass'n, *supra* note 13, at 4; William F. Baxter, *Section 85 of the*

have observed that "IFPA-style restriction[s] on interchange fees" will "lead to economic declines and job losses."[16]

Finally, the District Court's decision invites other states to impose similar (or varying) restrictions, opening the door to a patchwork of inconsistent state regulations and creating untenable compliance costs.  In fact, national banks could face up to 51 (or even more, if local governments join) different sets of interchange fee rules that impose potentially inconsistent obligations.  Such concerns are already materializing as states across the country are introducing their own variations of the IFPA.[17]  Further, states may be emboldened to extend their control over other domains within the national banking power, so long as they nominally regulate a

---

*National Bank Act and Consumer Welfare*, 1995 Utah L. Rev. 1009, 1012, 1019–23 (1995) (arguing on the basis of empirical studies that federal preemption of state-level price controls not just improves consumer welfare in competitive credit markets but also may do so particularly for the least well-off consumers); *see also* Natasha Sarin, *Making Consumer Finance Work*, 119 Colum. L. Rev. 1519, 1537-38 (2019); Mark D. Manuszak & Krzysztof Wozniak, *supra* note 14, at 5-6.

[16]     Zachary Milne, *The Economic Impact of State Restrictions on Interchange Fees*, Common Sense Institute (Feb. 3, 2025), https://www.commonsenseinstituteus.org/oregon/research/taxes-and-fees/the-economic-impact-of-state-restrictions-on-interchange-fees.

[17]     Peter Lucas, *The States' Battle to Regulate Interchange* (July 1, 2025), https://www.digitaltransactions.net/magazine_articles/the-states-battle-to-regulate-interchange/ ("Since Illinois in 2024 became the first state to pass an interchange law . . . such bills have been introduced or previewed before lawmakers in 22 states."); Josh Pynn, *Interchange Legislation Throughout the States*, Merchant Advisory Group (July 1, 2025), https://www.merchantadvisorygroup.org/news/mag-insights/article/2025/07/02/interchange-legislation-throughout-the-states (since the IFPA was signed, "13 other states have similar legislation pending in their legislatures"); Latham & Watkins LLP, *Federal Court Partially Upholds Illinois Law Limiting Interchange Fees* (Feb. 19, 2026), https://www.fintechanddigitalassets.com/2026/02/federal-court-partially-upholds-illinois-law-limiting-interchange-fees/ (similar bills are "introduced in over 20 states").

third party and not the bank itself. Such consequences pose an existential threat to national banks' ability to function and render defunct the protection and uniformity that the NBA was enacted to ensure. *See Watters* v. *Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) ("[The NBA] shields national banking from unduly burdensome and duplicative state regulation.").

The Interchange Fee Provision significantly interferes with the national banking power. This Court should thus reverse in part and find that NBA preemption applies.

## CONCLUSION

For the reasons above, this Court should reverse the District Court's decision in part and affirm in part.

Dated:   New York, New York
         March 13, 2026

                                        /s/ *Matthew A. Schwartz*
                                        H. Rodgin Cohen
                                        Matthew A. Schwartz
                                        SULLIVAN & CROMWELL LLP
                                        125 Broad Street
                                        New York, NY 10004
                                        (212) 558-4000

                                        *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with Seventh Circuit Rule 29, because it contains 6,213 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the requirements of Seventh Circuit Rule 32(b) because it was prepared in 12-point font using a proportionally spaced typeface.

/s/ *Matthew A. Schwartz*
Matthew A. Schwartz

March 13, 2026