Nos. 26-1354, 26-1371, 26-1440, 26-1441

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS & ILLINOIS CREDIT UNION LEAGUE,

*Plaintiffs-Appellants-Cross-Appellees*,

v.

KWAME RAOUL, IN HIS OFFICIAL CAPACITY AS ILLINOIS ATTORNEY GENERAL,

*Defendant-Appellee-Cross-Appellants.*

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 24-cv-7307
Honorable Virginia M. Kendall

## BRIEF OF *AMICUS CURIAE* ELECTRONIC PAYMENTS COALITION IN SUPPORT OF PLAINTIFFS-APPELLANTS-CROSS-APPELLEES

Kwaku A. Akowuah
Jillian S. Stonecipher
Christopher A. Eiswerth
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
kakowuah@sidley.com

*Counsel for Amicus Curiae*

## **CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

      Electronic Payments Coalition

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

      Sidley Austin LLP

(3) If the party, amicus or intervenor is a corporation:

   i) Identify all its parent corporations, if any; and

      N/A

   ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      N/A

(5) Provide Debtor information required by FRAP 26.1(c) 1 & 2: N/A

---

Attorney's Signature: _/s/  Kwaku A. Akowuah_    Date: <u>March 13, 2026</u>

Attorney's Printed Name: Kwaku A. Akowuah    Counsel of Record: Yes

Address: Sidley Austin LLP, 1501 K Street N.W., Washington, DC 20005

Phone Number: (202) 736-8000    Fax Number: (202) 736-8711

Email Address: kakowuah@sidley.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

     Electronic Payments Coalition

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

     Sidley Austin LLP

(3) If the party, amicus or intervenor is a corporation:

     i) Identify all its parent corporations, if any; and

     N/A

     ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

     N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     N/A

(5) Provide Debtor information required by FRAP 26.1(c) 1 & 2: N/A

---

Attorney's Signature: *_/s/ Jillian S. Stonecipher_*    Date: <u>March 13, 2026</u>

Attorney's Printed Name: Jillian S. Stonecipher      Counsel of Record: No

Address: Sidley Austin LLP, 1501 K Street N.W., Washington, DC 20005

Phone Number: (202) 736-8000          Fax Number: (202) 736-8711

Email Address: jstonecipher@sidley.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

      Electronic Payments Coalition

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

      Sidley Austin LLP

(3) If the party, amicus or intervenor is a corporation:

      i) Identify all its parent corporations, if any; and

      N/A

      ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      N/A

(5) Provide Debtor information required by FRAP 26.1(c) 1 & 2: N/A

---

Attorney's Signature: _/s/ Christopher A. Eiswerth_ Date: <u>March 13, 2026</u>

Attorney's Printed Name: Christopher A. Eiswerth  Counsel of Record: No

Address: Sidley Austin LLP, 1501 K Street N.W., Washington, DC 20005

Phone Number: (202) 736-8000        Fax Number: (202) 736-8711

Email Address: ceiswerth@sidley.com

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF *AMICUS CURIAE*..........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................2

ARGUMENT..................................................................................................5

I.   Electronic Payments Provide Significant Benefits to Consumers, Merchants, and the Economy as a Whole. .................................................6

II.  Interchange Fees Are Essential to the Payment Card System. ............10

    A.   Interchange Fees Compensate Issuing Banks for Services That Are Necessary to the Payment Card System. .....................11

    B.   Default Interchange Fee Rate Schedules Promote Efficient Functioning of the Payment Card Network.................................13

III. Other Payment-System Participants Must Receive the Benefits of Preemption to Permit Banks to Exercise Their Federal Powers. .........16

CONCLUSION .......................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*City of Chi. v. Barr*,
    961 F.3d 882 (7th Cir. 2020) ............................................................18

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) .......................................................15, 16

*Nat'l Bancard Corp. v. VISA U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ..................................................16, 18

**Rules and Regulations**

12 C.F.R. § 1005 ....................................................................................12

12 C.F.R. § 1026 ....................................................................................12

Federal Rule of Appellate Procedure 29(a)(2) ....................................1

**Statutes**

815 ILCS 151/150-10(a) ..........................................................................4

**Other Authorities**

*2024 Survey and Diary of Consumer Payment Choice*, Fed. Rsrv.
    Bank of Atlanta (2025), https://bit.ly/3NyXra0 ............................6

