Nos. 26-1354, 26-1371, 26-1440, 26-1441

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

---

ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS & ILLINOIS CREDIT UNION LEAGUE,

*Plaintiffs-Appellants-Cross-Appellees*,

*v.*

KWAME RAOUL, in his official capacity as Illinois Attorney General,

*Defendant-Appellee-Cross-Appellant*.

---

On Appeal from the United States District Court
For the Northern District of Illinois, Case No. 24-cv-7307
Honorable Virginia M. Kendall, C.J.

---

## BRIEF FOR FORMER COMPTROLLERS AND ACTING COMPTROLLERS OF THE CURRENCY AS *AMICI CURIAE* SUPPORTING PLAINTIFFS-APPELLANTS AND SEEKING REVERSAL IN PART

---

SAM MCHALE
OLU OISAGHIE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
sam.mchale@wilmerhale.com
olu.oisaghie@wilmerhale.com

NOAH A. LEVINE
  *Counsel of Record*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
noah.levine@wilmerhale.com

March 13, 2026

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1354, 26-1371, 26-1440, 26-1441

Short Caption: Illinois Bankers Association et al. v. Raoul

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Brian P. Brooks, Robert L. Clarke, John C. Dugan, Rodney E. Hood, Eugene Ludwig, Keith A. Noreika, Joseph Otting,

 Blake J. Paulson, John G. Walsh, Julie L. Williams

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Wilmer, Cutler, Pickering, Hale and Dorr LLP


(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     N/A

Attorney's Signature: /s/ Noah A. Levine     Date: 3/11/2026

Attorney's Printed Name:  Noah A. Levine

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [✓]  **No** [ ]

Address:  7 World Trade Center, 250 Greenwich Street

 New York, NY 10007

Phone Number: 212-230-8800     Fax Number:  212-230-8888

E-Mail Address: noah.levine@wilmerhale.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As     Clear Form

Appellate Court No: <u>26-1354, 26-1371,</u> 26-1440, 26-1441

Short Caption: <u>Illinois Bankers Association et al. v. Raoul</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 <u>Brian P. Brooks, Robert L. Clarke, John C. Dugan, Rodney E. Hood, Eugene Ludwig, Keith A. Noreika, Joseph Otting,</u>

 <u>Blake J. Paulson, John G. Walsh, Julie L. Williams</u>

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 <u>Wilmer, Cutler, Pickering, Hale and Dorr LLP</u>

(3)      If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

        <u>N/A</u>

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      <u>N/A</u>

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

      <u>N/A</u>

Attorney's Signature: <u>/s/ Samuel J. McHale</u>          Date: <u>3-11-2026</u>

Attorney's Printed Name: <u>Samuel J. McHale</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: <u>2100 Pennsylvania Avenue N.W.</u>

     <u>Washington, D.C. 20037</u>

Phone Number: <u>202-663-6000</u>          Fax Number: <u>202-663-6363</u>

E-Mail Address: <u>sam.mchale@wilmerhale.com</u>

rev. 12/19 AK

**Save As**     **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1354, 26-1371,</u> 26-1440, 26-1441

Short Caption: <u>Illinois Bankers Association et al. v. Raoul</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Brian P. Brooks, Robert L. Clarke, John C. Dugan, Rodney E. Hood, Eugene Ludwig, Keith A. Noreika, Joseph Otting,</u>

<u>Blake J. Paulson, John G. Walsh, Julie L. Williams</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Wilmer, Cutler, Pickering, Hale and Dorr LLP</u>

(3)     If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Olu O. Oisaghie</u>                    Date: <u>3/11/2026</u>

Attorney's Printed Name:  <u>Olu O. Oisaghie</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☐     **No** ☑

Address:  <u>2100 Pennsylvania Avenue NW</u>

    <u>Washington, DC 20037</u>

Phone Number: <u>202-663-6000</u>                    Fax Number:  <u>202-663-6363</u>

E-Mail Address: <u>olu.oisaghie@wilmerhale.com</u>

rev. 12/19 AK

## TABLE OF CONTENTS

Page

INTEREST OF THE AMICI .................................................................................. 1

INTRODUCTION ................................................................................................. 3

BACKGROUND ................................................................................................... 5

      A.      Factual Background ........................................................................ 5

      B.      Procedural Background ................................................................... 7

ARGUMENT ....................................................................................................... 9

I.      THE DISTRICT COURT ERRED BY PLACING DISPOSITIVE WEIGHT ON WHICH PARTY SETS INTERCHANGE FEES, RATHER THAN ON WHETHER THE IFPA PREVENTS AND SIGNIFICANTLY INTERFERES WITH NATIONAL BANK POWERS ... 10

