Nos. 26-1354, 26-1371, 26-1440, 26-1441 (consol.)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS, and ILLINOIS CREDIT UNION LEAGUE, | ) ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiffs-Appellants/ Cross-Appellees, | ) ) ) | No. 1:24-cv-07307 |
| v. | ) ) | |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | ) ) ) | |
| Defendant-Appellee/ Cross-Appellant. | ) ) ) | The Honorable VIRGINIA M. KENDALL, Chief Judge Presiding. |

**COMBINED PRINCIPAL AND RESPONSE BRIEF OF
DEFENDANT-APPELLEE/CROSS-APPELLANT**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

**CARSON R. GRIFFIS**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov

Attorneys for Defendant-
Appellee/Cross-Appellant

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................ iv

JURISDICTIONAL STATEMENT ..................................................................... 1

ISSUES PRESENTED FOR REVIEW .............................................................. 4

STATEMENT OF THE CASE ............................................................................ 5

The Electronic Payment System ...................................................................... 5

The Interchange Fee Prohibition Act................................................................ 6

Plaintiffs' Complaint and Motion for Preliminary Injunction ...................... 7

The Parties' Cross-Motions for Summary Judgment...................................... 12

SUMMARY OF ARGUMENT............................................................................ 16

ARGUMENT ....................................................................................................... 18

I.      This court reviews the district court's judgment *de novo* ................................ 18

II.     The district court correctly held that the Act's Interchange Fee
        Limitation is not preempted as to national banks or federal savings
        associations ............................................................................................. 18

        A.      The National Bank Act permits state laws regulating national
                banks unless they significantly interfere with national banks'
                powers ........................................................................................ 19

                1.      *Barnett Bank* and *Fidelity Federal* hold that States may
                        not ban national banks from exercising their express
                        authority under federal law ........................................... 21

                2.      *Franklin* and *First National Bank of San Jose* hold that
                        States may not effectively prevent national banks from
                        pursuing lines of business authorized by federal law .................. 22

i

3. *Anderson*, *McClellan*, and *National Bank* hold that States may enact even-handed regulations of national banks in areas left to States ................................................. 24

B. The Interchange Fee Limitation does not significantly interfere with national banks' authority to charge fees for services .................... 26

C. The Interchange Fee Limitation does not significantly interfere with national banks' ability to receive deposits, make loans, or process card transactions ................................................................. 32

D. The Interchange Fee Limitation does not significantly interfere with federal savings associations' powers under the Home Owners' Loan Act ............................................................................... 36

III. Even if the National Bank Act preempts the Interchange Fee Limitation, this court should uphold the district court's judgment as to federal credit unions ..................................................................... 37

A. *Barnett Bank* does not apply to federal credit unions ........................... 37

B. Even if National Bank Act preemption applied to federal credit unions, the Interchange Fee Limitation does not significantly interfere with their powers .................................................................. 42

IV. This court should reject plaintiffs' arguments as to state banks chartered in States other than Illinois .............................................................. 43

A. Plaintiffs' dormant Commerce Clause claim is barred by the Eleventh Amendment because it depends on a conclusion that the Attorney General may not enforce the Interchange Fee Limitation under state law .................................................................. 43

B. On the merits, plaintiffs' dormant Commerce Clause claim fails .......... 47

C. 12 U.S.C. § 1831a(j)(1) is limited to activities of Illinois branches of out-of-state state banks ......................................................... 51

V. Even if the Interchange Fee Limitation is preempted as to financial institutions, this court should not extend preemption to payment card networks based on equitable principles ...................................................... 53

VI. Plaintiffs lacked standing to bring a pre-enforcement challenge to the Data Usage Limitation ...................................................................... 57

ii

CONCLUSION ................................................................................................ 65

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*American Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n,*
    545 U.S. 429 (2005) ...................................................................49

*Anderson National Bank v. Luckett,*
    321 U.S. 233 (1944) ...............................................................*passim*

*Andrews v. Kowa Printing Corp.,*
    217 Ill. 2d 101 (2005).............................................................60, 61

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ...................................................................53

*Barnett Bank of Marion County, N.A. v. Nelson,*
    517 U.S. 25 (1996) .................................................................*passim*

*Bell v. Keating,*
    697 F.3d 445 (7th Cir. 2012) ......................................................18

*Benning v. Board of Regents of Regency University,*
    928 F.2d 775 (7th Cir. 1991) ......................................................45

*Cantero v. Bank of America, N.A.,*
    602 U.S. 205 (2024) ...............................................................*passim*

*Chamber of Com. of U.S. v. Whiting,*
    563 U.S. 582 (2011) ...................................................................38

*City of Chi. v. Barr,*
    961 F.3d 882 (7th Cir. 2020) ......................................................54

*City of Philadelphia v. New Jersey,*
    437 U.S. 617 (1978) ...................................................................48

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................57

*Conti v. Citizens Bank, N.A.,*
    157 F.4th 10 (1st Cir. 2025) .........................................27, 31, 33, 34

*C.Y. Wholesale, Inc. v. Holcomb*,
   965 F.3d 541 (7th Cir. 2020) ........................................................ 41, 42

*Dotson v. Faulkner*,
   138 F.4th 1029 (7th Cir. 2025) ........................................................... 41

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) ............................................................................. 38

*Evans v. Cook Cnty. State's Att'y*,
   2021 IL 125513 .................................................................................. 59

*Everett v. Schramm*,
   772 F.2d 1114 (3d Cir. 1985) ............................................................. 46

*Federal National Mortgage Ass'n v. Lefkowitz*,
   390 F. Supp. 1364 (S.D.N.Y. 1975) .................................................... 40

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) ..................................................................... *passim*

*First National Bank of San Jose v. California*,
   262 U.S. 366 (1923) ..................................................... 20, 23, 24, 29

*Franklin National Bank of Franklin Square v. New York*,
   347 U.S. 373 (1954) .................................................................... *passim*

*Hirst v. Skywest, Inc.*,
   910 F.3d 961 (7th Cir. 2018) .............................................................. 50

*Howard v. Wal-Mart Stores*,
   160 F.3d 358 (7th Cir. 1998) .............................................................. 41

*Hunt v. Wash. State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ........................................................................... 50

*Indiana Right to Life Victory Fund v. Morales*,
   66 F.4th 625 (7th Cir. 2023) ............................................................... 58

*Johnson v. First Banks, Inc.*,
   382 Ill. App. 3d 907 (5th Dist. 2008) .................................................. 52

*Keene Corp. v. United States*,
   508 U.S. 200 (1993) ........................................................................... 39

*Kemp v. Liebel*,
　　877 F.3d 346 (7th Cir. 2017) ....................................................................18

*Matrix IV, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*,
　　649 F.3d 539 (7th Cir. 2011) ....................................................................45

*McClellan v. Chipman*,
　　164 U.S. 347 (1896) ......................................................................20, 25, 31

*McHenry Cnty. v. Raoul*,
　　44 F.4th 581 (7th Cir. 2024) ....................................................................41

*Moreland v. Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chi.*,
　　2025 IL 131343 .........................................................................................62

*Mosby v. Ingalls Mem'l Hosp.*,
　　2023 IL 129081 .........................................................................................60

*Mount Olivet Cemetery Ass'n v. Salt Lake City*,
　　164 F.3d 480 (10th Cir. 1998) .................................................................40

*National Bank v. Commonwealth*,
　　76 U.S. 353 (1870) ..............................................................20, 25, 26, 31

*National Pork Producers Council v. Ross*,
　　598 U.S. 356 (2023) ..............................................................47, 48, 49, 50

*Oneok, Inc. v. Learjet, Inc.*,
　　575 U.S. 373 (2015) .................................................................................41

*Park Pet Shop, Inc. v. City of Chi.*,
　　872 F.3d 495 (7th Cir. 2017) ...................................................................48

*Pennhurst State Sch. & Hosp. v. Halderman*,
　　465 U.S. 89 (1984) ...................................................................................44

*People v. Chapman*,
　　2012 IL 111896 .........................................................................................59

*People v. Reed*,
　　2025 IL 130595 .........................................................................................60

*Pereira v. Regions Bank*,
    752 F.3d 1354 (11th Cir. 2014) ...................................................................52

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ...................................................................................48

*Relf v. Shatayeva*,
    2013 IL 114925 ..........................................................................................62

*Reporters Cmte. for Freedom of the Press v. Rokita*,
    147 F.4th 720 (7th Cir. 2025)...................................................................54

*See v. Ill. Gaming Bd.*,
    2020 IL App (1st) 192200 .........................................................................45

*State ex rel. Raoul v. Elite Staffing, Inc.*,
    2024 IL 128763 ....................................................................................58, 59

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...............................................................................57, 58

*Svendsen v. Pritzker*,
    91 F.4th 876 (7th Cir. 2024).....................................................................44

*Sweeney v. Raoul*,
    990 F.3d 555 (7th Cir. 2021) .....................................................................58

*Thomas v. Carmichael*,
    164 F.4th 1058 (7th Cir. 2026)..................................................................48

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979) ...................................................................................38

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ...............................................................................54, 55

*West Lynn Creamery v. Healy*,
    512 U.S. 186 (1994) ...................................................................................50

*Williams ex rel. J.E. v. Reeves*,
    954 F.3d 729 (5th Cir. 2020) .................................................................46, 47

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ...................................................................................38

**Statutes**

12 U.S.C. §§ 21-216(d) ...................................................................................8

12 U.S.C. § 24 ...............................................................................................23

12 U.S.C. § 25b(a)(2) .............................................................................. 19, 32

12 U.S.C. § 25b(b)(1) ................................................................................ *passim*

12 U.S.C. § 25b(h)(2) .........................................................................11, 53, 54

12 U.S.C. § 92 ...............................................................................................21

12 U.S.C. § 371 .............................................................................................23

12 U.S.C. § 1464 .............................................................................................8

12 U.S.C. § 1465 .................................................................................... *passim*

12 U.S.C. § 1757 .........................................................................................8, 42

12 U.S.C. § 1831a(j)(1) ............................................................................ *passim*

12 U.S.C. § 1831a(j)(4) ..................................................................................51

12 U.S.C. § 1831u ..........................................................................................51

15 U.S.C. § 1693o-2(a)(1) ........................................................................27, 34

15 U.S.C. § 1693o-2(a)(3)(A) ...................................................................27, 34

28 U.S.C. § 1291 ..............................................................................................3

28 U.S.C. § 1331 ..............................................................................................1

28 U.S.C. § 2107(a) .......................................................................................2, 3

42 U.S.C. § 1983 ..............................................................................................1

Pub. Law 111-203, 124 Stat. 1376 (eff. July 21, 2010) .................................39

205 ILCS 5/1 .................................................................................................62

205 ILCS 5/5(11) ................................................................................................ 44

205 ILCS 5/48.1(b)(17) ...................................................................................... 63

205 ILCS 5/48.1(b)(18) ...................................................................................... 63

205 ILCS 5/48.1(c) .............................................................................................. 63

205 ILCS 205/6002(a)(11) .................................................................................. 44

205 ILCS 305/65 .................................................................................................. 44

815 ILCS 151/150-1 .............................................................................................. 1

815 ILCS 151/150-5 ..................................................................................... *passim*

815 ILCS 151/150-10(a) ............................................................................... *passim*

815 ILCS 151/150-10(b) ................................................................................ 6, 55

815 ILCS 151/150-15(a) ................................................................................ 7, 55

815 ILCS 151/150-15(b) ..................................................................... 2, 7, 59, 62

815 ILCS 505/1 .................................................................................................... 7

815 ILCS 505/2 .................................................................................................. 62

820 ILCS 115/1 .................................................................................................. 61

820 ILCS 115/2 .................................................................................................. 61

Ill. Pub. Act 103-592 .......................................................................................... 7

Ill. Pub. Act 104-4 .............................................................................................. 7

## Other Authorities

12 C.F.R. § 7.1000(d)(1) .................................................................................. 14

12 C.F.R. § 7.4002 ........................................................................................ 10, 28

12 C.F.R. § 7.5006 ........................................................................................ 11, 14

12 C.F.R. § 145.17.............................................................................................37

12 C.F.R. § 235.3(b) ...................................................................................27, 34

12 C.F.R. § 545.8-3(f) .......................................................................................22

12 C.F.R. § 721.6 ...............................................................................................42

41 Fed. Reg. 18286 (1976)................................................................................22

Fed. R. App. P. 4(a)(1)(A).............................................................................2, 3

Fed. R. App. P. 4(a)(3) ..................................................................................2, 3

Fed. R. Civ. P. 65(d) ............................................................................................3

7th Cir. R. 28(b)...................................................................................................1

*Agent*, Black's Law Dictionary (12th ed. 2024)............................................53

*Facilitate*, Black's Law Dictionary (12th ed. 2024).....................................59

x

**JURISDICTIONAL STATEMENT**

The jurisdictional statement of Plaintiffs-Appellants/Cross-Appellees Illinois Bankers Association, American Bankers Association, America's Credit Unions, and Illinois Credit Union League is not complete and correct. As required by 7th Cir. R. 28(b), Defendant-Appellee/Cross-Appellant Kwame Raoul, in his official capacity as the Attorney General for the State of Illinois ("Attorney General"), provides this statement.

