**Nos. 26-1354, 26-1371, 26-1440, 26-1441 (consol.)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION,
AMERICA'S CREDIT UNIONS & ILLINOIS CREDIT UNION LEAGUE,
*Plaintiffs-Appellants and Cross-Appellees,*

v.

KWAME RAOUL, IN HIS OFFICIAL CAPACITY AS ILLINOIS ATTORNEY GENERAL
*Defendant-Appellee and Cross-Appellant.*

On Appeal from the United States District Court
for the Northern District of Illinois, Case No. 24-cv-7307
The Hon. Virginia M. Kendall, Chief United States District Judge

**BRIEF OF UNITED STATES SENATOR RICHARD J. DURBIN AS**
***AMICUS CURIAE* SUPPORTING DEFENDANT-APPELLEE**

David P. Germaine
Sperling Kenny Nachwalter, LLC
321 N. Clark Street, 25th Floor
Chicago, Illinois 60654
Tel: (312) 641-3200
dgermaine@sperlingkenny.com
Counsel for Amicus Curiae

April 10, 2026

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1354

Short Caption: Illinois Bankers Association, et al. v. Kwame Raoul

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Senator Richard J. Durbin

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Sperling Kenny Nachwalter LLC.

(3)   If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

      N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

      N/A

Attorney's Signature: /s/ David P. Germaine          Date: April 10, 2026

Attorney's Printed Name: David P. Germaine

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑  **No** ☐

Address: Sperling Kenny Nachwalter LLC., 321 North Clark Street, 25th Floor, Chicago, Illinois 60654

Phone Number: (312) 641-3200          Fax Number: N/A

E-Mail Address: dgermaine@sperlingkenny.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

INTEREST OF *AMICUS CURIAE*......................................................................1

INTRODUCTION ...............................................................................................2

ARGUMENT........................................................................................................7

I.     Interchange Fees Are Structured to Insulate the Fee Rates Banks
Receive From Normal Market Competition..............................................7

II.    The Durbin Amendment and the IFPA Both Sought to Constrain
Visa and Mastercard's Interchange Fee-Fixing.....................................11

III.  National Banks Authority to Charge Fees Does Not Authorize
Banks to Receive Fees Set Centrally by Third Party Companies ........13

    A.  Plaintiffs and the OCC cannot ignore the plain language of
       12 C.F.R. § 7.4002...............................................................................14

    B.  Federal authority permitting banks to "charge" fees that each
       bank sets individually on a competitive basis is not the same
       as Plaintiffs' claimed authority for banks to "receive" fees that
       are set centrally by third parties on their behalf...............................17

    C.  The Durbin Amendment does not confer power to banks to
       receive whatever fees card networks might fix on their
       behalf ....................................................................................................22

    D.  Preemption does not extend to fees fixed on banks' behalf by
       non-bank agents..................................................................................24

IV.     Implementation of the IFPA Will Provide Meaningful Relief to Merchants and Consumers and Can Be Achieved with Manageable Compliance Costs and Burdens for Payments System Participants ........................................................................27

CONCLUSION ........................................................................33

# TABLE OF AUTHORITIES

## Cases

*Bank of America v. City & County of San Francisco*,
   309 F.3d 551 (9th Cir. 2002) ...............................................................19

*Baptista v. JP Morgan Chase Bank, NA*,
   640 F.3d 1194 (11th Cir. 2011) .......................................................19, 21

*Monroe Retail, Inc. v. RBS Citizens, N.A.*,
   589 F.3d 274 (6th Cir. 2009) ..............................................................21

*United States of America v. Visa, Inc.*,
   1:24-cv-07214, (S.D.N.Y) Sept. 24, 2024 ...........................................9

*Wells Fargo Bank of Tx. NA v. James*,
   321 F.3d 488 (5th Cir. 2003) ..............................................................21

## Statutes, Rules and Regulations

12 U.S.C. § 25b .................................................................................25

15 U.S.C. § 1693o-2 ...............................................................1, 6, 12, 23

15 U.S.C. § 1693q ..............................................................................23

15 U.S.C. Chapter 41 ..........................................................................23

815 ILCS 151/150-1 .............................................................................2

815 ILCS 151/150-10 ...........................................................................28

815 ILCS 151/150-5 ............................................................................12

Pub. L. No. 111-203, 124 Stat. 1376 (2010)...........................................1

12 C.F.R. § 7.4002 .................................................................... passim

66 Fed. Reg. 34787 ............................................................................20

Fed. R. App. P. 29 ...........................................................................1, 34

**Other Authorities**

October 4, 2024 Amicus Curiae Senator Richard J. Durbin's
Memorandum of Law in Opposition to Plaintiffs' Motion for a
Preliminary Injunction, (24-cv-07307, ECF No. 71-1) ..................................1, 11

April 23, 2025 Amicus Curiae Senator Richard J. Durbin's
Memorandum of Law In Opposition to Plaintiffs' Motion
for Summary Judgment and a Permanent Injunction,
(24-cv-07307, ECF No. 139-1)...............................................................................1

Visa Rule 1.5.4.2, "Honor All Cards," Visa Core Rules and Visa
Product and Service Rules, 18 October 2025, available at
https://usa.visa.com/content/dam/VCOM/download/about-visa
/visa-rules-public.pdf. .........................................................................................8

Mastercard Rule 5.11.1 "Honor All Cards," Mastercard Rules, 3 June 2025,
available at
https://www.mastercard.com/content/dam/mccom/shared/business/s
upport/rules-pdfs/mastercard-rules.pdf. ..........................................................8

Federal Reserve, Report to Congress, "Profitability of Credit Card
Operations of Depository Institutions," June 2024, available at
https://www.federalreserve.gov/publications/files/ccprofit2024.pdf .......9

Greg Lindenberg, "Credit and Debit Card Swipe Fees Hit Record of $187.2
Billion," CSP Daily News, March 19, 2025, available at
https://www.mastercard.com/us/en/business/support/merchant-
interchange-rates.html.........................................................................................10

