In the
# United States Court of Appeals
## for the Seventh Circuit

ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS & ILLINOIS CREDIT UNION LEAGUE,

*Plaintiffs-Appellants-Cross-Appellees,*

v.

KWAME RAOUL, in his official capacity as Illinois Attorney General,

*Defendant-Appellee-Cross-Appellant.*

On Appeal from the United States District Court
For the Northern District of Illinois, Case No. 24-cv-7307
Honorable Virginia M. Kendall, *Chief United States District Judge*

**RESPONSE AND REPLY BRIEF OF
PLAINTIFFS-APPELLANTS-CROSS-APPELLEES**

Boris Bershteyn
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: 212-735-3000
boris.bershteyn@skadden.com

Charlotte H. Taylor
*Counsel of Record*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: 202-879-3939
ctaylor@jonesday.com

*Counsel for Plaintiffs-Appellants-Cross-Appellees*
*Additional Counsel listed in signature blocks at end of Brief*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ............1

ARGUMENT...................................................................................................6

    I.     Federal Law Invalidates the Interchange Fee Prohibition, and Its Enforcement Should Be Enjoined. ...................................6

          A.     The NBA Preempts the Interchange Fee Prohibition. .......6

              1.     The Attorney General's test for preemption contradicts governing Supreme Court precedent...................................................................8

              2.     The Interchange Fee Prohibition significantly interferes with national banks' federally granted powers to issue payment cards, process card transactions, and receive compensation for doing so. .....................................15

          B.     The HOLA Preempts the Interchange Fee Prohibition..................................................................................29

          C.     The FCUA Preempts the Interchange Fee Prohibition..................................................................................29

          D.     Federal Law Extends Protection to non-Illinois State-Chartered Financial Institutions. ..............................41

              1.     The dormant Commerce Clause prohibits Illinois from imposing the IFPA's burdens on financial entities other states charter, but not those it charters. .........................................................41

              2.     Riegle-Neal extends NBA preemption to out-of-state state-chartered banks. ...................................48

**Page**

E. Equity Calls for Enjoining Enforcement Against Other Payment-System Participants to the Degree They Are Facilitating the Receipt and Charging of Interchange by Federally Protected Institutions. ..............50

II. The District Court's Injunction Against the Data Usage Limitation Should Be Affirmed. ....................................................60

CONCLUSION ...............................................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson National Bank v. Luckett*,
321 U.S. 233 (1944)................................................................12, 32

*Andrews v. Kowa Printing Corp.*,
838 N.E.2d 894 (Ill. 2005) ..............................................................65

*Armstrong v. Exceptional Child Ctr.*,
575 U.S. 320 (2015)................................................................53, 54

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979)................................................................61, 67

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984)......................................................................47

*Bank of Am. v. City & Cty. of San Francisco*,
309 F.3d 551 (9th Cir. 2002) ..........................................................24

*Baptista v. JPMorgan Chase Bank N.A.*,
640 F.3d 1194 (11th Cir. 2011) ......................................................27

*Barany v. Butler*,
670 F.2d 726 (7th Cir. 1982) ....................................................36, 37

*Barnett Bank of Marion County, N.A. v. Nelson*,
517 U.S. 25 (1996).................................................................*passim*

*Bedrossian v. Nw. Mem. Hosp.*,
409 F.3d 840 (7th Cir. 2005) ....................................................53, 55

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) ..........................................................44

**Page(s)**

*Benning v. Board of Regents of Regency University*,
928 F.2d 775 (7th Cir. 1991) ................................................................43, 44

*Bethune Plaza, Inc. v. Lumpkin*,
863 F.2d 525 (7th Cir. 1988) .....................................................................19

*Brandt v. Village of Winnetka, Ill.*,
612 F.3d 647 (7th Cir. 2010) .....................................................................61

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) ...................................................................57

*Cantero v. Bank of Am., N.A.*,
602 U.S. 205 (2024)............................................................................*passim*

*Carson v. Makin*,
596 U.S. 767 (2022)...................................................................................45

*Cass County Music Co. v. Muedini*,
55 F.3d 263 (7th Cir. 1995) .......................................................................19

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)...............................................................................45

*City of Chi. v. Barr*,
961 F.3d 882 (7th Cir. 2020) .....................................................................57

*Conti v. Citizens Bank, N.A.*,
157 F.4th 10 (1st Cir. 2025)................................................................16, 17

*Ctr. for Biological Diversity v. EPA*,
56 F.4th 55 (D.C. Cir. 2022)......................................................................54

*Davis v. Elmira Savs. Bank*,
161 U.S. 275 (1896)...................................................................................32

**Page(s)**

*Easton v. Iowa*,
188 U.S. 220 (1903)..................................................................14, 32, 33

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004)...........................................................................56

*Fasano v. Fed. Reserve Bank of N.Y.*,
457 F.3d 274 (3d Cir. 2006) .......................................................31, 35

*Fed. Land Bank of St. Louis v. Priddy*,
295 U.S. 229 (1935)...........................................................................33

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982)......................................................10, 26, 27, 37

*Firebirds Int'l, LLC v. Zurich Am. Ins. Co.*,
208 N.E.3d 1187 (Ill. Ct. App. 2022) ...............................................68

*First Fed. Savs. & Loan Ass'n of Wisconsin v. Loomis*,
97 F.2d 831 (7th Cir. 1938) ...............................................................34

*First Nat'l Bank of San Jose v. California*,
262 U.S. 366 (1923).....................................................................12, 14

*Franklin Nat'l Bank of Franklin Square v. New York*,
347 U.S. 373 (1954).............................................................11, 26, 59

*Granholm v. Heald*,
544 U.S. 460 (2005)...........................................................................45

*Green v. Bock Laundry Mach. Co.*,
490 U.S. 504 (1989)...........................................................................50

*Green v. Mansour*,
474 U.S. 64 (1985).............................................................................44

**Page(s)**

*Gutierrez v. Wells Fargo Bank, N.A.*,
No. 07-cv-5923, 2008 WL 4279550 (N.D. Cal. Sept. 11, 2008) ........................39

*Henning v. Wachovia Mortg., FSB*,
969 F. Supp. 2d 135 (D. Mass. 2013) ................................................................39

*Herzog v. Lexington Twp.*,
657 N.E.2d 926 (Ill. 1995) .................................................................................68

*Hillside Dairy Inc. v. Lyons*,
539 U.S. 59 (2003) ..............................................................................................47

*Home Depot U.S.A., Inc. v. Jackson*,
587 U.S. 435 (2019) ............................................................................................48

*In re Vill. of Campton Hills*,
926 N.E.2d 429 (Ill. Ct. App. 2010) ..................................................................63

*Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs.*
*Admin.*,
149 F.4th 917 (7th Cir. 2025) ............................................................................53

*James v. Fed. Reserve Bank of N.Y.*,
471 F. Supp. 2d 226 (S.D.N.Y. 2007) ...............................................................31

*Johnson v. First Banks, Inc.*,
889 N.E.2d 233 (Ill. App. Ct. 2008) .............................................................48, 49

*Johnson v. Maryland*,
254 U.S. 51 (1920) .........................................................................................31, 36

*Knox Nat'l Farm Loan Ass'n v. Phillips*,
300 U.S. 194 (1937) ............................................................................................33

*Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*,
654 F.3d 728 (7th Cir. 2011) ......................................................................52

*Lavallee v. Med-1 Sols., LLC*,
932 F.3d 1049 (7th Cir. 2019) ....................................................................19

*Lewis v. BT Inv. Managers, Inc.*,
447 U.S. 27 (1980)......................................................................................50

*Maine Cmty. Options v. United States*,
590 U.S. 296 (2020).....................................................................................40

*Manago v. County of Cook*,
92 N.E.3d 412 (Ill. 2017)......................................................................64, 65

*McClellan v. Chipman*,
164 U.S. 347 (1896)....................................................................................13

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ....................................................30, 31, 32, 33

*McDonald v. Symphony Bronzeville Park, LLC*,
193 N.E.3d 1253 (Ill. 2022)......................................................................66

*McQuiggin v. Perkins*,
569 U.S. 383 (2013).............................................................................54, 55

*McShannock v. JP Morgan Chase Bank, N.A.*,
976 F.3d 881 (9th Cir. 2020) ....................................................................39

*Meyers v. Beverly Hills Fed. Savs. & Loan Ass'n*,
499 F.2d 1145 (9th Cir. 1974) ..................................................................35

*N.Y. State Pistol & Rifle Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)........................................................................................45

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) ............................................................56

*Nat'l Bank v. Commonwealth*,
76 U.S. (9 Wall.) 353 (1870) .......................................12, 13, 31, 33

*Nielsen v. Preap*,
586 U.S. 392 (2019) ............................................................63

*Osei Bonsu v. Fed. Home Loan Bank of N.Y.*,
726 F. Supp. 95 (S.D.N.Y. 1989) ...............................................35

*Pennhurst State School & Hosp. v. Halderman*,
465 U.S. 89 (1984) ......................................................42, 43, 45

*Pereira v. Regions Bank*,
752 F.3d 1354 (11th Cir. 2014) ................................................49

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946) ......................................................53, 55

*Rowe v. New Hampshire Motor Transp. Ass'n*,
552 U.S. 364 (2008) ............................................................14

*Rust v. Johnson*,
597 F.2d 174 (9th Cir. 1979) ..................................................35

*Seminole Tribe of Fla. v. Fla.*,
517 U.S. 44 (1996) ............................................................53

*Smith ex rel. Smith v. Severn*,
129 F.3d 419 (7th Cir. 1997) ..................................................51

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*,
906 F. Supp. 2d 202 (S.D.N.Y. 2012) ......................................34, 36

*State Farm Fire & Cas. Co. v. Watts Regulator Co.*,
  63 N.E.3d 304 (Ill. Ct. App. 2016) ................................................................68

*T I Fed. Credit Union v. DelBonis*,
  72 F.3d 921 (1st Cir. 1995)............................................................................29

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995).......................................................................................31

*United States v. Atl. Rsch. Corp.*,
  551 U.S. 128 (2007).......................................................................................57

*United States v. Howell*,
  958 F.3d 589 (7th Cir. 2020) .........................................................................19

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*,
  535 U.S. 635 (2002).......................................................................................54

*W. Lynn Creamery, Inc. v. Healy*,
  512 U.S. 186 (1994).......................................................................................46

*Watkins v. Blinzinger*,
  789 F.2d 474 (7th Cir. 1986) .........................................................................44

*Watters v. Wachovia Bank, N.A.*,
  550 U.S. 1 (2007)...........................................................................................55

*Williams ex rel. J.E. v. Reeves*,
  954 F.3d 729 (5th Cir. 2020) .........................................................................42

**STATUTES**

12 U.S.C. § 24 ......................................................................................................21, 23

12 U.S.C. § 25b.................................................................................................*passim*

**Page(s)**

12 U.S.C. § 1831a ...................................................................................6, 49

15 U.S.C. § 1693q .......................................................................................24

28 U.S.C. § 2244 .........................................................................................54

205 ILCS 5/48.1 ..........................................................................................66

815 ILCS 151/150-5 ..............................................................................21, 59

815 ILCS 151/150-10 ..................................................................................18

815 ILCS 151/150-15 ......................................................................60, 62, 63

**OTHER AUTHORITIES**

12 C.F.R. § 7.4002 .................................................................................25, 26

C. Chatman, *HOLA Preemption and the Original Intent of Congress:*
   *Are Federal Thrifts Necessary to Stabilize the Housing Market*, 18
   Fordham J. Corp. & Fin. Law 565, 591 (2013) .....................................39

J. Elosta, *Dynamic Federalism & Consumer Financial Protection:*
   *How the Dodd-Frank Act Changes the Preemption Debate*, 89
   N.C. L. Rev. 1273, 1298 (2011) ............................................................39

N.D. Ill. L.R. 56.1 ...........................................................................50, 51, 52

**PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT**

If enforcement of the Illinois Interchange Fee Prohibition Act ("IFPA") is not enjoined before July 1, the statute will upend the debit- and credit-card operations of federally chartered financial institutions and wreak havoc on the national payment-processing system. Uncontroverted evidence shows the Interchange Fee Prohibition will impose "staggering" compliance burdens and "potentially business-ending consequences." RSA.12, 27. Financial institutions that stay in the market will be forced to forfeit their fees for debit- and credit-card services for the tax and tip portion of every Illinois payment-card transaction—with sales tax alone averaging about 9%—while still bearing the cost and risk associated with the transaction's full amount. Federal law does not allow Illinois to significantly interfere with federal financial institutions' operations in this manner. Nor does it allow Illinois to subject financial institutions to substantial liability for engaging in routine activities like preventing fraud and administering rewards programs, as the IFPA's Data Usage Limitation would do.

