Nos. 26-1354, 26-1371, 26-1440, 26-1441

In the
# United States Court of Appeals
## for the Seventh Circuit

ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION,
AMERICA'S CREDIT UNIONS & ILLINOIS CREDIT UNION LEAGUE,

*Plaintiffs-Appellants-Cross-Appellees,*

v.

KWAME RAOUL, in his official capacity as Illinois Attorney General,

*Defendant-Appellee-Cross-Appellant.*

On Appeal from the United States District Court
For the Northern District of Illinois, Case No. 24-cv-7307
Honorable Virginia M. Kendall, *Chief United States District Judge*

**SUPPLEMENTAL BRIEF OF
PLAINTIFFS-APPELLANTS-CROSS-APPELLEES**

Boris Bershteyn
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: 212-735-3000
boris.bershteyn@skadden.com

Charlotte H. Taylor
*Counsel of Record*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: 202-879-3939
ctaylor@jonesday.com

*Counsel for Plaintiffs-Appellants-Cross-Appellees*
*Additional Counsel listed in signature blocks at end of Brief*

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| ARGUMENT | | 3 |
| I. | The OCC's Confirmation that the National Bank Act Grants National Banks the Power to Receive Interchange Fees Further Supports Enjoining the Interchange Fee Prohibition. | 3 |
| II. | The OCC's Preemption Order Requires that the IFPA Be Enjoined. | 8 |
| | A. The OCC's Preemption Order Directly Preempts the State Law. | 9 |
| | B. The OCC's Analysis of the IFPA's Interference With National Banks' and Federal Savings Associations' Powers is Entitled to Great Weight. | 12 |
| III. | The Rule and Order Reinforce Plaintiffs' Other Arguments. | 16 |
| CONCLUSION | | 18 |

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**CASES**

*Aguayo v. U.S. Bank,*
653 F.3d 912 (9th Cir. 2011) ................................................................13

*Barnett Bank of Marion County, N.A. v. Nelson,*
517 U.S. 25 (1996) .................................................................................4

*Brookhaven Cable TV, Inc. v. Kelly,*
573 F.2d 765 (2d Cir. 1978) ................................................................10

*Bureau of Alcohol, Tobacco & Firearms v. FLRA,*
464 U.S. 89 (1983) ...............................................................................13

*Cantero v. Bank of Am.,*
__ F.4th __, 2026 WL 1217467 (2d Cir. May 5, 2026) .............................5, 14

*City of New York v. FCC,*
486 U.S. 57 (1988) .................................................................................9

*FDA v. Wages & White Lion Invs., LLC,*
604 U.S. 542 (2025) .............................................................................10

*First Nat'l Bank in St. Louis v. Missouri,*
263 U.S. 640 (1924) .........................................................................12, 16

*Grosso v. Surface Transp. Bd.,*
804 F.3d 110 (1st Cir. 2015) ...............................................................10

*Humane Soc'y of the U.S. v. U.S. Dep't of Agric.,*
41 F.4th 564 (D.C. Cir. 2022) ..............................................................8

*Inv. Co. Inst. v. Camp,*
401 U.S. 617 (1971) ......................................................................8, 12, 16

*JPMorgan Chase Bank, N.A. v. Johnson,*
719 F.3d 1010 (8th Cir. 2013) ..............................................................5

**Page(s)**

*La. Pub. Serv. Comm'n v. FCC,*
   476 U.S. 355 (1986) ............................................................................9

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ........................................................................9, 13

*N.Y. State Comm'n on Cable TV v. FCC,*
   669 F.2d 58 (2d Cir. 1982) ..............................................................10

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,*
   513 U.S. 251 (1995) ................................................................6, 10, 13

*SEC v. Chenery Corp.,*
   332 U.S. 194 (1947) ..........................................................................11

*United States v. Brundage,*
   903 F.2d 837 (D.C. Cir. 1990) ..........................................................8

*Wachovia Bank, N.A. v. Burke,*
   414 F.3d 305 (2d Cir. 2005) ............................................................11

*Wells Fargo Bank N.A. v. Boutris,*
   419 F.3d 949 (9th Cir. 2005) .....................................................10, 11

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ..........................................................................13