Robert Adams et al., *Credit Card Profitability*, Fed. Rsrv. Bd.
    (Sept. 9, 2022), https://bit.ly/4d12AhS .........................................13

*Economic Growth*, Moody's Analytics (Nov. 2021),
    https://bit.ly/3P4JKA4 ....................................................................8

*Electronic Payments Coalition, Financial Lifeline: The Value of Credit
    Card Rewards* (May 2024), https://bit.ly/4gel4y2 ........................13

*Electronic Payments System Is the Force Behind 1 in 5 Jobs*, The Per-
    ryman Grp. (Nov. 4, 2015) .............................................................13

*Electronic Point-of-Sale Payments*, Fed. Rsrv. Hist. (September 25, 2024), https://bit.ly/4s7Ypcn..................................................................7

*Federal Reserve Payments Study: 2022 Triennial Initial Data Release*, Fed. Rsrv. Bd. (last updated March 6, 2025), https://bit.ly/46XQ7eJ...................................................................7

Glenn Grossman, *True Impact of Interchange Regulation: How Government Price Controls Increase Consumer Costs and Reduce Security*, Cornerstone Advisors, https://bit.ly/4dRPW5U .....................12

Katherine Haan, *People Are Twice as Likely to Spend More Money When Using Card Than Cash*, Forbes (May 16, 2024), https://bit.ly/4uoF6wO...............................................................9

*Interchange Regulation: How Government Price Controls Increase Consumer Costs and Reduce Security*, Cornerstone Advisors, https://bit.ly/4dRPW5U;.................................................12

Javelin, *Small Merchants on Interchange* (Mar. 2017), https://bit.ly/4uo6ETf ...............................................................9, 10

Benjamin Klein, et al., *Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 Antitrust L.J. 571 (2006)...............................................................7

Tim Mead et al., *The Role of Interchange Fees on Debit and Credit Card Transactions In the Payments System*, Fed. Rsrv. Bank of Richmond 2 (May 2011), https://bit.ly/3MG1Rru ...............................7, 13

*The Electronic Payment System: An Assessment of Benefits for the US and State Economies*, The Perryman Grp. (Oct. 2015) ...........................10

*The Role of Interchange Fees on Debit and Credit Card Transactions In the Payments System*, Fed. Rsrv. Bank of Richmond 2 (May 2011), https://bit.ly/3MG1Rru ...............................................................7

Mark Zandi et al., *The Impact of Payment Cards on Economic Growth*, Moody's Analytics 3 (Nov. 2021), https://bit.ly/3P4JKA4.............................................................8, 10

Todd J. Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of Regulation*, Int'l Ctr. for L. & Econ. 10 (Jun. 2, 2010), https://bit.ly/3XlBXyi ........................................................8

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Electronic Payments Coalition ("EPC") is a coalition of payments industry stakeholders, including credit unions, payment card networks, banks, and trade associations. Its members collectively operate, maintain, and secure the electronic payment systems on which millions of consumers and merchants rely each day.

The reliability and security of those systems depend on sustained investment by all participants in the payments ecosystem. Interchange fees—modest sums paid by merchants' banks to consumers' banks for credit and debit card transactions—help defray the costs of operating and protecting the systems. The Illinois Interchange Fee Prohibition Act's ("IFPA") Interchange Fee Prohibition limits those fees in ways that threaten to upend electronic payment systems nationwide, harming banks, merchants, consumers, and the card networks that enable card transactions. EPC's members thus have a direct and substantial interest in this action.[1]

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(2), EPC states that counsel conferred with counsel for the parties, and all parties have consented or not objected to the filing of this brief. Further, EPC states that no party's counsel authored the brief in whole or in part, and no person—other

## INTRODUCTION AND SUMMARY OF ARGUMENT

Two-thirds of all payments made in the United States today will be made using payment cards. The electronic payments system has achieved that place of ubiquity in the modern economy by virtue of its convenience, reliability, and security. A consumer can tap a card at a merchant's sales terminal, and within seconds, the sale is complete and the merchant is guaranteed payment.

But that seamless experience depends on entities working behind the scenes to encourage consumers and merchants to use the system, to develop the funds-transfer infrastructure, to combat fraud, and to assume the risk that a cardholder may not pay. Those services are indispensable, and they are not free. The electronic payments system, consistent with federal law, compensates these actors through an interchange fee—a small percentage of the transaction amount that the merchant's bank pays the consumer's bank.