      A.      The IFPA Prevents And Significantly Interferes With National Banks' Lending And Deposit Powers ..................................... 10

      B.      The IFPA Cannot Escape Preemption Simply Because It Targets Payment Networks In Addition To Banks ............................. 13

CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

Page

*Bank of America v. City & County of San Francisco,*
309 F.3d 551 (9th Cir. 2002) ................................................................. 11, 14

*Barnett Bank of Marion County, N.A. v. Nelson,*
517 U.S. 25 (1996) ................................................................................. 11

*Cantero v. Bank of America, N.A.,*
602 U.S. 205 (2024) ..................................................... 9, 11, 12, 18

*Cohen v. Capital One Funding*, LLC,
489 F. Supp. 3d 33 (E.D.N.Y. 2020) ................................................... 14

*Franklin National Bank of Franklin Square v. New York,*
347 U.S. 373 (1954) ............................................................................... 8

*Illinois Bankers Association v. Raoul,*
No. 24-7307, 2026 WL 371196 (N.D. Ill. Feb. 10, 2026) ....3, 7, 8, 12, 13, 17, 18, 19

*M&M Leasing Corporation. v. Seattle First National Bank,*
563 F.2d 1377 (9th Cir. 1977) ............................................................. 14

*Nations Bank of North Carolina, N.A. v. Variable Annuity Life*
*Insurance Company*, 513 U.S. 251 (1995) ......................................... 1

*Pacific Capital Bank, N.A. v. Connecticut,*
542 F.3d 341 (2d Cir. 2008) ........................................................... 13, 14

*Peterson v. Chase Card Funding, LLC,*
2020 WL 5628935 (W.D.N.Y. Sept. 21, 2020) ........................... 13, 14

*SPGGC, LLC v. Ayotte,*
443 F. Supp. 2d 197 (D.N.H. 2006) .................................................... 15

*SPGGC, LLC v. Ayotte,*
488 F.3d 525 (1st Cir. 2007) ........................................................... 13, 15

**STATUTES**

12 U.S.C.
    §24...................................................................................................... 5, 9, 10
    §25b........................................................................................................ 11, 12
    §93a............................................................................................................. 1
    §1867......................................................................................................... 17

Illinois Comp. Stat.
    815 ILCS 151/150-5.............................................................................. 7
    815 ILCS 151/150-10............................................................................ 7

**REGULATIONS AND LEGISLATIVE MATERIALS**

12 C.F.R.
    §5.20....................................................................................................... 10
    §7.1026 ..................................................................................................16
    §7.4002.................................................................................................... 11
    §7.5002.................................................................................................... 16

61 Fed. Reg. 4849 (Feb. 9, 1996) ................................................................ 15

69 Fed. Reg. 1904 (Jan. 13, 2004) .............................................................. 19

88 Fed. Reg. 37,920 (June 9, 2023) ............................................................. 17

Colo. S.B. 26-134, 2026 Reg. Sess. ............................................................. 18

**OTHER AUTHORITIES**

OCC, *Comptroller's Handbook: Merchant Processing* (Aug. 2014),
    https://www.occ.treas.gov/publications-and-
    resources/publications/comptrollers-handbook/files/merchant-
    processing/pub-ch-merchant-processing.pdf ...................................... 6

OCC Conditional Approval Letter No. 220 (Dec. 2, 1996),
    https://www.occ.gov/topics/charters-and-
    licensing/interpretations-and-actions/1996/ca220.pdf................................... 16

OCC Interpretive Letter No. 1075 (Nov. 14, 2006),
    https://www.occ.treas.gov/topics/charters-and-
    licensing/interpretations-and-actions/2006/int1075.pdf................................. 16

OCC Interpretive Letter No. 1140 (Jan. 13, 2014),
    https://www.occ.treas.gov/topics/charters-and-
    licensing/interpretations-and-actions/2014/int1140.pdf................................. 16