On August 15, 2024, plaintiffs filed a complaint in the district court under 42 U.S.C. § 1983, claiming that two provisions of the Illinois Interchange Fee Prohibition Act ("Act"), 815 ILCS 151/150-1 *et seq.*, violated the Supremacy and dormant Commerce Clauses of the United States Constitution. Doc. 1 at 63-74.[1] Plaintiffs sought declaratory and injunctive relief. *Id.* at 71-72. As explained below, the district court lacked jurisdiction over plaintiffs' challenge to section 150-15(b) of the Act because they lacked standing. *See infra* pp. 57-64. Otherwise, the district court had jurisdiction over this action under 28 U.S.C. § 1331 because it raised federal questions.

---

[1] This brief cites the district court's docket, which is the record on appeal, as "Doc. ___." It cites plaintiffs' opening brief as "AT Br. ___," the short appendix to plaintiffs' brief as "SA___," the *amicus* brief of the Bank Policy Institute as "BPI Br. ___," the *amicus* brief of the Office of the Comptroller of the Currency as "OCC Br. ___," the *amicus* brief of the Electronic Payments Coalition as "EPC Br. ___," the *amicus* brief of the Electronic Transactions Association as "ETA Br. ___," and the *amicus* brief of former and acting Comptrollers of the Currency as "Comptrollers Br. ___."

On February 10, 2026, the district court entered an order granting in part and denying in part plaintiffs' motion for a permanent injunction and the parties' cross-motions for summary judgment. Doc. 179 at 47. The district court denied plaintiffs' request for a permanent injunction as to section 150-10(a) of the Act (the "Interchange Fee Limitation"), 815 ILCS 151/150-10(a). *Id.* at 14-15, 28, 30-31, 34-35. The district court also "granted" plaintiffs' request for a "permanent injunction as to the [Act's] Data Usage Limitation" provision, 815 ILCS 151/150-15(b) (the "Data Usage Limitation"), to the extent it applied to national banks, banks chartered by States other than Illinois, federal savings associations, federal credit unions, and other entities participating in electronic payment transactions "when they facilitate the preempted institutions' power implicated by the Data Usage Limitation." Doc. 179 at 30, 44; *see id.* at 15, 44-47.

On February 13, 2026, plaintiffs filed a notice of appeal from the portions of the district court's order denying them injunctive relief. Doc. 181. Plaintiffs' notice of appeal was timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A) because it was filed within 30 days of the district court's order. This court assigned the appeal No. 26-1354.

On February 23, 2026, the Attorney General filed a notice of cross-appeal from the portions of the district court's order granting plaintiffs injunctive relief. Doc. 185. The Attorney General's notice of cross-appeal was timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(3) because it was filed within 30 days of the district court's order. This court assigned the cross-appeal No. 26-1371.

On February 27, 2026, the district court entered a stipulated final judgment consistent with its February 10 order, thereby disposing of all claims against all parties. Doc. 193. It also entered a separate injunction order under Fed. R. Civ. P. 65(d), setting forth the permanent injunction it had granted plaintiffs in its February 10 order. Doc. 194. No motion to alter or amend the judgment was filed.

On March 4, 2026, plaintiffs filed a notice of appeal, Doc. 196, and the Attorney General filed a notice of cross-appeal, Doc. 198, which were timely under 28 U.S.C. § 2107(a), Fed. R. App. P. 4(a)(1)(A), and Fed. R. App. P. 4(a)(3) because they were filed within 30 days of the district court's final judgment. This court assigned those appeals Nos. 26-1440 and 26-1441 and consolidated all four appeals.

This court has jurisdiction over the district court's final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the district court correctly granted summary judgment to the Attorney General on plaintiffs' claims that the Act's limit on interchange fees on electronic payment transactions are preempted by federal law.

2.      Whether the district court erred in permanently enjoining the Attorney General from enforcing the Act's limit on data use as to various financial institutions because plaintiffs lacked standing to bring a pre-enforcement challenge to that provision.

**STATEMENT OF THE CASE**

**The Electronic Payment System**

When a consumer uses a credit, debit, or other electronic payment card, several entities are involved in completing the transaction: the merchant, the merchant's bank (the "acquirer"), the bank that issued the card to the consumer (the "issuer"), and the payment card network (*e.g.*, Mastercard or Visa). Doc. 137 at 5-7. When a consumer uses a card, the merchant sends information about the consumer's card, the merchant, the purchase amount, and the purchase date to its acquirer. *Id.* at 8; *see* Doc. 135-2 at 7. The acquirer routes that information to the payment card network, which asks the issuer to approve the transaction. Doc. 137 at 8. The issuer's decision to approve or deny the transaction then flows back through the payment card network and the acquirer to the merchant. *Id.*

Although transactions are approved or denied in seconds, funds are not transferred until a later settlement process. Doc. 135-2 at 6. Payment card networks facilitate the settlement of a transaction between the issuer and the acquirer. Doc. 137 at 8. Four payment card networks — Visa, Mastercard, American Express, and Discover — settle almost all credit card transactions in the United States, with a handful of other networks settling debit card transactions. Doc. 124-1 at 15-16.

In doing so, those payment card networks develop fee schedules, which set default interchange fees. Doc. 137 at 9. Interchange fees are payments from acquirers to issuers for each transaction, usually made up of both a fixed fee and a percentage of the transaction amount, including tax and gratuity. *Id.*

Ultimately, acquirers pass on the cost of interchange fees to merchants by factoring them into the rates they charge merchants.  Doc. 124-1 at 18.  As a result, merchants pay significant sums of interchange fees.  *See* Doc. 135-1 at 1 n.1 ("Merchants in the U.S. paid nearly $145 billion in fees — mostly interchange fees — to accept Visa and Mastercard credit and debit cards in 2024.").

Although payment card networks set default interchange fee rates, they are not compensated by them.  Doc. 124-1 at 18.  Instead, their revenue derives from separate fees they charge the acquirer and issuer, known as "network fee[s]."  *Id.*

**The Interchange Fee Prohibition Act**

In June 2024, Illinois enacted the Act, which generally prohibits any payment card network, acquirer, or other "entity that facilitates, services, processes, or manages" an electronic payment transaction from receiving or charging "a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction if the merchant informs the acquirer . . . of the tax or gratuity amount as part of the authorization or settlement process for the electronic payment transaction."  815 ILCS 151/150-5, 150-10(a).  Alternatively, a merchant "may submit tax documentation for the electronic payment transaction" to the acquirer "no later than 180 days after the date of the electronic payment transaction," in which case the issuer "must credit to the merchant the amount of interchange fees charged on the tax or gratuity amount."  *Id.* § 150-10(b).  If the merchant does not inform the acquirer of the tax or gratuity amount, or submit the necessary tax documentation, the Act's limit on interchange fees does not apply.  *Id.* § 150-10(a).

6

An entity that violates the Act's limit on interchange fees is subject to a $1,000-per-transaction civil penalty. *Id.* § 150-15(a).

Under the Act, an "interchange fee" is "a fee established, charged, or received by a payment card network for the purpose of compensating the issuer for its involvement in an electronic payment transaction." *Id.* § 150-5. "Tax" is defined as "any use and occupation tax or excise tax imposed by the State or a unit of local government in the State." *Id.* And "gratuity" is defined as "a voluntary monetary contribution to an employee from a guest, patron, or customer in connection with services rendered." *Id.*

The Act separately provides that entities, other than merchants, "involved in facilitating or processing an electronic payment transaction . . . may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." *Id.* § 150-15(b). Violations of this provision constitute violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS 505/1 *et seq.* 815 ILCS 151/150-15(b).

Initially, the effective date of these provisions was July 1, 2025. Ill. Pub. Act 103-592, art. 999, § 999-99. In June 2025, however, the Illinois General Assembly delayed the Act's effective date to July 1, 2026. Ill. Pub. Act 104-4, § 5.

**Plaintiffs' Complaint and Motion for Preliminary Injunction**

Two months after the Act's passage, plaintiffs — four trade groups with members including national banks, state-chartered banks, federal savings

associations, payment card networks, and state and federal credit unions, *see* Doc. 1 at 9-15 — initiated this action, claiming that the Interchange Fee Limitation and the Data Usage Limitation were preempted by federal law and violated the dormant Commerce Clause, *id.* at 63-71.

A few days later, plaintiffs filed a motion for a preliminary injunction based on their preemption claims. Doc. 15 at 2. More specifically, plaintiffs argued that they were likely to succeed on their claim that the Interchange Fee Limitation and Data Usage Limitation were preempted by: (1) the National Bank Act, 12 U.S.C. §§ 21-216(d), as to national banks, Doc. 24 at 26-33; (2) the Home Owners' Loan Act, 12 U.S.C. § 1464, as to federal savings associations, Doc. 24 at 36-37; and (3) the Federal Credit Union Act, 12 U.S.C. § 1757, as to federal credit unions, Doc. 24 at 37-40. They further argued that each of these preemption theories extended to payment card networks because the State should be prohibited from indirectly regulating those financial institutions by regulating the payment card networks. *Id.* at 40-42.

As for irreparable harm, plaintiffs asserted that complying with the Act by the July 1, 2025 effective date would be costly. *Id.* at 44-47. And according to plaintiffs, the public interest favored injunctive relief because implementing and complying with the Act would cause confusion and could lead some issuers or acquirers to "exit the market entirely." *Id.* at 48.

In support of their motion for preliminary injunction, plaintiffs submitted declarations of officers and employees of various financial institutions and payment card networks attesting to the difficulty of complying with the Act if it took effect by

8

July 1, 2025.  Doc. 24-3 at 4-5; Doc. 24-5 at 3-7; Doc. 24-6 at 3-8; Doc. 24-7 at 3-7; Doc. 24-8 at 3-9; Doc. 24-9 at 3-7; Doc. 24-10 at 3-7; Doc. 24-11 at 5-12; Doc. 24-12 at 9-15; Doc. 24-13 at 8-11; Doc. 24-14 at 3-8.  These declarations noted that, in past circumstances in which payment card networks made significant changes to their electronic payment systems, national banks had to expend resources, and the changes took months to implement.  *See*, *e.g.*, Doc. 24-3 at 4; Doc. 24-5 at 4; Doc. 24-6 at 4; Doc. 24-7 at 4; Doc. 24-8 at 5; Doc. 24-9 at 6; Doc. 24-10 at 4; Doc. 24-11 at 7.

Plaintiffs also submitted the declaration of the president and CEO of a state-chartered credit union, who opined that the combined effect of the Act's Data Usage Limitation and Interchange Fee Limitation "would likely cause [his credit union] to exit the market and cease offering card services."  Doc. 24-15 at 8.  He explained that the credit union used "cardholder data to develop spending patterns" to detect fraud and that, with the Data Usage Limitation in place, it could face "$1.3 million a year in potential fraud losses," which would render its "card programs unprofitable."  *Id*. Similarly, plaintiffs submitted the declaration of the president of an Illinois state-chartered bank, who posited that the Act's provision allowing merchants to seek reimbursement of interchange fees based on tax documentation would "create[ ] an unsustainable burden on debit card issuers" of his bank's size.  Doc. 24-4 at 6. Likewise, establishing a system to separate tax and gratuity amounts in purchase data would require "extraordinary . . . resources," though he did not specify how many.  *Id*. at 5.  And although he did not specify that the Act would prevent his bank from issuing debit cards, he stated that, "[i]f the debit card product becomes

9

unprofitable," his bank would be "forced to consider no longer offering [debit] cards." *Id.* at 6.

In response, the Attorney General moved to dismiss plaintiffs' action and opposed their request for a preliminary injunction. *See* Docs. 75, 76. In relevant part, the Attorney General argued that plaintiffs lacked standing to challenge the Data Usage Limitation because they could not show that they were likely to engage in activity that would violate that provision. Doc. 76 at 25-28. Indeed, the conduct that plaintiffs feared would be prohibited — using transaction data to detect fraud or administer customer rewards programs — would facilitate electronic payment transactions, such that they would be exempt from the Data Usage Limitation. *Id.* at 25-27. As for plaintiffs' request for a preliminary injunction, the Attorney General argued that plaintiffs had failed to demonstrate that they were likely to prevail on their preemption claims, *id.* at 30-49, would suffer irreparable harm, *id.* at 49-51, or that the equities weighed in plaintiffs' favor, *id.* at 52.