Mass Market Retailers, "Merchants sound alarm as swipe fees hit $198B,"
March 18, 2026, available at https://massmarketretailers.com/merchants-
sound-alarm-as-swipe-fees-hit-198b/................................................................10

Clearly Payments, "Statistics on How Much Merchants Pay for Payment Processing in 2024," available at https://www.clearlypayments.com/blog/statistics-on-how-much-merchants-pay-for-payment-processing-in-2024/#:~:text=North%20American%20payment%20processing%20fees,over%2080%25%20of%20the%20market ...............................................................10

Bridget Goldschmidt, "Swipe Fees Reach Record $198.25B," Progressive Grocer, March 19, 2026, available at https://progressivegrocer.com/swipe-fees-reach-record-19825b ....................................................................10

Andrew Martin, "How Visa, Using Card Fees, Dominates a Market," New York Times, Jan. 4, 2010, available at https://www.nytimes.com/2010/01/05/your-money/credit-and-debit-cards/05visa.html .......................................................................11

Terri Bradford & Fumiko Hayashi, "Developments in Interchange Fees in the United States and Abroad," Federal Reserve Bank of Kansas City, Apr. 2008, available at https://www.kansascityfed.org/documents/695/briefings-psr-briefingapr08.pdf...............................................................................11

Consumer Finance Monitor, "Gould says OCC will take steps to promote federal preemption," Nov. 6, 2025, available at https://www.consumerfinancemonitor.com/2025/11/06/gould-says-occ-will-take-steps-to-promote-federal-preemption/ ............................................20

American Banker, "OCC's Gould doubles down on state preemption," March 10, 2026, available at https://www.americanbanker.com/news/occs-gould-doubles-down-on-state-preemption ...........................................................................20

Jan. 23, 2026 letter from Merchants Payments Coalition in support of interchange fee reform, available at https://www.merchantspaymentscoalition.com/sites/default/files/2026-01/Trade%20letter%20in%20support%20of%20CCCA-Final.pdf ................27

Jan 28, 2026 letter from labor unions in support of interchange fee reform, available at https://www.merchantspaymentscoalition.com/sites/default/files/2026-01/Unions-CCCA-Letter-2026-01-28-2.pdf ........................................................27

Jan. 21, 2026 letter from consumer advocacy organizations in support of interchange fee reform, available at https://demandprogress.org/letter-endorsement-of-credit-card-swipe-fee-reform-legislation/ ...........................27

Louis Juricic, "Visa and Mastercard stock falls as Trump doubles down on fee crackdown," Investing.com, Jan. 13, 2026, available at https://finance.yahoo.com/news/visa-mastercard-stock-falls-trump-162741353.html?guccounter=1 .........................................................................27

Visa's website explanation of its Intellilink Spend Management service, which discusses how millions of merchants have used the program to provide purchasing data including "sales tax amount," available in archived form at https://web.archive.org/web/20200401204136/https:/usa.visa.com/run-your-business/commercial-solutions/solutions/intellilink.html ................28

Fumiko Hayashi et al., "Public Authority Involvement in Payment Card Markets: Various Countries – August 2023 Update," Federal Reserve Bank of Kansas City, available at https://www.kansascityfed.org/Interchange%20Fees/documents/9753/PublicAuthorityInvolvementPaymentCardMarkets_VariousCountries_August2023Update.pdf .............................................................................11, 31

CMSPI, "How Much Interchange was Paid on Sales Tax in the U.S.?", available at https://cmspi.com/how-much-interchange-was-paid-on-sales-tax-in-the-us/ ...............................................................................................31

## INTEREST OF *AMICUS CURIAE*

Senator Richard J. Durbin is the primary author of Section 920 of the Electronic Fund Transfer Act (15 U.S.C. § 1693o-2), a provision commonly known as the Durbin Amendment ("Amendment").[1]  Senator Durbin offered the Amendment on the Senate floor during the consideration of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), and the Amendment was adopted by a bipartisan vote and ultimately enacted into law.  Pub. L. No. 111-203, 124 Stat. 1376 (2010).

The Durbin Amendment was invoked by the financial industry trade association plaintiffs ("Plaintiffs") and by the Office of the Comptroller of the Currency ("OCC") when this case was before the District Court, prompting Senator Durbin to file amicus briefs at the preliminary injunction and merits stages. *See* 24-cv-07307, ECF Nos. 71-1 (10/04/24) & 139-1 (04/23/25).  The Amendment has been invoked again by Plaintiffs and the OCC in their briefs on appeal.  Senator Durbin has a strong interest in

---

[1]      As required by Fed. R. App. P. 29(a)(2), Senator Durbin has obtained the consent of all parties to the filing of this brief. Senator Durbin further affirms, as required by Fed. R. App. P. 29(a)(4)(E), that no counsel for a party authored this brief in whole or in part and that no person other than amicus or his counsel made any monetary contributions intended to fund the preparation or submission of this brief.

ensuring the proper understanding of the law he authored and the anticompetitive fee practices that the law sought to rein in. He submits this brief to correct inaccurate characterizations of the Durbin Amendment and interchange fees and to urge the Court to reject Plaintiffs' arguments that the interchange fee restrictions in the Illinois Interchange Fee Prohibition Act ("IFPA"), H.B. 4951, Section 150, 815 ILCS 151/150-1 *et seq.*, are preempted by federal law.

## INTRODUCTION

Market competition has long been a foundational principle of federal banking laws. To that end, the National Bank Act ("NBA") and its implementing OCC regulations provide national banks with power to charge fees for bank services, but that power only applies when each bank sets its own fees on a competitive basis and through the exercise of each bank's individual banking judgment. 12 C.F.R. § 7.4002(a), (b), (d). Collusive fee-setting arrangements that avoid market competition are not authorized by the statutory and regulatory provisions that give banks federal authority to charge fees, and such arrangements also are not subject

2

to the preemption protection given to bank fees that have been properly established pursuant to federal authority.  12 C.F.R. § 7.4002(b)(1), (d).