The Attorney General's attempts to avoid preemption of the Interchange Fee Prohibition misstate the law and turn a blind eye to its practical effects. He argues that *Barnett Bank*'s "prevents or significantly

interferes with" standard requires that a state law "actually or effectively prohibit[] banks from exercising powers granted to them by federal law." *See* AG.Br. 20. That reads "significantly interferes" out of *Barnett Bank*, which is why the Supreme Court rejected the same argument in *Cantero v. Bank of America, N.A.*, 602 U.S. 205, 221 (2024).

The Attorney General also argues that the Interchange Fee Prohibition has no effect on any federal banking power because it would leave banks free to charge or receive interchange fees, so long as the banks set the fees themselves rather than choosing to charge and receive Card Network default rates. But as the Office of the Comptroller of the Currency ("OCC") recognizes, the National Bank Act ("NBA") authorizes national banks to exercise their core payment-card powers—lending money through credit cards, providing payment services to depositors through debit cards, and receiving compensation for both—through contracts with third parties like Networks. The alternative of negotiating countless bilateral agreements with acquirers or the millions of merchants they serve is neither realistic nor an efficient exercise of national-bank powers. NBA preemption turns on a "practical assessment" of a law's effects, guided by "common sense." *Cantero*, 602 U.S. at 219-20 & n.3. Its protection of national banks' federal

powers does not dissipate just because third parties play a role in their exercise.

The same analysis applies to Federal savings associations (by statute) and federal credit unions (under the "ordinary pre-emption principles" applied by *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 27 (1996)). The Attorney General concedes the former point, but argues states can more freely interfere with federal credit unions' exercise of their federally conferred powers. The long history of preemption of state efforts to regulate federal instrumentalities forecloses that credit-union exceptionalism.

Federal law also invalidates the IFPA as to institutions chartered by states other than Illinois. Illinois has granted Illinois-chartered institutions—but not out-of-state institutions—the same relief from its own laws that federally chartered institutions enjoy. The Commerce Clause forbids this favoritism. And contrary to the Attorney General's theory, settled precedent forbids such discrimination against out-of-state institutions whether Illinois accomplishes it through one statute or through a combination of two. The Riegle-Neal Act also invalidates the IFPA as to out-of-state banks. The Attorney General claims that Riegle-Neal's protections toggle on and off for

any given bank based on which specific branch is involved. The illogic of that novel interpretation is underscored by the total absence of precedent supporting it.

Federally chartered and out-of-state state-chartered financial institutions alike are therefore entitled to an injunction against the IFPA's enforcement. But the Attorney General insists that they should be denied any meaningful relief, contending that Dodd-Frank's amendments to the NBA require that non-financial-institution participants in the payment system, including Card Networks, be excluded from any injunction. Yet he has conceded that if the Interchange Fee Prohibition applies to Networks and other payment-system participants, issuers cannot receive the full amount to which they are entitled. Nothing in the text of Dodd-Frank—which reaffirmed the robust "significant interference" standard—indicates that Congress intended to embed such a loophole in NBA preemption.

Given the statute's July 1, 2026 effective date, an injunction is urgently needed to preclude enforcement against both exempt institutions and other payment-system participants that enable exempt institutions to receive or charge interchange on the full transaction amount. This Court should therefore reverse the District Court's judgment with respect to the

Interchange Fee Prohibition, direct the District Court to enter Plaintiffs' requested injunction, and order that the mandate issue forthwith.

On his cross-appeal of the District Court's order enjoining the Data Usage Limitation, the Attorney General argues only that Plaintiffs lack standing to challenge the Data Usage Limitation that expressly and specifically targets them. His argument is untethered to the statutory text, instead relying on the supposed "absurdity" of taking the statute at face value and positing that the Illinois legislature would not have wanted to ban uses of transaction data that benefit consumers. But he cites no example of any federal court holding that a plaintiff that has demonstrated it intends to engage in conduct proscribed by a statute's plain text lacks standing because state courts might someday decide the statute is such bad policy that it is "absurd." This Court should not be the first to close the doors of the federal courthouse for such a tenuous reason. And neither the Attorney General nor any of his *amici* dispute that preemption is proper if the Data Usage Limitations means what it says.

## ARGUMENT

### I. Federal Law Invalidates the Interchange Fee Prohibition, and Its Enforcement Should Be Enjoined.

The Interchange Fee Prohibition is preempted by the NBA, the Home Owners' Loan Act ("HOLA"), and the Federal Credit Union Act ("FCUA"). And federal parity principles—the dormant Commerce Clause and Riegle-Neal, 12 U.S.C. § 1831a(j)—mandate that out-of-state, state-chartered institutions also be exempted from the Interchange Fee Prohibition's onerous burdens. This Court should therefore direct that the District Court enter an injunction that gives all of these institutions meaningful, rather than illusory, protection.

#### A. The NBA Preempts the Interchange Fee Prohibition.

The NBA preempts the Interchange Fee Prohibition because the prohibition "prevents or significantly interferes with" the exercise of several national-bank powers.[1] The Attorney General's defense of the prohibition

---

[1] The Attorney General asserts that the Interchange Fee Prohibition is a "state consumer financial law" so that preemption is expressly governed by 12 U.S.C. § 25b(b). *See* AG.Br. 19. Plaintiffs disagree, *see* Dist.Ct.Dkt. 174 at 34-35, but that distinction does not alter the NBA preemption analysis because that Dodd-Frank provision simply codified the pre-existing standard with respect to one category of laws. *Barnett Bank* therefore applies regardless. *See Cantero*, 602 U.S. at 214 n.2.

rests on the argument that only state laws that "actually or effectively prohibit[] banks from exercising powers granted to them by federal law" are preempted. *See* AG.Br. 20. But the Supreme Court recently rejected an almost identical attempt to read "significantly interferes with" out of *Barnett Bank*. Applying that rejected standard, the Attorney General then essentially echoes the District Court's flawed reasons for concluding that the Interchange Fee Prohibition does not significantly interfere with national-bank powers.

First, he argues that compliance costs can virtually never qualify as a significant interference. But the practical, commonsense NBA-preemption analysis does not allow such categorical rules. Illinois' law would fundamentally transform the way national banks lend money by credit card, provide payment services to depositors, and receive compensation for those services—either requiring entirely new technology for processing transactions or imposing costly, cumbersome refund procedures through channels that neither exist nor are specified in the law. In short, the Interchange Fee Prohibition's "undeniable" and "complicated compliance challenges," "staggering" costs, and "potentially business ending consequences" plainly constitute significant interference.

Second, the Attorney General discounts national banks' federal power to earn compensation for the services they provide by focusing on most banks' decision to charge default interchange-fee amounts that the Card Networks set. But national banks do not shed their powers by contracting with third parties to deliver services to bank customers more efficiently and effectively. They are authorized to receive interchange fees whether Networks are involved in the determination of those fees or not.

### 1. The Attorney General's test for preemption contradicts governing Supreme Court precedent.

The Attorney General gets off on the wrong foot by asserting a standard for NBA preemption that conflicts with *Barnett Bank*, *Cantero*, and the other cases *Cantero* directs courts to apply. As all parties agree, *Barnett Bank*'s test "asks whether a state law prevents or significantly interferes with the exercise by [a] national bank of its powers." *Cantero*, 602 U.S. at 209 (internal quotation marks omitted). That standard requires "a practical assessment of the nature and degree of the interference caused by a state law," which includes examining "the text and structure of the laws, comparison to other precedents, and common sense." *Id.* at 219-20 & n.3.

The Attorney General alludes to those principles but then jettisons them, purporting to glean from the cases *Cantero* cites the rule that a state law is preempted only if it "actually or effectively prohibits banks from exercising powers granted to them by federal law." AG.Br. 20. The petitioners in *Cantero* made a similar argument, claiming that "significantly interferes with" "captures state laws that, although they do not prevent the exercise of an expressly authorized power, come close to doing so by making it practically infeasible." *See* Brief of Petitioners at 35-36, *Cantero*, 602 U.S. 205 (No. 22-529), 2023 WL 8652908, at *35-36. Swap "prevent" for "prohibit," and that is the Attorney General's argument, which *Cantero* rejected as "extreme." 602 U.S. at 221.

Simply reading *Barnett Bank* forecloses the Attorney General's proposed standard. As that case explains, the NBA preempts state laws that "prevent" *or* "significantly interfere with" national banks' exercise of their powers. 517 U.S. at 33. The Attorney General reads the second part out of the standard altogether. He does so based on readings of the cases to which *Cantero* directs NBA-preemption analysis that are irreconcilable with both the cases themselves and the Supreme Court's explanation of them in *Cantero*.

The Attorney General starts by grouping *Barnett Bank* and *Fidelity* together and attempting to limit them to the "principle that States cannot prohibit national banks from engaging in conduct that is expressly authorized by federal law." AG.Br. 21. Both the "prohibit" and "expressly authorized" prongs of this supposed rule are wrong. In *Fidelity*, California's law did not prohibit exercising due-on-sale clauses in mortgages. It purported to limit the exercise of such clauses to cases where "enforcement [was] reasonably necessary." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 149 (1982) (internal quotation marks omitted). So *Fidelity* holds that the NBA preempts significant state limitations on the *manner or circumstances* in which a national bank may exercise its federal powers—it does not require a prohibition. And *Barnett Bank* specifically explained that "[l]egislative grants of *both* enumerated *and* incidental 'powers' to national banks historically have been interpreted as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." 517 U.S. at 25-26 (internal quotation marks omitted; emphases added). Conduct thus does not need to be "expressly authorized by federal law" to receive protection.