**STATUTES**

5 U.S.C. § 554 ...........................................................................................10

12 U.S.C. § 1 ...............................................................................................6

12 U.S.C. § 24 .............................................................................................4

12 U.S.C. § 25b .........................................................................................11

12 U.S.C. § 27 .............................................................................................6

12 U.S.C. § 43 ...........................................................................................11

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

12 U.S.C. § 93a ................................................................................6, 10

12 U.S.C. § 1757 ....................................................................................16

REGULATIONS

12 C.F.R. § 7.4002 ..........................................................................1, 3, 6

12 C.F.R. § 145.17 ...................................................................................6

12 C.F.R. § 701.21 .................................................................................16

12 C.F.R. § 721.3 .............................................................................16, 17

12 C.F.R. § 721.6 ...................................................................................16

National Bank Non-Interest Charges and Fees, 91 Fed. Reg.
22,989 (Apr. 29, 2026) ................................................................*passim*

Order Preempting the Illinois Interchange Fee Prohibition Act
91 Fed. Reg. 23,150 (Apr. 29, 2026) ...........................................*passim*

**PRELIMINARY STATEMENT**

The National Bank Act ("NBA") and Home Owners' Loan Act ("HOLA") provide national banks and Federal savings associations broad statutory powers to carry on the business of banking. As Plaintiffs' Principal and Response-Reply Briefs explain, the Illinois Interchange Fee Prohibition Act ("IFPA") significantly interferes with the exercise of those federal powers. The IFPA is therefore preempted.

The Office of the Comptroller of the Currency ("OCC"), the regulator that administers the NBA and HOLA, recently took two regulatory actions that confirm the IFPA is preempted.

First, the OCC issued an interim final rule amending 12 C.F.R. § 7.4002, a non-exhaustive regulation regarding national banks' power to receive fees. National Bank Non-Interest Charges and Fees, 91 Fed. Reg. 22,989 (Apr. 29, 2026). This action is a direct response to the District Court's opinion, which, in OCC's words, "fails to recognize the reality of the payment card systems and the modern economy" and created "uncertainty" by questioning banks' authority to receive interchange fees in default amounts set by Card Networks. 91 Fed. Reg. at 22,990/3, 22,991/1. Although the OCC believes that national banks already had the power to receive those fees—as its

amicus brief explained, OCC.Br. 8-18, it has now made that power impossible to miss. *Id.* at 22,991/1. Its amendments to the regulation address the district court's "misunderstanding of the NBA and § 7.4002" by making explicit national banks' power to charge interchange fees indirectly through payment-card networks, as well as their discretion to opt into interchange-fee rates set by or in consultation with third parties like the Networks. *Id.* In doing so, they refute most of the Attorney General's and his *amici*'s arguments on their own terms, providing further reason to conclude that the NBA preempts the IFPA.

Second, the OCC issued a declaratory order finding that federal law preempts the IFPA as to national banks and Federal savings associations. Order Preempting the Illinois Interchange Fee Prohibition Act, 91 Fed. Reg. 23,150 (Apr. 29, 2026). That preemption determination should conclusively resolve the NBA and HOLA questions in this case. At a minimum, the OCC's considered judgment deserves great weight in this Court's analysis.

The OCC's actions also bear on other issues in this case. The OCC's explanation of the IFPA's effects is relevant to Federal Credit Union Act preemption. And its emphasis on the importance of other payment-system

participants to the exercise of federal banking powers confirms that an injunction must encompass other payment-system participants.

## ARGUMENT

**I.   The OCC's Confirmation that the National Bank Act Grants National Banks the Power to Receive Interchange Fees Further Supports Enjoining the Interchange Fee Prohibition.**

As Plaintiffs have explained, the NBA preempted the Interchange Fee Prohibition before the OCC's amendments to 12 C.F.R. § 7.4002. Those amendments, however, put the question beyond doubt, even under the District Court and Attorney General's misapprehension that an express, codified power is essential to NBA preemption.

The District Court's conclusion at summary judgment that the NBA does not preempt the Interchange Fee Prohibition turned almost exclusively on (1) its treatment of § 7.4002 as the sole source of national banks' power to receive fees; and (2) its conclusion that § 7.4002 did not authorize banks to receive interchange fees if they chose to charge default amounts set by Networks. RSA.21-28. Thus, according to the District Court, the NBA did not preempt the Interchange Fee Prohibition because the Interchange Fee Prohibition did not interfere with "the powers set out in 12 C.F.R. § 7.4002" as it understood them. RSA.27.