The State of Illinois has adopted a first-of-its-kind law that rewrites how interchange fees are calculated. Instead of allowing interchange fees to

---

than *amicus* EPC or its counsel—contributed money that was intended to fund preparing or submitting this brief.

be assessed on the total funds flowing through the interchange infrastructure, the IFPA requires card-issuing banks ("issuing banks") to carve out the portions of Illinois-based transactions that are attributable to State and local taxes and gratuities. That would mean issuing banks are compensated only for a portion of the transaction while supporting all of it. If the IFPA is allowed to stand, it will disrupt the nationwide electronic payment system and threaten the availability of safe, efficient, and convenient card transactions.

The district court erred in upholding this disruptive state interference with interchange fees. Reversing its preliminary-injunction-stage view that the interchange fee provisions were likely preempted because they "would prohibit stakeholders involved in a credit card transaction from charging or receiving interchange fees," SA.17, the district court held on summary judgment that the same provisions were not preempted. The district court's summary analysis appeared to turn on its view that "banks do not set, or arguably charge, interchange fees; rather, they receive them." RSA.20.

That logic is mistaken at several levels.

First, national banks have undoubted power under federal law to receive compensation for payment-related services such as issuing payment cards and processing card transactions. Banks exercise those federally-

conferred powers when they receive compensation for such services, whether or not they set the compensation level unilaterally. And by its plain terms, the Illinois act interferes with those powers—the IFPA says banks may not "*receive* or *charge* a merchant any interchange fee" on transaction amounts carved out by the Illinois legislature. 815 ILCS 151/150-10(a).

Second, the district court erred in concluding that banks do not set interchange fees. It is true that banks often *choose* to adopt *default* interchange fee schedules designed by card networks such as Visa and Mastercard. They do so because those default schedules promote the efficient operation of the nationwide system. But banks can and do set interchange fees by contracting directly with other participants in the system. It would be inordinately costly, however, if banks had to individually negotiate interchange with every other counterparty.

If, as the district court's order suggests, banks *must* resort to one-off contracts in order to ensure that they will receive interchange on the whole of the transaction, that will seriously disrupt the status quo, which allows parties to avoid the time and costs of one-off negotiations by accepting the default schedule, and prevents gaps in card acceptance from appearing wherever negotiations have not taken place. The likely result would be an

electronic payment system that is worse and more costly for everyone—banks, merchants, consumers, and other stakeholders. That risk need not be run. Federal law wisely precludes individual states from interfering with the nationwide electronic payments system in this way. The Court should so hold.

## ARGUMENT

The district court's error, if uncorrected, will have profound effects. Modern payment cards are the dominant way in which consumers make payments, and they are responsible for at least hundreds of billions of dollars in economic growth. The district court's decision threatens to upend the payment card system because, under the rule the district court adopted, individual states have the power to interfere with interchange fees that are essential to the nationwide payment card system.

The district court's reasoning rested heavily on its mistaken belief that the federal preemption question turns on who sets default interchange rates. That is wrong in two senses—as relevant, federal law protects banks' powers to receive compensation for their services (regardless of who sets the compensation level); and in any event, the banks set the actual rates by choosing *whether* to opt into default interchange rates or to negotiate individualized

interchange rates where appropriate. The district court's analysis also over-looked the importance of default interchange rates to the electronic payments system.

Finally, the Court should make clear that any injunction against enforcement of the Interchange Fee Prohibition must cover non-bank participants in the payment card system, including payment card networks, because those participants are essential to banks' exercise of their federal powers.

## I.   Electronic Payments Provide Significant Benefits to Consumers, Merchants, and the Economy as a Whole.

In the United States today, two-thirds of payments are made using payment cards. *See 2024 Survey and Diary of Consumer Payment Choice*, 10-12, Fed. Rsrv. Bank of Atlanta (2025), https://bit.ly/3NyXra0.

Card transactions are now so prevalent that it can be easy to forget how dramatically things have changed. Just fifty years ago, most consumers used cash for small purchases and checks for larger transactions. *The Federal Reserve Payments Study: 2022 Triennial Initial Data Release*, Fed. Rsrv. Bd. (last updated March 6, 2025), https://bit.ly/46XQ7eJ. Payment cards were initially offered only by particular retailers for use at the retailer's stores. Tim

Mead et al., *The Role of Interchange Fees on Debit and Credit Card Transactions In the Payments System*, Fed. Rsrv. Bank of Richmond 2 (May 2011), https://bit.ly/3MG1Rru. Electronic payment networks like Visa and Mastercard changed everything when they developed and expanded payment-card networks to the point where they now include nearly every retailer, allowing participants to benefit from economies of scale. *See Electronic Point-of-Sale Payments*, Fed. Rsrv. Hist. (September 25, 2024), https://bit.ly/4s7Ypcn; *see also* Benjamin Klein, et al., *Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 Antitrust L.J. 571, 589-90 (2006).