## INTEREST OF THE AMICI

Amici are former Comptrollers of the Currency and former Acting Comptrollers of the Currency.[1] The Office of the Comptroller of the Currency (OCC) is an independent bureau of the U.S. Department of the Treasury. The OCC charters, regulates and supervises national banks and federal savings associations, which comprise roughly two-thirds of the assets of the entire U.S. banking system. Charged with administration of the National Bank Act (NBA) and other statutes, the OCC has the "primary responsibility for surveillance of 'the business of banking[,]'" *NationsBank of North Carolina, N.A. v. Variable Annuity Life Insurance Company*, 513 U.S. 251, 256 (1995), and has broad authority to prescribe rules and regulations to carry out its responsibilities, *see* 12 U.S.C. §93a. Amici led the OCC over a collective forty-year period that included service in administrations of both political parties, spanning from the Reagan Administration to the second Trump Administration.

**Brian P. Brooks** served as Acting Comptroller of the Currency from April 2020 until January 2021, under President Trump.

**Robert L. Clarke** served as the 26th Comptroller of the Currency from December 1985 until February 1992, under Presidents Reagan and George H.W. Bush.

---

[1] No counsel for a party authored any part of this brief and no person other than amici curiae and their counsel made a monetary contribution to the preparation or submission of this brief. Amici submit this brief only for themselves and not on behalf of the OCC or any current or former employer or client.

**John C. Dugan** served as the 29th Comptroller of the Currency from August 2005 to August 2010, under Presidents George W. Bush and Obama.

**Rodney E. Hood** served as Acting Comptroller of the Currency from February 2025 to July 2025, under President Trump.

**Eugene Ludwig** served as Comptroller of the Currency from April 1993 through April 1998, under President Clinton.

**Keith A. Noreika** served as Acting Comptroller of the Currency in 2017, under President Trump.

**Joseph Otting** served as the 31st Comptroller of the Currency from November 2017 through May 2020, under President Trump.

**Blake J. Paulson** served as Acting Comptroller of the Currency in 2021, under Presidents Trump and Biden.

**John G. Walsh** served as Acting Comptroller of the Currency from 2010 to 2012, under President Obama.

**Julie L. Williams** served twice as Acting Comptroller of the Currency and was Chief Counsel and First Deputy Comptroller of the Currency for two decades, serving in both Democratic and Republican administrations.

Amici have decades of experience with the powers of national banks and the OCC's approach to NBA preemption. During that time, amici have witnessed the evolution of the business of banking. That evolution is important here. This case involves national banks' exercise of their credit card lending and deposit powers, which the banks exercise through modern-day payment networks. In amici's

2

experience, the preemption analysis conducted by courts like this one is critical to national banks' ability to exercise the powers that the NBA grants them, especially as the business of banking evolves. Amici thus have an interest in bringing their experience to this Court, to aid in its resolution of the NBA preemption question before it.

## INTRODUCTION

The Illinois Interchange Fee Prohibition Act (IFPA) forbids banks, including national banks, from charging or receiving interchange fees on portions of transactions carried out on credit and debit cards issued by the banks. Federal courts that have considered previous attempts by states to regulate national bank fees have not hesitated to find that the National Bank Act (NBA) preempted such state laws. By the district court's own recognition, the ways in which the IFPA implements its fee restriction would be "indisputably disruptive," requiring "new procedures to replace the current process for authorizing and settling debit and credit card transactions," and would impose "staggering" costs on banks. *Illinois Bankers Ass'n v. Raoul*, --- F. Supp. 3d ----, 2026 WL 371196, at \*12-13 (N.D. Ill. Feb. 10, 2026). The district court nonetheless held that the NBA does not preempt the IFPA because of a single "snag," *id.* at \*13—interchange fees are set by the payment card networks, not the banks, *see, e.g., id.* at \*5, \*7.

This fact is no snag, however, and the district court's contrary conclusion reflects a misapprehension of national bank powers and the significant interference that warrants NBA preemption. The IFPA squarely concerns national bank powers—

indeed, core bank powers. The NBA grants national banks the powers to lend money, take deposits, and receive compensation for those activities. National banks exercise those powers when they lend money through credit cards, provide debit card payment services to depositors, and receive interchange fees as compensation. National banks do so through contractual relationships with the payment card networks, including by choosing (in most instances) to receive the default interchange fees set by the networks. The payment card networks are critical to banks' credit card lending and deposit service powers.