In December 2024, the district court granted plaintiffs' motion for a preliminary injunction in part. Doc. 104 at 1. The court concluded that plaintiffs were likely to prevail on their claim that the Interchange Fee Limitation was preempted by the National Bank Act because federal regulations provided "an express right for national banks to collect non-interest fees from customers, while the [Interchange Fee Limitation] forbids national banks from collecting some of th[o]se fees." *Id.* at 18 (citing 12 C.F.R. § 7.4002). As for the Data Usage Limitation, the court rejected the Attorney General's standing argument and held that this provision

10

likely interfered with national banks' "power to provide data processing and transmission services for [themselves] and others, where that data relates to banking, finance, and economics." *Id.* at 23 (citing 12 C.F.R. § 7.5006(a)). For the same reasons, the court held that plaintiffs were likely to prevail as to their preemption claims under the Home Owners' Loan Act, since federal savings associations are subject to the same preemption standards as national banks and the Data Usage Limitation similarly interfered with federal savings associations' powers to collect fees and use data. *Id.* at 24. And the court enjoined the Act as to out-of-state, state-chartered banks under 12 U.S.C. § 1831a(j)(1), Doc. 115 at 7-8, which provides that the laws of a "host State . . . shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank," 12 U.S.C. § 1831a(j)(1).

But the district court denied plaintiffs' motion as to "other . . . participants in credit and debit card transactions, including Card Networks like Visa and Mastercard," noting that Congress had expressly provided that the National Bank Act cannot be construed as preempting a state law applicable to "any subsidiary, affiliate, or agent of a national bank." Doc. 104 at 27-28; *see* 12 U.S.C. § 25b(h)(2). Finally, the district court denied plaintiffs' motion as to federal credit unions, concluding that they had not shown that it would be impossible to comply with the Act and the Federal Credit Union Act. Doc. 115 at 3-7.

11

**The Parties' Cross-Motions for Summary Judgment**

Three months later, plaintiffs filed a motion for summary judgment and a permanent injunction, *see* Doc. 123, and the Attorney General filed a cross-motion for summary judgment, *see* Doc. 136. Plaintiffs again argued that the federal laws they had referenced in their preliminary-injunction motion preempted the Interchange Fee Limitation and Data Usage Limitation. Doc. 125 at 22-41. Plaintiffs also asked the district court to "revisit" its conclusion that National Bank Act preemption should not extend "to participants in the payment system other than national banks, out-of-state state banks, and Federal savings associations, including the Card Networks," *id.* at 41, as well as its rejection of plaintiffs' argument as to federal credit unions, *id.* at 32-41. Plaintiffs argued that, to the extent the Act's provisions applied to "other participants in the intricately interconnected payment system," the Act "significantly interfere[d]" with national banks' "exercise of their federally granted powers." *Id.* at 42. And even if it did not, "equitable principles" required the expansion of the injunction to these other entities to provide national banks with complete relief. *Id.* at 45-46.

Likewise, as in their preliminary injunction motion, plaintiffs argued that any conclusion that the National Bank Act preempted the Act as to national banks had to extend to "out-of-state state banks" under 12 U.S.C. § 1831a(j)(1). Doc. 125 at 28. Furthermore, plaintiffs claimed that the dormant Commerce Clause required that any preemption extend to out-of-state state banks because, otherwise, Illinois's parity

12

statutes — which put Illinois-chartered banks on equal footing with national banks — would discriminate against out-of-state state banks. *Id.* at 29-30.

In support of their motion, plaintiffs attached an expert report from Anthony Hayes, a management consultant for "the payments industry." Doc. 124-1 at 4. Hayes opined that issuers use interchange fees "to pay for the operating expenses associated with their card programs," such as "processing transactions, monitoring for fraud, administering accounts, [and] customer service." *Id.* at 17. He alleged that, for credit cards, "interchange fees . . . generate the revenue needed to pay for . . . cardholder benefits" such as "rewards programs." *Id.* at 17-18. And for debit cards, "financial institutions use interchange revenue to support the provision of checking accounts." *Id.* at 18. He did not, however, opine as to the impact of the Interchange Fee Limitation on issuers' revenue or ability to fund these activities. *Id.* at 17-18.

In response, the Attorney General argued that, for the same reasons set forth in his response to the preliminary-injunction motion, plaintiffs lacked standing to challenge the Data Usage Limitation. Doc. 138 at 17-19. On the merits, the Attorney General argued that the Interchange Fee Limitation did not significantly interfere with national banks' powers because it only affected fees established, charged, or received by payment card networks, not banks, and only affected a fraction of a purchase's total. *Id.* at 19-25. As for entities that were not national banks or federal savings associations, the Attorney General argued that National Bank Act

13

preemption principles did not apply, *id.* at 26-42, and plaintiffs had not established that the Act was preempted under any other laws applicable to those institutions, *id.*

The district court granted in part both parties' cross-motions for summary judgment, and granted in part plaintiffs' motion for a permanent injunction. SA1, SA47. The court first held that the Interchange Fee Limitation was not preempted by the National Bank Act because it did not "directly restrict[ ] banks' ability to charge fees." SA20. Instead, the interchange fees affected by the Act "are set and calculated by Payment Card Networks like Visa and Mastercard, not by national banks." SA21. The court also held that the Federal Credit Union Act did not preempt the Interchange Fee Limitation as to federal credit unions because it did not "intrude on" their powers. SA34. For the same reasons, the court held that the Interchange Fee Limitation was not preempted as to other financial institutions or payment card networks. SA26. Accordingly, the court denied plaintiffs' request to enjoin the Interchange Fee Limitation. SA28, SA31, SA33-34.

Turning to the Data Usage Limitation, the district court held that it was preempted by National Bank Act regulations authorizing national banks to process data. SA28 (citing 12 C.F.R. §§ 7.1000(d)(1), 7.5006). And it rejected the Attorney General's argument that the Data Usage Limitation should not be read as applying to plaintiffs' members' conduct in using data to administer rewards programs and detect fraud. SA29.

The district court added that the Data Usage Limitation was preempted as to federal savings associations under the Home Owners' Loan Act, SA15 n.2 (citing 12

U.S.C. § 1465), as to out-of-state state banks under 12 U.S.C. § 1831a(j)(1), SA30-31, and as to federal credit unions under Federal Credit Union Act regulations, SA34. Finally, the court agreed that, to provide these financial institutions with complete relief, "other participants in the payment system" that "facilitate the preempted institutions' powers implicated by the Data Usage Limitation," including "the Payment Card Networks," should be covered by any injunction prohibiting the Data Usage Limitation's enforcement. SA43. The court, however, declined to find that the Data Usage Limitation was preempted as to out-of-state financial institutions other than out-of-state, state-charted banks. SA42. The district court, therefore, permanently enjoined the Data Usage Limitation's enforcement as to: (1) national banks; (2) federal savings associations; (3) out-of-state state banks; (4) federal credit unions; and (5) "other entities participating in an electronic payment transaction, such as [p]ayment [c]ard [n]etworks and processors, to the extent they are carrying out the functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation." *See* Doc. 194 at 2.

Plaintiffs and the Attorney General both appealed from the portions of the district court's judgment that were adverse to them, Docs. 181, 186, 196, 198, and this court later consolidated these appeals.

## SUMMARY OF ARGUMENT

In plaintiffs' appeal, this court should affirm the district court's grant of summary judgment in the Attorney General's favor as to the Interchange Fee Limitation.  The National Bank Act expressly permits States to regulate national bank activity, unless the regulation, under the standard set forth in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), significantly interferes with national banks' powers under federal law.  As the district court correctly observed, the Interchange Fee Limitation does not purport to constrain national banks' authority to establish or collect interchange fees from their customers.  Instead, it exempts a fraction of a transaction from interchange fees, *if* those fees are established, received, or charged by payment card networks.  That limit on fees established by non-bank entities does not rise to the level of significant interference under *Barnett Bank*.  The district court therefore correctly rejected plaintiffs' claims brought on behalf of national banks and federal savings associations, which are subject to the same preemption standard as national banks.

This court should also reject plaintiffs' attempts to fashion similar relief for financial institutions beyond national banks.  It should uphold the district court's conclusion that the Interchange Fee Limitation is not preempted as to federal credit unions, which are not subject to the *Barnett Bank* standard.  It should reject plaintiffs' unprecedented dormant Commerce Clause theory and their argument that 12 U.S.C. § 1831a(j)(1) extends National Bank Act preemption to all activities of out-of-state state banks.  And it should reject plaintiffs' contention that general,

16

equitable principles authorize the extension of any injunction favoring national banks to payment card networks, when doing so would contradict the National Bank Act's text and sweep far broader than necessary to afford national banks relief.

In the Attorney General's cross-appeal, this court should reverse the district court's grant of summary judgment and a permanent injunction as to the Data Usage Limitation. At summary judgment, plaintiffs failed to offer evidence supporting their standing to bring a pre-enforcement challenge to that provision, as they failed to show that it was likely that the Data Usage Limitation would apply to their desired conduct. Although plaintiffs worried that the Data Usage Limitation could be construed to prohibit them from using transaction data to develop fraud protections and customer rewards programs, that fear was grounded in an unreasonable reading of the Data Usage Limitation that contradicts fundamental principles of statutory interpretation under Illinois law.

## ARGUMENT

**I.     This court reviews the district court's judgment *de novo*.**

Plaintiffs appeal from the grant of summary judgment in the Attorney General's favor as to the Interchange Fee Limitation. This court reviews "*de novo* a district court's decision on cross-motions for summary judgment, construing all facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was filed." *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (cleaned up). This court also should apply *de novo* review in the Attorney General's cross-appeal, which challenges plaintiffs' standing to seek injunctive relief as to the Data Usage Limitation. *See Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012).

**II.    The district court correctly held that the Act's Interchange Fee Limitation is not preempted as to national banks or federal savings associations.**

The district court correctly held that federal law did not preempt the Interchange Fee Limitation as to national banks and federal savings associations. To establish preemption as to those entities, plaintiffs had to show that the Interchange Fee Limitation significantly interfered with national banks' and federal savings associations' powers under federal law. 12 U.S.C. § 25b(b)(1)(B); *see id.* § 1465(a) (under the Home Owners' Loan Act, which governs federal savings associations, preemptions decisions "shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of [s]tate law"). Because plaintiffs failed to make that showing, the district court correctly granted summary judgment to the Attorney General on those claims.

18

**A.**     **The National Bank Act permits state laws regulating national banks unless they significantly interfere with national banks' powers.**

The National Bank Act preempts "State consumer financial laws . . . only if": (1) the "application of a State consumer financial law would have a discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State"; or (2) "in accordance with the legal standard for preemption" set forth in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), "the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers."  12 U.S.C. § 25b(b)(1)(A)-(B).  A "State consumer financial law" is one "that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer."  *Id.* § 25b(a)(2).  Here, plaintiffs did not contend that the Act discriminates against national banks or dispute that the Act qualifies as a "State consumer financial law." Instead, they asserted that the Act significantly interferes with their powers under *Barnett Bank*.  *See* AT Br. 32.

In *Cantero v. Bank of America, N.A.*, 602 U.S. 205 (2024), the Supreme Court explained that *Barnett Bank* "did not purport to establish a clear line to demarcate when a state law 'significantly interfere[s] with the national bank's exercise of its powers.'"  *Id.* at 215 (quoting *Barnett Bank*, 517 U.S. at 33).  Thus, "courts addressing preemption questions in this context must do as *Barnett Bank* did and

19

likewise take account of . . . prior decisions of this Court and similar precedents." *Id.* at 215-16.

More specifically, the Court identified seven cases that inform whether a state law significantly interferes with a national bank's powers: *Barnett Bank* itself; *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982); *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954); *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944); *First National Bank of San Jose v. California*, 262 U.S. 366 (1923); *McClellan v. Chipman*, 164 U.S. 347 (1896); and *National Bank v. Commonwealth*, 76 U.S. 353 (1870). *Cantero*, 602 U.S. at 214-20. In reviewing those cases, courts "must make a practical assessment of the nature and degree of the interference caused by a state law" that involves a "nuanced comparative analysis" of the state law at issue to the laws addressed in those seven cases. *Id.* at 219-20. And courts must avoid crafting "a categorical test that would preempt virtually all state laws that regulate national banks." *Id.* at 220-21.

As discussed below, those seven cases establish that "significant interference" under the National Bank Act means that a state law actually or effectively prohibits banks from exercising powers granted to them by federal law. But States remain free to regulate banks in even-handed ways, even if those regulations affect or impose costs on financial institutions.

20

1. ***Barnett Bank* and *Fidelity Federal* hold that States may not ban national banks from exercising their express authority under federal law.**

The Supreme Court's most recent, relevant preemption cases reflect the commonsense principle that States cannot prohibit national banks from engaging in conduct that is expressly authorized by federal law.  In *Barnett Bank*, a Florida statute prohibited most banks from selling insurance in small cities.  517 U.S. at 29.  But the National Bank Act authorized banks to "'act as the agent for any fire, life, or other insurance company . . . by soliciting and selling insurance,'" and specified that the banks' authority to sell insurance was in "'addition to the powers now vested by law in national [banks].'" *Id.* at 28 (quoting 12 U.S.C. § 92).  By using the word "powers," the Court explained, Congress invoked a "history . . . of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority . . . ordinarily pre-empting[ ] contrary state law." *Id.* at 32.  In concluding that the National Bank Act preempted Florida's law, the Court emphasized that "the Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids," so the Florida law stood "as an obstacle to the accomplishment of" the federal law's purpose.  *Id.* at 31 (cleaned up).