Plaintiffs, however, are seeking to suppress the central role that market competition plays in federal banking law.  In this litigation, Plaintiffs seek to establish a new principle that would empower national banks to receive payment for their services "however that payment is structured" and confer NBA preemption upon interchange fee arrangements where thousands of banks delegate their individual fee-setting function to a third-party company to fix fee rates on their collective behalf.  Pls' Br. (ECF No. 12) at 55.

Interchange fees, which are centrally fixed by card network companies such as Visa and Mastercard for card-issuing banks to receive on credit and debit card transactions, are inherently anticompetitive fee-setting arrangements that impose high costs and unnecessary inefficiencies on merchants and consumers.  Banks claim that they need and use interchange fee revenue to pay for things like processing costs, fraud prevention costs, and cardholder rewards.  With network-fixed interchange rates, however, each bank receives the same fee rates as every other bank in the network and no bank's rates are tethered to that bank's actual costs.  This fee structure

3

insulates rates from normal market competition and leads to higher fees than what a normal competitive market would bear. These fees are lucrative for banks, but they inflate costs for merchants and are ultimately borne by consumers in the form of higher retail prices and surcharges.

Banks may find market competition over fees to be inconvenient sometimes, but it is what federal law requires because it is what serves consumers and the overall economy best. Recognizing that market competition had been stymied by the structure of interchange fees, Congress (through the Durbin Amendment) and the state of Illinois (through the IFPA) have enacted measures to rein in Visa's and Mastercard's collusive interchange fee-setting and to mitigate the inefficiencies and burdens that those fees impose on merchants and consumers. The IFPA's limits on interchange fees were crafted to be complementary with the Durbin Amendment and consistent with federal banking law (including the NBA and its implementing OCC regulations), under which states are not preempted from constraining bank fees when the fees are established through collusive arrangements instead of being properly established by individual banks on a competitive basis.

Plaintiffs, with an assist from the OCC, seek to massively broaden NBA preemption to apply to all fees that banks may receive, no matter how the fees are "structured" and even when banks do not set their own rates for those fees. Pls' Br. at 55. Under Plaintiffs' new principle, banks could form arrangements to have non-bank third-party companies like Visa and Mastercard establish common rates for any type of banking fee, such as late fees or annual fees, and there would be nothing states could do to protect their residents from such anticompetitive arrangements. The District Court recognized the problems with this principle, observing that "by [Plaintiffs'] reasoning, national banks could shield a vast amount of their otherwise regulatable activities from State regulation by hiding behind third-party entities like credit card companies." Required Short Appendix (ECF No. 12) ("RSA") at 21.

Although the banking industry and the OCC may be willing to cast aside the central role of market competition in federal banking law for the sake of preserving national banks' lucrative interchange fee revenue stream, this Court should not. The OCC's own brief acknowledges that 12 C.F.R. § 7.4002 is the applicable law "stating the authority of national banks to impose non-interest charges and fees," and the text of § 7.4002 is clear that it

5

does not confer federal authorization and preemption for fees that are not set by each bank in a competitive market environment. OCC Br. (ECF No. 31) at 4.  Furthermore, the only source of federal law that even mentions interchange fees is the Durbin Amendment—a law that was enacted to mitigate the harms of centrally-fixed debit interchange fees, not to confer carte blanche authority on banks to receive whatever interchange fees network companies centrally fix.[2]  The Durbin Amendment certainly does not provide Plaintiffs' interchange fee arrangements with preemption protection against the IFPA.  Indeed, Plaintiffs do not even contest the District Court's ruling that the Durbin Amendment does not preempt state interchange fee regulation as long as the regulation does not cause debit interchange fees to exceed the Durbin Amendment's fee ceiling.

Senator Durbin respectfully requests that the Court uphold the District Court's conclusion that the IFPA's limits on interchange fees are not preempted so that the law can finally take effect and provide Illinois

---

[2] The Durbin Amendment does not address credit cards at all; its definition of interchange transaction fees only applies to debit transactions, so the Amendment provides no basis for any claim that the Amendment authorizes the receiving of network-fixed interchange fees on credit transactions. 15 U.S.C. § 1693o-2(c)(8).

merchants and consumers with relief from the excessive and anticompetitive fees that Visa and Mastercard fix on banks' behalf.

## ARGUMENT

### I.     Interchange Fees Are Structured to Insulate the Fee Rates Banks Receive from Normal Market Competition.

Interchange fees are unique among fees in the banking industry.  Other fees charged by banks, such as annual fees or late fees, are set in a competitive market environment where each bank individually sets its own rate and the payor can choose among different banks' offerings.  Interchange fee rates, however, are centrally set by card network companies like Visa and Mastercard on behalf of thousands of financial institutions that issue cards branded with the network logo.   Visa and Mastercard perform this centralized fee-fixing by establishing and publishing interchange fee schedules that provide rate formulas for various types of credit and debit card transactions.[3]  RSA 22.  All card-issuing financial institutions in the Visa and Mastercard systems adhere to these fee schedules for the fee rates they

---

[3] Visa's most recent interchange fee schedule is available here and Mastercard's is available here.

receive on transactions involving their issued cards.[4] Visa and Mastercard also impose contractual "honor all cards" rules requiring that a merchant accept all network-branded cards issued by all financial institutions in a given card network system if the merchant accepts any card branded in that network.[5] "Honor all cards" rules make it unnecessary for issuers to negotiate over rates with merchants and effectively force merchants into a take-it-or-leave-it situation where they must accept the rates Visa and Mastercard fix in order to accept the brand for payment.

Visa's and Mastercard's centralized interchange rate-fixing is structurally anticompetitive, as the thousands of banks within the Visa and Mastercard systems do not have to compete with one another for the fees they receive. This is a highly lucrative arrangement for card-issuing banks. Each bank is guaranteed to receive the same supracompetitive network-established schedule of interchange rates as every other bank in the network

---

[4] As the District Court noted, the Plaintiffs' expert confirmed that "Networks develop fee schedules that establish the applicable interchange rate for transactions that utilize the network." RSA 22. Plaintiffs and their *amici* now claim that issuers can "and sometimes do" deviate from Visa's and Mastercard's fee rate schedules when receiving interchange fees, though they cite no examples of issuers that actually do so. Pls' Br. at 49; *see also* brief of *amicus curiae* Electronic Payments Coalition (ECF No. 33) at 14-15.