The Attorney General next characterizes *Franklin National Bank* and *First National Bank of San Jose* as involving "effective[]" "prohibit[ions] [on] national banks … exercising their powers." AG.Br. 22-23. That misstates their import. In explaining *Franklin National Bank of Franklin Square v. New York*, *Cantero* emphasized that, "[i]mportantly," New York's restriction on the use of a single word (and its variants) in advertising "did not bar national banks from receiving savings deposits, 'or even' from 'advertising that fact.'" *Cantero*, 602 U.S. at 216 (quoting 347 U.S. 373, 378 (1954)); *contra* AG.Br 30 (stating that *Franklin National Bank* involved a "law prohibiting national banks from advertising savings deposits in any way"). But "the New York law significantly interfered with the banks' power" all the same "because the banks could not advertise *effectively*." *Cantero*, 602 U.S. 205 (emphasis added); *see also id.* ("[S]tate law could not interfere with the national bank's ability to [advertise] *efficiently*." (emphasis added)).[2] Similarly, *First National*

---

[2] The Attorney General elsewhere notes that *Franklin National Bank*'s advertising restriction did not apply to certain state-chartered entities and implies that the case's holding rested on discrimination concerns. *See* AG.Br. 35-36. But *Cantero* analyzed *Franklin National Bank* in terms of significant interference, not discrimination, which is a distinct ground for preemption. *See* 602 U.S. at 216.

*Bank of San Jose v. California* turned on the fact that an unusual California law governing escheatment "*could* cause customers to hesitate before depositing funds at the bank — and thus interfere with the '*efficiency*' of the national bank in receiving deposits." *Id.* at 218 (emphases added) (quoting 262 U.S. 366, 369-70 (1923)). It did not hold or even suggest that the law amounted to an effective prohibition on the exercise of national-bank powers.

On the other hand, the Attorney General greatly overstates the degree of interference the Court approved in the cases *Cantero* discusses that held state laws were not preempted. He reads those cases to mean that "States remain free to regulate national banks, so long as they do not discriminate against them or actually or effectively prohibit banks from exercising their express authority." AG.Br. 24. But that is not what those cases say.

Taking them in turn: *Anderson National Bank v. Luckett* involved an escheatment provision that tracked existing common-law rules, and thus "could produce no … deterrent effect" on customers' decision to deposit funds with national banks. *Cantero*, 602 U.S. at 218 (citing 321 U.S. 233 (1944)). *National Bank v. Commonwealth* involved a tax on banks' *shareholders* that survived only "[b]ecause [it] 'in no manner hinder[ed]' the national bank's banking operations." *Id.* at 219 (quoting 76 U.S. (9 Wall.) 353, 361-62

(1870)). The Court even reaffirmed that "national banks are 'exempted from State legislation, so far as that legislation *may* interfere with, or *impair their efficiency* in performing the functions' that federal law authorizes them to perform." *Nat'l Bank*, 76 U.S. at 362 (emphases added). And *McClellan v. Chipman* simply upheld the validity of "generally applicable Massachusetts contract law," reiterating that "state laws could apply to national banks as long as the state laws did not 'in any way impair the efficiency of national banks or frustrate the purposes for which they were created.'" *Cantero*, 602 U.S. at 218 (quoting 164 U.S. 347, 358 (1896))) (brackets omitted).

Two final points for clarity. First, contrary to the Attorney General's suggestion, Plaintiffs have not argued that *only* "'generally applicable state contract, property, and debt-collection laws' or those that have 'roots deep in the common law'" escape preemption. *See* AG.Br. 31-32. Laws with those traits are less likely to significantly interfere with national bank powers, as *Cantero* establishes. *See* 602 U.S. at 217-19. But by themselves, general applicability and common-law roots are neither necessary nor sufficient to save a state law from preemption; the test remains significant interference. Second, Plaintiffs have never "assert[ed] that state regulations are limited to those recognized at common law." *See* AG.Br. 32. Rather, Plaintiffs

emphasized that the Interchange Fee Prohibition not only "reflects no common-law principle" but also "has no statutory analog in any other state," which means that it "seeks 'to qualify in an unusual way' national banks' business relationships," Pl.Br. 47—a factor that *Cantero* confirmed supports preemption. *See* 602 U.S. at 218 (citing *First Nat'l Bank of San Jose*, 262 U.S. at 370); *see also* AG.Br. 25 (conceding the relevance of this factor).[3]

---

[3] While Plaintiffs do not argue for any categorical rule, it makes sense that the NBA will less often preempt state-law rules that have common-law roots or close analogs in other states. Such rules are less likely to subject national banks to a patchwork of varying regulatory standards. National banks were created to provide a national banking system. *Easton v. Iowa*, 188 U.S. 220, 234 (1903). Allowing the proliferation of intrusive state-specific requirements would undermine this system. With the Interchange Fee Prohibition, Illinois demands that national banks adapt their credit- and debit-card operations so that tax and tip can be exempted from interchange; another state might attempt to cap interchange outright. Left unchecked, such restrictions will threaten national banks' ability to offer these services seamlessly around the country. *Cf. Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) ("To allow Maine to insist that the carriers provide a special checking system would allow other States to do the same. And to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations."). The "significant interference" standard guards against such a result by ensuring states do not intrude on national banks' exercise of their federal powers to a disruptive degree. *See* Dist.Ct.Dkt. 61-1 at 2 (NBA preemption prevents an "unmanageable patchwork of state laws").

The cases are clear, over and over, that "interference" is "significant" enough to produce preemption if it is likely to make the exercise of a federal power less "efficient" or "effective." There can be no doubt that the Interchange Fee Prohibition flunks that proper understanding of the test in multiple ways.

**2.     The Interchange Fee Prohibition significantly interferes with national banks' federally granted powers to issue payment cards, process card transactions, and receive compensation for doing so.**

As Plaintiffs' opening brief explained, national banks have statutory powers to issue payment cards, process card transactions, and receive compensation for doing so. *See* Pl.Br. 32-36. Indeed, the Attorney General concedes that federal law gives national banks these powers. AG.Br. 33. And all of his attempts to resist the conclusion that the Interchange Fee Prohibition significantly interferes with them fail.

**a.     The costs and regulatory burdens of the Interchange Fee Prohibition prevent or significantly interfere with national-bank powers to issue payment cards and process payment-card transactions.**

The Attorney General downplays the burden that the Interchange Fee Prohibition places on national banks' federal powers to receive deposits and

make loans on personal credit by issuing payment cards and processing card transactions. He insists Plaintiffs have "offered no evidence that national banks would struggle to carry out these activities with the Interchange Fee [Prohibition] in effect," or that "compliance costs would make [exercising these powers] cost prohibitive or impractical." AG.Br. 33. That is wrong on several levels.

**1.** The Attorney General's first error is his assertion that Plaintiffs were obligated to prove NBA preemption via factual submissions on which the District Court made "finding[s]." AG.Br. 33-34 & n.3. The petitioners in *Cantero* made the same argument, contending *Barnett Bank* "requires a factual showing that compliance with the state law would have a significant and demonstrable 'impact.'" Brief of Petitioners at 30, *Cantero*, 602 U.S. 205 (No. 22-529), 2023 WL 8652908, at \*30; *see also id.* at \*38 (arguing that "factfinding [is] necessary to show substantial interference"). The Supreme Court instead explained that the "significant interference" standard requires "a practical assessment of the nature and degree of the interference caused by a state law," which includes examining "the text and structure of the laws, comparison to other precedents, and common sense." 602 U.S. at 219-20 & n.3. The Attorney General repeatedly invokes *Conti v. Citizens Bank, N.A.*, to

criticize Plaintiffs for supposedly failing to offer "any substantial argument about the practical effects" of the Interchange Fee Prohibition. AG.Br. 33-34 (quoting 157 F.4th 10, 25 (1st Cir. 2025)). But *Conti* applied *Cantero*'s "common sense" approach, 157 F.4th at 24 (quoting 602 U.S. at 220 n.3); to the extent the Attorney General reads *Conti* as requiring an evidentiary record and factfinding where *Cantero* did not, that is incorrect.

**2.** The Attorney General also mischaracterizes the developed record that does exist concerning the Interchange Fee Prohibition's "practical effects." As the District Court summarized several times in its opinion, "[t]he Interchange Fee [Prohibition] is *indisputably* disruptive," RSA.26 (emphasis added), "[t]here is *no doubt* that the IFPA presents complicated compliance challenges," RSA.14 (emphasis added), and the provision has "potentially business-ending consequences for some members of the market," RSA.12.

Those conclusions rest on ample record support. As the District Court explained, "[w]hile declarations from Visa and Mastercard … indicate compliance [with the Automatic Process] could theoretically be possible, they suggest it might take months, if not years to achieve, be extraordinarily expensive, and require system-wide modifications." RSA.14. Meanwhile,

"[o]ther financial institutions have expressed concerns that compliance costs associated with the [Manual Process] will also be particularly onerous." RSA.14. Among other problems, the Manual Process provides for merchants to share tax information about a card transaction with *Acquiring Banks*, but requires the *Issuing Banks* to provide merchants a rebate triggered by that information. *See* 815 ILCS 151/150-10(b). Those banking entities seldom have direct contractual relationships (the Issuing Bank could be based in Chicago, or it could be in Chattanooga or Czechia), and "the statute does not indicate how the two entities [should] transmit the information to one another." RSA.27. In many cases, it may not even be possible for an Acquiring Bank to identify the applicable Issuing Bank from the information a merchant submits. RSA.14; *see* Dist.Ct.Dkt. 24-10 at 11-12. Yet the Issuing Bank could be subject to draconian penalties if it does not reimburse the merchant within 30 days, regardless of when it received the merchant's tax information from the Acquiring Bank. In short, the Manual Process alone will require Issuers to overhaul their operations. As the District Court noted,

"[t]hese compliance costs, among others, are *undeniable*" and may well be

"staggering." RSA.27 (emphasis added).[4]

The Attorney General protests that some of the evidence regarding the

Interchange Fee Prohibition's burdens comes from declarations from

financial institutions that are not national banks. *See* AG.Br. 33. But even

setting aside that the litany of evidence the District Court recited included a

---

[4] Several of the Attorney General's *amici* offer extra-record contentions about the extent of the compliance burden and who bears these costs. *E.g.*, Restaurant.Law.Center.Br. 15-17; Retail.Litigation.Center.Br. 12-16; Illinois.Retail.Merchants.Association.Br. 17-23. This Court should disregard those factual assertions; "[a]ny supplemental facts, true or not, provided by [an] *amicus* cannot be considered." *Cass County Music Co. v. Muedini*, 55 F.3d 263, 264 n.2 (7th Cir. 1995). The Illinois Retail Merchants Association ("IRMA") attempts to disguise its attempt to rely on facts not properly before this Court by citing an "expert report" that it appended—with neither explanation nor justification—to its district-court amicus brief. IRMA.Br. 17-23; Dist.Ct.Dkt. 135, 135-2. But IRMA's attempt to alter the factual record as a non-party was no more proper below. The path for a non-party to participate in developing the factual record is to become a party through intervention. *See Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 532-33 (7th Cir. 1988). But the District Court denied IRMA's intervention motion. Dist.Ct.Dkt. 112. Plaintiffs pointed all of this out below, Dist.Ct.Dkt. 146 at 22 n.6, and the District Court did not rely on IRMA's "expert report." Nor should this Court. *See United States v. Howell*, 958 F.3d 589, 595 (7th Cir. 2020) (this Court's review is limited to "the facts … considered by the district court"); *Lavallee v. Med-1 Sols., LLC*, 932 F.3d 1049, 1056 (7th Cir. 2019) (*amici* cannot fundamentally alter the issues before the court). Regardless, IRMA's claims do not outweigh Plaintiffs' detailed factual record of the IFPA's significant interference with the banks' operations.

declaration from Citibank, N.A., a large national bank, *see* RSA.14 (citing Dist.Ct.Dkt. 24-10), the concerns expressed in the declarations are largely independent of the type of institution or the government that charters it. For example, the American Bankers Association, Visa, and Mastercard declarations discuss difficulties that apply across the board. *See generally* Dist.Ct.Dkt. 24-2, 24-12, 24-13.