The Attorney General and his *amici* similarly rest heavily on the claim that "no federal law expressly authorizes national banks to receive payment card networks' interchange fees on the tax and gratuity portions of a transaction." AG.Br. 27; *see* IRMA.Br. 4 ("no federal statute or regulation grants national banks the power to receive interchange fees set and collected by card networks"); Durbin.Br. 18 ("there is no NBA provision or OCC regulation that enumerates banks' authority to receive fees that are not set individually by each bank"); Ten.Nonprofits.Br. 21. They return to that point again and again. *See, e.g.*, AG.Br. 28 ("federal law authorizes *national banks* to establish fees, but does not expressly authorize them to pass the costs of interchange fees established by a *payment card network* onto consumers or merchants."); IRMA.Br. 8-14; Durbin.Br. 13-22.

As a threshold matter, the District Court, the Attorney General, and his *amici* are wrong to insist that a particular national-bank power must be made express in the statute or OCC regulations to support preemption. The National Bank Act grants national banks "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). They have those powers whether or not the statute or OCC regulations specifically codify them. *Barnett Bank of Marion County, N.A. v. Nelson*, 517

U.S. 25, 32 (1996) ("grants of both enumerated and incidental 'powers' to national banks" are "grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law"); *Cantero v. Bank of Am.*, __ F.4th __ , 2026 WL 1217467, at *6-9 (2d Cir. May 5, 2026) (incidental power to offer mortgage-escrow accounts preempts state interest-on-escrow law); *JPMorgan Chase Bank, N.A. v. Johnson*, 719 F.3d 1010, 1018 (8th Cir. 2013) ("[T]reating promulgation as a prerequisite converts incidental powers into enumerated ones and, as such, flatly contradicts the terms of the NBA."). As Plaintiffs have explained in detail, the statute gives national banks the powers to take deposits and extend credit on personal security, which carry with them the powers to issue payment cards, process transactions, and receive interchange fees. Opening.Br. 32-36, 42-45; Response-Reply.Br. 15, 21-28. With or without the amendments to § 7.4002—indeed, even if the OCC had never promulgated § 7.4002 at all—the Interchange Fee Prohibition is preempted because it significantly interferes with these national-bank powers. *Cf.* 91 Fed. Reg. at 23,151/2 ("[T]he OCC believes that [preemption] is clear under relevant Supreme Court precedent.").[1]

---

[1] These points apply with equal force to Federal savings associations, which have "comparable powers" to national banks and enjoy the same

In any event, the amendments to 12 C.F.R. § 7.4002 put preemption beyond dispute. Even if the District Court's and Attorney General's express-powers-focused analysis were correct, their overly demanding test is now satisfied. The OCC has broad authority from Congress to prescribe rules and regulations respecting national banks' powers. 12 U.S.C. §§ 1, 27(b)(2), 93a; *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995). Pursuant to that authority, it has promulgated amendments to § 7.4002. The amended regulatory text provides the express authorization that the District Court thought essential and that the Attorney General and his *amici* claim is necessary for preemption. 91 Fed. Reg. at 22,995/1-2. As amended, § 7.4002(b) specifically states that national banks "may charge … interchange fees." 91 Fed. Reg. at 22,995/1. The amendments further clarify that national banks' power to charge interchange fees includes the power to "directly or indirectly, through

preemption standard. 91 Fed. Reg. at 23,151/3 n.10. The OCC did not amend the implementing regulations for the HOLA because it concluded that Federal savings associations' existing power to "transfer, with or without fee, its customers' funds," 12 C.F.R. § 145.17, "clearly provide[s] Federal savings associations with comparable authority" to the amended § 7.4002. 91 Fed. Reg. at 22,990/2 n.4. So, like the OCC's rule, this section focuses on national banks.

intermediaries, partners, payment networks, interchanges, or other third parties … receive, reserve, take, or otherwise obtain" the interchange fees, "including through a fee sharing or similar economic relationship." *Id.* (§ 7.4002(a)). And they expressly recognize national banks' discretion to choose to rely on Network-set default rates, explaining that the fee "amounts, the method of calculating them … and whether they are set by or in consultation with third parties, are business decisions to be made by each national bank, in its discretion." *Id.* at 22,995/2 (§ 7.4002(c)(2)).