Payment cards won out over other payment options (*e.g.*, cash, checks, and travelers' checks) because they provide unique benefits to consumers and merchants alike. The electronic payments system massively reduces friction in the economy "by provid[ing] consumers with convenient and secure access to their funds,  reduc[ing] cash and check handling for merchants, and expand[ing] the pool of customers." Mark Zandi et al., *The Impact of Payment Cards on Economic Growth*, Moody's Analytics 3 (Nov. 2021), https://bit.ly/3P4JKA4. Consumers can carry only limited cash. Checks present a risk of nonpayment to merchants. But cards "provide consumers with access to all

available funds or lines of credit for a given transaction and they give merchants peace of mind about payment guarantees." *Id*. at 5.

Card payments also uniquely address fraud risk. Along with payment card networks, "[c]ard issuers deploy extraordinarily-complicated neural networks and intelligent computer systems to detect changing patterns of fraud in real-time. Very few of these protections would be cost-feasible for department store chains (much less supermarkets, small appliance, hardware, or convenience stores)." Todd J. Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of Regulation*, Int'l Ctr. for L. & Econ. 10 (Jun. 2, 2010), https://bit.ly/3XlBXyi. Reducing the cost of both fraud and fraud prevention by placing those costs on parties better able to manage that risk benefits everyone. Sellers face less fraud, buyers are victims of less fraud, and buyers and sellers can more confidently and cheaply engage in commerce. "This trust in the payment system eases friction, bolstering consumption and thereby GDP growth." Zandi at 6.

Credit cards also reduce cash-flow friction that might otherwise operate as a drag on economic activity. "Access to credit helps calibrate periodic income with continuous consumption." *Id*. That access in turn "stimulat[es] personal consumption." *Electronic Payments System Is the Force Behind 1 in 5*

8

*Jobs*, The Perryman Grp. (Nov. 4, 2015), https://bit.ly/40uiBZU; *see also* Zandi at 6 (credit cards "smooth[] out the consumption of durable and non-durable goods by lessening the need to wait for paydays"). And payment cards have helped democratize access to credit. Before cards, consumers seeking to smooth consumption would need to negotiate individual bank loans or a line of store credit. Zywicki at 6.

Consumers recognize these benefits. When consumers who predominantly use cards are asked why they do so, they list ease of payment as the number-one factor. Katherine Haan, *People Are Twice as Likely to Spend More Money When Using Card Than Cash*, Forbes (May 16, 2024), https://bit.ly/4uoF6wO. Merchants similarly profess a high degree of satisfaction with the electronic payments system and recognize that, among other benefits, it has increased their sales. Javelin, *Small Merchants on Interchange* 10-13 (Mar. 2017), https://bit.ly/4uo6ETf. In all of these ways, the electronic payments system has successfully lowered barriers that stand in the way of retail and other transactions, minimizing consumers' and merchants' fears and efficiently allocating risk. Zandi at 5. In turn, "increased consumption leads to increased production, more jobs[,] and greater income." *Id.*

Several economists have sought to measure the total benefit to the economy from the electronic payments system. The estimated benefits are breathtaking. According to one 2015 study, the electronic payments system has, since its inception, "led to gains in business activity in the United States for 2014 (compared to the results if no such system existed) totaling $1.760 trillion in gross product and almost 23.2 million permanent jobs." *The Electronic Payment System: An Assessment of Benefits for the US and State Economies*, The Perryman Grp. at 2. That is an increase in the size of the U.S. economy of 12%, an increase in personal consumption expenditures of 17%, and an increase in employment of 20%. *Id.* Other studies also show dramatic benefits to the U.S. economy as a whole. *See, e.g.*, Zandi at 3 (finding that the marginal shift to payment cards between the years 2015 and 2019 accounted for $245 billion in GDP growth).

## II.    Interchange Fees Are Essential to the Payment Card System.

Interchange fees are "the economic foundation of the payment card industry." SA.76. Interchange fees are small fees, typically calculated as a percentage of the total transaction, that the acquiring bank "pays" to the issuing bank for the essential services the issuing bank provides. SA.76-77.