The IFPA prevents and significantly interferes with the exercise of those powers. It does not matter which party "sets" the default interchange fees at issue because they are indisputably charged and received by national banks as compensation for their lending and deposit services. The relevant question for purposes of NBA preemption remains the same: whether the state statute significantly interferes with national banks' exercise of their federally authorized powers. The IFPA does, for the reasons the district court correctly recognized in earlier granting a preliminary injunction—the statute forbids national banks from collecting fees for their banking services and imposes undeniably staggering costs on banks' credit card lending and debit card payments services.

This Court should find that the NBA preempts the IFPA.

## BACKGROUND

### A.     Factual Background

This case concerns two core national banking powers—lending money and taking deposits. More specifically, this case concerns the way that national banks lend money on credit cards and provide payment services to depositors, and how those services have evolved, with national banks utilizing new technologies and depending on the payment card networks as an essential means to efficiently and effectively exercise these bank powers.

Each of the national banks that lend money through credit cards or support debit card payments by deposit customers could, in theory at least, engage in those activities by entering into their own bilateral agreements with each of the thousands of acquirer banks (many of which are also national banks). *See* 12 U.S.C. §24 (Third) (granting national banks the power to contract). Each national bank could, in each such bilateral agreement, set bespoke rules for the processing of credit and debit card transactions between the issuing bank and acquiring bank and set fees for those transactions. Scaling one-off agreements for tens of thousands of merchants and their acquirers is a practical impossibility, however, and smaller national banks may lack the resources to negotiate effectively with large numbers of other payment system participants.

Instead of such a contract-by-contract approach, national banks have leveraged new technologies as they developed their core credit-card lending and deposit-taking businesses over the last several decades, including by working with payment

5

networks like Visa and Mastercard. *See* Plaintiff's Separate Appendix (SA) 53 (¶¶38-39). The networks establish default rules to govern transactions on the networks and establish default interchange fees paid to card issuers, including national banks. *See* OCC, *Comptroller's Handbook: Merchant Processing* 32 (Aug. 2014)[2]; *see also* SA.53 (¶¶38-39). National banks, in turn, engage with the networks because in this modern day, the networks are essential to the banks' efficient and effective exercise of their credit card lending and deposit services powers.

This system is an efficient way for national banks to deliver their services, but it is not without costs to the banks. When a consumer uses her credit or debit card to pay for goods or services, the bank loans or advances the money, and assumes the risk of non-payment. Providing these lending and deposit payment services—which entails authorization, fraud monitoring, processing, and other related services—costs the bank money. *See* SA.46 (¶¶19-21).

National banks collect interchange fees as part of the compensation for these services and for assuming the credit and operational risks inherent in such payments. *See* SA.78, 81 (¶¶38, 47). Payment card networks may set default interchange fees, but the fees are charged for, and received by, the card-issuing national banks as compensation for the national banks' services. The IFPA recognizes this basic point, defining an "interchange fee" as a fee charged "for the purpose of compensating the issuer for its involvement in an electronic payment

---

[2] *Available at* https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/merchant-processing/pub-ch-merchant-processing.pdf.

transaction." 815 ILCS 151/150-5. In choosing to contract with payment card networks, in deciding how to contract with the networks, and in deciding to extend their credit and debit card services through the networks at rates established by the networks, the banks use the networks as the means to exercise their lending and deposit powers in the modern marketplace.

### B.     Procedural Background

The IFPA is a "first-of-its-kind intervention into payment card transactions." *Illinois Bankers*, 2026 WL 371196, at *1. The Interchange Fee Prohibition of the IFPA prohibits a card-issuing national bank from charging or receiving an interchange fee on tax or tip. *See* 815 ILCS 151/150-10(a); SA.3, 47. The IFPA implements this prohibition in two ways. First, if the electronic transaction "authorization or settlement process" affords such an opportunity, the merchant may transmit information showing the amount of a transaction corresponding to tax or tip. 815 ILCS 151/150-10(a).[3] Second, absent such technology, a merchant may submit tax documentation within 180 days of an electronic payment transaction. *Id.* §150-10(b). In the former case, no interchange fee may be received on the tax or tip portion and, in the latter case, any such interchange fee must be refunded. *See id.* §150-10(a)-(b); SA.3-4, 47-48.