Similarly, *Fidelity Federal* involved a federal regulation expressly recognizing federal savings associations' "'power to include, as a matter of contract between it and the borrower, a provision in its loan instrument whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or

transferred by the borrower without the association's prior written consent.'" 458 U.S. at 146-47 (quoting 12 C.F.R. § 545.8-3(f)). Consistent with that regulation, a federal savings association included such a "due-on-sale clause" in one of its mortgages, *id.* at 148, but, in later foreclosure proceedings, California courts held that the clause was an unreasonable restraint on alienation under state law, *id.* at 149-50.

In holding that the federal regulation preempted California law, the Court emphasized that the "due-on-sale regulation plainly provides that a federal savings and loan 'continues to have the power' to include a due-on-sale clause in a loan instrument and to enforce that clause 'at its option,'" whereas "the California courts ha[d] forbidden a federal savings and loan to enforce a due-on-sale clause solely 'at its option.'" *Id.* at 154-55. And the Court highlighted that the federal regulation's preamble made clear that "'due-on-sale practices of [f]ederal associations [were] governed *exclusively* by [f]ederal law,'" stating that "'[f]ederal associations shall not *be bound by or subject to any conflicting State law which imposes different . . . due-on-sale requirements*.'" *Id.* at 158 (emphases in original) (quoting 41 Fed. Reg. 18286, 18287 (1976)). Because of the "actual conflict between federal and state law," the Court held that California law was preempted. *Id.* at 159 n.14.

> **2.    *Franklin* and *First National Bank of San Jose* hold that States may not effectively prevent national banks from pursuing lines of business authorized by federal law.**

The two other relevant Supreme Court cases holding that the National Bank Act preempted state laws involved situations where States did not explicitly prohibit

national banks from exercising their powers, but effectively did so by placing extreme limits on the banks' expressly authorized activities. In *Franklin*, New York law prohibited national banks from using "the word 'savings,' or its variants" in their businesses, while exempting the State's "own chartered savings banks and savings and loan associations" from that prohibition. 347 U.S. at 374. The Court held that the New York law was "incompatible" with federal law, which expressly authorized national banks "'to receive . . . savings deposits'" and exercise "'all such incidental powers as shall be necessary to carry on the business of banking.'" *Id.* at 374-76 (quoting 12 U.S.C. §§ 24, 371). The Court held that these "incidental powers" should be construed to include "the use of advertising in [national banks'] authorized business," since "[m]odern competition for business finds advertising one of the most usual and useful of weapons." *Id.* at 377. The Court declined to read federal law as permitting "a national bank to engage in a business but [giving it] no right to let the public know about it." *Id.* at 377-78. And by prohibiting national banks from using the word that Congress "specifically selected" to describe the accounts at issue, the New York statute created a "clear conflict" with federal law. *Id.* at 378.

*First National Bank of San Jose* addressed a California law that "escheat[ed] to the state" any bank-account deposits if the account was inactive for 20 years. 262 U.S. at 366 (cleaned up). Because national banks had the express "power to receive deposits" under federal law, *id.* at 368, the Court reasoned, "no state may prohibit national banks from accepting deposits, or directly impair their efficiency in that regard," *id.* at 369. By "dissolv[ing] contracts of deposit" after 20 years and

23

"requir[ing] national banks to pay to it the amounts then due," however, California contradicted that authority.  *Id.*  The Court later explained that, in *First National Bank of San Jose*, the key fact in deciding that the California law was preempted was that it effectively prevented banks from exercising their powers to receive deposits — it was "so unusual and so harsh in its application to depositors as to deter them from placing or keeping their funds in national banks."  *Anderson*, 321 U.S. at 250.

>        3.    ***Anderson, McClellan,* and *National Bank* hold that States may enact even-handed regulations of national banks in areas left to States.**

The three Supreme Court decisions declining to find National Bank Act preemption, in turn, reflect the principle that States remain free to regulate national banks, so long as they do not discriminate against them or actually or effectively prohibit banks from exercising their express authority.  In *Anderson*, the Court addressed a Kentucky law that, like the California law in *First National Bank of San Jose*, addressed the disposition of inactive deposit accounts.  321 U.S. at 236-37.  The Kentucky statute created a rebuttable presumption that an account was abandoned (and thus the State's property) if certain transactions had not occurred within 10 or 25 years, depending on the type of account.  *Id.* at 237-38.  National banks claimed that the law was preempted under the provision of the National Bank Act authorizing them "to accept deposits and to do . . . banking business."  *Id.* at 239 (citing 12 U.S.C. § 24).

In rejecting that claim, the Court first noted that the statute was non-discriminatory, as it applied to "state and national banks alike," and emphasized that

24

it had never held that "non-discriminatory [state property] laws . . . are so burdensome as to be inapplicable to the accounts of depositors in national banks." *Id.* at 247-48. The Court also noted that Kentucky's law simply provided that the State had "the right to demand payment of the accounts in the place of the depositors" when an account was abandoned, which was no different than a depositor seeking to withdraw his money. *Id.* at 248. And the Court distinguished the rebuttable presumption created by the Kentucky law from the "unusual alteration of depositors' accounts" in *First National Bank of San Jose*, which the Court described as a *de facto* "confiscation of depositors' accounts" that "operat[ed] as an effective deterrent to depositors' placing their funds in national banks doing business within the state." *Id.* at 251 (cleaned up).

In *McClellan*, the Court held that federal law did not preempt a Massachusetts law voiding real estate transfers made when the transferee had reasonable cause to believe that the transferor was going to become insolvent. 164 U.S. at 348-49. The Court held that federal laws allowing national banks to obtain real estate as security for loans or to satisfy debts did not conflict with the Massachusetts law. *Id.* at 357-58. The Court explained that "[n]o function of [national] banks [was] destroyed or hampered by allowing the banks to exercise the power to take real estate, provided only they do so under the same conditions and restrictions to which all other citizens of the state are subjected." *Id.* at 358.

And in *National Bank*, the Court rejected a challenge to a Kentucky law taxing "bank stock." 76 U.S. at 360. The Court acknowledged that it had previously held

25

that national banks' "capital [was] exempt from [s]tate taxation," *id.* at 361, but Kentucky "intended to tax the shares of the [banks'] stockholders," rather than the banks' capital, *id.* at 360.  This was so even though the law "require[d] the officers of the bank to pay th[e] tax on the shares of its stockholders."  *Id.* at 361.

As explained below, the district court, applying this precedent, correctly held that the National Bank Act did not preempt the Interchange Fee Limitation because it did not actually or effectively prohibit national banks from exercising any of their powers under federal law or discriminate against national banks.

> **B.      The Interchange Fee Limitation does not significantly interfere with national banks' authority to charge fees for services.**

As the district court recognized, the Interchange Fee Limitation does not actually or effectively prevent national banks from charging or receiving fees, even fees based on a percentage of an electronic payment transaction's sum.  Instead, it applies only to fees set by payment card networks, not banks, and even then limits only a portion of a fee's total.  The district court, therefore, correctly rejected plaintiffs' claim that the National Bank Act preempted the Interchange Fee Limitation as to national banks.

By its terms, the Interchange Fee Limitation only applies to "interchange fee[s]," 815 ILCS 151/150-10(a), which are fees "established, charged, or received by a *payment card network*," such as Visa or Mastercard, *id.* § 150-5 (emphasis added).  And in practice, payment card networks, not national banks or any other financial institution, set default interchange fees that banks acting as acquirers or issuers

26

often accept.  *See* Doc. 124 at 9 ("networks establish default interchange rates"); Doc. 124-1 at 17 (payment "networks establish the appropriate interchange fee for each transaction" on their systems); Doc. 174 at 93 (plaintiffs' acknowledgment that networks "set the rates").  Thus, the Interchange Fee Limitation will not have any "practical effects" on "on the exercise of federal-*banking* power."  *Conti v. Citizens Bank, N.A.*, 157 F.4th 10, 25 (1st Cir. 2025) (emphasis added); *see id.* (explaining that *Barnett Bank* standard "turn[s] in large measure on the likely practical effects that a state law would have on the ability of national banks to exercise their powers").  National banks remain free to charge or receive any fees they choose, so long as those fees are established *by the banks*, not by the payment card networks.

And as plaintiffs seem to acknowledge, *see* AT Br. 35, no federal law expressly authorizes national banks to receive payment card networks' interchange fees on the tax and gratuity portions of a transaction.  The only federal statute that refers to interchange fees at all is the Electronic Funds Transfer Act, which requires "any interchange transaction fee" on a debit card transaction to be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(1), (3)(A); *see* 12 C.F.R. § 235.3(b) (setting formula to determine reasonableness of interchange fee).  This statute does not speak to the national banks' authority to receive fees that payment card networks impose on taxes and gratuities, much less use language reflecting a congressional intent to preempt any state laws.  *See Barnett Bank*, 517 U.S. at 32 (emphasizing that, in using word "powers" in statute, Congress invoked "history . . . of interpreting grants of both

27

enumerated and incidental 'powers' to national banks as grants of authority . . . ordinarily pre-empting[ ] contrary state law"); *Fidelity Federal*, 458 U.S. at 158 (citing federal regulation specifying that federal associations should not be bound by state due-on-sale clause regulations in concluding that such a regulation was preempted).

As for the federal regulation on which plaintiffs principally relied on in the district court, *see* Doc. 24 at 28; Doc. 125 at 24 — which they tellingly abandon on appeal, *see* AT Br. 50 — it also does not refer to fees established by payment card networks. It provides that national banks may charge their "customers non-interest charges and fees," 12 C.F.R. § 7.4002(a), but says that "[a]ll charges and fees should be arrived at by each *bank* on a competitive basis," using "sound banking judgment and safe and sound banking principles," *id.* § 7.4002(b)(1), (2) (emphasis added). Thus, federal law authorizes *national banks* to establish fees, but does not expressly authorize them to pass the costs of interchange fees established by a *payment card network* onto consumers or merchants.

Furthermore, the Interchange Fee Limitation does not bar any entity from establishing, charging, or receiving interchange fees — instead, it exempts a fraction of a transaction's total from such fees. For example, plaintiffs' expert stated that Visa uses a 2.6% interchange fee on "restaurant purchases performed by credit card," Doc. 124-1 at 20, and one of plaintiffs' *amici* hypothesizes that the Interchange Fee Limitation could exempt 23% of a Chicago restaurant purchase from interchange fees, BPI Br. 18-19. Under that hypothetical, the issuer would receive $2 from a $100

28

purchase, only $0.60 less than would be collected without the Interchange Fee Limitation.

Accordingly, the Interchange Fee Limitation does not resemble the state laws that were held preempted in *Barnett Bank* and *Fidelity Federal*, each of which completely prohibited national banks' expressly authorized conduct. *See Barnett Bank*, 517 U.S. at 28-29 (Florida law prohibited banks from selling insurance when federal law authorized them to); *Fidelity Federal*, 458 U.S. at 149-50 (California court decisions held that "due-on-sale" clauses, which were expressly authorized by federal law, were unenforceable restraints on alienation of property). Nor does it resemble the laws at issue in *Franklin* and *First National Bank of San Jose*, which would have effectively crippled national banks' ability to engage in certain lines of business expressly authorized by Congress. *See Franklin*, 347 U.S. at 377-78 (state law stripped national banks of "right to let the public know about" their "savings deposits," which were expressly authorized by federal law); *First Nat'l Bank of San Jose*, 262 U.S. at 369-70 (state law "dissolve[d] contracts of deposit . . . after 20 years," which could deter depositors from placing money with national banks and undermine "[t]he success of almost all commercial banks"); *see also Anderson*, 321 U.S. at 250 (law in *First National Bank of San Jose* was "so unusual and so harsh in its application to depositors as to deter them from placing or keeping their funds in national banks").

Instead, the Interchange Fee Limitation more closely resembles the state laws upheld in *Anderson*, *McClellan*, and *National Bank*, as it is a nondiscriminatory

regulation that does not actually or effectively prevent national banks from exercising their authority under federal law.  It is nondiscriminatory in that it applies to "state and national banks alike," *Anderson*, 321 U.S. at 247, as well as any "entity that facilitates, services, processes, or manages the debit or credit authorization, billing, transfer, payment procedures, or settlement with respect to any electronic payment transaction," 815 ILCS 151/150-5.  *Cf. Franklin*, 347 U.S. at 374 (holding preempted law prohibiting national banks from advertising savings deposits in any way, but exempting state banks from that prohibition).  Like the laws at issue in *Anderson*, *McClellan*, and *National Bank*, the Interchange Fee Limitation do not actually or effectively prohibit banks from exercising their powers, even if it does have some effect on their current practices.  Under the *Barnett Bank* standard, therefore, the district court correctly held that plaintiffs failed to establish that the Interchange Fee Limitation significantly interferes with national banks' power to charge fees for their services.