[5] Visa Rule 1.5.4.2, "Honor All Cards," Visa Core Rules and Visa Product and Service Rules, 18 Oct. 2025; Mastercard Rule 5.11.1 "Honor All Cards," Mastercard Rules, 3 June 2025.

system regardless of how much it costs a particular bank to conduct their card operations and regardless of how efficiently (or inefficiently) a bank manages its operational and fraud costs.  As a result, interchange fee rates are not tethered to any issuer's actual costs and market competition cannot serve to constrain fees from rising to levels that far exceed costs.  Moreover, Visa and Mastercard are a duopoly that control approximately 85 percent of the credit card and debit card network markets, which means that most merchants cannot realistically refuse to accept the Visa and Mastercard brands.[6]  This market dominance gives Visa and Mastercard incentive to increase interchange rates above what reasonably is needed for issuers to cover transaction costs, because doing so incentivizes more issuers to issue more cards.[7]  Given Visa's and Mastercard's market power and role in fee-setting, there is little merchants can do to temper interchange fee increases.

---

[6] *See* Federal Reserve, Report to Congress, "Profitability of Credit Card Operations of Depository Institutions," June 2024, at 5 ("The general-purpose bank credit card market in the U.S. is dominated by cards issued on the Visa and Mastercard networks, which, combined, accounted for 726.6 million cards, or about 85 percent of general-purpose credit cards, in 2023."); *see also* Complaint, *United States of America v. Visa, Inc.,* 1:24-cv-07214, (S.D.N.Y.) Sept. 24, 2024, at 7 ("Today, over 60% of all U.S.  debit transactions run via Visa's payments network. Mastercard is a distant second, processing less than 25% of all U.S. debit transactions.").

[7] Card networks like Visa and Mastercard charge their own fee, called a network fee, on every transaction involving a card bearing their network logo, so they profit when banks issue more of their cards.

Rising interchange fees impose significant costs on American merchants and consumers. Visa and Mastercard credit card interchange fee rates keep going up, with an industry analyst reporting that average Visa and Mastercard credit card fees rose from 2.02 percent in 2010 to 2.26 percent in 2023 and 2.36 percent in 2025.[8] U.S. credit card interchange rates, which now frequently exceed 3 percent of the transaction amount, are the highest in the world.[9] Merchants, who generally have narrow single-digit profit margins, are typically compelled to raise retail prices or impose surcharges to cover the cost of these fees, which means interchange fees are ultimately borne by consumers. A total of over $198 billion in U.S. credit and debit card merchant fees was collected in 2025, inflating retail prices by an estimated $1,200 per year for the average American family.[10]

---

[8] *See* Greg Lindenberg, "Credit and Debit Card Swipe Fees Hit Record of $187.2 Billion," CSP Daily News, March 19, 2025; Mass Market Retailers, "Merchants sound alarm as swipe fees hit $198B," March 18, 2026.

[9] *See* Clearly Payments, "Statistics on How Much Merchants Pay for Payment Processing in 2024."

[10] *See* Bridget Goldschmidt, "Swipe Fees Reach Record $198.25B," Progressive Grocer, March 19, 2026.

## II.    The Durbin Amendment and the IFPA Both Sought to Constrain Visa and Mastercard's Interchange Fee-Fixing.

The Durbin Amendment and the IFPA were both enacted to help restrain structurally anticompetitive aspects of the interchange fee system.

The Durbin Amendment was enacted by Congress in 2010 after a substantial record had been built showing that centralized interchange fee-fixing was insulating fees from market competition, subsidizing bank inefficiencies and generating high fee rates that far exceeded what a normal competitive market would produce.[11]  Congress also recognized that high interchange rates were not necessary to operate an efficient and secure debit system, as the American debit system had initially operated without interchange fees[12] and as other countries have successfully operated (and continue to operate) debit card systems with low or no interchange fees.[13] The Amendment provided that a debit interchange fee rate established by a

---

[11] *See* Amicus Curiae Sen. Richard J. Durbin's Memo. of Law in Opp. to Plaintiffs' Mot. for a Prelim. Inj., (24-cv-07307, ECF No. 71-1) (10/04/24) at nn. 3-5 (*citing* Congressional hearings, studies and press reports).

[12] *See e.g.,* Andrew Martin, "How Visa, Using Card Fees, Dominates a Market," New York Times, Jan. 4, 2010.

[13] *See e.g.,* Terri Bradford & Fumiko Hayashi, "Developments in Interchange Fees in the United States and Abroad," Federal Reserve Bank of Kansas City, Apr. 2008, at 2 ("In about 20 countries, public authorities have taken actions that limit the level of interchange fees or merchant discount fees….In several countries, interchange fees are set at zero.").

card network on behalf of card issuers with over $10 billion in assets may not exceed an amount that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(2).  The Durbin Amendment essentially created a ceiling for certain network-fixed debit interchange rates, since centralized fee-fixing had prevented marketplace competition from constraining those fee rates at a reasonable level.

The IFPA was similarly enacted to help restrain ever-rising interchange fees by exempting sales taxes and tips—money that merchants collect on behalf of the state and their employees but do not retain—from the transaction amount to which Visa's and Mastercard's interchange fee rate formulas are applied.  Notably, the IFPA's provisions only apply to interchange fees, defined in the law as fees set by networks for the purpose of compensating issuers.  815 ILCS 151/150-5.  No other types of fees are regulated by the IFPA.

Plaintiffs argued before the District Court that the IFPA conflicted with and was thus preempted by the Durbin Amendment.  The District Court rejected this argument, recognizing that the Amendment created a ceiling for network-fixed debit interchange rates while in no way preempting

12

further regulation of interchange fee rates and structures so long as the rates do not exceed the ceiling. RSA 34-35. On appeal, Plaintiffs have not challenged the District Court's holding that the Durbin Amendment does not preempt the IFPA.