**3.** The Attorney General's criticism of the record also rests on his erroneous legal standard for preemption. He never meaningfully disputes that "complying with the Interchange Fee [Prohibition] will be expensive," *see* AG.Br. 36, or indeed that these costs may be "staggering," *see* RSA.27. But in his view, unless Plaintiffs prove that the Interchange Fee Prohibition will drive national banks to stop offering payment-card services, it is not preempted. *See* AG.Br. 33. That is not what the law requires.

After all, neither the New York law in *Franklin National Bank* nor the California law in *First National Bank of San Jose* needed to chase national banks from the deposit-taking business entirely to be preempted. Both cases turned on practical effectiveness or efficiency, not *de jure* prohibition or *de facto* prevention. *See supra* at 11-12. Relatively minor intrusions sufficed— a restriction on one particular form of advertising in *Franklin National Bank*,

and in *First National Bank of San Jose,* an escheatment rule that applied only after decades of account inactivity. The compliance challenges and costs here far exceed that level of interference, especially in a setting where, as the Attorney General does not dispute, "anticipated fee revenue directly correlates to how broadly [a] service will be available, and the benefits it will include." Pl.Br. 42.

        **b.**     **The Interchange Fee Prohibition's direct restriction on national banks' compensation for providing authorized services prevents or significantly interferes with their exercise of federal powers.**

The "significant interference" is no less plain with respect to national banks' power to charge and receive compensation for the payment-card services they provide, which is essential to "the business of banking." 12 U.S.C. § 24 (Seventh). The Interchange Fee Prohibition places explicit limits on the manner and circumstances in which national banks may do so and forbids circumvention of those limits. Indeed, the Interchange Fee Prohibition's deliberate focus on the *issuing bank's* right to compensation is clear—its prohibition targets fees that have a "purpose of compensating the issuer for its involvement in an electronic payment transaction." 815 ILCS 151/150-5. The statute thereby contravenes a robust circuit-court consensus

specifically forbidding such state interference with bank fees and contradicts the reasoning of the cases cited in *Cantero*.

In response, the Attorney General echoes the District Court's repeated reliance on Card Networks' role in "set[ting] default interchange fees that banks … often accept." AG.Br. 26-27. He says that means the Interchange Fee Prohibition does not significantly interfere with national banks' powers because Issuing Banks remain free to separately negotiate interchange fees with the countless Acquiring Banks and merchants that they serve. That is wrong for several reasons.

**1.** To start, there is no basis for the Attorney General's insistence that national-bank powers dissipate whenever they are exercised by contracting with or otherwise involving third parties. National banks exercise their core payment-card powers—including lending through credit cards, facilitating deposits and payments through debit cards, and earning compensation for doing so—through contractual arrangements with the Card Networks that enable them to exercise those powers with seamless efficiency. The alternative that the Attorney General implicitly hypothesizes, in which national banks establish and charge interchange fees through countless

bilateral contracts with acquiring banks or the merchants they serve, is not a realistic or effective means of exercising bank powers.

Unsurprisingly, then, neither the OCC nor Congress has ever understood the Networks' well-known role in offering default interchange rates and processing interchange fees to vitiate national banks' federal power to receive those fees. The OCC told the District Court that it had previously "addressed the specific issue of interchange fees, finding that national banks are authorized to charge them to merchants as part of the standard clearing and settlement process for debit and credit card transactions." Dist.Ct.Dkt. 61-1 at 8. The "standard clearing and settlement process," of course, includes Networks setting default rates and processing transactions. In this Court, the agency further explains that, "[i]n a highly complex economy, national banks' powers to lend, take deposits, and to charge and receive fees have come to necessarily encompass some involvement of third parties." OCC.Br. 15. The NBA accounts for that possibility by giving national banks power to make contracts, *see* 12 U.S.C. § 24 (Third), which means "federal law not only contemplates that national banks will use third parties to assist them in the exercise of their federally

authorized powers but also expressly provides national banks with the power to do so."  OCC.Br. 15.

And while the Attorney General notes that Congress did not explicitly mention Networks in the Electronic Funds Transfer Act ("EFTA"), AG.Br. 27, he stops well short of claiming that Congress was unaware of Networks' role in interchange fees when it enacted that statute.  When it placed limitations on debit-card interchange fees, Congress clearly contemplated that national banks have the power to receive interchange fees with the participation of Networks.  The absence of "powers" or similar language in EFTA, *see* AG.Br. 27, is irrelevant.  Plaintiffs do not claim (contrary to Senator Durbin's mischaracterization, *see* Durbin.Br. 22-23) that EFTA is the *source* of national banks' power to receive compensation.  It just demonstrates Congress's understanding that the power separately exists.[5]

---

[5] Some *amici* point to EFTA's provision addressing the scope of preemption by that statute, 15 U.S.C. § 1693q.  Durbin.Br. 23; IRMA Br. 23-25.  But that provision is, on its face, irrelevant.  It states that "*[t]his subchapter*"—i.e., EFTA itself—"does not annul, alter, or affect" certain state laws.  15 U.S.C. § 1693q (emphasis added).  It does not speak to the NBA's preemptive effect.  *See Bank of Am. v. City & Cty. of San Francisco*, 309 F.3d 551, 565 (9th Cir. 2002).

The Attorney General's position is also unmoored from common sense. Banks commonly and uncontroversially exercise their federal banking powers by referencing rates set by third parties—and not only in the card-issuing context. No one would argue that a national bank strayed beyond its federal lending power if, for example, it set the interest rate on a loan by reference to LIBOR or the Federal Funds Rate, respectively calculated by the Bank of England and the Federal Reserve.

**2.** For similar reasons, the many pages of argument the Attorney General and his *amici* offer regarding 12 C.F.R. § 7.4002 all miss the point. They claim, with various formulations, that the regulation limits national banks' power to charge fees to those set by the bank itself without reference to a third-party default rate. AG.Br. 28; Durbin.Br. 14-22; IRMA.Br. 9-10; Ten.Nonprofits.Br. 21. They also suggest that Plaintiffs, recognizing this, have now "abandon[ed]" their reliance on the regulation. AG.Br. 28; *see also* IRMA.Br. 9.

But Plaintiffs' position respecting § 7.4002 has been perfectly consistent: it is a "*non-exhaustive example* of th[e] power" granted by the NBA to "receive non-interest compensation for banking services." Pl.Br. 50 (emphasis added); *see, e.g.*, Dist.Ct.Dkt. 125 at 15 ("The NBA also gives

national banks the power to receive fees for their services. For example, one *non-exhaustive* OCC regulation authorizes any national bank to 'charge its customers non-interest charges and fees.'" (emphasis added) (quoting 12 C.F.R. § 7.4002(a))); Dist.Ct.Dkt. 146 at 7-8. The broader statutory power is the source of preemption; by partially codifying the statutory power, the regulation confirms its existence.

NBA preemption does not require that a given federal power be elaborated in a regulation. For example, the power to advertise savings accounts that preempted the New York law in *Franklin National Bank* was nowhere codified. The dissent there would have held that this absence defeated preemption. 347 U.S. at 380 ("As no federal statute expressly authorizes the national banks to use the words 'saving' or 'savings' in their advertisements, I think they must conform to the New York law …."). The majority disagreed. *See id.* at 377. It therefore does not matter whether 12 C.F.R. § 7.4002 itself covers interchange fees that national banks choose to charge and receive at Card Networks' default rates.

**3.** In resisting national banks' power to charge non-interest fees as a basis for preemption, the Attorney General also repeats his misreading of *Barnett Bank* and *Fidelity*, continuing to characterize them as limited to state

laws that "completely prohibited national banks' expressly authorized conduct." *See* AG.Br. 29. Again, however, *Barnett Bank* specifies that its rule applies equally to "grants of both enumerated and incidental 'powers.'" 517 U.S. at 32. And the law in *Fidelity* was preempted not because it completely banned due-on-sale mortgage clauses, but because by restricting their enforcement to particular circumstances, it "interfered with 'the flexibility given' … by federal law." *See Cantero*, 602 U.S. at 217 (quoting *Fidelity*, 458 U.S. at 155). That is likely why the circuits—in cases Plaintiffs rely on but the Attorney General never mentions—uniformly agree that states cannot tell national banks under what circumstances or to what counterparties they may charge fees. *See, e.g.*, *Baptista v. JPMorgan Chase Bank N.A.*, 640 F.3d 1194, 1198 n.2 (11th Cir. 2011); *see also* Pl.Br. 44-45 (collecting cases).

**4.** Almost in passing, the Attorney General also suggests that the Interchange Fee Prohibition does not significantly interfere with national banks' powers because the amounts involved are relatively small on a per-transaction basis. *See* AG.Br. 28 (hypothetical in which tax and tip account for 23% of a transaction and "the issuer would receive … only $0.60 less than would be collected without the Interchange Fee [Prohibition]"). That is no more than numerical sleight-of-hand. On virtually all of the

*multiple billions* of Illinois payment-card transactions occurring annually, the Interchange Fee Prohibition prohibits national-bank issuers from receiving or charging interchange for two substantial categories of transactional activity: tax and tip. So for those amounts, national banks are providing all the same services as for other dollars processed through the payment system—for example, confirming funds availability, monitoring for fraud, and (for credit cards) taking on liability—*without compensation*. On any common-sense measure, that is a significant impairment of national banks' power to charge fees in the exercise of their deposit-taking and credit-extending authorities.

To be clear, Plaintiffs' position is not that "*any* diminution in national bank revenue" invariably "establish[es] preemption." *See* AG.Br. 31. Nor is NBA preemption a comparative accounting exercise, with courts tallying up relative costs for affected parties. *Contra, e.g.*, Restaurant.Law.Center.Br. 4-9; Retail.Litigation.Center.Br. 3-4, 12-16. Rather, as the caselaw holds, the NBA preempts state laws that directly target and interfere with the statutory fee-setting power by limiting the manner, circumstances, or amounts in which fees may be charged. That is all the clearer where, as here, the aggregate amounts at issue are quite large in practical terms.

**B.  The HOLA Preempts the Interchange Fee Prohibition.**

The Attorney General agrees that the standards under the HOLA and NBA are the same and simply reiterates his NBA-preemption arguments in arguing that there is no significant interference with Federal savings associations' powers.  AG.Br. 36-37.  For all the reasons above, those arguments fail.  The HOLA thus preempts the Interchange Fee Prohibition as well.  RSA.15 n.2.

**C.  The FCUA Preempts the Interchange Fee Prohibition.**

As federal instrumentalities, federal credit unions are entitled to exercise their federal powers free from prevention or significant interference by state law.  The Attorney General does not contest the District Court's holding that federal credit unions, like national banks and Federal savings associations, are federal instrumentalities—federally chartered entities exercising federally conferred powers to further federal policy under the comprehensive regulation and supervision of a federal agency.  RSA.32; *see T I Fed. Credit Union v. DelBonis*, 72 F.3d 921, 931-35 (1st Cir. 1995).  Instead, he argues that despite having the same nature, federal credit unions must be treated differently for preemption purposes.  That position rests on a

- 29 -

misunderstanding of Dodd-Frank and its relationship to the underlying law of preemption for federal instrumentalities.