The OCC promulgated the amendments to § 7.4002 precisely to address the "ambiguity" the District Court's opinion "created" about the scope of national banks' fee-charging powers. *Id.* at 22,990/2. The amendments work as intended—they eliminate any possible uncertainty regarding the scope of national banks' power to charge interchange fees. *Id.* at 22,991. Section 7.4002 now specifically says that national banks have the federal power to receive interchange fees through the Networks, and to opt into Network-set default rates. *Id.* at 22,995/1-2. The Attorney General and

his *amici* "cannot ignore the clear command of this pivotal source of federal authority."  Durbin.Br. 17.[2]

## II.  The OCC's Preemption Order Requires that the IFPA Be Enjoined.

The OCC's order determining that the NBA and HOLA preempt the IFPA makes this case easier still.  That order directly preempts the IFPA, so the IFPA must be enjoined.  Alternatively, if the Court prefers not to address the direct preemptive force of an OCC preemption order, the OCC's conclusion that preemption applies nonetheless merits "great weight" in the analysis.  *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 626 (1971).  The OCC's determination is thoroughly analyzed, is consistent with and follows naturally from the interim final rule, and turns on the OCC's expertise in the banking industry.  Accordingly, respect for the Executive Branch's expert judgment that the IFPA will wreak havoc on the industry it oversees should be at its zenith.

---

[2] The OCC's interim final rule conclusively resolves these issues now even though it does not become effective until June 30, 2026 because, "like an enacted statute, which becomes 'valid law' once enacted even if not yet 'effective,' a duly prescribed rule is law even if it sets a future effective date." *Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 571–72 (D.C. Cir. 2022) (quoting *United States v. Brundage*, 903 F.2d 837, 843 (D.C. Cir. 1990)).

**A. The OCC's Preemption Order Directly Preempts the State Law.**

"'[A] federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation' and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law." *City of New York v. FCC*, 486 U.S. 57, 63-64 (1988) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986)). The OCC exercised such authority here. Accordingly, the OCC's preemption order conclusively resolves the NBA and HOLA preemption issues.

Where Congress affords an agency "a broad grant of authority to reconcile conflicting policies," the agency's reasonable "choice to pre-empt" should not be disturbed "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* (internal quotation marks omitted); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (when a statute "delegates discretionary authority to an agency, the role of the reviewing court" is to "recogniz[e] constitutional delegations, fix[] the boundaries of the delegated authority, and ensur[e] the agency has engaged in reasoned decisionmaking" (cleaned up)). Consistent with these principles, agencies from the Surface Transportation Board to the Federal Communications

Commission issue declaratory orders to resolve preemption questions. *See, e.g., Grosso v. Surface Transp. Bd.*, 804 F.3d 110, 115-16, 117 n.3 (1st Cir. 2015); *N.Y. State Comm'n on Cable TV v. FCC*, 669 F.2d 58, 61-62, 66 (2d Cir. 1982). Where agency "preemption has rendered invalid" a state law or regulation, injunctive relief is proper if the state persists with actual or threatened enforcement. *Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765, 768 (2d Cir. 1978).

Here, the OCC has "primary responsibility for surveillance of 'the business of banking' authorized by § 24 Seventh." *NationsBank*, 513 U.S. at 256. The NBA gives the agency express statutory authority to "prescribe rules and regulations to carry out" its "responsibilities." 12 U.S.C. § 93a. And in turn, that statutory "authority is as broad as the OCC's statutory responsibilities." *Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 958 (9th Cir. 2005). The Administrative Procedure Act allows the OCC to exercise that power through declaratory orders to "to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e).[3]

---

[3] The OCC's choice to act through a declaratory order rather than a rule does not affect the analysis. Agencies have discretion to choose whether to act "by general legislative rule or by individual order." *FDA v. Wages &*

That these principles endow the OCC with authority to issue state-law-specific preemption determinations is well settled. *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) ("Congress has expressly recognized the OCC's power to preempt particular state laws"); *see also Wells Fargo*, 419 F.3d at 962 (recognizing the OCC's "authority to displace contrary state regulation"). Congress has repeatedly recognized that the OCC has that power, imposing on the OCC only procedural requirements for exercising it in two instances not applicable here. Specifically, Congress has required notice and comment for preemption of certain state laws in 12 U.S.C. § 43. And in Dodd-Frank, Congress imposed additional procedural requirements for certain "preemption determinations" respecting "state consumer financial laws." *See* 12 U.S.C. § 25b(b).[4] By imposing those

*White Lion Invs., LLC*, 604 U.S. 542, 565 (2025) (brackets omitted) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947)).