**A.      Interchange Fees Compensate Issuing Banks for Services That Are Necessary to the Payment Card System.**

Interchange fees "cover the costs and risks that Issuers incur, such as fraud and administrative costs associated with managing cardholders' accounts" that are essential to a functioning payment card system. Decl. of Tom Rosenkoetter, *Ill. Bankers Ass'n v. Raoul*, Case No. 24-v-07307, ECF No. 24-2 (N.D. Ill. Aug. 21, 2024) ("American Bankers Ass'n Decl."), ¶ 16. To provide these essential services, issuing banks often use a portion of the interchange fee to cover programs, including anti-fraud programs housed at payment networks themselves. SA.35.

Those anti-fraud programs are indispensable. Issuing banks, together with payment card networks, provide assurance that reasonably vigilant consumers will not have to pay a penny of unauthorized or otherwise fraudulent transactions, and that merchants will not be left unpaid for their goods or services. Building on federal regulations, both Visa and Mastercard have "zero liability polic[ies]." Those policies require issuing banks to replace funds taken from a consumer's account as a result of an unauthorized credit or debit transaction processed by the network. Glenn Grossman, *True Impact of Interchange Regulation: How Government Price Controls Increase Consumer*

11

*Costs and Reduce Security*, Cornerstone Advisors 26 https://bit.ly/4dRPW5U; *see also* 12 C.F.R. §§ 1005, 1026. To make these policies feasible, payment card networks and issuing banks have developed sophisticated data collection and analysis capacities that allow them to spot fraudulent transactions with a high degree of accuracy. *See* Grossman at 28-29. These systems work. In 2021, the total volume of card transactions in the United States was $11 trillion, while fraud losses were barely 0.1% of that total. *Id.* at 24.

Interchange fees may also be used to fund rewards programs to consumers, programs that ultimately also benefit the merchant by incentivizing consumer transactions through the payment network. Mead at 4; *see also* Electronic Payments Coalition, Financial Lifeline: The Value of Credit Card Rewards 17 (May 2024), https://bit.ly/40xv1QD ("[R]educ[ing] interchange fees … would … lead to a substantial reduction or outright elimination of rewards for many cardholders.").

Finally, interchange fees are an important part of fairly spreading the costs of maintaining a system that promotes widespread trust in all consumer transactions. Without interchange, the costs of ensuring the breadth of the network and providing for its reliability and reducing the potentially

12

significant risks and costs of fraud would likely shift to cardholders, including in the form of increased credit-card interest rates. *See* Robert Adams et al., *Credit Card Profitability*, Fed. Rsrv. Bd. (Sept. 9, 2022), https://bit.ly/4d12AhS. But such a system would allow merchants to enjoy the system's benefits without helping to shoulder its costs.

### B. Default Interchange Fee Rate Schedules Promote Efficient Functioning of the Payment Card Network.

The district court correctly recognized the "staggering" burden the IFPA's Interchange Fee Prohibition imposes on the electronic payment system. RSA.27. All the same, it found the IFPA is not preempted because "banks do not set" interchange fees. RSA.27. As the district court understood it, interchange fees are fees that "banks do not set and that are not keyed to [banks] particular services." RSA.22. But the district court critically misunderstood this aspect of the electronic payment system, both logically and factually.

First, as a matter of reasoning, it is hard to understand why the district court thought it important that card networks establish default interchange rates. As plaintiffs well explain, Blue Br. 30–36, national banks have undoubted power under federal law to receive compensation for issuing

payment cards and processing card transactions. Banks exercise those feder-ally-conferred powers when they receive compensation for those services, whether or not they set the compensation level unilaterally. And by its plain terms, the Illinois act interferes with those powers—the IFPA says banks may not "*receive* or *charge* a merchant any interchange fee" on transaction amounts carved out by the Illinois legislature. That attempted constraint squarely and directly conflicts with the banks' powers under federal law.