The district court initially granted preliminary injunctive relief, holding that the Interchange Fee Prohibition was likely preempted by the NBA. SA.16-18. The court

---

[3] The record indicates that the technology does not support this functionality and would require immense costs and operational changes to do so. *See* Dkt. 24-12, Declaration of Chiro Aikat ¶32; Dkt. 24-11, Declaration of Jonette Sullivan ¶¶16-19.

found that the Prohibition "directly constrains" the NBA's grant of "an express right for national banks to collect non-interest fees" because the IFPA "forbids national banks from collecting some of these fees." SA.18. The court observed that the Interchange Fee Prohibition "appears even more directly at odds" with the NBA than the state law at issue in the seminal case of *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), which prohibited a national bank from using the word "savings" in its advertising. SA.19-20. Finally, the court rejected the State's contention that the costs of compliance did not establish irreparable harm, crediting evidence that the costs for some financial institutions "would be so devastating" that they might be "drive[n] … from the market altogether." SA.32-33.

At summary judgment, the district court reversed course. It did not change its view about the likely impact of the Interchange Fee Prohibition, which the court still characterized as "staggering." *Illinois Bankers*, 2026 WL 371196, at *13. Rather, as the decision makes clear throughout, the court changed its view based upon one fact it found determinative—that the interchange fees are set by "third parties" (i.e. the payment card networks), rather than directly by the national banks. *See id.* at *10, *13, *20. As a result, the district court held that the NBA does not preempt the Interchange Fee Prohibition because the "statutory scheme does [not] put national banks directly in the spotlight" or "directly regulate banks." *Id.* at *5, *13.

## ARGUMENT

Under any "practical assessment," a state law that prohibits national banks from charging and receiving the interchange fees that compensate them for their lending and deposit services prevents and significantly interferes with national banks' exercise of those core powers—regardless of whether a different party sets the fee that is meant to compensate the national bank. *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 219 (2024). A national bank's authority to loan money and to receive deposits encompasses the authority to charge for these services. The NBA authorizes national banks to engage in the "business of banking." 12 U.S.C. §24 (Seventh). It does not consign national banks to philanthropy, and no banking business could be safe or sound without the ability to receive compensation.

The IFPA prevents and significantly interferes with the exercise of national banks' express powers for all the reasons the district court cited when it granted the preliminary injunction: it prohibits national banks from receiving compensation for their services, it imposes staggering costs, and it is inordinately disruptive. SA.16-21. In short, it frustrates the national banks' exercise of their express lending and deposit powers. The district court was wrong to abandon this assessment based solely on the fact that the payment networks set default interchange fees. This detail, which led the district court to conclude that the IFPA does not implicate (let alone interfere with) national bank powers, is immaterial.

As the OCC has long recognized, national banks frequently exercise their core lending and deposit powers through third parties and various technology-based

9

systems, and, more specifically, national banks exercise their credit card lending and deposit payment powers through the payment card networks. It therefore is irrelevant whether Illinois directs its Interchange Fee Prohibition in name against both banks and the payment card networks. In either case, the statute regulates, and significantly interferes with, national banks' exercise of their powers, including the power to be compensated for their federally-authorized lending and deposit activities. Here, the interference is undeniably significant and warrants preemption.

## I. THE DISTRICT COURT ERRED BY PLACING DISPOSITIVE WEIGHT ON WHICH PARTY SETS INTERCHANGE FEES, RATHER THAN ON WHETHER THE IFPA PREVENTS AND SIGNIFICANTLY INTERFERES WITH NATIONAL BANK POWERS

### A. The IFPA Prevents And Significantly Interferes With National Banks' Lending And Deposit Powers

The IFPA significantly interferes with the exercise of national banks' powers because it prevents the banks from receiving compensation for exercising their lending and deposit powers and seriously disrupts those powers by imposing staggering costs on the banks. The National Bank Act authorizes national banks to "carry on the business of banking" through the exercise of certain "enumerated" powers and "all such incidental powers" necessary to the exercise of those enumerated powers. 12 U.S.C. §24 (Seventh). Among other enumerated powers, the NBA expressly authorizes national banks to "loan[] money" and to "receiv[e] deposits." *Id.*; *see also* 12 C.F.R. §5.20(e)(1)(i) (describing such powers as "core banking functions").