For their part, plaintiffs and their *amici* maintain that the Interchange Fee Prohibition significantly interferes with their "power to earn compensation by charging and receiving fees for [their] services" because it will "diminish their revenue."  AT Br. 42, 46; *see also* BPI Br. 17-18; OCC Br. 13-14.  This argument lacks any legal or factual foundation.  As explained, the Interchange Fee Prohibition does not prevent national banks from charging or receiving fees they establish as compensation for their services.  Although it exempts a fraction of a purchase from interchange fees set by payment card networks, national-bank issuers will still be

compensated by those fees. Indeed, no national bank declarant stated that the Interchange Fee Limitation would have any appreciable effect on its ability to be fairly compensated for its services. *See*, *e.g.*, Doc. 24-3 at 3-4; Doc. 24-8 at 3-9; Doc. 24-9 at 3-10; Doc. 24-10 at 3-7; Doc. 24-11 at 3-12.

And to the extent that plaintiffs suggest that *any* diminution in national bank revenue suffices to establish preemption, that contention has been refuted by decisions upholding state laws that would affect national banks' revenue. *See*, *e.g.*, *McClellan*, 164 U.S. at 348-49, 357-61 (rejecting preemption challenge to law prohibiting banks from engaging in certain real estate transfers); *National Bank*, 76 U.S. at 360-61 (rejecting preemption challenge to tax on bank shares paid by banks); *Conti*, 157 F.4th at 12, 25-26 (rejecting preemption challenge to law requiring national banks to pay interest to borrowers on funds deposited in mortgage-escrow accounts). That position would also amount to an improper rule preempting virtually any state regulation, as most regulations have *some* effect on the regulated entity's revenue. *See Cantero*, 602 U.S. at 220-21 (rejecting "a categorical test that would preempt virtually all state laws that regulate national banks").[2]

Plaintiffs also seek to distinguish the Interchange Fee Limitation from the state laws in *Anderson*, *McClellan*, and *National Bank*, arguing that those cases

---

[2] Some of plaintiffs' *amici* attempt to fill the gap in plaintiffs' evidence by citing industry reports suggesting that national banks might lose revenue. *See*, *e.g.*, ETA Br. 21. But even they concede that "it is difficult to precisely calculate the extent to which [the Act] will reduce national banks' interchange fee revenue," BPI Br. 19, which is a far cry from showing the "practical effects" of the Act "on the exercise of federal-banking power." *Conti*, 157 F.4th at 25.

31

limited permissible state laws to "generally applicable state contract, property, and debt-collection laws" or those that have "roots deep in the common law."  AT Br. at 46-47.  But *Cantero* rejected this same "categorical test that would preempt virtually all state laws that regulate national banks, . . . *other than generally applicable state laws such as contract or property laws*."  602 U.S. at 220-21 (emphasis added).  Nor do plaintiffs adequately explain how the Interchange Fee Limitation is not a "generally applicable" consumer-protection law, AT Br. 46, when it applies to any "entity that facilitates, services, processes, or manages the debit or credit authorization, billing, transfer, payment procedures, or settlement with respect to any electronic payment transaction," 815 ILCS 151/150-5, 150-10(a).  And plaintiffs' assertion that state regulations are limited to those recognized at common law contradicts Congress's express recognition that States may continue to enact laws "that directly and specifically regulate[ ] the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in) . . . with respect to a consumer," 12 U.S.C. § 25b(a)(2), so long as they do not "prevent[ ] or significantly interfere[ ] with the exercise by the national bank of its powers," *id.* § 25b(b)(1)(B).

## C.    The Interchange Fee Limitation does not significantly interfere with national banks' ability to receive deposits, make loans, or process card transactions.

Unable to establish that the Interchange Fee Limitation would actually or effectively prohibit national banks from charging or receiving fees, plaintiffs resort to an argument that the Interchange Fee Limitation significantly interferes with their

"powers to receive deposits, make loans on personal credit, and process card transactions." AT Br. 37. Although federal law does authorize national banks to receive deposits, make loans, and process card transactions, plaintiffs have not explained how the Interchange Fee Limitation's exemption of certain taxes and gratuities from interchange fees will impact those activities. *See Cantero*, 602 U.S. at 219-20 (*Barnett Bank* requires "practical assessment of the nature and degree of the interference caused by a state law"); *Conti*, 157 F.4th at 25 (holding that law was not preempted where national banks did not establish the "practical effects that [would] arise from the enforcement of" statute "on the exercise of federal-banking power")

Indeed, they cannot, since they offered no evidence that national banks would struggle to carry out these activities with the Interchange Fee Limitation in effect. Plaintiffs posit that national banks will have to spend "tens of millions of dollars" to comply with the law, AT Br. 38, but neither of the declarations they cite suggest that these compliance costs would make lending, receiving deposits, or processing card transactions cost prohibitive or impractical, *see* Doc. 24-6 at 5-6 (stating that federal savings bank would have to "spend substantial resources" to comply, including hiring "three to four employees" to process reimbursement requests); Doc. 24-8 at 1, 6 (stating that JPMorgan Chase, N.A., might have to spend $25 million and hire "over 100" employees to comply with Act). They also cite the declaration from the president of "an Illinois *state-chartered* bank" as evidence that certain banks might exit the market, Doc. 24-4 at 1 (emphasis added); *see* AT Br. 39-40, which plainly is not evidence of the Interchange Fee Limitation's effect on *national banks*. And one

33

of plaintiffs' *amici* confirms that, despite federal law limiting the amount of interchange fees on debit card transactions, 15 U.S.C. § 1693o-2(a)(1), (3)(A); 12 C.F.R. § 235.3(b), national banks have continued to issue debit cards. *See* ETA Br. 21-22 (asserting that limit on interchange fees deprived "large banks" of "37% of their interchange revenue," but debit cards continued to "facilitate nearly 50 billion transactions annually").[3]

Indeed, plaintiffs failed to offer "any substantial argument about the practical effects that [would] arise from the enforcement of" the Act "on the exercise of federal-banking power." *Conti*, 157 F.4th at 25. Instead, they offered evidence that national banks would incur costs to develop systems to comply with the Act. *See, e.g.*, Doc. 24-3 at 3-4; Doc. 24-8 at 3-9; Doc. 24-9 at 3-10; Doc. 24-10 at 3-7; Doc. 24-11 at 3-12. But the Supreme Court has never considered compliance costs, alone, when determining whether a state law is preempted — instead, the question is the effect of the state regulation "on the ability of national banks to exercise their powers." *Conti*, 157 F.4th at 25. If anything, plaintiffs' declarations show that national banks have been able to continue exercising their powers while complying with "significant new standards and technical specifications" set by "payment card network[s]," suggesting that they could comply with the Interchange Fee Limitation while

---

[3] Plaintiffs also suggest that the district court found that the Interchange Fee Limitation would "drive institutions out of the market." AT Br. 38. In reality, the district court simply described "declarations from various stakeholders who *claim*[*ed*] that preparing for the . . . *July 1, 2025*" effective date would be expensive and could drive them out of the market. SA14 (emphases added). Describing plaintiffs' evidence is not a finding and, in any event, evidence of costs to develop systems by a now-defunct effective date has little relevance.

continuing act as issuers and acquirers.  Doc. 24-3 at 4; *see* Doc. 24-10 at 4 (same); *see also* Doc. 24-8 at 5 (explaining that Visa and Mastercard "release major technical updates twice a year" that national banks comply with); Doc. 24-9 at 6 (explaining national banks' past compliance with "major payment standards changes"); Doc. 24-11 at 7 ("All payment networks have regularly scheduled technology and product changes.").

Next, plaintiffs incorrectly equate the Interchange Fee Limitation to the advertising ban at issue in *Franklin*.  AT Br. 37.  As explained, *Franklin* involved an outright prohibition on national banks' ability to use the word "'savings' or its variants" in their businesses.  347 U.S. at 374.  And the practical effect of that prohibition was obvious, as it deprived national banks "one of the most usual and useful . . . weapons" in "[m]odern [business] competition," while exempting New York's "own chartered savings banks and savings and loan associations" from the prohibition.  *Id.* at 374, 377.  As explained, the Interchange Fee Limitation does not prohibit national banks — or any entity — from charging interchange fees or promoting their ability to do so, let alone from exercising "core retail-lending, deposit-services, and card-processing powers."  AT Br. 38.  It merely exempts state and local taxes and gratuities from such fees, provided that the fees also are established, received, or charged by a payment card network and the merchant complies with its obligations to furnish tax and gratuity data.  815 ILCS 151/150-5, 150-10(a).  Nor does it place national banks at any competitive disadvantage, like the New York law in *Franklin* — it applies broadly to any issuers, acquirers, payment

35

card networks, and other entities. *Id.*; *see Anderson*, 321 U.S. at 247-48 (emphasizing law's "non-discriminatory" effect in holding it was not preempted).

At bottom, plaintiffs' preemption theory is a complaint that complying with the Interchange Fee Limitation will be expensive. AT Br. 25, 27-28, 36, 38, 56-58; *see also* BPI Br. 20; ETA Br. 19. But the *Barnett Bank* standard does not permit courts to strike down any state law that national banks view as too costly. Because plaintiffs failed to demonstrate that the Interchange Fee Limitation would cause any significant interference with national banks' powers under federal law, the district court correctly granted the Attorney General summary judgment on plaintiffs' claim brought on behalf of national banks.

> **D.     The Interchange Fee Limitation does not significantly interfere with federal savings associations' powers under the Home Owners' Loan Act.**

As explained, preemption challenges to state laws that apply to federal savings associations are subject to the same standard as preemption challenges brought under the National Bank Act. *See* 12 U.S.C. § 1465(a). Plaintiffs argue that the Interchange Fee Limitation significantly interferes with federal savings associations' powers to receive deposits and issue debit cards. AT Br. 58-59. But for the same reasons that plaintiffs failed to make that showing as to national banks' authority to receive deposits, *see supra* pp. 32-36, they failed to do so with respect to federal savings associations. Nor did they show that federal savings associations' ability to issue debit cards would be affected by the Interchange Fee Limitation — the only declarations suggesting that financial institutions might stop issuing cards were from

an Illinois-chartered bank and a state-chartered credit union, not federal savings associations.  Doc. 24-6 at 6; Doc. 24-15 at 8.

Plaintiffs also cite a regulation authorizing federal savings associations to transfer its customers' funds "with or without fee."  12 C.F.R. § 145.17.  But federal savings associations are free to charge fees for transferring their customers' funds under the Interchange Fee Limitation, so long as the fee they charge is not imposed on "the tax amount or gratuity of an electronic payment transaction," is not "established, charged, or received by a payment card network," and only if the merchant provides the federal savings association with a calculation of the tax and gratuity.  815 ILCS 151/150-5, 150-10(a); *see supra* pp. 26-32.  Thus, plaintiffs have failed to show that the Interchange Fee Limitation significantly interferes with any federal savings association power.

III.    **Even if the National Bank Act preempts the Interchange Fee Limitation, this court should uphold the district court's judgment as to federal credit unions.**

This court also should uphold the grant of summary judgment on plaintiffs' claim as to federal credit unions.  As the district court correctly held, Congress did not intend to apply the *Barnett Bank* preemption standard to federal credit unions. And even if it had, plaintiffs have not established that the Interchange Fee Limitation significantly interferes with any federal credit union power.

A.    *Barnett Bank* **does not apply to federal credit unions.**

The district court correctly held that the National Bank Act preemption standard does not extend to federal credit unions.  SA31-34.  "Pre-emption

37

fundamentally is a question of congressional intent . . . ." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).  And Congress expressly adopted the *Barnett Bank* standard in the National Bank Act and incorporated it into the Home Owners' Loan Act.  *See* 12 U.S.C. §§ 25b(b)(1)(B), 1465(a).  In other words, when Congress intended to implement a preemption standard for a financial institution, it "knew how to do so and did so expressly."  *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979).  But there is no similar preemption provision in the Federal Credit Union Act, demonstrating Congress's intent to retain ordinary preemption standards for federal credit unions.  *See*, *e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 574-75 (2009) (Congress's enactment of "an express pre-emption provision for medical devices," but not "prescription drugs," was "powerful evidence that Congress did not intend" to preempt state regulation of prescription drugs).

For their part, plaintiffs do not grapple with Congress's decision not to apply *Barnett Bank* to state laws regulating federal credit unions.  AT Br. 59-62.  Instead, they argue that "[c]ourts, including the Supreme Court, routinely extend this approach to other federal instrumentalities."  *Id.* at 60.  But this argument suffers from the fundamental flaw that "Congress rather than the courts . . . pre-empts state law."  *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (cleaned up).