### III. National Banks' Authority to Charge Fees Does Not Authorize Banks to Receive Fees Set Centrally by Third Party Companies.

Plaintiffs and the OCC both claim that national banks have federal authority to receive fees for their provision of banking services. For example, Plaintiffs assert that:

> [N]ational banks have the federal power to receive compensation for the core banking services they provide. As the OCC observed in the District Court proceedings, "[i]t is a fundamental principle that the authority conferred by federal banking law to provide a banking service necessarily carries with it the authority to charge for that service."

Pls' Br. at 35. However, the sources of this federal authority for national banks—the NBA and its implementing regulations issued by the OCC—do not give banks unfettered authority to "receive" fees in any way they choose. As discussed below, those sources of authority are explicit that the fees must be charged by each bank in a competitive market environment. Fees not charged in this manner do not enjoy the preemption protection that comes with NBA authorization.

**A. Plaintiffs and the OCC cannot ignore the plain language of 12 C.F.R. § 7.4002.**

In its amicus brief filed in this appeal, the OCC asserted that:

[N]ational banks necessarily have the authority to be compensated for their provision of banking services—as reflected in the OCC's regulation stating the authority of national banks to impose non-interest charges and fees, 12 C.F.R. § 7.4002—including services related to credit and debit card payments.

OCC Br. at 4. The plain text of 12 C.F.R. § 7.4002, however, makes clear that authority is not conferred upon banks to let third parties centrally set fees on the banks' behalf. Indeed, 12 C.F.R. § 7.4002, which implements the NBA and which the OCC points to in its brief as the source of federal law "stating the authority of national banks to impose non-interest charges and fees" (OCC Br. at 4), explicitly provides that "[a]ll charges and fees should be arrived at by each bank on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding, or discussion with other banks." 12 C.F.R. § 7.4002(b)(1) (emphasis added). The regulation goes on to state that "[t]he establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment

14

and safe and sound banking principles." 12 C.F.R. § 7.4002(b)(2) (emphasis added). Interchange fees, however, are not established by each bank on a competitive basis as the regulation specifies, and thus, do not meet the regulation's requirement as a threshold matter.

Additionally, 12 C.F.R. § 7.4002(b) directs each bank to consider certain factors when establishing fees, such as "[t]he cost incurred by the bank in providing the service" and "[t]he enhancement of the competitive position of the bank in accordance with the bank's business plan," in order for those fees to demonstrate sound banking judgment. 12 C.F.R. § 7.4002(b)(2)(i), (iii). However, the listed factors are not factors that <u>any</u> bank considers in establishing interchange fee rates, because Visa and Mastercard establish the rates on the banks' behalf and require merchants to "honor all cards" that follow the Visa and Mastercard fee schedules. In other words, the primary source of federal legal authority that the OCC points to for establishing national banks' fee-charging authority, 12 C.F.R. § 7.4002, does not authorize, or even contemplate, the type of fees that interchange fees are— fees that banks receive but that are centrally established by a third-party company.

15

It is also clear under 12 C.F.R. § 7.4002 that the way bank fees are structured and charged has relevance to the preemption analysis before the Court. Subsection (d) of 12 C.F.R. § 7.4002 discusses the preemptive effect of this OCC regulation and says: "[t]he OCC applies preemption principles derived from the United States Constitution, as interpreted through judicial precedent, when determining whether State laws apply that purport to limit or prohibit charges and fees <u>described in this section</u>." 12 C.F.R. § 7.4002(d) (emphasis added). Fees that card networks set on banks' behalf are not, however, "fees described in this section," and thus the IFPA's limitation on network-fixed interchange fees is not a limit on "fees described in this section" in a way that triggers 12 C.F.R. § 7.4002 preemption. If each card-issuing bank were to set its own interchange fee rates on a competitive basis after taking into account the considerations identified in 12 C.F.R. § 7.4002, then there might be a different analysis, but that is not how interchange fee rates are actually set.

The District Court properly recognized the incompatibility between network-fixed interchange fees and the requirements of 12 C.F.R. § 7.4002. RSA 19-23, 27-28. In response, Plaintiffs now claim that 12 C.F.R. § 7.4002 is a "non-exhaustive example" of national banks' statutory power to receive

16

compensation and that "[t]he regulation is illustrative but ultimately ancillary to the NBA preemption analysis." Pls' Br. at 50-51. Yet, the OCC, as quoted above, explicitly identifies 12 C.F.R. § 7.4002 as the provision "stating the authority of national banks to impose non-interest charges and fees." OCC Br. at 4. It is clear under 12 C.F.R. § 7.4002 that the federal authority banks have to impose fees is contingent on those fees being set by each bank individually in a competitive market; fees not set in this way do not enjoy preemption protection. Plaintiffs cannot ignore the clear command of this pivotal source of federal authority.

**B. Federal authority permitting banks to "charge" fees that each bank sets individually on a competitive basis is not the same as Plaintiffs' claimed authority for banks to "receive" fees that are set centrally by third parties on their behalf.**

Recognizing the hurdle that 12 C.F.R. § 7.4002 presents to Plaintiffs' position, Plaintiffs argue that national banks have broad statutory power under the National Bank Act to "receive compensation" such as interchange fees, either "as part of their authority to exercise core banking powers" or as a power "incidental to the business of banking." Pls' Br. at 27, 42, 45. This is incorrect. While the NBA does enumerate banks' power to receive deposits, it does not enumerate a power to "receive" fees. Plaintiffs repeatedly and

17

wrongly conflate banks' established authority to "charge" fees that each individual bank sets on a competitive basis with a claimed authority for banks to "receive" fees in whatever way banks choose for such fees to be structured. *Id* at 55. Plaintiffs go so far as to describe interchange fees as "federally authorized compensation," even though fee structures like interchange are not described in 12 C.F.R. § 7.4002 and countermand the competitive marketplace principles and requirements that underlie 12 C.F.R. § 7.4002's grant of fee-charging authority and preemption. *Id.* at 28.