### 1. National banks, Federal savings associations, and federal credit unions share the same preemption analysis.

The crux of the Attorney General's argument against preemption for federal credit unions is that "Congress expressly adopted the *Barnett Bank* standard in the National Bank Act and incorporated it into the Home Owners' Loan Act"—but not the FCUA. AG.Br. 38. That argument, however, ignores the distinctive analysis that has long applied to federal instrumentalities, as well as the background to Dodd-Frank's codification of *Barnett Bank* in the HOLA. That context makes plain that the same preemption standard applies to federal credit unions, national banks, and Federal savings associations.

**a.** *McCulloch v. Maryland* is the fount of federal-instrumentality doctrine. 17 U.S. (4 Wheat.) 316 (1819). There, Chief Justice Marshall answered two questions: (1) whether the federal government had "the power of creating a corporation" to further its endeavors, and (2) whether states could impede that federal instrumentality's operations. *Id.* at 409, 427. The Court held that Congress can create such federal instrumentalities. *Id.*

at 422-23.  It then held that "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government."  *Id.* at 436; *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802 (1995) (*McCulloch* held that states cannot tax "federal instrumentalities").[6]

Although the Second Bank of the United States did not last, the doctrine *McCulloch* articulated retained its vitality as Congress created new federal instrumentalities.  Soon after Congress enacted the National Bank Act, the Supreme Court addressed the extent to which state law applied to "banks or other corporations or instrumentalities of the government" in *National Bank*.  76 U.S. at 361.  It reaffirmed *McCulloch*'s rule that federal instrumentalities are "exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the

---

[6] *McCulloch* emphasized "the entire absence of power on the part of the States to touch, in that way at least, the instrumentalities of the United States."  *Johnson v. Maryland*, 254 U.S. 51, 55-56 (1920).  A few modern cases accordingly refer to the principle *McCulloch* recognized as "federal instrumentality immunity."  *James v. Fed. Reserve Bank of N.Y.*, 471 F. Supp. 2d 226, 237 (S.D.N.Y. 2007).  But others now describe it as preemption.  *E.g. Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 280 & n.5 (3d Cir. 2006).

functions by which they are designed to serve [the federal] government." *Id. at 362; see also Davis v. Elmira Savs. Bank*, 161 U.S. 275, 283 (1896) ("National banks are instrumentalities of the Federal government, created for a public purpose, and *as such* necessarily subject to the paramount authority of the United States." (emphasis added)); *Anderson*, 321 U.S. at 247 (assessing whether a state law "unconstitutionally interferes with … an instrumentality of the federal government").

Those cases did not ground their expansive preemption doctrine in the text of the NBA, which had no express preemption provision. They treated it as a straightforward application of the principle that, because "[n]ational banks organized under the act are instruments designed to be used to aid the government[,] … it must be obvious that their operations cannot be limited or controlled by state legislation." *Easton*, 188 U.S. at 230. The Supreme Court later altered the standard for federal-instrumentality preemption (at least for financial instrumentalities like national banks), shifting from *McCulloch*'s prohibition on *any* interference or impairment to *Barnett Bank*'s "prevents or significantly interferes" standard. *See Cantero*, 602 U.S. at 220-21 (holding that the Second Circuit erred by applying the more-categorical test from the nineteenth century). But the principle

remains: national banks' powers are "not normally limited by, but rather ordinarily pre-empt[], contrary state law," *Barnett Bank*, 517 U.S. at 32, because national banks are "instrumentalities of the Federal government, created for a public purpose," *Easton*, 188 U.S. at 238 (quoting *Davis*, 161 U.S. at 283) (cited by *Barnett Bank* to support the "ordinarily pre-empt[]" rule).

**b.** *McCulloch* did not announce a good-for-national-banks-only rule — its strong preemption standard governs all "banks or other corporations or instrumentalities of the government." *National Bank*, 76 U.S. at 361. So federal-instrumentality immunity has applied, over time, as Congress has created new federal instrumentalities.

For example, federal-instrumentality immunity applied to national farm loan associations and federal land banks. *See Knox Nat'l Farm Loan Ass'n v. Phillips*, 300 U.S. 194, 202-03 (1937) ("a national farm loan association is an instrumentality of the federal government," so "jurisdiction does not reside in the tribunals of a state to wind up" its business (citing *Easton*, 188 U.S. at 233)); *Fed. Land Bank of St. Louis v. Priddy*, 295 U.S. 229, 237 (1935) (state attachment and execution laws could apply to federal land banks only because they were "not obstacles to the performance of the governmental functions committed to [them]," but could be preempted if "attachment

would directly interfere with any function performed by petitioner as a federal instrumentality"). It also applies to federal-reserve banks, so (following NBA precedent) state law is preempted when "state prescriptions significantly impair the exercise of" the instrumentality's federal authority. *Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202, 236 (S.D.N.Y. 2012) (quoting *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11-12 (2007)), *aff'd* 742 F.3d 37, 41 (2d Cir. 2014) (applying federal-common-law framework but relying on *McCulloch*'s holding that "'[t]he states have no power, by taxation *or otherwise*, to retard impede, burden, or in any manner control' [federal] instrumentalities" (quoting 17 U.S. at 436)).

And in *First Federal Savings & Loan Ass'n of Wisconsin v. Loomis*, this Court affirmed the district court's declaration that state law could not apply to "hinder and harass" a federal savings and loan association (a predecessor of the modern Federal savings association) "in the performance of its duties as an instrumentality of the United States" because "as a Federal savings and loan association it is under the sole authority and control of the laws of the United States." 97 F.2d 831, 833-34 (7th Cir. 1938). Soon after, the Federal Home Loan Bank Board "promulgated comprehensive regulations covering all aspects of every federal savings and loan association 'from its cradle to

its corporate grave,'" creating regulatory field preemption that went beyond ordinary federal-instrumentality immunity. *Meyers v. Beverly Hills Fed. Savs. & Loan Ass'n*, 499 F.2d 1145, 1146-47 (9th Cir. 1974) (quoting *California v. Coast Fed. Savs. & Loan Ass'n*, 98 F. Supp. 311, 316 (S.D. Cal. 1951)).

In short, ample precedent across an array of federal financial institutions shows that the Supremacy Clause principles *Barnett Bank* applied are not unique to national banks. *See also, e.g., Fasano*, 457 F.3d at 280-81 & n.5 (noting federal instrumentalities' "entitlement to presumptive preemption" but declining to decide whether a federal-reserve bank is an instrumentality); *Rust v. Johnson*, 597 F.2d 174, 178-79 (9th Cir. 1979) (the Federal National Mortgage Association was a federal instrumentality like Federal land banks and Federal home loan banks, so the case presented "a supremacy clause question" about whether state law operated "to impede or condition the implementation of federal policies and programs"); *Osei Bonsu v. Fed. Home Loan Bank of N.Y.*, 726 F. Supp. 95, 98 (S.D.N.Y. 1989) ("[L]ogic and consistency dictate that the Federal Home Loan Banks are

federal instrumentalities, and that employment disputes between them and their employees may not be prosecuted by state or local agencies.").[7]

**c.** Although the preemption standard for federal credit unions is an issue of first impression, this Court's decision in *Barany v. Butler* indicates that they should be treated the same as other federal instrumentalities. 670 F.2d 726 (7th Cir. 1982). *Barany* held that "uniquely federal interests" in maintaining "uniform administration of federal credit unions, which can be achieved only by application of federal law," justified the creation of federal common law to govern them. *Id.* at 731-33. That was so in part because "federal credit unions [were] similar in important respects to federal savings and loan associations," and other courts had held that "the need for uniformity in the administration of [savings and loan associations] required the application of federal common law." *Id.* at 734-35; *see also Starr Int'l*, 742 F.3d at 40-41 (federal common law displaced state law with respect to federal-reserve banks). The same considerations apply to the proper preemption standard for federal credit unions.

---

[7] The same principles apply to non-financial federal instrumentalities. *See, e.g., Johnson*, 254 U.S. at 57 (Postal Service driver could not be required to obtain a state driver's license).

The Attorney General offers no reason to think otherwise. As *Barany* indicates and the cases above demonstrate, the federal-instrumentality-preemption standard applies across the board. *Barnett Bank* itself illustrates the point—it described its analysis as applying "ordinary pre-emption principles" and relied on *Fidelity* alongside NBA cases without seeing any need to justify doing so. 517 U.S. at 27, 33.

The Attorney General insists that *Fidelity* "is now relevant to determining the scope of National Bank Act preemption" only "because *Barnett Bank* analyzed *Fidelity* … in applying National Bank Act preemption, and Congress expressly incorporated *Barnett Bank*'s analysis into the National Bank Act." AG.Br. 39 n.4. That misses the point. *Barnett Bank*'s choice to look to *Fidelity* for guidance indicates that the same preemption inquiry governed these two types of federal financial instrumentalities—even though at the time no statute said so.

**d.** That leaves only the Attorney General's argument for a negative inference from Congress's decision, in 2010, to codify the *Barnett Bank* standard for certain applications of the NBA and for the HOLA, but not for the FCUA. That argument cannot be squared with the centuries of

federal-instrumentality precedent that preceded Dodd-Frank or with the Supreme Court's understanding of Dodd-Frank's effect in *Cantero*.

As to national banks themselves, the Supreme Court has already held that Dodd-Frank did not alter the judicial preemption analysis. *Cantero*, 602 U.S. at 214 n.2.[8] And as just explained, there is every reason to think that, prior to Dodd-Frank, the *Barnett Bank* standard applied to FCUA preemption. So Congress's decision to codify the status quo reinforces *Barnett Bank*'s application to federal credit unions.

Nor do Dodd-Frank's provisions addressing HOLA preemption create the negative inference the Attorney General attempts to draw. Dodd-Frank narrowed preemption for Federal savings associations, replacing field preemption with the *Barnett Bank* standard. The Attorney General complains that Plaintiffs lack a citation for that obvious proposition. AG Br.

---

[8] Notably, Dodd-Frank's preemption provision applies by its terms only to "state consumer financial laws," which are laws that "specifically regulate[] the manner, content, or terms and conditions of any financial transaction … or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2), (b)(1). As noted above, the parties disagree about whether the Interchange Fee Prohibition is such a law, but it makes no difference because the same *Barnett Bank* standard applies either way. *See supra* at 6 n.1.

39-40.  Here are a few:  *McShannock v. JP Morgan Chase Bank, N.A.*, 976 F.3d 881, 885 n.3 (9th Cir. 2020) (HOLA went from field preemption to conflict preemption); *Henning v. Wachovia Mortg., FSB*, 969 F. Supp. 2d 135, 146 (D. Mass. 2013) ("Dodd–Frank significantly diminished the extent to which HOLA and its implementing regulations may preempt state law." (internal quotation marks omitted); *Gutierrez v. Wells Fargo Bank, N.A.*, No. 07-cv-5923, 2008 WL 4279550, at *12 (N.D. Cal. Sept. 11, 2008) (under pre-Dodd-Frank regime, the HOLA preempted a state law but the NBA did not).[9]

Thus, Congress's decision to amend the HOLA to harmonize the preemption analysis for Federal savings associations with that for other federal financial instrumentalities—the *Barnett Bank* standard—cuts against the Attorney General's position.  It certainly does not indicate that federal credit unions should be worse off than other federal instrumentalities.