[4] Neither of these special procedural requirements apply to the OCC's preemption order here. As the OCC correctly noted, even if 12 U.S.C. § 43 otherwise applied—and "there are strong arguments that" it does not—the order falls within the exception to its notice-and-comment requirement "to avoid a serious and imminent threat to the safety and soundness of any national bank." 91 Fed. Reg. at 23155/1. And Dodd-Frank's special procedural requirements for "State consumer financial laws" do not apply because the IFPA does not "directly and specifically regulate[] the manner, content, or terms and conditions of any financial transaction … or any

procedural limits on certain uses of the OCC's power to directly preempt specific state laws, Congress necessarily recognized the existence of that power in the first place.

In short, the Preemption Order is a proper exercise of the OCC's power to conclusively preempt state regulation. It requires that enforcement of the IFPA be enjoined.

### B. The OCC's Analysis of the IFPA's Interference With National Banks' and Federal Savings Associations' Powers is Entitled to Great Weight.

Even if the OCC's order did not conclusively resolve the preemption question, the Supreme Court has recognized for more than a century the "great weight" due to the Comptroller of the Currency's judgment on the scope of national banks' incidental powers. *See Inv. Co. Inst.*, 401 U.S. at 626-27 (citing *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 658 (1924)). That weight remains appropriate and further tips the scales in favor of the conclusion that the IFPA significantly interferes with national-bank powers.

---

account related thereto, with respect to a consumer." The Interchange Fee Prohibition does not regulate any facet of card transactions with respect to consumers; it regulates with respect to merchants. *See* 91 Fed. Reg. at 23,155/1. And the Data Usage Limitation governs "how a national bank may use data generally," so it "does not directly and specifically regulate a financial transaction or a related account." 91 Fed. Reg. at 23,155/1.

*Loper Bright* held that courts may not "mechanically afford *binding* deference to agency interpretations." 603 U.S. at 399. But it recognized that "exercising independent judgment often include[s] according due respect to Executive Branch interpretations." *Id.* at 385. That is especially true when the agency's interpretation "rests on factual premises within the agency's expertise." *Id.* at 402 (brackets omitted) (quoting *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)); *see also Wyeth v. Levine*, 555 U.S. 555, 576 (2009) (courts give weight to an agency's preemption analysis, especially where "the subject matter is technical and the relevant history and background are complex and extensive" (cleaned up)).

The great weight that courts have long afforded the OCC's judgment on the scope of banks' incidental powers, and the effect of state law on those powers, thus remains appropriate. The OCC has a unique understanding of "'the business of banking' authorized by § 24 Seventh." *NationsBank*, 513 U.S. at 256. That expertise on the technical facets of national banks' and Federal savings associations' work, and the long history that led to the powers those institutions exercise, warrants respect for its judgments about preemption. *See Aguayo v. U.S. Bank*, 653 F.3d 912, 919 (9th Cir. 2011); *see also*

*Cantero*, 2026 WL 1217467, at *8 (relying on a proposed OCC determination's judgment on the degree of interference).

Here, the OCC relied on its expertise to conclude that the IFPA significantly interferes with national banks' exercise of their powers.[5] It explained that the Interchange Fee Prohibition is "likely to introduce significant complexity into the payment card systems, including by requiring national banks to accommodate the taxation schemes of hundreds of localities." 91 Fed. Reg. at 23,153/2. That disruption would "jeopardize[] national banks' ability to effectively and efficiently participate in the payment card systems, and thereby exercise their lending and deposit-taking powers, on a national scale." *Id.*

The Interchange Fee Prohibition also threatens national banks' "broader payment card infrastructure." *Id.* at 23,153/3. If banks must "process the entirety of a card transaction" without "compensation for the portion of the transaction related to taxes and tips," they may be forced to "pursue less efficient and less effective alternatives, such as increasing costs

---

[5] The OCC focused on national banks, but it noted that its analysis also applies to Federal savings associations, which have "comparable powers" and the same preemption standard. 91 Fed. Reg. at 23,151/3 n.10.

for credit and debit card users, limiting or eliminating rewards programs, or deferring investments in tools to detect and prevent fraud." *Id.* And if they cannot rely on third-party services like card networks without losing the ability to exercise their federal powers, national banks will lose the "many benefits" to the efficient exercise of their powers that the networks provide. *Id.* at 23,153/3-23,154/1. The NBA does not permit that "odd result" or compel national banks to make that harmful choice. *Id.* at 23,154/1.