Second, the district court was wrong to conclude that "banks do not set" interchange rates. Again, it is true that payment card networks "set[] a schedule of *default* interchange rates." Decl. of Chiro Aikat, *Ill. Bankers Ass'n v. Raoul*, Case No. 24-v-07307, ECF No. 24-12 (N.D. Ill. Aug. 21, 2024) ("Mas-tercard Decl."), ¶ 25 (emphasis added); SA.54. But banks *choose* to pay and accept those rates when they opt to use default fee schedules. They can also choose *not* to accept those default rates. They can "negotiate[] a different in-terchange fee" directly with merchants or their acquiring banks. Mastercard Decl. ¶ 25; *see Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 713 (2d Cir. 2023) ("While the issuing and acquiring banks are contractually free to agree on an applicable interchange fee, Visa and MasterCard each set a default fee in the absence of such an agreement."). And, in certain instances,

they do. For example, under Visa and Mastercard rules, individual issuers may and do agree with individual acquirers or merchants on separately determined bilateral interchange fees. Klein, *supra*, at 593; Mastercard Decl. at 25; SA.76; SA.54.

Many banks do regularly choose to exercise their power to charge and receive fees for payment card services by agreeing to default card network interchange fee rate schedules. That choice should not be surprising. Default interchange rates spare banks the immense investments of time and costs that would be necessary if they were required to individually negotiate with every counterparty. *See* Klein, *supra* at 589-90 (explaining that the "payment card system could not function effectively without default interchange fees"). That benefits the system as a whole, and consumers as a whole—it helps facilitate the creation of card networks that link virtually all issuers with virtually all merchants and their acquiring banks. That creates a world where customers can walk into virtually any store and make an electronic payment transaction. *See id*.; *Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 602 (11th Cir. 1986) (recognizing that "universality of acceptance—the key element to a national payment system—could not be guaranteed absent prearranged interchange rules"). Everyone benefits from that.

### III. Other Payment-System Participants Must Receive the Benefits of Preemption to Permit Banks to Exercise Their Federal Powers.

The EPC agrees with Plaintiffs that the IFPA's Interchange Fee Prohibition is unlawful because it is preempted by federal law. Indeed, it would be hard to think of any element of commerce that is more interstate, and more in need of a uniform national rule, than the card payment system.

For this interconnected nationwide system to function, banks must be able to exercise their federally-granted powers through and with other participants in the payment card system. Thus, if this Court reverses and enjoins enforcement of the interchange fee provision, an injunction must protect non-bank participants in the payment card system, including payment card networks, in order to have any practical effect at all.

The IFPA purports to prohibit all participants in the payment card system, including the processor and payment card network from "receiv[ing] or charg[ing] any interchange fee." Enjoining this prohibition only against banks is not effective to protect the banks' ability to exercise their federally-authorized powers. The payment card system is an intricately connected system. And "[g]iven the pass-through nature of interchange," it would be impossible for federally protected entities like national banks to

have the benefit of federal law if an injunction covers only them and not the actions of other entities, like Card Networks and processors, that facilitate the transmission of interchange fees. SA.55. In other words, there is no way for an issuing bank to receive the full amount of interchange if every other participant in the payment ecosystem, including the network, is barred from conveying it to the issuer. *Id.* In fact, the Attorney General made very much this point below, arguing that an "injunction preventing enforcement of the Fee Prohibition against everyone except payment card networks will not do anyone any good," because "[t]hose networks are essential to the process." Dkt. 76 at 39.

In these circumstances, it is should be uncontroversial that a "court can "impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties." *City of Chi. v. Barr*, 961 F.3d 882, 920-21 (7th Cir. 2020). The Court should extend the relief here, to enable the payment card system to continue functioning.

## CONCLUSION

The Court should reverse and remand with instructions to enter a permanent injunction consistent with the request made by Plaintiffs.

Dated: March 13, 2026                    Respectfully submitted,


                                         /s/ Kwaku A. Akowuah
                                         Kwaku A. Akowuah
                                         Jillian S. Stonecipher
                                         Christopher A. Eiswerth
                                         SIDLEY AUSTIN LLP
                                         1501 K Street, N.W.
                                         Washington, D.C. 20005
                                         Tel.: (202) 736-8000
                                         Fax: (202) 736-8711
                                         kakowuah@sidley.com

                                         *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.    This amicus brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because this brief contains 3,371 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This amicus brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point size and Book Antiqua style.

*/s/ Kwaku A. Akowuah*
Kwaku A. Akowuah

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I caused the foregoing to be electronically filed with the U.S. Court of Appeals for the Seventh Circuit via the CM/ECF system, which will automatically send email notifications of such filing to all attorneys of record.

*/s/ Kwaku A. Akowuah*
Kwaku A. Akowuah