It is fundamental that the power to engage in the authorized business of banking includes the power to be compensated for performing that business. Any other result would be unsafe or unsound. For that reason, courts have recognized that the NBA and OCC regulations "preempt conflicting state limitations on the authority of national banks to collect fees" for their services, including for the "provision of deposit and lending-related … services." *Bank of Am. v. City & Cnty. of S.F.*, 309 F.3d 551, 564 (9th Cir. 2002); *see also* SA.19-20 ("a national bank's authority to provide a banking service necessarily carries with it the authority to charge for that service"). As courts have noted, a "significant objective of the NBA" was to "allow[] the banks the option of how to charge fees," *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.2 (11th Cir. 2011), which the OCC at times has made explicit by promulgating regulations, *see, e.g.,* 12 C.F.R. §7.4002(a). In short, the business of banking would be no business at all if a bank could not receive compensation for lending money and providing deposit-related services.

The powers that the NBA grants to national banks are "not normally limited by, but rather ordinarily pre-empt[], contrary state law." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996). To determine whether the NBA preempts a state consumer financial law, the Supreme Court has interpreted the Dodd-Frank Act, 12 U.S.C. §25b, to require courts to conduct a "practical assessment of the nature and degree of the interference caused by [the] state law[,]" based on the statutory text, comparison to *Barnett Bank* and other precedents, and "common sense." *Cantero*, 602 U.S. at 219-220 & n.3. If the state law "prevents" or

11

"significantly interferes" with the exercise of a national bank's powers, it is preempted. *Id.* at 213-214 (quoting 12 U.S.C. §25b(b)(1)).

Here, the district court issued a preliminary injunction after holding that the Interchange Fee Prohibition, which "forbids" national banks from collecting interchange fees on tax and tip, was "dramatically" and "directly at odds" with—and therefore likely preempted by—the NBA, which provides national banks the "express right" to collect such fees. *See* SA.16-21. Later, at summary judgment, the district court also recognized the undisputed fact that complying with the IFPA would impose "undeniable" and even "staggering" costs on national banks. *Illinois Bankers*, 2026 WL 371196, at \*13. These findings should have compelled the conclusion that the IFPA significantly interferes with national banks' exercise of powers expressly granted to them by the NBA.

However, the district court allowed what it admitted was only a "snag"—that the payment networks "set the fees"—to sink its practical assessment. 2026 WL 371196, at \*13. The court focused repeatedly and nearly exclusively on the role of the payment card networks in processing credit-card and deposit-account payments, *id.* at \*5, \*10-13, \*21, and, as a result, on whether the networks are entitled to preemption "of their own accord," *id.* at \*21. That focus ignored a central principle that should have resolved the NBA preemption issue notwithstanding any "snag": a state law that significantly interferes with *national banks'* federally-authorized powers is preempted. *See Cantero*, 602 U.S. at 220.

12

### B.    The IFPA Cannot Escape Preemption Simply Because It Targets Payment Networks In Addition To Banks

The district court's focus on the fact that the payment networks set default interchange fees should have been irrelevant to the preemption analysis. To determine whether the NBA preempts the IFPA, the relevant question is not whether the payment networks set interchange fees or whether, in that role, they are entitled to preemption "of their own accord." *Illinois Bankers*, 2026 WL 371196, at \*21. Preemption is an inquiry about interference with a national bank's exercise of its powers. The NBA thus preempts a state law that significantly interferes with a national bank's exercise of its powers, whether the law does so directly or "indirectly." *Peterson v. Chase Card Funding, LLC*, 2020 WL 5628935, at \*4 (W.D.N.Y. Sept. 21, 2020).

This follows from the way the National Bank Act works and the foundational reason for preemption: The NBA grants national banks powers, which banks may exercise in a number of ways, including, in some cases, through third parties. A state law that prevents or significantly interferes with a national bank's exercise of those powers is preempted—period. Thus, courts have been clear that "a state statute cannot be allowed to avoid preemption by imposing … a prohibition indirectly." *Pacific Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 353 (2d Cir. 2008); *see also SPGGC, LLC v. Ayotte*, 488 F.3d 525, 533 (1st Cir. 2007) (states may not "avoid preemption of their statutes simply by enacting laws that prohibited non-bank firms from providing national banks with the resources to carry out their banking activities"). What matters is whether the state law "significantly interferes