And the argument is incorrect.  Plaintiffs cite *Fidelity Federal*, but nothing in that case suggests that the Court applied the National Bank Act's preemption standard to state laws regulating federal savings associations merely because they were federal instrumentalities.  Instead, the Court held that a federal agency had

expressly preempted California precedent prohibiting the use of "due-on-sale" clauses in mortgages by promulgating a regulation allowing federal savings associations to include such clauses in their contracts. *Fidelity Federal*, 458 U.S. at 154-59. Because the federal and state law "actually conflict[ed] with" with one another, ordinary preemption principles required state law to give way. *Id.* at 153.[4]

Indeed, plaintiffs overlook that, if *Fidelity Federal* extended National Bank Act preemption to federal savings associations, there would have been no reason for Congress to do so when it amended the Home Owners' Loan Act to incorporate the National Bank Act preemption standard to federal savings associations in 2010. *See* Pub. Law 111-203, § 1046, 124 Stat. 1376 (eff. July 21, 2010) (adding 12 U.S.C. § 1465). This court should "presum[e] that Congress was aware of" *Fidelity Federal* at that time, *Keene Corp. v. United States*, 508 U.S. 200, 212 (1993), particularly since it expressly referred to Supreme Court precedent in establishing the preemption standard for federal savings associations, Pub. Law 111-203, § 1044 (expressly adopting "the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank*"). And although plaintiffs state that Congress incorporated the National Bank Act preemption standard to "limit [the Home

---

[4] Although *Fidelity Federal* is now relevant to determining the scope of National Bank Act preemption, that is because *Barnett Bank* analyzed *Fidelity Federal* in applying National Bank Act preemption, and Congress expressly incorporated *Barnett Bank*'s analysis into the National Bank Act. *See supra* pp. 19-20. It is not because *Fidelity Federal* applied the National Bank Act preemption standard to federal savings associations absent an express statement of congressional intent.

39

Owners' Loan Act's] preemptive force" as to federal savings associations, AT Br. 60 n.9, they cite no authority to support that supposition.

Plaintiffs also cite *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 483-90 (10th Cir. 1998), but that case involved no federal credit unions — it held that a municipal zoning ordinance was not preempted as to a non-profit corporation that owned cemetery land under federal law. And the Tenth Circuit applied ordinary preemption principles; it did not mention, let alone apply, National Bank Act preemption. *Id.* at 486-90.

Plaintiffs' citation to *Federal National Mortgage Ass'n v. Lefkowitz*, 390 F. Supp. 1364, 1368-69 (S.D.N.Y. 1975), is likewise unavailing because, in that case, the court held that, even under the preemption standard applicable to national banks, a New York law requiring mortgage lending institutions to pay interest on escrow accounts was not preempted as to Fannie Mae. *See id.* (citing *Anderson*, 321 U.S. 233). As plaintiffs recognize, *see* AT Br. 59-60, National Bank Act preemption is a more lenient standard for the party arguing preemption, so the district court's holding that Fannie Mae failed to establish preemption under a more lenient standard is not the same as holding that every federal financial institution is automatically entitled to the same preemption standard as national banks. Even if it was, a 50-year-old district court order has no precedential value and limited persuasive value given Congress's subsequent expressions of its intent to limit National Bank Act preemption to national banks and federal savings associations.

*See Howard v. Wal-Mart Stores*, 160 F.3d 358, 359 (7th Cir. 1998) ("a district court's decision does not have precedential authority").

To the extent that plaintiffs argue that National Bank Act preemption should extend to federal credit unions because the Federal Credit Union Act was intended to make credit more readily available and allow credit unions to perform other "governmental functions," AT Br. 61, they seem to invoke ordinary, conflict preemption, in which courts determine whether "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (cleaned up). But plaintiffs do not actually argue that, under that standard, the Interchange Fee Limitation would be preempted as to federal credit unions, thus forfeiting any such argument. AT Br. 59-62; *see Dotson v. Faulkner*, 138 F.4th 1029, 1031 (7th Cir. 2025) ("Arguments omitted from an opening appellate brief are forfeited, if not waived.").

Regardless, plaintiffs' suggestion that the Interchange Fee Limitation conflicts with the Federal Credit Union Act's general purposes is insufficient. Even conflict preemption requires a showing that preemption is the "clear and manifest purpose of Congress," *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (cleaned up), so this court should reject plaintiffs' resort to "general preference[s]" or unspecified "tension" between state and federal law, *McHenry Cnty. v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2024) (cleaned up). Nor have plaintiffs shown that the Interchange Fee Limitations "would do major damage to clear and substantial federal interests," as would be required for any conflict preemption claim. *C.Y. Wholesale*,

41

965 F.3d at 547 (cleaned up). Indeed, the Federal Credit Union Act does not list collecting interchange fees set by payment card networks on tax and gratuity among federal credit unions' powers, *see* 12 U.S.C. § 1757, so the Interchange Fee Limitation will not have any major effect on any federal interest. Accordingly, this court should conclude that National Bank Act preemption does not extend to federal credit unions and uphold the district court's conclusion that the Interchange Fee Limitation is not preempted as to federal credit unions.

> **B.    Even if National Bank Act preemption applied to federal credit unions, the Interchange Fee Limitation does not significantly interfere with their powers.**

Even if *Barnett Bank* applied, however, plaintiffs have failed to establish that the Interchange Fee Limitation significantly interferes with federal credit unions' powers. Plaintiffs argue that the Interchange Fee Limitation will significantly interfere with federal credit unions' ability to extend credit or issue debit cards, *see* AT Br. 63, but for the same reasons that this argument failed as to national banks and federal savings associations, it fails as to federal credit unions, *see supra* pp. 32-37.

Plaintiffs also cite a regulation stating that federal credit unions may "earn income for those activities determined to be incidental to [their] business." 12 C.F.R. § 721.6. AT Br. 63. Like most of plaintiffs' arguments, this amounts to an assertion that any state regulation affecting a federal credit union's revenue is preempted. As explained, that argument is inconsistent with the National Bank Act's text. *See* 12 U.S.C. § 25b(b)(1); *Cantero*, 602 U.S. at 220-21.

42

**IV.    This court should reject plaintiffs' arguments as to state banks chartered in States other than Illinois.**

This court also should reject plaintiffs' two arguments that any national bank preemption should extend to banks chartered by States other than Illinois, *i.e.*, out-of-state state banks.  First, plaintiffs' dormant Commerce Clause claim depends on the resolution of an argument that, as plaintiffs have conceded, is barred by the Eleventh Amendment and must be resolved by Illinois courts.  Setting that aside, the dormant Commerce Clause claim fails on the merits.  Second, plaintiffs overread 12 U.S.C. § 1831a(j)(1) in asserting that it broadly extends preemption to all out-of-state state banks.  In reality, it applies only to the activities of *branches* of such banks located in Illinois, not all activities of out-of-state state banks.

**A.    Plaintiffs' dormant Commerce Clause claim is barred by the Eleventh Amendment because it depends on a conclusion that the Attorney General may not enforce the Interchange Fee Limitation under state law.**

First, plaintiffs contend that any denial of preemption to out-of-state state banks would violate the dormant Commerce Clause.  This argument proceeds in two steps: (1) if the court holds that the Interchange Fee Prohibition is preempted as to national banks, then three Illinois "parity statutes" will preclude the Attorney General from enforcing the Interchange Fee Prohibition against Illinois-chartered banks; and (2) if the Interchange Fee Prohibition is preempted as to Illinois-chartered banks, then not preempting it as to out-of-state state banks would violate the dormant Commerce Clause.  AT Br. 69-73.

43

The problem is that the first step of plaintiffs' argument asks this court to evaluate whether, by enforcing the Interchange Fee Limitation as to Illinois banks, the Attorney General would violate Illinois's parity statutes. The parity statutes on which plaintiffs rely generally provide that Illinois banks, savings banks, and credit unions may carry out the same activities that federal law authorizes national banks, federal savings associations, and federal credit unions to perform. *See* 205 ILCS 5/5(11); 205 ILCS 205/6002(a)(11); 205 ILCS 305/65. According to plaintiffs, these statutes "exempt . . . Illinois-chartered institutions from [the Interchange Fee Limitation's] burdens," leading to "facial discrimination" against out-of-state state banks. AT Br. 72.

But concluding that these statutes prohibit enforcement of the Interchange Fee Limitation against Illinois banks is tantamount to a request for "relief against state officials based on a conclusion that they have violated state law," which is barred by the Eleventh Amendment. *Svendsen v. Pritzker*, 91 F.4th 876, 877 (7th Cir. 2024) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97-123 (1984)). In fact, plaintiffs conceded that the Eleventh Amendment barred their "claims on behalf of Illinois institutions" premised on these same parity statutes in response to the Attorney General's motion to dismiss. Doc. 93 at 5. Furthermore, plaintiffs represented that they "will . . . refile their claims on behalf of Illinois institutions in state court." *Id.* at 12; *see also* Doc. 174 at 21-22. This court, therefore, should not consider an issue that Illinois courts are entitled to address in the first instance. *See Pennhurst*, 465 U.S. at 106 (recognizing that granting relief

44

against state officials based on state law, "whether prospective or retroactive," intrudes "on state sovereignty" and "the principles of federalism that underlie the Eleventh Amendment").

Although plaintiffs attempt to package their claim in the dormant Commerce Clause, this court has rejected similar efforts to circumvent the Eleventh Amendment. For example, in *Benning v. Board of Regents of Regency University*, 928 F.2d 775, 776 (7th Cir. 1991), the plaintiff brought a state-law, personal-injury claim against a state university, arguing that his request for declaratory relief could avoid *Pennhurst*. *Id.* at 778. This court rejected that argument because "such a declaration would be . . . *res judicata* on the issue of liability, leaving to state courts the mechanical process of tabulating damages." *Id.* Because the "issuance of a federal declaratory judgment as a step toward a state damage or injunctive remedy would operate as an end-run around *Pennhurst*," this court held that it was "equally forbidden by the Eleventh Amendment." *Id.*

Here, as in *Benning*, granting plaintiffs relief on their dormant Commerce Clause claim would require this court to decide whether the Interchange Fee Limitation is enforceable as to Illinois banks, which could have preclusive effect when plaintiffs refile their claim against the Attorney General in state court. *See Matrix IV, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011) (under federal law, issues that are "actually litigated" and were "essential to the final judgment" have preclusive effect on same parties); *See v. Ill. Gaming Bd.*, 2020 IL App (1st) 192200, ¶ 11 (Illinois courts apply federal common law "when determining

45

the preclusive effect of a federal court judgment").  That would leave Illinois courts to carry out the mechanical process of setting forth the terms of any injunction favoring Illinois banks, effectively giving plaintiffs an end-run around *Pennhurst*.[5]

At summary judgment, plaintiffs cited two out-of-circuit cases for the proposition that the district court could address the parity statutes' application in the context of their dormant Commerce Clause claim.  Doc. 125 at 29 n.7.  But those cases recognized that claims are not barred by *Pennhurst* simply because they might require a federal court to interpret state law.  *See Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 740 (5th Cir. 2020) (claim that Mississippi constitutional provision violated federal law not barred by Eleventh Amendment just because it "ask[ed] the court to interpret the meaning of *federal* law . . . by reference to a related state law" (emphasis in original)); *Everett v. Schramm*, 772 F.2d 1114, 1119 (3d Cir. 1985) (plaintiffs brought claim under 42 U.S.C. § 1983, claiming that state officials violated the federal Social Security Act by failing to use required calculation that was set forth in state statute).

Here, plaintiffs' dormant Commerce Claim did not simply ask the district court to interpret Illinois's parity statutes — it depended on a holding that, under those statutes, the Interchange Fee Limitation "cannot be applied" to Illinois banks. Doc. 1 at 4-5; *see* Doc. 125 at 31 ("because the Illinois Banking Act *protects* Illinois-

---

[5]  Notably, if plaintiffs were genuinely concerned over the alleged protectionism created by the parity statutes, they could have brought a dormant Commerce Clause claim challenging the parity statutes themselves, which would have avoided this Eleventh Amendment problem.  But plaintiffs chose not to pursue that theory.

chartered banks from the [Interchange Fee Limitation], the dormant Commerce Clause requires that out-of-state state banks receive the same protection" (emphasis added)); AT Br. 72 (arguing that dormant Commerce Clause was violated because "the parity statutes . . . exempt only Illinois-chartered institutions" from Interchange Fee Limitation).  Because plaintiffs effectively sought a declaration that the parity statutes are "binding upon state officials," *Williams*, 954 F.3d at 740, the Eleventh Amendment barred their dormant Commerce Clause claim, *see id.* at 740-41 (claim seeking declaration that earlier provision of Mississippi Constitution "remain[ed] valid and enforceable" went beyond interpretation of state law and amounted to an impermissible "order compelling state officials to comply with a specific state law").