Plaintiffs argue that "[t]he District Court failed to explain why any distinction between charging fees and receiving them matters." *Id.* at 54. It is no surprise that Plaintiffs seek to conflate banks' clear authority to individually charge competitive fees under 12 C.F.R. § 7.4002 with an asserted broad authority for banks to "receive" fees "however that payment is structured" because, in Plaintiffs' words, "[r]ecognizing national banks' power to receive compensation for providing core banking services makes this an easy case." *Id.* at 55, 42. Unfortunately for Plaintiffs, however, there is no NBA provision or OCC regulation that enumerates banks' authority to receive fees that are not set individually by each bank, and as the District Court recognized, the cases which Plaintiffs cite as precedent involve fees

18

that banks individually set and charged for themselves and that courts said federal law permitted banks to "charge."   RSA 20 (*discussing Baptista v. JP Morgan Chase Bank, NA*, 640 F.3d 1194 (11th Cir. 2011) and *Bank of America v. City & County of San Francisco*, 309 F.3d 551 (9th Cir. 2002)).

The OCC, in an apparent attempt to salvage Plaintiffs' argument, now advocates for a different view of its own regulation than what it asserted before the District Court.  In its earlier brief, the OCC conceded that 12 C.F.R. § 7.4002 "states that the establishment of [non-interest charges and fees] 'are business decisions to be made by each bank…according to sound business judgment and safe and sound banking principles' and identifies factors bearing upon a bank's decision to establish a fee."  OCC District Court Br. (24-cv-07307 (N.D. Ill) ECF No. 61-1) at 8.   The OCC now argues that the District Court focused too much on the language in 12 C.F.R. § 7.4002(b) and that "the considerations outlined in 12 C.F.R. § 7.4002(b) do not limit the scope of the express 'authority to impose charges and fees'" in 12 C.F.R. § 7.4002(a). OCC Br. at 12.  This is a novel and concerning position for the OCC to adopt, as it abandons the OCC's position articulated in the creation of current 12 C.F.R. § 7.4002 that

> The imposition of non-interest charges and fees <u>is governed by the standards set out in §7.4002(b)</u>, as revised (namely that the charges and fees be arrived at on a competitive basis and be made according to sound banking judgment and safe and sound banking principles).  If a bank adheres to those standards, the OCC will not substitute its judgment about how much a bank should charge for a given product or service.

66 Fed. Reg. 34787 (emphasis added).  It appears that in its well-publicized zeal to back up the financial industry's desire for preemption,[14] the OCC is now straying from its previous commitment to ensuring that bank fees are set by individual banks through market competition.  The plain text of § 7.4002(b) cannot be ignored, however, and it provides that "fees, their amounts, and the methods of calculating them are business decisions to be made by each bank," not through an arrangement where Visa and Mastercard fix fees, amounts, and rate formulas on the collective behalf of thousands of banks. 12 C.F.R. § 7.4002(b)(2).

The OCC goes on to claim that banks' powers to charge fees under 12 C.F.R. § 7.4002(a) "do not turn on who determines the amount of the fee—be it the bank itself or a third party" after citing several cases where courts

---

[14] *See, e.g.*, Consumer Finance Monitor, "Gould says OCC will take steps to promote federal preemption," Nov. 6, 2025; American Banker, "OCC's Gould doubles down on state preemption," March 10, 2026.

ruled that the OCC had authorized banks to charge fees. OCC Br. at 13 (*citing*

*Baptista*, *Wells Fargo Bank of Tx. NA v. James*, 321 F.3d 488 (5th Cir. 2003)*, Bank of America*, and *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009)). Again, the fee involved in each of those cases was established and charged by individual banks in a competitive market environment, unlike centrally-fixed interchange fees.

The District Court properly recognized that while the NBA and its implementing OCC regulation authorize banks to <u>charge</u> fees that are set by each bank based on sound banking judgment and principles, 12 C.F.R. § 7.4002(b)(2), there is no source of federal authority under the NBA, OCC regulations, or elsewhere that authorizes banks to <u>receive</u> fees centrally set by a third-party entity on the banks' behalf—let alone any such federal authority that would have the effect of preempting state regulation of such third-party-established fees. RSA 21-23, 27-28. Federal law is clear that market competition principles must be followed in the setting of bank fees in order for those fees to enjoy preemption protection, because regulatory intervention may be needed where the market is structurally precluded from working. Plaintiffs argue that the District Court had a "misunderstanding of the full scope of the national-bank powers at issue." Pls' Br. at 54. To the

21

contrary, the District Court stayed true to the actual sources of authority -- the NBA and 12 C.F.R. § 7.4002, which the OCC concedes is the provision "stating the authority of national banks to impose non-interest charges and fees" and which does not encompass fees banks receive that are set by third party companies. OCC Br. at 4.  It is the Plaintiffs and the OCC that stray from text and precedent in an attempt to continue insulating the lucrative interchange revenue stream that banks enjoy unconstrained by market competition.

### C. The Durbin Amendment does not confer power to banks to receive whatever fees card networks might fix on their behalf.

Plaintiffs do not contest the District Court's decision that the Durbin Amendment does not preempt the IFPA.  Instead, Plaintiffs argue on appeal that the enactment of the Durbin Amendment provides evidence of Congress's understanding that banks do in fact have "the power to receive interchange fees" and that such power enjoys preemption protection from state regulation.  Pls' Br. at 35.  Plaintiffs are incorrect.  The Durbin Amendment did not confer power upon banks to receive whatever fees card network companies might set on the banks' behalf on debit transactions. Rather, the Amendment sought to rein in and mitigate the inefficiencies and

burdens caused by the fee-fixing that card network companies were already engaged in on banks' behalf. The Amendment did so by establishing a maximum limit on network-fixed debit interchange fees and then permitting further regulation below that statutory maximum. The Amendment did not give banks carte blanche power to receive debit interchange fees fixed by third-party card networks.