---

[9] For secondary sources: C. Chatman, *HOLA Preemption and the Original Intent of Congress: Are Federal Thrifts Necessary to Stabilize the Housing Market*, 18 Fordham J. Corp. & Fin. Law 565, 591 (2013) ("Dodd-Frank attempts to limit the scope of HOLA preemption"); J. Elosta, *Dynamic Federalism & Consumer Financial Protection: How the Dodd-Frank Act Changes the Preemption Debate*, 89 N.C. L. Rev. 1273, 1298 (2011) ("Dodd-Frank significantly weakens the standard of preemption … that the OTS had applied to national thrifts.").

* * *

To sum up, federal credit unions are federal instrumentalities like national banks and Federal savings associations, so the same federal-instrumentality principles apply to them. The Attorney General offers no persuasive reason to think that federal credit unions *alone* among instrumentalities should be subject to a broader swath of state law, and no good reason to think that Dodd-Frank silently produced that result. *Cf. Maine Cmty. Options v. United States*, 590 U.S. 296, 315 (2020) ("[R]epeals by implication are not favored." (quoting *Morton v. Mancari*, 417 U.S. 535, 549 (1974))). This Court should therefore apply the *Barnett Bank* framework to the Interchange Fee Prohibition's burden on federal credit unions.

### 2. The Interchange Fee Prohibition prevents or significantly interferes with federal credit unions' exercise of their powers.

The FCUA confers comparable payment-card powers on federal credit unions to those the NBA grants national banks. So if this Court holds that the Interchange Fee Prohibition significantly interferes with national banks' exercise of their powers, it should reach the same conclusion for federal credit unions.

**D.** **Federal Law Extends Protection to non-Illinois State-Chartered Financial Institutions.**

If the Court agrees that preemption protects national banks, Federal savings associations, and federal credit unions from the IFPA's burdens, that means that Illinois law exempts their Illinois-chartered peers as well. In turn, the dormant Commerce Clause's parity principles ensure that non-Illinois state-chartered financial institutions receive the same protection. Riegle-Neal independently compels that result for banks specifically.[10]

**1.** **The dormant Commerce Clause prohibits Illinois from imposing the IFPA's burdens on financial entities other states charter, but not those it charters.**

Working together, the IFPA and Illinois parity statutes facially discriminate against financial institutions chartered by other states. In the District Court, the Attorney General primarily argued that no discrimination exists because the Illinois parity statutes did *not* protect Illinois-chartered institutions from the IFPA to the same degree that federal law protects federally-chartered institutions. *See* Dist.Ct.Dkt. 138 at 32-34. Now, however, he appears to accept the District Court's conclusion that the parity

---

[10] Because the dormant Commerce Clause and Riegle-Neal analysis is the same for the Interchange Fee Prohibition and Data Usage Limitation, this Section refers to the IFPA generally.

statutes do just that. *See* RSA.40. Instead, he raises two arguments: that federal courts cannot interpret state law even to resolve a federal constitutional claim, and that there is no dormant Commerce Clause violation in any event. Neither is persuasive.

### a. The presence of a subsidiary state-law issue does not deprive federal courts of their jurisdiction and responsibility to adjudicate federal claims.

To state the obvious, Plaintiffs' dormant Commerce Clause claim seeks relief as a matter of *federal* law. Citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), the Attorney General insists federal courts may not adjudicate this federal constitutional claim because it depends on a conclusion that Illinois' parity statutes protect Illinois-chartered institutions to the same degree federal law protects corresponding federally chartered institutions. *Pennhurst* does not reach nearly that far.

Under *Pennhurst*, a federal court may not "award injunctive relief against state officials on the basis of state law." *Id.* at 91. But a federal claim "does not run afoul of *Pennhurst* [if] it does not ask the court to compel compliance with state law *qua* state law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 740 (5th Cir. 2020) (internal quotation marks omitted); *see also* AG.Br. 46 (conceding that "claims are not barred by *Pennhurst* simply

because they might require a federal court to interpret state law"). Plaintiffs'

dormant Commerce Clause claim respects that limit. It seeks no injunction

or declaratory judgment respecting the Attorney General's enforcement of

the IFPA against Illinois-chartered entities. If the Attorney General believes

Illinois law allows for enforcement against Illinois-chartered entities—

despite no longer arguing that it does—nothing in the District Court's

judgment prevents him from attempting such enforcement.

The Attorney General insists, however, that federal courts lack

jurisdiction to resolve these federal claims because they might incidentally

have preclusive effect in later state-court litigation of a state-law issue. But

the only case he cites to support this idea—*Benning v. Board of Regents of

Regency University*, 928 F.2d 775 (7th Cir. 1991)—is entirely off point. In

*Benning*, the plaintiff brought no federal claim whatsoever and asked the

federal court, sitting in diversity, for a declaration purely under state law.

*Id.* at 776. So he was improperly "seek[ing] to circumvent" *Pennhurst*. *Id.* at

778. Here, the federal claim remains live, Plaintiffs seek no declaration of

state law, and any incidental preclusive effect is irrelevant to the Court's jurisdiction.[11]

Indeed, if the Attorney General's res judicata concerns were enough to trigger *Pennhurst*'s exception to *Ex Parte Young*, there would scarcely be anything left of *Ex Parte Young* itself. *Every* suit asking a federal court to enjoin enforcement of state law requires the federal court to ascertain what state law says. In an overbreadth challenge to a state criminal law, for example, this Court "begin[s] by construing the ordinance to assess its overall reach and impact upon the First Amendment." *Bell v. Keating*, 697 F.3d 445, 456 (7th Cir. 2012). "If [the statute] is readily susceptible to an interpretation that would preserve its constitutionality, [this Court] must uphold it, but [the Court] will not rewrite a state law to conform it to constitutional requirements." *Id.* (internal quotation marks omitted).[12]

---

[11] The cases cited in *Benning* are similar—"when there is no ongoing or impending violation of federal law, a federal court may not issue declaratory … relief." *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir. 1986); *see also, e.g.*, *Green v. Mansour*, 474 U.S. 64, 73 (1985) (declaratory judgment improper where "[t]here is no claimed continuing [or future] violation of federal law").

[12] Although this Court "must adopt any limiting construction proffered by a state court," *Bell*, 697 F.3d at 456, the Attorney General does

Nobody thinks, however, that in "assess[ing]" a state law's "overall reach," this Court violates *Pennhurst*—even though a conclusion that the state criminal law does not prohibit certain conduct might be necessary to the Court's ultimate holding and thus could have potential issue-preclusive force against future state enforcement.

Federal courts routinely interpret state law in the course of adjudicating all manner of federal challenges to state statutes. *See, e.g.*, *Chiles v. Salazar*, 146 S. Ct. 1010, 1023-24 (2026) (Free Speech Clause); *Carson v. Makin*, 596 U.S. 767, 773-75, 782-85 (2022) (Free Exercise Clause); *N.Y. State Pistol & Rifle Ass'n, Inc. v. Bruen*, 597 U.S. 1, 12-13 (2022) (Second Amendment); *Granholm v. Heald*, 544 U.S. 460, 473-76 (2005) (dormant Commerce Clause). There is no reason the federal courts in this case cannot do the same.

> **b.** **The state statutory scheme facially and impermissibly discriminates against out-of-state, state-chartered financial institutions.**

On the merits, Plaintiffs' dormant Commerce Clause challenge is straightforward. Imagine that the IFPA by its plain terms applied only to

---

not argue that any such narrowing judicial construction of the parity statutes exists here.

out-of-state, state-chartered financial institutions. Even the Attorney General probably would not defend such blatant discrimination. But if federal law preempts the IFPA's application to federally chartered entities, *see supra* Section I.A-C, and if, as the Attorney General no longer appears to dispute, the parity statutes extend that protection to Illinois-chartered entities, then that is precisely the result of Illinois' statutory scheme.

It makes no difference that Illinois has accomplished this discrimination in two steps rather than one. Thus, for example, the Supreme Court had no difficulty holding that the dormant Commerce Clause forbids a state from implementing "a broad-based tax on a single kind of good" together with "special provisions for in-state producers." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 197 (1994) (citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 273 (1984)). "By granting a tax exemption for local products" from an otherwise broadly applicable tax, the state impermissibly "in effect create[s] a protective tariff," which is just as invalid as if the State had enacted the tariff directly. *Id.*

The Attorney General asserts that, "[r]ead together or independently," the IFPA and the Illinois parity statutes do not "facially discriminate against out-of-state institutions." AG.Br. 49. But read together, that is precisely

what they do: as in *West Lynn Creamery* and *Bacchus*, they impose a burden on all state-chartered institutions then exempt in-state ones. The Attorney General offers no real rebuttal. The closest he comes is to assert that Congress' decision to preempt the IFPA as to federal institutions cannot "create a dormant Commerce Clause problem" because "Congress may 'authorize states to engage in activities that but for the authorization would violate the dormant commerce clause.'" AG.Br. 49-50 (quoting *Hirst v. Skywest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018)). The unlawful discrimination here, however, arises not from Congress' preemption of the IFPA as to federally chartered institutions, but from Illinois' choice to place in-state, but not out-of-state, state-chartered institutions on level footing with national banks. Nothing in the NBA or any other federal statute "clearly expresse[s]" Congress's intent to authorize that discrimination. *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 66 (2003).

The Attorney General also suggests that there is no unlawful discrimination because the parity statutes do not "purport to prohibit other States from granting similar benefits to their chartered financial institutions." AG.Br. 49. But other states lack the power to exempt their institutions from an otherwise-applicable Illinois law. Only Illinois can do

that, and its choice to exempt only its own entities from the IFPA is the epitome of facial discrimination that violates the dormant Commerce Clause.

### 2. Riegle-Neal extends NBA preemption to out-of-state state-chartered banks.

Even if the dormant Commerce Clause did not shield all out-of-state state-chartered financial institutions from the IFPA's burdens, Riegle-Neal would do so with respect to out-of-state state-chartered *banks*. Congress enacted § 1831a(j)(1) to ensure that out-of-state State banks can compete with nationally chartered banks. The Attorney General does not dispute that Congress did so with respect to out-of-state banks' activities conducted at branches in Illinois. *See* AG.Br.51-52. And while he argues that § 1831a(j)'s parity principle does not apply to out-of-state banks more broadly, that reading would turn the law's clear legislative purpose on its head and violate the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Context makes clear that § 1831a(j) is a straightforward "parity law[]" of the type that characterizes the United States' dual banking system. *See Johnson v. First Banks, Inc.*, 889 N.E.2d 233, 237 (Ill. App. Ct. 2008). That is likely why the Attorney General can cite no case that reads the provision to impose the "in-state-branch" limit he asserts exists. And likewise why cases applying Riegel-Neal speak in terms of the law "treating [out-of-state state banks] as out-of-state national banks are treated"—without discussion of any branching limitations. *Pereira v. Regions Bank*, 752 F.3d 1354, 1357 (11th Cir. 2014). When the NBA preempts state law, it does so regardless of whether a national bank is operating through a branch in a particular state. To ensure the parity § 1831a(j) was designed to provide, the same must hold for out-of-state banks.