As for the Data Usage Limitation, the OCC concluded that the limitation's "near-complete ban on a national bank's use of electronic payment transaction data … would undermine not only a national bank's efficient and effective operations but also its ability to manage risks in a safe and sound manner." *Id.* at 23,154/2. Thus, the Data Usage Limitation "unambiguously prevents or significantly interferes with national banks' exercise of their Federally authorized powers." *Id.*

Finally, the OCC noted that the "significant uncertainty for consumers" and "incredible operational challenges for national banks and other participants in the nation's card networks" could worsen if other states and localities enact laws governing interchange fees and transaction data. *Id.* at 23,154/3. "Such a fractured patchwork of State laws would undermine

the uniformity necessary for the functioning of the nation's payment card systems, thereby materially disrupting interstate commerce." *Id.*

The OCC's thorough analysis of the IFPA's significant effects on national banks' exercise of their powers is due "great weight," *Inv. Co. Inst.*, 401 U.S. at 626, and "go[es] far to remove doubt" on the correct outcome in this case, "if any existed," *First Nat'l Bank*, 263 U.S. at 658.

## III. The Rule and Order Reinforce Plaintiffs' Other Arguments.

The rule and order focus on the NBA- and HOLA-preemption issues. But the order also bears on Plaintiffs' Federal Credit Union Act argument because the IFPA significantly interferes with federal credit unions' federal powers in the same way it interferes with those of national banks. And both the order and the rule confirm the need for relief to extend to other payment-system participants to enable federal financial institutions to exercise their federal powers.

Like national banks and Federal savings associations, federal credit unions' powers include making loans and extending lines of credit to members, 12 U.S.C. § 1757(5), including through credit cards and debit cards, 12 C.F.R. §§ 701.21(a); 721.3(k). They also have the power "to earn income for those activities." *Id.* § 721.6. And they have the power to engage

in "[e]lectronic financial services," including "account aggregation services" and "data processing." *Id.* § 721.3(d), (e). So the OCC's thorough explanation of how the IFPA interferes with national banks' exercise of their powers applies with equal force to federal credit unions. They, too, face a serious threat to their "ability to effectively and efficiently participate in the payment card systems, and thereby exercise their lending and deposit-taking powers." 91 Fed. Reg. at 23,153/2.

The rule and order also reinforce the importance of granting Plaintiffs meaningful relief by enjoining enforcement of the Interchange Fee Prohibition against the Networks and other payment-system participants to the extent that they facilitate protected institutions' ability to charge and receive interchange. The rule confirms that national banks have the power to charge interchange fees "indirectly, through … payment networks" and discretion to charge fees "set by or in consultation with third parties." 91 Fed. Reg. at 22,995/1-2 (§ 7.4002(a), (c)(2)). National banks cannot exercise that power if card networks and other payment-system participants face prohibitive penalties for their role. And the order reaffirms national banks' "clear authority to contract with third parties." 91 Fed. Reg. at 23,153/3. Its analysis of Card Networks' importance to national banks' efficient and

effective exercise of their powers reinforces the need for effective relief. *Id.* at 23,153/2.

## CONCLUSION

For the above reasons, the OCC's interim final rule and interim final order confirm that the IFPA is preempted, as well as the importance of Plaintiffs receiving complete relief that allows their members to exercise their federal power to charge interchange fees.

Dated: May 6, 2026

Respectfully submitted,

*/s/ Charlotte H. Taylor*

Boris Bershteyn
Kamali P. Willett
Sam Auld
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: 212-735-3000
boris.bershteyn@skadden.com
kamali.willett@skadden.com
sam.auld@skadden.com

Charlotte H. Taylor
   *Counsel of Record*
Anthony J. Jeffries
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: 202-879-3939
ctaylor@jonesday.com
ajjeffries@jonesday.com

Matthew J. Rubenstein
JONES DAY
90 S. Seventh St., Suite 4950
Minneapolis, MN 55402
Telephone: 612-217-8846
mrubenstein@jonesday.com

*Attorneys for Plaintiffs-Appellants-Cross-Appellees*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with (1) the type-volume limitation set by this Court's April 29, 2026 order because, as calculated by Word for Microsoft 365, it contains 3601 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f); and (2) the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in a 14-point Book Antiqua font.

Dated: May 6, 2026                      */s/ Charlotte H. Taylor*
                                        Charlotte H. Taylor

## CERTIFICATE OF SERVICE

In accordance with Circuit Rule 25(a), I hereby certify that on May 6, 2026, I electronically filed Plaintiffs-Appellants-Cross-Appellees' Supplemental Brief with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: May 6, 2026 　　　　　　　　　*/s/ Charlotte H. Taylor*
　　　　　　　　　　　　　　　　　　　Charlotte H. Taylor