13

with national banks' ability to carry on" "a particular NBA-authorized activity." *Pacific Cap. Bank*, 542 F.3d at 353. Or, stated differently, the NBA precludes enforcement of state laws that, though technically regulating non-national bank entities, would "significantly interfere with [a national bank's] exercise of its powers." *Cohen v. Capital One Funding*, LLC, 489 F. Supp. 3d 33, 48 (E.D.N.Y. 2020); *accord Peterson*, 2020 WL 5628935, at *7. Where national bank powers are concerned, the national banks are "the real party-in-interest" that matter for the preemption analysis. *Cohen*, 489 F. Supp. 3d at 49. Were the law otherwise, states would be free to significantly interfere with national bank powers whenever third parties were the means by which national banks exercised those powers—or worse, as is the case here, where those third parties are absolutely critical to national banks' ability to exercise their bank powers efficiently and effectively.

The NBA, in authorizing the powers of national banks, "'did not freeze the practices of national banks in their nineteenth century forms.'" *Bank of Am.*, 309 F.3d at 563 (quoting *M&M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir. 1977)). Instead, the NBA has been understood "'to permit the use of new ways of conducting the very old business of banking.'" *Id.* Amici, during their collective 40-year span of leadership of the OCC, have witnessed the development of the new ways in which national banks exercise their lending and deposit-taking powers. This includes the growth of credit card lending and deposit payment services. While the first modern credit card was issued in the middle of the twentieth century, today nearly every U.S. consumer has a credit or debit card,

14

many of which are issued by national banks, and the commerce conducted on those cards is substantial, with over 100 billion transactions annually. *See* SA.49 ¶¶19-20.

The OCC too has broadly recognized that "banks can undertake traditional banking activities in ways that Congress did not contemplate." 61 Fed. Reg. 4849, 4851 (Feb. 9, 1996). For example, national banks "routinely establish relationships with non-banking entities" to provide "the national bank's products." *SPGGC, LLC v. Ayotte*, 443 F. Supp. 2d 197, 205 (D.N.H. 2006), *aff'd*, 488 F.3d 525 (1st Cir. 2007). Relevant here, payment networks are an essential means by which national banks lend money on credit cards and provide debit card payment services to depositors, and by which national banks receive the interchange fees that "compensate [national banks] for the risk of non-payment that they take on by providing funds up front, each time a cardholder swipes his credit or debit card." SA.2-4.

Far from any ordinary third-party service provider, the payment networks are critical to the national banks' ability to exercise their core banking powers. Today, national banks could not conduct credit card lending or provide their depositors with debit card payment services efficiently—if at all—without the payment card networks. *See* SA.51-52 ¶29 (networks "enabl[e] electronic payment authorization, clearing, and settlement").

Ultimately, though, the lending and payment services involved in credit and debit card transactions derive from the bank-borrower or bank-depositor relationship. Payment card networks enable banks to provide these services to their borrowers and depositors. The networks are, indeed, critical. But the services are, at

15

the end of the day, bank services. This interdependence of banks and payment card networks is reflected in the law, in at least three ways.

*First*, the OCC has made clear that the role national banks play in "administer[ing] credit card and debit card programs" makes banks the "most important institutional participant" in the payment networks. OCC Conditional Approval Letter No. 220, at 7 (Dec. 2, 1996).[4]

*Second*, the OCC has repeatedly confirmed, both by regulation and in its interpretive letters, that national banks exercise their powers *through* the networks. *See, e.g.*, 12 C.F.R. §7.1026 (authorizing national banks to become members of payment systems); OCC Interpretive Letter No. 1075, at 2-3 (Nov. 14, 2006) (approving national bank's ownership of stock in MasterCard as "necessary" to issue credit cards);[5] OCC Interpretive Letter No. 1140, at 3 n.12 (Jan. 13, 2014) (payment system activities are "*clearly* within the business of banking").[6] The OCC also has expressly authorized national banks to provide "through electronic means" any service they are authorized to provide. 12 C.F.R. §7.5002(a).

*Third*, as a result of the foregoing, the law authorizes federal financial regulators to supervise and bring enforcement actions against third parties—including the payment networks—that provide critical services for banks. For

---

[4] *Available at* https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/1996/ca220.pdf.

[5] *Available at* https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/2006/int1075.pdf.