## B.     On the merits, plaintiffs' dormant Commerce Clause claim fails.

Even if plaintiffs' dormant Commerce Clause claim were properly before this court, plaintiffs failed to demonstrate that the parity statutes, coupled with the Interchange Fee Limitation, unlawfully discriminate against out-of-state state banks. The dormant "Commerce Clause prohibits the enforcement of state laws driven by economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (cleaned up).  For purposes of the dormant Commerce Clause, state laws fall into three categories: (1) those "that explicitly discriminate against interstate commerce"; (2) "[f]acially nondiscriminatory laws" that "appear to be neutral among states but that bear more heavily on interstate commerce than on local commerce"; and (3) laws that "do not give local firms any

47

competitive advantage over those located elsewhere" and thus pose "no problem under the dormant commerce clause." *Park Pet Shop, Inc. v. City of Chi.*, 872 F.3d 495, 501-02 (7th Cir. 2017) (cleaned up).  Laws in the second category are evaluated under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), under which a court asks whether the law's burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Ross*, 598 U.S. at 377 (cleaned up).

Here, plaintiffs solely pursue a claim that the parity statutes, combined with the Interchange Fee Limitation, fall within the first category of facially discriminatory laws.  *See* AT Br. 72, 73 (arguing that statutes put Illinois institutions on "facially better footing" and that the Act "discriminates on its face").  In fact, they disavowed any *Pike* claim even after the district court invited them to raise one.  Doc. 174 at 20-21; *see* SA42 (noting that plaintiffs had not raised "*Pike* balancing" at summary judgment).  Thus, plaintiffs have waived any argument that these laws have discriminatory effects, and this court should confine its analysis to plaintiffs' claim that they are facially discriminatory.  *See Thomas v. Carmichael*, 164 F.4th 1058, 1066 (7th Cir. 2026) (party waives argument by "intentional[ly] relinquish[ing] or abandon[ing]" it (cleaned up)).

Neither the parity statutes nor the Interchange Fee Limitation, by their terms, discriminate against interstate or out-of-state commerce.  *Cf. City of Philadelphia v. New Jersey*, 437 U.S. 617, 625-27 (1978) (New Jersey law that prohibited "treatment and disposal within this State of all wastes generated outside of the State"

48

discriminated "on its face").  The parity statutes simply put Illinois financial institutions on a level playing field with national banks — they do not target out-of-state state financial institutions or purport to prohibit other States from granting similar benefits to their chartered financial institutions.  *See Ross*, 598 U.S. at 370 (law that did not "advantage in-state firms or disadvantage out-of-state rivals" was not subject to "discrimination-based claim" under the dormant Commerce Clause). And the Interchange Fee Limitation applies to all electronic payment transactions occurring in Illinois without discriminating against the parties effectuating it.  *See Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 434 (2005) (fee levied "only upon intrastate transactions" did not "facially discriminate against interstate or out-of-state activities").  Read together or independently, none of these laws facially discriminate against out-of-state institutions.

Recognizing as much, plaintiffs' facial-discrimination theory depends on this court's conclusion that "federal institutions enjoy preemption" from the Interchange Fee Limitation.  AT Br. 70.  In other words, plaintiffs concede that there is no discrimination unless Congress has preempted the Interchange Fee Limitation as to national banks.  But no court has recognized this kind of chain-reaction theory under the dormant Commerce Clause.  And for good reason — it defies logic to suggest that a *State* engages in "purposeful discrimination against out-of-state businesses" when *Congress* preempts an otherwise facially neutral state law as to national corporations (but only those corporations).  *Ross*, 598 U.S. at 379.  Nor could Congress's decision to preempt a state law create a dormant Commerce Clause problem in any event,

since Congress may "authorize states to engage in activities that but for the authorization would violate the dormant commerce clause." *Hirst v. Skywest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018) (cleaned up).

Indeed, the cases on which plaintiffs rely lend no support to their argument that the parity statutes or Interchange Fee Limitation are facially discriminatory or that this court should recognize plaintiffs' discrimination-by-preemption theory of the dormant Commerce Clause. AT Br. 73. Instead, they involved statutes that either expressly or effectively disadvantaged out-of-state businesses. *See W. Lynn Creamery v. Healy*, 512 U.S. 186, 188, 194-95 (1994) (Massachusetts law imposing assessment on milk sold to Massachusetts retailers, which, after collection, was paid "to Massachusetts dairy farmers," was effectively an unlawful "tariff" on out-of-state milk); *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 335, 350 (1977) (statute requiring apples sold in North Carolina to bear "no grade other than the applicable U.S. grade or standard," though facially non-discriminatory, had "the practical effect of not only burdening interstate sales of Washington apples, but also discriminating against them" (cleaned up)).

At bottom, plaintiffs' dormant Commerce Clause claim is an attempt to unwind a "confusing conundrum" created by their preemption arguments — namely, that "out-of-state State-chartered institutions [may be] the only relevant entities subject to" the Interchange Fee Limitation. SA41. If there is any recourse for that confusion, however, it lies with the political branches, not an unprecedented expansion of the dormant Commerce Clause. *See Ross*, 598 U.S. at 382-83

50

(explaining that, if California law threatened "a 'massive' disruption of the pork industry," pork producers could "petition Congress . . . to adopt federal legislation that may preempt conflicting state laws"). Regardless of this court's decision as to the preemption of the Interchange Fee Limitation, therefore, it should reject plaintiffs' effort to engraft a favorable ruling onto out-of-state state banks via the dormant Commerce Clause.

### C.    12 U.S.C. § 1831a(j)(1) is limited to activities of Illinois branches of out-of-state state banks.

Plaintiffs next contend that 12 U.S.C. § 1831a(j)(1) requires that any preemption of the Interchange Fee Limitation as to national banks also must apply to out-of-state state banks. AT Br. 64-65. Under section 1831a(j)(1), "[t]he laws of a host State . . . shall apply to any *branch* in the host State of an out-of-State State bank to the same extent as such State laws apply to a *branch* in the host State of an out-of-State national bank." 12 U.S.C. § 1831a(j)(1) (emphases added). Section 1831a(j) also incorporates the definitions of "host State" and "home State" found in 12 U.S.C. § 1831u, *see* 12 U.S.C. § 1831a(j)(4), which make clear that the provision only refers to branches of banks chartered in other States. *See id.* §§ 1831u(g)(4)(A)(ii), (5) (defining "home State" as "the State by which the bank is chartered" and "host State" as "a State, other than the home State of the bank, in which the bank maintains, or seeks to establish and maintain, a branch").

In other words, Illinois is a "host State" to banks that are chartered in other States, but that maintain branches in Illinois. Under section 1831a(j)(1), Illinois's laws apply to those banks' "*branch*[*es*] in" Illinois to the same extent that they apply

51

to national banks' branches in Illinois. *Id.* § 1831a(j)(1) (emphasis added). But that provision does not speak to activities carried out by non-Illinois banks' main offices or non-Illinois branches.

As applied to the Interchange Fee Limitation, therefore, section 1831a(j)(1) would extend any national bank preemption to the activities of branches of a non-Illinois bank operating in Illinois, such as serving as the issuer of a credit card or the acquirer for an Illinois merchant. If, however, a consumer uses a card in an Illinois transaction that was issued by a non-Illinois branch of an out-of-state state bank, section 1831a(j)(1) does not apply. Nor would it apply to any non-Illinois branch of a non-Illinois bank that acts as an acquirer for a transaction occurring in Illinois.

For their part, plaintiffs do not address section 1831a(j)(1)'s limited reach to branches of out-of-state state banks. AT Br. 64-65. Instead, they cite two out-of-circuit cases, both of which involved preemption claims brought by *branches* of out-of-state banks. *See*, *e.g.*, *Pereira v. Regions Bank*, 752 F.3d 1354, 1356 (11th Cir. 2014) (plaintiffs brought claim challenging check-cashing fee after "present[ing] a check at a Regions Bank . . . *branch*" (emphasis added)); *Johnson v. First Banks, Inc.*, 382 Ill. App. 3d 907, 908 (5th Dist. 2008) (similar). Accordingly, neither case had occasion to address a claim, like this one, in which out-of-state state banks broadly sought protection for all of their activities under section 1831a(j)(1). This court, therefore, should hold that 12 U.S.C. § 1831a(j)(1) only extends any national bank preemption to out-of-state state banks' Illinois branches.

52

**V.     Even if the Interchange Fee Limitation is preempted as to financial institutions, this court should not extend preemption to payment card networks based on equitable principles.**

Plaintiffs finally contend that the Interchange Fee Limitation should be enjoined as to payment card networks like Visa and Mastercard.  AT Br. 65-67.  But they make no attempt to show that Congress has chosen to preempt state consumer-protection laws as to these entities, and for good reason: no federal law precludes application of the Interchange Fee Limitation (or any other state law) to the payment card networks.  Plaintiffs' argument, instead, is that an injunction must apply to the networks and "other payment-system participants" so that plaintiffs themselves can receive "complete relief."  *Id.* (cleaned up).  That is incorrect.

Initially, plaintiffs' resort to equity ignores Congress's express intent to limit National Bank Act preemption to financial institutions.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015) ("Courts of equity can no more disregard statutory . . . requirements and provisions than can courts of law." (cleaned up)).  The National Bank Act provides that nothing in it "shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or *agent* of a national bank."  12 U.S.C. § 25b(h)(2) (emphasis added).  An agent is "[s]omeone who is authorized to act for or in place of another; a representative."  *Agent*, Black's Law Dictionary (12th ed. 2024).  And it was undisputed that payment card networks are not financial institutions themselves, but rather act on behalf of banks to facilitate the setting and collection of interchange fees.  *See* Doc. 137 at 7 ("Payment card networks connect acquirers and issuers,

enabling electronic payment authorization, clearing, and settlement."); Doc. 124-1 at 12 (same); AT Br. 16 (networks "enabl[e] banks to efficiently exercise their powers to issue credit and debit cards and process millions of transactions every day"); OCC Br. 15 ("Card payment networks perform these functions *on behalf of banks* and do so in a more efficient manner than client banks could perform individually.") (emphasis added)). Indeed, plaintiffs make no effort to explain why payment card networks are not national banks' agents in their opening brief, which does not cite 12 U.S.C. § 25b(h)(2) or discuss the district court's reliance on that provision in denying their request for preliminary injunctive relief as to payment card networks. *See* AT Br. 22-23, 30-73. Thus, this court should not extend injunctive relief to payment card networks merely because they act on banks' behalf in facilitating electronic payments.

Even aside from the National Bank Act's text, this court should reject plaintiffs' contention that payment card networks need to benefit from an injunction to afford plaintiffs complete relief. "Complete relief is not synonymous with universal relief." *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025). Courts should avoid awarding "expansive" injunctive relief "if a more narrow approach is available." *City of Chi. v. Barr*, 961 F.3d 882, 920 (7th Cir. 2020). And courts should enter "an injunction requiring the defendant to cease the offending activity entirely" only when it is "the only way to provide complete relief to the plaintiff." *Reporters Cmte. for Freedom of the Press v. Rokita*, 147 F.4th 720, 733 (7th Cir. 2025).

For example, the "archetypal case" is one "in which one neighbor sues another for blasting loud music at all hours of the night." *CASA*, 606 U.S. at 851. Because there is "no way to peel off just the portion of the nuisance that harmed the plaintiff," the "only . . . feasible option" is to order the defendant to turn down the music, which would "necessarily benefit the defendant's surrounding neighbors too." *Id*. at 851-52 (cleaned up). That the other neighbors might, in practice, benefit from the injunction does not mean that "the injunction's protection extends" to them. *Id*. at 852.

This is not a circumstance in which the only feasible option would be to exempt payment card networks from the Interchange Fee Limitation. If the Interchange Fee Limitation is enjoined as to national banks or other financial institutions, they would be free from any potential civil penalties for collecting or receiving an interchange fee on the tax or gratuity portions of a transaction. *See* 815 ILCS 515/150-15(a). And they would not be obligated to maintain systems for refunding those fees. *See id*. § 150-10(a), (b). Thus, they would obtain the relief they seek — freedom from these allegedly "draconian" and "burdensome" regulations. AT Br. 19, 36.

Plaintiffs nevertheless maintain that, without injunctive relief extending to payment card networks, issuers would not receive the "full amount" of fees to which they are "entitled." AT Br. 66. According to them, this is because "the amount of interchange fee received by the Issuer is necessarily equal to the amount transferred through the Card Network." *Id*.