The Durbin Amendment also did not confer NBA preemption protection upon such fees. The Amendment was incorporated into the Electronic Fund Transfer Act (Subchapter VI of Title 15 U.S.C. Chapter 41), which contains its own preemption section specifically providing that:

> This subchapter does not annul, alter, or affect the laws of any State relating to electronic fund transfers…[or] service fees…except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

15 U.S.C. § 1693q; Separate Appendix of Plaintiffs (ECF No. 93) at 29-30. Additionally, nothing in the Durbin Amendment applies to credit card interchange fees at all; the Amendment's definition of "interchange transaction fee" only applies to fees set by payment card networks for the purpose of compensating an issuer in an electronic <u>debit</u> transaction. 15 U.S.C. § 1693o-2(c)(8).

In fact, Plaintiffs' invocation of the Durbin Amendment only reaffirms the deficiencies in their arguments on appeal. Plaintiffs do not even challenge the District Court's well-reasoned decision that the Durbin Amendment is not inconsistent with the IFPA and does <u>not</u> preempt state efforts to rein in debit interchange fees below the federal statutory maximum. Thus, there is no preemptive outcome to be obtained from Plaintiffs' invocation of the Durbin Amendment, and Plaintiffs have no other source of federal authority to point to that allegedly authorizes banks to "receive" interchange fees.

## D. Preemption does not extend to fees fixed on banks' behalf by non-bank agents.

In addition to claiming that banks have NBA authority to receive fees on card transactions however those fees are structured, Plaintiffs also seek to extend NBA preemption to block states from regulating the non-bank card network companies that set interchange fees on national banks' behalf. This argument would, for the sake of advancing banks' convenience, insulate Visa and Mastercard's role as fee-setting agents of banks from state efforts to protect merchants and consumers from the inefficiencies and excessive costs caused by centralized fee-fixing that stifles normal market competition.

24

As the District Court properly recognized, this type of fee-setting cannot be "such a cornerstone of national banking power as to preempt all State intervention." RSA 23. It is a loophole that would swallow the law governing how banking fees work and allow all sorts of third-party fee setting arrangements, and it is a loophole that Congress already foreclosed in Dodd-Frank. On summary judgment, the Court did not have to revisit the question it considered at the preliminary injunction stage whether an extension of preemption to non-bank card network companies is precluded by 12 U.S.C. § 25b(h)(2), the provision in Dodd-Frank providing that

> No provision of title 62 of the Revised Statutes or section 371 of this title shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or <u>agent</u> of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank). (emphasis added).

If this Court reaches that question, it should follow the District Court's conclusion that the preemptive effect of NBA's provision of fee authority to national banks does not extend to other non-bank agents like Visa or Mastercard or the default fees they set. Federal banking laws have not occupied the field when it comes to regulation of non-bank card network companies that act as agents of national banks, and there is ample room for

25

states to act to protect their merchants and consumers from burdensome card network practices without conflicting with federal law. For example, the IFPA does not conflict with any conception of national banks' fee setting authority when the IFPA constrains the fee schedules that Visa and Mastercard publish by directing Visa and Mastercard to modify their rate formulas so that taxes and tips are subtracted from the transaction amount to which Visa's and Mastercard's rate formulas apply. After all, as Plaintiffs acknowledge, banks that do not wish to be bound by Visa's and Mastercard's fee schedules as regulated by the IFPA are free to set their own fees on a competitive basis, as federal law contemplates and authorizes. Pls' Br. at 49. Indeed, if banks took this route and set their own interchange fee rates individually on a competitive basis, then those fees would no longer fall within the definition of interchange fees subject to regulation by the IFPA and the Durbin Amendment. Both the IFPA and Durbin Amendment define interchange fees as fees that are set by networks for the purpose of compensating issuers on electronic payment transactions. In other words, banks could avoid regulation by the IFPA by simply setting their own fees instead of using Visa and Mastercard's centralized rate-setting schemes.

26

**IV.    Implementation of the IFPA Will Provide Meaningful Relief to Merchants and Consumers and Can Be Achieved with Manageable Compliance Costs and Burdens for Payments System Participants.**

Reforms such as the IFPA that reduce inefficiencies and burdens in the interchange fee system are urgently needed.  Calls for reform of the current interchange fee system, where two dominant card network companies are fixing excessively high fee rates in a pricing cartel arrangement with thousands of banks, have been made by a growing number of businesses, labor unions, and consumer groups.[15]    Even President Trump has characterized the current system as an "out of control Swipe Fee ripoff."[16] The status quo is not simply sustainable when dominant card networks are extracting bigger and bigger tolls out of card transactions and making retail payments increasingly costly for merchants and consumers.

Plaintiffs claim that the IFPA would impose staggering compliance costs and regulatory burdens that necessitate preemption because these costs and burdens would interfere with banks' claimed power to receive fees

---

[15] *See, e.g.,* Jan. 23, 2026 letter from Merchants Payments Coalition; Jan 28, 2026 letter from labor unions; and Jan. 21, 2026 letter from consumer advocacy organizations.

[16] Louis Juricic, "Visa and Mastercard stock falls as Trump doubles down on fee crackdown," Investing.com, Jan. 13, 2026.

and would reduce banks' compensation. Pls' Br. at 36. This argument ignores reality in several ways.

First, compliance with the IFPA does not need to be so difficult or complicated. Sales tax and tip information is already collected by point-of-sale card processing systems for the vast majority of merchants, as taxes must be remitted to the state and tips paid out to employees. There may be software upgrade costs for real-time transmission of these items on transactions that do not currently include them, but the technology and process flow is not new; card networks already itemize tax amounts in real time on transactions involving millions of merchants.[17] There are also even simpler methods of compliance. For example, Visa and Mastercard could comply by simply changing their fee schedules to use flat fees instead of percentage-based fees, and then their interchange fees would not "charge a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction" in violation of the IFPA. 815 ILCS 151/150-10(a). Amending Visa's and Mastercard's interchange rate schedules, which

---

[17] *See* Visa's website explanation of its Intellilink Spend Management service, which discusses how millions of merchants have used the program to provide purchasing data including "sales tax amount," available in archived form at https://web.archive.org/web/20200401204136/https://usa.visa.com/run-your-business/commercial-solutions/solutions/intellilink.html.

currently combine flat fees with percentage-based fees, to only use flat fees, would be remarkably easy to implement.  Of course, Visa, Mastercard and their card-issuing banks may prefer not to shift to flat fees because it would be less lucrative for them than their current percentage-based formulas which collect more fees as inflation increases, but this example shows that compliance with the IFPA is not necessarily complex.

Second, banks can also comply with the IFPA by simply setting their own fee rates rather than using network-fixed rates.  Interestingly, Plaintiffs claim that national bank issuers "can, and sometimes do, negotiate different interchange rates with particular merchants or Acquirers." Pls' Br. at 49. Plaintiffs provide no source citation for this statement, and there does not appear to be any public record of any issuer in the Visa or Mastercard networks deviating from Visa's or Mastercard's fee schedule in the rates they receive.  Nevertheless, Plaintiffs' statement is illuminating because it contradicts their claim that the payment card system "could scarcely work any other way" than having issuers "receive fees in a default amount."  Pls' Br. at 48.  With their statement, Plaintiffs concede that the system <u>can</u> work with issuers setting their own interchange rates. Thus, banks that do not wish to be bound by the limits that the IFPA and the Durbin Amendment

place on network-fixed fees are free to set their own fees on a competitive basis pursuant to 12 C.F.R. §7.4002 rather than let Visa and Mastercard fix fees for them. This would reflect actual market competition at work, and if issuing banks want to embrace it as Plaintiffs concede they "can, and sometimes do," then banks will not have to worry about the IFPA. Pls' Br. at 49. On the other hand, if banks wish to continue avoiding market competition by letting Visa and Mastercard fix their fees for them, then those banks are choosing to subject themselves to state regulatory interventions that seek to constrain fees in the absence of actual market competition.

Furthermore, claims that the IFPA would require national banks to provide card transaction services for free are factually incorrect. Each transaction involving a sales tax or gratuity also includes a non-tax and tip amount, and the IFPA does not regulate interchange fees assessed on that amount. Therefore, banks would not be providing transaction services for free; they would just receive a modest reduction from the current Visa/Mastercard rates for the transaction. Moderately diminishing interchange fees by precluding card networks from applying percentage-based interchange rate formulas to the tax and tip portion of transaction amounts would not wreak havoc on the functioning of card transactions. In

30

fact, many countries around the world have taken far more sweeping steps to rein in network-established interchange fees than the IFPA proposes. The European Union, for example, has capped interchange fee rates since 2015 at a small fraction of the average U.S. rates.[18] Nations within the EU and elsewhere continue to enjoy secure, efficient payment systems with far lower interchange rates, and Visa, Mastercard, and card-issuing banks operate smoothly and effectively in those overseas markets.

Finally, any discussion of compliance costs under the IFPA must also acknowledge the enormous costs that merchants and their customers have borne as IFPA implementation has been delayed. Illinois merchants pay over $507 million per year in interchange fees on sales taxes alone and likely even more on tips.[19] The IFPA has already been delayed one year, a delay that cost Illinois merchants and consumers over a half-billion dollars in unnecessarily excessive fees. Those costs likely far outweigh any costs Plaintiffs claim they might incur complying with the law.

---

[18] *See* Fumiko Hayashi et al., "Public Authority Involvement in Payment Card Markets: Various Countries – August 2023 Update," Federal Reserve Bank of Kansas City (discussing how the European Union has capped interchange rates since 2015 at 0.3% for credit cards and 0.2% for debit cards, as well as discussing regulatory interventions in numerous other countries to rein in network-established interchange fees).

[19] CMSPI, "How Much Interchange was Paid on Sales Tax in the U.S.?"

In short, the sky will not fall and the card transaction system will not fail should the IFPA take effect on July 1, 2026. Interchange revenue for card issuers may modestly decrease, but other countries have shown that the current high level of network-fixed rates are not necessary to sustain a well-running card system. Speculative claims about exorbitant costs and compliance burdens for banks (especially when those claims ignore simple compliance options that Plaintiffs prefer not to acknowledge) do not necessitate preemption of state efforts to protect merchants and consumers from the inefficiencies and inflationary effects of Visa's and Mastercard's centralized fee-fixing. State regulations like the IFPA can find ways to rein in inefficiencies created by the lack of market competition for interchange fees and can do so in ways that are complementary with federal banking law and with the Durbin Amendment (which only set a ceiling for network-fixed debit fees and which did not address credit cards at all). Finally, the interchange fee savings that Illinois merchants and consumers achieve because of the IFPA will stay in Illinois communities rather than excessively subsidizing and profiting national banks that choose to avoid market competition in fee-setting.

32

The Court should not adopt Plaintiffs' requested principle empowering banks to receive fees "however they are structured" and should not shut the door on state regulation that provides fairness and relief from the anticompetitive interchange fee system for other participants in the economy besides banks.

## CONCLUSION

For the reasons discussed above, Amicus Curiae Senator Durbin urges that the District Court's decision with respect to the IFPA's interchange fee restrictions be upheld.

Dated:  April 10, 2026

Respectfully submitted,

By: /s/ *David P. Germaine*
David P. Germaine
Sperling Kenny Nachwalter, LLC
321 N. Clark Street, 25th Floor
Chicago, Illinois 60654
Tel: (312) 641-3200
dgermaine@sperlingkenny.com
*Counsel for Amicus Curiae*

Senator Richard J. Durbin
711 Hart Senate Office Building
Washington, D.C. 2051

33

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation specified in Seventh Circuit Rule 29 and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. 32(f), the brief contains 6,680 words.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14- point Book Antiqua font.

Dated: April 10, 2026                    Respectfully submitted,

By: /s/ *David P. Germaine*
David P. Germaine
Sperling Kenny Nachwalter, LLC
321 N. Clark Street, 25th Floor
Chicago, Illinois 60654
Tel: (312) 641-3200
dgermaine@sperlingkenny.com
*Counsel for Amicus Curiae*