Indeed, to accept the Attorney General's reading, the Court would have to conclude that Congress stripped Illinois of the right to regulate banking activities occurring at branches within its borders, while leaving it free to regulate the same at branches in other states. *See* AG.Br. 52 (acknowledging as much). In the District Court, the Attorney General sought to minimize this incongruence as an "odd result." Dist.Ct.Dkt. 138 at 35. It is that and more—it produces such "an absurd, and perhaps

unconstitutional, result" that the Court should be wary of adopting it. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring in the judgment). After all, the Attorney General's reading would transform a provision designed to promote parity into a mandate for states to discriminate against banks' out-of-state operations. *Cf. Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 39 (1980) (holding unconstitutional a statute that regulated based on "the out-of-state location of a bank holding company's principal operations").

E. **Equity Calls for Enjoining Enforcement Against Other Payment-System Participants to the Degree They Are Facilitating the Receipt and Charging of Interchange by Federally Protected Institutions.**

In order to give national banks and other exempt institutions the benefit of the protection federal law provides, an injunction that encompasses the Card Networks and other participants in the payment system to the extent that they facilitate protected institutions' receipt and charging of the full amount of interchange is needed. Pl.Br. 65-67. The Attorney General does not dispute the factual premise that underpins this necessity: He expressly conceded in his Rule 56.1(b)(2) statement that

> given the way the "payment card ecosystem" is currently
> structured, if the issuer associated with a transaction is exempt

from the IFPA with respect to a transaction then—to give effect to the issuer's exemption—other participants in the payment card ecosystem also need relief from the requirements of the IFPA for purposes of that transaction.

Dist.Ct.Dkt. 137 ¶ 45. That admission is binding. *See Smith ex rel. Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997) (applying predecessor rule to N.D. Ill. L.R. 56.1). The Attorney General nevertheless contests an injunction providing such relief on several grounds.

**1.** The Attorney General first asserts that Plaintiffs are "ignor[ing] Congress's express intent to limit [NBA] preemption to financial institutions." AG.Br. 53. He invokes 12 U.S.C. § 25b(h)(2), which states that "no provision of [the NBA] … shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." But that provision is no bar to the relief Plaintiffs seek, for multiple reasons.[13]

To start, § 25b(h)(2) does not apply to Card Networks that are not "subsidiar[ies], affiliate[s], or agent[s]" of national banks. As the District Court concluded (in a portion of its opinion the Attorney General ignores),

---

[13] The Attorney General's statutory arguments against complete equitable relief are relevant only to national banks and Federal savings associations.

Networks are not "agents" within the meaning of § 25b(h)(2).  RSA.43-44.

"An agent is a person authorized by another, the principal, to act for him or

in his place."  *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 735

(7th Cir. 2011).  The Networks have no such relationship with national banks.

They instead have established payment systems that issuers (and acquirers)

can opt into by contract; they set their own rules for clearing payments, they

develop fee schedules, and they otherwise run their systems as they decide

is optimal.  *See* SA.75-77.  In other words, they are contractual counterparties,

not agents.

The Attorney General's citations to the parties' Local Rule 56.1

statements indicating that the Networks "connect acquirers and issuers" and

"enabl[e]" payment processing are not to the contrary.  *See* AG.Br. 53-54.

Those statements mean only that Networks perform a vital function by

maintaining and operating a global, interconnected payment system.  As the

District Court found, that does not make them agents carrying out the

directives of issuers.

In any case, even if the Networks (or any other relevant entities) fell

within its terms, § 25b(h)(2) would not preclude the injunctive relief

Plaintiffs seek.  Federal courts have the power "to do equity and to mould

each decree to the necessities of the particular case." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Bedrossian v. Nw. Mem. Hosp.*, 409 F.3d 840, 842-43 (7th Cir. 2005) (quoting *Weinberger v. Romelo-Barcelo*, 456 U.S. 305, 313 (1982)).

The Attorney General cites *Armstrong v. Exceptional Child Center*, 575 U.S. 320, 327-28 (2015), to claim that § 25b(h)(2) signals Congress's intent to limit equitable relief narrowly to injunctions protecting only national banks. AG.Br. 53. But *Armstrong* is inapposite; it addressed the standard for determining whether Congress implicitly displaced the availability of *an action* in equity. 575 U.S. at 328; *see also Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*, 149 F.4th 917, 937 (7th Cir. 2025). There is no question here that Plaintiffs have a right of action under *Ex parte Young*; the only question is the permissible scope of a resulting injunction under equitable principles. "[A]n action brought against a state official under *Ex parte Young* … expose[s] that official to the full remedial powers of a federal court." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 75 (1996). To restrict those

equitable powers, the rule is that Congress must have spoken "by 'the clearest command.'" *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 71 (D.C. Cir. 2022) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013), and collecting cases).[14]

*Perkins* demonstrates how high the bar is for Congress to displace traditional equitable principles. There, the Supreme Court addressed whether a gateway actual-innocence claim otherwise barred by the one-year statute of limitations in the Antiterrorism and Effective Death Penalty Act ("AEDPA") could be saved by the traditional equitable "miscarriage of justice" exception. *Perkins*, 596 U.S. at 397. AEDPA uses mandatory language, providing that a "1-year period of limitation *shall apply* to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1) (emphasis added). Yet

---

[14] Even under *Armstrong*, a key sign that Congress intended to limit equitable actions is that a statute supplies other remedies. *See Armstrong*, 575 U.S. at 328; *see also, e.g., Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 647 (2002) (noting that a "detailed remedial scheme" can foreclose equitable actions (internal quotation marks omitted)). The Attorney General does not suggest that condition is present here.

the Court held that "shall" was insufficiently clear to displace traditional equitable principles. *Perkins*, 596 U.S. at 397-98.

The Attorney General identifies no provision in the NBA or anywhere else providing the "clearest command" that courts' equitable authority to provide national banks relief is limited. His only argument is that if 12 U.S.C. § 25b(h)(2) precludes NBA preemption from applying as a statutory matter to non-national-bank "subsidiar[ies], affiliate[s], or agent[s]," then no equitable relief can encompass them either. That does not follow. Section 25b(h)(2) does not even allude to equitable remedies. Rather, it announces itself as a rule of statutory interpretation, addressing how "provision[s] of [the NBA] *shall be construed*." *Id.* Far more is required before equity yields, as *Perkins*, *Porter*, and *Bedrossian* indicate.

Even setting the clear-statement rule aside, the Attorney General overreads § 25b(h)(2). That provision is best interpreted as narrowly overruling the categorical approach to preemption that the Supreme Court applied three years before Dodd-Frank in *Watters v. Wachovia Bank, N.A.*, which held that operating subsidiaries of national banks enjoyed NBA preemption *in their own right*. *See* 550 U.S. at 18 ("[J]ust as duplicative state examination, supervision, and regulation would significantly burden

mortgage lending when engaged in by national banks, so too would those state controls interfere with that same activity when engaged in by an operating subsidiary." (internal citation omitted)). Section 25b(h)(2) prevents third parties from claiming NBA preemption for their own activities merely by virtue of being "subsidiar[ies], affiliate[s], or agent[s]" of a national bank. But it does not purport to alter the scope of NBA preemption for national banks, which remain protected against state laws that "significantly interfere" with their own activities by targeting third parties that facilitate such activities.

Any other reading would create a gaping loophole in NBA preemption, because states could circumvent the NBA simply by regulating national banks' contractual counterparties. For example, in *Franklin National Bank*, the state could simply have banned *billboard companies* from displaying certain advertisements. *See* BPI.Br 13-14 (offering additional examples). That is not how preemption works. *See, e.g.*, *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) ("treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense" because a "manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them"); *Nat'l Meat*

*Ass'n v. Harris*, 565 U.S. 452, 464 (2012) (allowing a "State [to] impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat … would make a mockery of … preemption"). Nor can Dodd-Frank reasonably be understood to have opened that loophole at the same time it reaffirmed and codified *Barnett Bank*'s highly protective standard for assessing preemption. *See, e.g.*, *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007) ("Statutes must 'be read as a whole'" (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991)).

Given the weakness of the Attorney General's interpretation of § 25b(h)(2), his claim that the statute restricts federal courts' equitable authority is even more strained. As the District Court correctly held, there is no statutory limitation here on courts' traditional power to issue an injunction that affords complete relief. *See City of Chi. v. Barr*, 961 F.3d 882, 920-21 (7th Cir. 2020); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987).[15]

---

[15] Oddly, given his failure to address the District Court's analysis of § 25b(h)(2) at the summary judgment stage, the Attorney General faults Plaintiffs (at 54) for not discussing the District Court's reliance on § 25b(h)(2) at the preliminary-injunction stage. But an appellant is not required to raise and rebut preliminary rulings of a district court that later, in its final ruling, changed course. That is precisely what the District Court did here, albeit in

**2.** The Attorney General argues in the alternative that even if a broader injunction is *permissible*, it is not necessary to afford complete relief to exempt institutions here. But these factual arguments are contradicted by the record and common sense.

He first claims that equity does not require a broader injunction because exempt institutions will not be subject to civil penalties if the Interchange Fee Prohibition is enjoined as to them. *See* AG.Br. 55. But that bypasses the critical point, which the Attorney General has admitted: If there is no protection for the Card Networks and other non-exempt participants, exempt institutions will still be unable to receive any interchange fees on tax and tip—which is the impermissible result that federal law bars. Pl.Br. 65-67; *see supra* Section I.A.2. The IFPA's civil penalties are, to be sure, extraordinarily burdensome, but they are not the sole reason preemption applies. Significant interference also exists if national banks are substantially impaired, in practice, from exercising

---

reference to the Data Usage Limitation. RSA.43-44. This Court should affirm that reasoning.

federally granted powers. *E.g.*, *Cantero*, 602 U.S. at 216 (citing *Franklin Nat'l Bank*, 347 U.S. at 377-78).

The Attorney General next claims the practical problems can be cured if protected issuers simply negotiate different interchange rates with the various acquirers or millions of merchants they service. *See* AG.Br. 56. But that simply will not work, at least not in a way and at a scale that avoids the impairment of efficiency and effectiveness giving rise to preemption in the first place. Nor does the Attorney General explain how Issuers and Acquirers could implement such a system in a way that avoids a Card Network "receiv[ing]" the fee at some point—or whether such a system exists (or ever has existed) anywhere. 815 ILCS 151/150-5. If it were even possible, the Attorney General's experiment would require a wholesale reinvention of the way banks issue payment cards—which reinforces that the Interchange Fee Prohibition significantly interferes with national banks' exercise of their banking powers. The Attorney General's purported solution is no solution at all.

The Attorney General, in sum, provides no valid justification for an impotent injunction limited only to national banks and other exempt financial institutions and not encompassing other essential participants in

the payment system. All of the equities, in fact, point the other way: if the Interchange Fee Prohibition is allowed to go into effect on July 1, protected institutions will see their credit- and debit-card operations upended, and chaos will ensue for banks, businesses, and consumers. If this Court agrees that Plaintiffs are entitled to a fully protective injunction, it should therefore direct the District Court to enter one and order that the mandate issue forthwith.

## II. The District Court's Injunction Against the Data Usage Limitation Should Be Affirmed.

The Attorney General offers no merits challenge to the District Court's conclusion that the Data Usage Limitation is preempted. *See* AG Br. 57-64. Nor do any of his *amici* defend the Data Usage Limitation in any way or ask this Court to revisit the District Court's permanent injunction against its enforcement.

Instead, the Attorney General argues only that despite Plaintiffs' members being the Data Usage Limitation's targets—the "issuers" and "acquirers" the law restricts, 815 ILCS 151/150-15(b)—the Data Usage Limitation does not actually apply to any of their conduct. His argument does not comport with the IFPA's text; aware of this problem, he argues that

- 60 -

it would be "absurd" if the Illinois statute means what it says.  But he cites no case in which a federal court has held that a Plaintiff lacks standing because a state legislature cannot be taken at its word.

The District Court's permanent injunction as to the Data Usage Limitation should stand.

**A.** To have standing, a plaintiff seeking to challenge a state law in a pre-enforcement posture need show only that fear of enforcement "is not imaginary or wholly speculative."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979); *see also Brandt v. Village of Winnetka, Ill.*, 612 F.3d 647, 649-50 (7th Cir. 2010) (similar).  To satisfy this standard, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute."  *Babbitt*, 442 U.S. at 298.  Plaintiffs have done so.

The Data Usage Limitation makes it unlawful for any "entity, other than the merchant, involved in facilitating or processing an electronic payment transaction, including, but not limited to, an issuer, a payment card network, an acquirer bank, a processor, or other designated entity" to "distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment

transaction or as required by law." 815 ILCS 151/150-15(b). As the District Court twice recognized, that text, on its face, imposes a broad prohibition and carves out only a narrow exception for data usage that is "necessary to facilitate a transaction from Point A to Point B." RSA.11; *see also* SA.11-13. The most natural reading of "use *the* electronic payment data to process *the* electronic payment transaction" is that it refers to using data from a transaction to complete that transaction. SA.12.

**B.** The Attorney General asks this Court to deny Plaintiffs standing by instead interpreting the Data Usage Limitation to only proscribe "unauthorized, commercial use" of data. AG.Br. 63. Neither limit is supported by the Data Usage Limitation's text, which mentions neither authorization nor commercial purpose.

First, the Attorney General claims the word "facilitates" covers *all* of Plaintiffs' members' uses of transaction data that are not specific to a transaction, arguing, for example, that the Data Usage Limitation's exception covers rewards programs because they "make electronic payment transactions easier by incentivizing customers' use of electronic payment methods, leading to wider use and adoption of those methods." AG.Br. 59. In other words, his view is that any use of data that is good for the

card-payment ecosystem passes muster.  While that may be good policy, he does not square it with the exception's narrow authorization to use "the electronic payment transaction data" to "facilitate or process the" transaction that generates it.  815 ILCS 151/150-15(b).

The definite article "the" indicates "that a following noun refers to something that is unique or is thought of as unique or exists as only one at a time."  *In re Vill. of Campton Hills*, 926 N.E.2d 429, 434 (Ill. Ct. App. 2010); *see also Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("'the' is 'a function word indicating that a following noun or noun equivalent is definite or has been previously specified by context.'" (cleaned up).  So in the Data Usage Limitation, "the electronic payment transaction" is most naturally understood to refer to a single, discrete transaction, not transactions in general.

The Attorney General does not explain how, as a matter of plain text, facilitating the overall health of the card-payment ecosystem—as reward programs and predictive fraud models do—is the same as using the data to facilitate "the" transaction.  Nor does he attempt to explain how the terms of the Data Usage Limitation's exception cover uses of data like anti-money-laundering monitoring and analyzing the institution's business,

acquisition, and attrition trending. But the record establishes that Plaintiffs' members engage in all of those activities. Dist.Ct.Dkt. 153; Dist.Ct.Dkt. 24-11 at 10. So even if fraud analysis and rewards programs were safe, Plaintiffs would still have standing.

Second, the District Court's reading of the exception does not make "facilitate" redundant of "process." AG.Br. 60. The two verbs describe different actions that may be performed by the various participants in the payment system. For example, a participant could "process" a transaction by approving it or moving the funds, or "facilitate" it by providing infrastructure enabling others to do so. There is no superfluity problem where the statute uses different verbs to capture different transaction-related activities.

Third, the Attorney General's absurdity argument is, at best, highly speculative. "Interpreting legislation to mean something other than what it clearly says is a measure of last resort, to avoid 'great injustice' or an outcome that could be characterized, without exaggeration, as an absurdity and an utter frustration of the apparent purpose of the legislation." *Manago v. County of Cook*, 92 N.E.3d 412, 416 (Ill. 2017) (quoting *Ill. State Treasurer v. Ill. Workers' Compensation Comm'n*, 30 N.E.3d 288, 299 (Ill. 2015)). So where

applying the text's plain meaning "neither creates a great injustice or clear absurdity nor utterly frustrates the legislature's intent," the text controls. *Id.* The Attorney General's belief that the Illinois General Assembly would have preferred to preserve rewards programs and the development of anti-fraud models in their current forms does not rise to the level of identifying a "great injustice," "clear absurdity," or utter frustration of legislative intent.

*Andrews v. Kowa Printing Corp.* illustrates the high bar that must be cleared before the absurdity canon applies. 838 N.E.2d 894 (Ill. 2005). The plain text of a statutory definition would have made "every supervisory employee," from the head of the janitorial staff to the CEO, "strictly and personally liable for the payment of his or her subordinates' wages." *Id.* at 899. *That* is absurd. But even that was not enough, on its own, for the Illinois Supreme Court to set aside the statute's text. It further recognized that the literal reading of the definition would make another provision that was tailor-made for determining when supervisory employees are liable "wholly superfluous." *Id.* at 899-900. Those considerations together justified deviating from the law's text. *Id.* The Attorney General does not engage with the Data Usage Limitation in enough depth to show that Illinois courts will likely depart from its text in this manner.

Fourth, the Attorney General cites a purported conflict between the Data Usage Limitation and certain provisions of the Illinois Banking Act. *See* AG.Br. 63 (discussing 205 ILCS 5/48.1(a)). Specifically, he argues that because the Banking Act expressly "does not prohibit" certain uses of customer information, *see* 205 ILCS 5/48.1(b), the Data Usage Limitation would create a "conflict" if it does prohibit them. But that does not follow. There is nothing remarkable about the legislature declining to subject particular conduct to one enforcement scheme and set of remedies and instead subjecting it to another. Indeed, there would be no need for the rules that "later-enacted statutes control over earlier statutes, and more-specific statutes control over general acts" if legislatures only ever addressed a subject once. *See McDonald v. Symphony Bronzeville Park, LLC*, 193 N.E.3d 1253, 1268 (Ill. 2022). The Attorney General may find the legislature's decision questionable as a policy matter, but—as with his absurdity argument—that is not a sufficient reason to assume Illinois courts will disregard plain statutory text.

**C.** In short, the Attorney General's attempts to narrow the Data Usage Limitation or expand its exception are cold comfort. And he admitted below that Plaintiffs' members use transaction data for more than just facilitating

or processing discrete transactions.  Dist.Ct.Dkt. 153 at 1-2.  They use the data for fraud prevention, predictive fraud and credit models, credit-risk-scoring models and decisions, anti-money-laundering monitoring, and rewards programs. *Id.*  Unrebutted evidence in the district court showed that federal financial institutions also use transaction data for "analysis of the Bank's overall business, acquisition and attrition trending," "financial reporting," and to "calculate points or cash back offers to" cardholders as part of a rewards program.  Dist.Ct.Dkt. 24-11 at 10.  So the exception does not shield "all of Plaintiffs' conduct."  RSA.11.

Plaintiffs have therefore shown "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute."  *Babbitt*, 442 U.S. at 298. The Data Usage Limitation's broad prohibition, by its plain terms, covers many of their uses of data.  And the exception offers no reliable safe harbor.  Plaintiffs have standing.

Indeed, it would be perverse if Plaintiffs could be deprived of their opportunity to challenge a state statute in federal court on the basis of a speculative, atextual reading such as the one the Attorney General offers here.   If this Court were to adopt the Attorney General's proposed construction and bar Plaintiffs' challenge to the Data Usage Limitation at the

threshold, that likely would not stop him from taking a contrary position if he re-reads the law and decides to enforce its literal terms in state court. *See Herzog v. Lexington Twp.*, 657 N.E.2d 926, 930 (Ill. 1995) (collateral estoppel requires a judgment on the merits); *State Farm Fire & Cas. Co. v. Watts Regulator Co.*, 63 N.E.3d 304, 310 (Ill. Ct. App. 2016) ("Judicial estoppel does not apply to inconsistent legal positions."). And Illinois courts, of course, are not bound to follow this Court's interpretation of Illinois law. *Firebirds Int'l, LLC v. Zurich Am. Ins. Co.*, 208 N.E.3d 1187, 1193-94 (Ill. Ct. App. 2022). That would leave plaintiffs with no choice but to risk massive liability and simply hope that the Illinois Supreme Court will come to their aid by overriding the statute's text.

This Court should reject the Attorney General's "heads I win, tails you lose" approach. Plaintiffs had standing to seek the permanent injunction the District Court granted. And because the Attorney General challenges neither the merits of the District Court's preemption analysis nor the scope of the injunction it issued, that injunction should be upheld in its entirety.

## CONCLUSION

Plaintiffs respectfully request that the Court affirm the District Court's entry of permanent injunctive relief against the Data Usage Limitation,

reverse the District Court's denial of permanent injunctive relief against the Interchange Fee Prohibition, and remand with instructions to enter a permanent injunction against enforcement of both IFPA components against banks, savings associations or savings banks, and credit unions chartered by the federal government or states other than Illinois, as well as against other payment-system participants to the extent those participants are facilitating protected activities by protected issuers. And, in order to ensure that the Interchange Fee Prohibition does not wreak havoc on the payment system on the scheduled July 1, 2026 effective date, Plaintiffs respectfully request that the Court direct that its mandate issue forthwith.

Dated: April 17, 2026

Boris Bershteyn
Kamali P. Willett
Sam Auld
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: 212-735-3000
boris.bershteyn@skadden.com
kamali.willett@skadden.com
sam.auld@skadden.com

Respectfully submitted,

*/s/ Charlotte H. Taylor*

Charlotte H. Taylor
 *Counsel of Record*
Anthony J. Jeffries
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: 202-879-3939
ctaylor@jonesday.com
ajjeffries@jonesday.com

Matthew J. Rubenstein
JONES DAY
90 S. Seventh St., Suite 4950
Minneapolis, MN 55402
Telephone: 612-217-8846
mrubenstein@jonesday.com

*Attorneys for Plaintiffs-Appellants-Cross-Appellees*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with (1) the type-volume limitation of Circuit Rule 28.1 because, as calculated by Word for Microsoft 365, it contains 13,995 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f); and (2) the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in a 14-point Book Antiqua font.


Dated: April 17, 2026              */s/ Charlotte H. Taylor*
                                   Charlotte H. Taylor

**CERTIFICATE OF SERVICE**

In accordance with Circuit Rule 25(a), I hereby certify that on April 17, 2026, I electronically filed Plaintiffs-Appellants-Cross-Appellees' Response and Reply Brief with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: April 17, 2026          */s/ Charlotte H. Taylor*
                                    Charlotte H. Taylor