[6] *Available at* https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/2014/int1140.pdf.

example, under the Bank Service Company Act, regulators may conduct "regulation and examination" of third parties that perform services for banks "to the same extent as if such services were being performed" by the bank itself. 12 U.S.C. §1867(c)(1). Regulators also may "pursue corrective measures, including enforcement actions," against such third parties. *See Interagency Guidance on Third-Party Relationships: Risk Management*, 88 Fed. Reg. 37,920, 37,936 (June 9, 2023). This authority has been understood to extend to the examination of payment networks. Visa, for example, acknowledges that federal banking agencies, including the OCC, "have supervisory oversight over Visa under applicable federal banking laws and policies as a technology service provider to U.S. financial institutions." Visa Inc., Annual Report (Form 10-K), at 19 (filed Nov. 6, 2025).[7]

Here, notwithstanding that the court previously had held that the IFPA's disruptions would prohibit banks from "charging or receiving interchange fees" on tax or tip, 760 F. Supp. 3d at 654, and notwithstanding the court's continued recognition at summary judgment that the IFPA was "indisputably disruptive" and would impose "staggering" costs on banks, *Illinois Bankers*, 2026 WL 371196, at *12-13, the court ultimately rejected preemption because the networks "set the fees," *id.* at *10, *13.

That holding rests on a distinction between national banks and the payment card networks that should be irrelevant. National banks exercise their banking

---

[7] *Available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/6f9169d8-c0e6-4edb-8ead-982691a348ce.pdf.

17

powers *through* the networks, who in turn are essential to those powers. The Interchange Fee Prohibition restricts the compensation paid to and collected by *national banks* and therefore restricts the national banks' exercise of *their own* banking powers. Ascribing importance to the fact that networks "set" default interchange fees, which national banks choose to utilize in exercising their bank powers, ignores *Cantero*'s command to use "common sense" to evaluate preemption. 602 U.S. at 220 n.3. Whether the payment networks "set" the interchange fees, any "practical assessment" of the IFPA must recognize that the networks do so in providing an essential means for national banks to exercise their federally-authorized powers. National banks, by using the networks in this way and electing to charge and collect fees at levels set by the networks, do not thereby surrender their federally-authorized powers to state-law interference.

The district court therefore erred by resolving the NBA preemption issue in this case by reference to whether the banks "set" the fees themselves. *Illinois Bankers*, 2026 WL 371196, at *10, *13. The IFPA prevents and significantly interferes with the exercise of national bank powers because it would prohibit national banks from collecting fees for their services in Illinois.

The preemption question in this case has serious implications for national bank powers. If the district court's decision stands, other states may follow suit. Indeed, the Colorado legislature is considering its own similar restriction now. *See* Colo. S.B. 26-134, 2026 Reg. Sess. As the OCC explained in the district court, allowing each state to each regulate in its own chosen manner national banks' credit card

18

lending and deposit payment services, and the compensation banks receive for those services, would result in an "unmanageable patchwork" and "undermine the uniformity necessary for the smooth and effective functioning of the national payment system." Dkt. 61-1, OCC Br. 6.[8] This is precisely the result the NBA was meant to prevent. The NBA grants national banks powers so that they can operate "to the full extent of [those] powers under Federal law" and "without interference from inconsistent state laws" that would hamper their "safe and sound operations." 69 Fed. Reg. 1904, 1908 (Jan. 13, 2004).

## CONCLUSION

For the foregoing reasons, this Court should hold that the National Bank Act preempts the Interchange Fee Prohibition.

Respectfully submitted.

/s/ Noah A. Levine

SAM MCHALE
OLU OISAGHIE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
sam.mchale@wilmerhale.com
olu.oisaghie@wilmerhale.com

NOAH A. LEVINE
    *Counsel of Record*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
noah.levine@wilmerhale.com

March 13, 2026

---

[8] All docket citations herein are to the case below, *Illinois Bankers Association v. Raoul*, No. 24-cv-7307 (N.D. Ill.).

19

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 4,609 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 12-point Century Schoolbook font in the body and 11-point font in the footnotes. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Noah A. Levine
NOAH A. LEVINE

March 13, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026, I caused the foregoing to be filed through the Court's CM/ECF system, which caused it to be served on all counsel of record.

/s/ Noah A. Levine
NOAH A. LEVINE