But this argument rests on the flawed assumption that the default interchange fees set by payment card networks cannot be changed, such that any limitation on those default interchange fees necessarily would flow through to limit the amount issuers receive or acquirers charge.  Indeed, plaintiffs have repeatedly recognized the opposite, conceding that banks could negotiate interchange fees independent of the payment card networks if they chose.  *See* AT Br. 28 ("[N]ational banks' power to receive compensation for their services does not depend on whether they choose to charge Networks' default fees or instead *negotiate separate fee arrangements with merchants or Acquirers*." (emphasis added)); Doc. 124 at 9 ("Although networks establish default interchange rates, *issuers and acquirers remain free to separately negotiate different rates*." (emphasis added)); Doc. 124-1 at 16 n.22 (plaintiffs' expert stating that networks "establish *default* interchange rates, which apply in the absence of *separately negotiated rates*") (emphases added); *see also* EPC Br. 14 ("[B]anks *choose* to pay and accept [networks' default] rates when they opt to use default fee schedules.  They can also choose *not* to accept those default rates." (emphases in original)).  Consequently, an injunction in favor of issuers and acquirers would leave them free to negotiate interchange fees that could provide them with the amounts to which plaintiffs allege they are "entitled."  AT Br. 66.

On appeal, plaintiffs and their *amici* suggest that any negotiation process would be onerous.  *See*, *e.g.*, AT Br. 28; Comptrollers Br. 5; EPC Br. 4.  But they offered no evidence in the district court that because they would have to justify their interchange fees through market negotiation, injunctive relief in their favor would be

ineffective.  Plaintiffs cannot justify the entry of an overbroad injunction based speculation concerning possible inconvenience.

## VI.    Plaintiffs lacked standing to bring a pre-enforcement challenge to the Data Usage Limitation.

In the Attorney General's cross-appeal, this court should reverse the district court's grant of summary judgment and permanent injunction as to the Data Usage Limitation because plaintiffs lacked standing to bring a pre-enforcement challenge to that provision.  At summary judgment, they failed to demonstrate that their desired conduct — namely, using transaction data to develop fraud prevention models and administer customer rewards programs — would be prohibited by a reasonable construction of the Data Usage Limitation.  This court, therefore, should reverse that portion of the district court's judgment and its permanent injunction.

"To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (cleaned up).  "The party invoking federal jurisdiction bears the burden of establishing standing — and, at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013) (cleaned up).

Although a plaintiff challenging a law's constitutionality need not subject itself to liability to show an injury-in-fact, the "threatened enforcement" of the law must be "sufficiently imminent" to seek "pre-enforcement review."  *Susan B. Anthony*

57

*List*, 573 U.S. at 159.  "Meeting this standard requires allegations of both an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and a credible threat of prosecution thereunder."  *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (cleaned up).  And "[i]t is a threshold requirement to establish a credible threat of enforcement that the statute actually cover the plaintiff's desired conduct."  *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023).  Whether a state statute covers a plaintiff's desired conduct "is without a doubt a question of [state] law."  *Id.* at 632.

Thus, plaintiffs' standing to challenge the Data Usage Limitation hinges on whether that provision, under Illinois principles of statutory interpretation, applies to their desired conduct.  At summary judgment, plaintiffs argued that the Data Usage Limitation would impermissibly interfere with banks' ability to "use data to build predictive models that detect and combat fraud" and "offer cardholder rewards."  Doc. 125 at 28, 48; *see also* Doc. 124 at 11 (claiming that Data Usage Limitation "would make it impossible to maintain effective fraud prevention systems" and impede "cardholder rewards").  But no plausible reading of the Data Usage Limitation could apply to those activities.

Under Illinois law, statutory interpretation is a question of legislative intent. *See State ex rel. Raoul v. Elite Staffing, Inc.*, 2024 IL 128763, ¶ 16 ("The most fundamental rule in statutory construction is to give effect to the legislative intent." (cleaned up)).  "The statutory language, given its plain and ordinary meaning, is generally the most reliable indicator of that legislative intent, but a literal reading

58

must fail if it yields absurd, inconvenient, or unjust results." *Id.*; *see Evans v. Cook Cnty. State's Att'y*, 2021 IL 125513, ¶ 27 ("When a plain or literal reading of a statute leads to . . . results that the legislature could not have intended, courts are not bound to that construction, and the literal reading should yield."). "In addition to the statutory language, the court may consider the purpose behind the law and the evils sought to be remedied, as well as the consequences that would result from construing the law one way or the other." *Elite Staffing*, 2024 IL 128763, ¶ 16 (cleaned up).

Here, the Data Usage Limitation provides that covered entities "may not distribute, exchange, transfer, disseminate, or use . . . electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). The word "facilitate" is broad, meaning "[t]o make the occurrence of (something) easier; to render less difficult." *Facilitate*, Black's Law Dictionary (12th ed. 2024); *see People v. Chapman*, 2012 IL 111896, ¶ 24 ("When a statute contains a term that is not specifically defined, it is entirely appropriate to look to the dictionary to ascertain the plain and ordinary meaning of the term."). Of course, using a consumer's data to develop fraud prevention mechanisms makes their electronic payment transactions easier by ensuring that they are legitimate. Rewards programs also make electronic payment transactions easier by incentivizing customers' use of electronic payment methods, leading to wider use and adoption of those methods. Under the Act's text, therefore, the Data Usage Limitation does not prohibit the conduct in which plaintiffs intend to engage.

59

According to the district court, however, the Data Usage Limitation prohibits any use of data "outside of conduct formally necessary to facilitate a transaction from Point A to Point B." SA11; *see also id.* (Data Usage Limitation only allows for use of information to "'facilitate or process' the transaction itself"). But that reading renders the word "facilitate" superfluous by equating it to the word "process." If, as the district court believed, the only information sharing permitted by the Data Usage Limitation was the passing of information related to a single transaction through the electronic payment system to complete that transaction, the legislature would have simply said that data may only be used to "process the electronic payment transaction." By using the phrase "facilitate *or* process," however, the General Assembly intended the Data Usage Limitation's exception to be much broader, applying to both data exchanges necessary to carry out a transaction and those that make electronic payment transactions easier. *See Mosby v. Ingalls Mem'l Hosp.*, 2023 IL 129081, ¶ 36 ("The word 'or' is disjunctive" and "connotes two different alternatives." (cleaned up)). This court should not construe the deliberate choice to include the word "facilitate" as mere surplusage. *See People v. Reed*, 2025 IL 130595, ¶ 25 ("When interpreting a statute, each word, clause, and sentence must be given a reasonable meaning if possible, and no part of the statute should be rendered superfluous or meaningless.").

Furthermore, the district court's overly literal interpretation of the Act's language defies Illinois principles of statutory construction. The Illinois Supreme Court's decision in *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101 (2005), is

illustrative.  There, the court considered the definition of "employer" in the Illinois Wage Payment and Collection Act ("Wage Act"), 820 ILCS 115/1 *et seq.*, which defined that term to include "'any person . . . acting directly or indirectly in the interest of an employer in relation to an employee,'" *Andrews*, 217 Ill. 2d at 106-07 (quoting 820 ILCS 115/2).  The court noted that, "[r]ead literally," this definition "would make an employer out of every person who possesses even a modicum of authority over another employee, from the CEO to the head of the maintenance staff, as such persons undeniably act directly or indirectly in the interest of an employer in relation to an employee."  *Id.* at 107 (cleaned up).  Applying the presumption that the "legislature did not intend to produce absurd or unjust results," the court declined to adopt a reading that would "make every supervisory employee strictly and personally liable for the payment of his or her subordinates' wages."  *Id.* at 107-08.  Instead, the court interpreted the definition as only imposing liability on "those individual decision makers who knowingly permitted the Wage Act violation," looking to another provision of the statute providing that an employer's agent is liable for a Wage Act violation if he or she "knowingly permit[s]" the violation.  *Id.* at 109 (cleaned up).

Just as the Illinois General Assembly did not intend to impose Wage Act liability on every supervisory employee in the State, it did not intend to punish banks for using transaction data to protect the consumers engaging in those transactions from fraud or to give them rewards.  Adopting that construction would run counter to the Act's purpose of protecting consumers, instead depriving them of fraud

61

protection and rewards they otherwise would have earned.  The legislature could not have intended that result in enacting the Data Usage Limitation.

And like the statute in *Andrews*, another provision of the Act offers insight as to the Data Usage Limitation's intended scope.  The Act specifies that violations of the Data Usage Limitation constitute violations the Consumer Fraud Act, 815 ILCS 151/150-15(b), which generally prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices," 815 ILCS 505/2.  Like the provision limiting Wage Act violations to knowing violations in *Andrews*, the Act's incorporation of the Consumer Fraud Act suggests that the legislature intended to prohibit unfair or deceptive acts, not programs that benefit consumers.

In addition to creating absurd, unintended results, the district court's interpretation of the Data Usage Limitation created an unnecessary conflict with the Illinois Banking Act, 205 ILCS 5/1 *et seq*.  *See Moreland v. Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chi.*, 2025 IL 131343, ¶ 31 (Illinois courts "presume that several statutes relating to the same subject are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious" (cleaned up)); *Relf v. Shatayeva*, 2013 IL 114925, ¶ 39 ("When construing statutes, it is appropriate to consider similar and related enactments, though not strictly *in pari materia*.").  Section 48.1(c) of the Banking Act generally prevents a bank from disclosing "any financial records or financial information obtained from financial records relating to that customer of that bank" unless the customer authorizes the disclosure, the disclosure is required by law, or

the bank is attempting to collect a debt. 205 ILCS 5/48.1(c). The Banking Act carves out exceptions to that rule, however, including for the "disclosure of financial records or information . . . in connection with servicing or processing a financial product or service requested or authorized by the customer," *id.* § 48.1(b)(17)(A), and the "disclosure of financial records or information as necessary to protect against actual or potential fraud, unauthorized transactions, claims, or other liability," *id.* § 48.1(b)(18). Thus, the Banking Act authorizes banks to disclose financial records for services authorized by a customer (like a credit card rewards program) or fraud prevention. To avoid any unnecessary conflict between the Data Usage Limitation and the Banking Act, this court should reject the district court's reading of the Data Usage Limitation.

Instead, the most plausible reading of the Data Usage Limitation is one that is consistent with the financial records provision of the Banking Act, which states that it was not intended to "authorize[ ] the sale of financial records or information of a customer without the consent of the customer." *Id.* § 48.1(b)(17). Reading the Data Usage Limitation as prohibiting only unauthorized, commercial use of bank customers' transaction data — for example, selling data to targeted advertisers — will effectuate the Act's purpose of protecting consumers while allowing banks to carry out tasks beneficial to their customers. Applying that reasonable construction of the Data Usage Limitation, plaintiffs have not plausibly shown that it will be enforced against them. This court should thus reverse the district court's permanent

injunction as to the Data Usage Limitation because plaintiffs lack standing to challenge that provision.

## CONCLUSION

For these reasons, Defendant-Appellee/Cross-Appellant requests that this court affirm the district court's grant of partial summary judgment in the Attorney General's favor, reverse the grant of partial summary judgment in plaintiffs' favor, and reverse the permanent injunction entered against the Attorney General.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for Defendant-
Appellee/Cross-Appellant

/s/ Carson R. Griffis
**CARSON R. GRIFFIS**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov

April 3, 2026

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 365, in 12-point Century Schoolbook BT font, and complies with Federal Rule of Appellate Procedure 28.1(a)(2)(B) and Circuit Rule 28.1 in that the brief contains 16,482 words.

<u>/s/ Carson R. Griffis</u>
CARSON R. GRIFFIS
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

I hereby certify that all materials required by Circuit Rule 30(a) and (b) are contained in the Short Appendix to the Appellant's Brief because it contains copies of the district court's order on the parties' cross-motions for summary judgment, SA1-47 (Doc. 179), final judgment, SA48-50 (Doc. 193), and permanent injunction order, SA51-52 (Doc. 194), under review in these consolidated appeals.

/s/ Carson R. Griffis
CARSON R. GRIFFIS
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 3, 2026, I electronically filed the foregoing Combined Principal and Response Brief of Defendant-Appellee/Cross-Appellant with the Clerk of United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

I further certify that the other participants in this appeal, named below, are CM/ECF users, and thus will be served via the CM/ECF system.

Charlotte Taylor
ctaylor@jonesday.com

Jillian Stonecipher
jstonecipher@sidley.com

Matthew Alexander Schwartz
schwartzmatthew@sullcrom.com

Matthew J. Rubenstein
mrubenstein@jonesday.com

Oluwalani Oisamoje Oisaghie
olu.oisaghie@wilmerhale.com

Samuel Joshua McHale
sam.mchale@wilmerhale.com

Noah A. Levine
noah.levine@wilmerhale.com

Kyle H. Keraga
KHKeraga@Venable.com

Hannah Hicks
hannah.hicks@occ.treas.gov

Sean Joseph Byrnes Franzblau
sjfranzblau@venable.com

Christopher A. Eiswerth
ceiswerth@sidley.com

H. Rodgin Cohen
cohenhr@sullcrom.com

Michaela R. Bevan
MRBevan@Venable.com

Boris Bershteyn
boris.bershteyn@skadden.com

Megan Barbero
MBarbero@Venable.com

Kwaku A. Akowuah
kakowuah@sidley.com

/s/ Carson R. Griffis
CARSON R. GRIFFIS
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov